IN THE UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

| | |
|---|---|
| In re: | ) Chapter 13 |
| | ) |
| LORIN EDWIN MASSINGALE, | ) Bankruptcy No.: |
| | ) 20-12628 MLB |
| Debtor. | ) |

_____

| | |
|---|---|
| LORIN EDWIN MASSINGALE, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Adversary No.: |
| | ) 21-01013 MLB |
| U.S. BANK NATIONAL ASSOCIATION | ) |
| AS LEGAL TITLE TRUSTEE FOR | ) |
| TRUMAN 2016 SC6 TITLE TRUST; | ) |
| CALIBER HOME LOANS, INC.; | ) |
| RUSHMORE LOAN MANAGEMENT | ) |
| SERVICES, LLC, | ) |
| | ) |
| Defendants. | ) |

_____

DEPOSITION UPON ORAL EXAMINATION

OF

LORIN EDWIN MASSINGALE

_____

1201 Third Avenue, Suite 4900

Seattle, Washington

DATE:  Friday, August 5, 2022

REPORTED BY:  Donald W. McKay, RMR, CRR, CCR 3237

```
 1               A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3
                 STEVEN C. HATHAWAY, ESQ.
 4               Hathaway Holland
                 3811 Consolidation Avenue
 5               Bellingham, Washington 98229
                 360.676.0529
 6               steve@hathawayholland.com

 7  FOR THE DEFENDANT, CALIBER HOME LOANS, INC.:

 8               THOMAS N. ABBOTT, ESQ.
                 Perkins Coie LLP
 9               1120 N.W. Couch Street, Tenth Floor
                 Portland, Oregon 97209
10               503.727.2000
                 tabbott@perkinscoie.com
11
    FOR THE DEFENDANTS, U.S. BANK NATIONAL ASSOCIATION and
12  RUSHMORE LOAN MANAGEMENT SERVICES, LLC:

13               DAVID W. CRAMER, ESQ.
                 M|B Law Group
14               117 S.W. Taylor Street, Suite 200
                 Portland, Oregon 97204
15               503.914.2015
                 dcramer@mblglaw.com
16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2   EXAMINATION BY                                    PAGE
    _____
3
    MR. ABBOTT.......................................  8
4   MR. CRAMER...................................... 231
    MR. ABBOTT...................................... 310
5

6

7                      E X H I B I T S

8   NUMBER        DESCRIPTION                         PAGE
    _____
9
    Exhibit 1   Statutory Warranty Deed (not stamped)   16
10
    Exhibit 2   Beneficial Credit Line Account          18
11              Agreement (CALIBER 0955-962)

12  Exhibit 3   Trust Deed (CALIBER 0969-971)           20

13  Exhibit 4   Statement and Claim of Lien             27
                (not stamped)
14
    Exhibit 5   Certified Copy of Judgment              28
15              (not stamped)

16  Exhibit 6   Certified Copy of Docket (not stamped)  30

17  Exhibit 7   Notice and Statement of Lien            32
                (not stamped)
18
    Exhibit 8   Order of Default Judgment (not stamped) 36
19
    Exhibit 9   Notice of Default (CALIBER 0950-953)    38
20
    Exhibit 10  Notice of Default (CALIBER 0184-186)    50
21
    Exhibit 11  Compilation of letters                  64
22              (CALIBER 0595-690)

23  Exhibit 12  Notice of Servicing Transfer           100
                (CALIBER 0027-28)
24

25

```
 1                E X H I B I T S (continued)

 2      NUMBER        DESCRIPTION                        PAGE

 3      _____

        Exhibit 13   Letter dated August 12, 2016, to Lorin   107
 4                   Massingale from Caliber Home Loans
                     (CALIBER 0031-32)
 5
        Exhibit 14   Letter dated October 31, 2016, to Lorin   108
 6                   Massingale from Caliber Home Loans
                     (CALIBER 0037-40)
 7
        Exhibit 15   Copy of check dated 12/2/16, payable to   115
 8                   Caliber Home Loans, in the amount of
                     $8,930.29 (not stamped)
 9
        Exhibit 16   Letter dated January 12, 2017, to Lorin   125
10                   Massingale from Caliber Home Loans
                     (not stamped)
11
        Exhibit 17   Letter dated February 21, 2017, to        130
12                   Lorin Massingale from Caliber Home
                     Loans (CALIBER 0100-104)
13
        Exhibit 18   Composite - e-mails dated March 14,       137
14                   2017, to Complaint Inbox from Customer
                     Service, re: FW: Billing Statement
15                   Inquiry (CALIBER 0178-179)

16      Exhibit 19   Letter dated March 14, 2017, to Lorin     148
                     Massingale from Caliber Home Loans
17                   (CALIBER 0110)

18      Exhibit 20   Letter dated April 18, 2017, to Lorin     149
                     Massingale from Caliber Home Loans
19                   (CALIBER 0111-112)

20      Exhibit 21   Caliber Home Loans Notice of Error,       169
                     Request for Information or Qualified
21                   Written Request - undated
                     (CALIBER 0147)
22
        Exhibit 22   Letter dated October 25, 2017, to         173
23                   Caliber Home Loans from Lorin
                     Massingale (CALIBER 0180)
24


25
```

```
 1              E X H I B I T S (continued)

 2     NUMBER        DESCRIPTION                          PAGE
       _____
 3
       Exhibit 23   Letter dated November 17, 2017, to    181
 4                  Lorin Massingale from Caliber Home
                    Loans (CALIBER 0145-146)
 5
       Exhibit 24   Caliber Home Loans Annual Escrow       185
 6                  Account Disclosure Statement
                    (CALIBER 0292-294)
 7
       Exhibit 25   Letter dated March 15, 2017, to whom it 188
 8                  may concern, from Lorin Massingale
                    (not stamped)
 9
       Exhibit 26   U.S. Bankruptcy Court PACER printout -  191
10                  11/08/2021 (not stamped)

11     Exhibit 27   U.S. Bankruptcy Court PACER printout -  191
                    08/05/2022 (not stamped)
12
       Exhibit 28   Letter dated February 8, 2017, to Lorin 194
13                  Massingale from Caliber Home Loans
                    (CALIBER 0092-97)
14
       Exhibit 29   HFC Home Equity Credit Line Statement   214
15                  (not stamped)

16     Exhibit 30   First Amended Complaint - In re: Lorin  234
                    Edwin Massingale, Debtor
17
       Exhibit 31   Untitled spreadsheet (CALIBER 0135)     236
18
       Exhibit 32   Caliber Home Loans Notice of            245
19                  Assignment, Sale or Transfer of
                    Servicing (RUSHMORE_003581-3588)
20
       Exhibit 33   Form 410 - Proof of claim (not stamped) 252
21
       Exhibit 34   Letter dated November 24, 2017, to      253
22                  Lorin E. Massingale from Rushmore Loan
                    Management Services
23                  (RUSHMORE_002488-2516)

24


25
```

```
 1              E X H I B I T S (continued)

 2    NUMBER        DESCRIPTION                          PAGE

 3    _____

      Exhibit 35  Letter dated January 8, 2018, to        258
 4                Lorin E. Massingale from Rushmore Loan
                  Management Services
 5                (RUSHMORE_005530-1721)

 6    Exhibit 36  Letter dated February 22, 2018, to      267
                  Lorin E. Massingale from Rushmore Loan
 7                Management Services
                  (RUSHMORE_001719-1721)
 8
      Exhibit 37  Letter dated January 31, 2018, to       272
 9                Lorin E. Massingale from Rushmore Loan
                  Management Services (RUSHMORE_008769)
10
      Exhibit 38  Letter dated March 7, 2018, to Lorin E. 273
11                Massingale from Rushmore Loan
                  Management Services
12                (RUSHMORE_008730-8766)

13    Exhibit 39  Letter dated July 18, 2018, to Lorin E. 275
                  Massingale from Rushmore Loan
14                Management Services (RUSHMORE_000047)

15    Exhibit 40  Letter dated August 24, 2018,  to       275
                  Lorin E. Massingale from Rushmore Loan
16                Management Services
                  (RUSHMORE_005521-5523)
17
      Exhibit 41  Letter dated January 18, 2019, to       277
18                Lorin E. Massingale from Rushmore Loan
                  Management Services (RUSHMORE_000056)
19
      Exhibit 42  Letter dated January 30, 2019, to       277
20                Lorin E. Massingale from Rushmore Loan
                  Management Services (RUSHMORE_005695)
21
      Exhibit 43  Letter dated April 22, 2019, to         281
22                Lorin E. Massingale from Rushmore Loan
                  Management Services (RUSHMORE_000060)
23
      Exhibit 44  Letter dated May 6, 2019, to Lorin E.   281
24                Massingale from Rushmore Loan Management
                  Services (RUSHMORE_006058-6060)
25
```

```
1                   E X H I B I T S (continued)

2      NUMBER        DESCRIPTION                           PAGE

3      _____

       Exhibit 45   Letter dated September 24, 2019, to    282
4                   Lorin E. Massingale from Rushmore Loan
                    Management Services
5                   (RUSHMORE_005788-5791)

6      Exhibit 46   Letter dated November 1, 2019, to      284
                    Lorin E. Massingale from Rushmore Loan
7                   Management Services
                    (RUSHMORE_005784-5786)
8
       Exhibit 47   Letter dated January 5, 2021, to       285
9                   Steven C. Hathaway from Rushmore Loan
                    Management Services
10                  (RUSHMORE_006467-6470)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Seattle, Washington; Friday, August 5, 2022

2                          10:00 a.m.

3

4   LORIN EDWIN MASSINGALE        called as a witness in the

5                                above-entitled cause, being

6                                first duly sworn, testified

7                                as follows:

8

9                   E X A M I N A T I O N

10  BY MR. ABBOTT:

11       Q.  Good morning.  My name is Thomas Abbott.  I

12  represent defendant, Caliber Home Loans.

13       Would you state and spell your name for the

14  record, please.

15       **A.  Lorin Massingale.  L-O-R-I-N**

16  **M-A-S-S-I-N-G-A-L-E.**

17       Q.  Mr. Massingale, I want to just go over some

18  ground rules for depositions for you very briefly.  I

19  may mention things later on if they seem relevant.  But

20  generally, the biggest thing to know is that you're

21  under oath, so everything you say has the same force and

22  effect as if you were in court.  And you're required to

23  say the truth, the whole truth, and nothing but the

24  truth.  You're probably familiar with that.  Right?

25       **A.  Right.**

1    Q.  You're not under any medication or any kind of

2   substances that might impair your ability to testify or

3   to remember things; are you?

**4    A.  No.  Age.**

5    Q.  Age.  All right.  And now you've distracted me.

6   See, my age, too.

7        All right.  So we don't have a videographer

8   today.  It's a written record.  So it's important that

9   we have verbal communication.  So if you do occasionally

10  nod your head, which is totally natural for people to

11  do, I might just prod you for a verbal response; not to

12  give you a hard time, but to make sure the court

13  reporter can get down a clean record.  Okay?

**14   A.  Okay.**

15   Q.  Your attorney might object to my question.  He

16  has to preserve objections, because there is no judge

17  here today.

**18   A.  Right.**

19   Q.  You've probably seen on TV, very dramatic scenes

20  where somebody asks a question, there is an objection,

21  and the judge rules.  Right?  But for depositions, that

22  ruling happens later.  So he has to preserve any

23  objections he thinks he needs to make, but you still

24  have to answer the question.  And the way that it works

25  is that if the judge agrees with your attorney later on,

1  then whatever you said won't count.  If he disagrees

2  with your attorney, what's called overruling the

3  objection, then your testimony will count.

4         But we only have you here for today, so you have

5  to answer.  The only exception to this is if your

6  attorney specifically says to you, "Mr. Massingale,

7  don't answer that question," which would be sort of a

8  nuclear option is what we call it.  So I don't expect

9  he'll do that.  But that's how that works.  Does that

10  make sense?

11       **A.  Yeah.**

12       Q.  Okay.  Let's see.  What else?  It's an informal

13  setting here.  As I mentioned, my questions, your

14  answers do have the same force and effect as if you were

15  testifying in front of a judge or jury.  So please take

16  care and -- I'm sure you will -- but with your answers,

17  because you're kind of stuck with them --

18       **A.  All right.**

19       Q.  -- I guess is the way that I would put it to

20  somebody.

21         You have an opportunity to make what they call

22  corrections to the record later, but I have an

23  opportunity to say, "Well, now he's unreliable, he's

24  changing his answer," what we call impeaching the

25  witness.

1    A.  Ditto.

2    Q.  Right.  So just keep that in mind.  All right?

3    A.  Right.

4    Q.  So that dovetails to a point, which is if you

5   don't understand my question, just let me know.  I don't

6   want you to guess -- no one here wants you to guess.

7   The Court doesn't want you to guess.  And I want you to

8   really understand what I'm asking, too.  So if I'm

9   unclear -- and that happens.  I'm told that all the

10  time.  So it's not you, it's me.  Just say, "I'm sorry,

11  I don't understand the question," or however you want to

12  say that.

13   A.  Okay.

14   Q.  But don't hesitate, because suffering under

15  silence is really nothing -- no one wants you to do that

16  as a witness.  Okay?

17   A.  Okay.

18   Q.  Okay.  The only other thing I would say is some

19  things happened a while ago, as you're probably aware.

20  So none of us walk around with a full data bank of

21  perfect memories.

22   A.  Right.

23   Q.  I don't expect it of you.  And sometimes I will

24  try to get your best estimate to something, because you

25  just are not going to remember something exactly.

1      A.  Um-hmm.

2      Q.  And this often happens with time periods.

3      A.  Um-hmm.

4      Q.  When something happened, things like that.  But

5   it could happen in a few different instances, too.  So

6   you may say something like, "Well, I don't really

7   remember."  And I might say, "Well, was it, you know,

8   around Christmas?"  I may ask you a series of questions,

9   trying to get you kind of to give me a sense.  Right?

10  And I'm not trying to give you a hard time there either.

11  I'm just trying to get your best estimate.  Legally, the

12  way people say it is, "I don't want you to guess, but

13  I'm entitled to your best estimate."  Right?  So that's

14  sort of what that is.

15        Now, one comment about guessing versus your best

16  estimate that I do want to have us have the same

17  understanding about -- a guess is something where you

18  don't have percipient knowledge.  Okay?  So if I were to

19  say to you, "Mr. Massingale, what type of wood is the

20  conference room table in my office made of back in

21  Portland?"  And let's assume you've never seen pictures

22  of my office, you've never been to my office.  You could

23  only guess.  You have no percipient knowledge.

24     A.  Okay.

25     Q.  Now, if you had visited my office ten years ago

1  and I said, "What was the type of wood?  Was that
2  rosewood or was that" -- bubinga or whatever it is -- my
3  conference room table is probably plywood, to be honest
4  with you; maybe a nice, high-level plywood -- and you
5  had seen it, then I could get your best estimate,
6  because you had perceived it, even if you don't really
7  remember.  I might say, "Do you remember if it was light
8  colored?  Dark colored?"  That's the kind of thing that
9  me or the other attorney here for Rushmore might kind of
10  engage you.  That's not to give you a hard time.  That's
11  to kind of just get the best testimony.
12      **A.  All right.**
13      Q.  Does that make sense?
14      **A.  Yeah.**
15      Q.  Okay.  Good.  We're just going to go in, and
16  then if something happens, I might have some other kind
17  of rules if they make sense or if they're warranted.
18          The other thing is let's try not to talk over
19  each other.  This poor gentleman here, the court
20  reporter, he's just a human.  So really, we want to have
21  the best record possible so we all understand
22  everything.
23          So we're here today about a property that has a
24  couple of different street addresses, I think, over the
25  years.  I see documents that refer to it as 743 Baker

1  Lake Road in Concrete, but I also have seen documents
2  that refer to it as 39681 Baker Lake Road.
3      A.  Um-hmm.
4      Q.  That's the same property?
5      A.  Yes, it is.  And I can't tell you what year it
6  is, but the County went through and changed the
7  addressing in the whole county.  So the road name stayed
8  the same, but everybody has got a different number.
9      Q.  That's what I thought.  Right.
10         So I'll make a deal with you.  For today, let's
11  just call it "the property" --
12     A.  Um-hmm.
13     Q.  -- and not get caught up in the different
14  addresses.  Because it seems like you got things, and it
15  seems like people at some point updated their records on
16  that.  Would you agree with that?
17     A.  Yes, I would agree.
18     Q.  Okay.  So "the property" means that Baker Lake
19  Road property.  Okay.
20         Now, there is also a line of credit that's at
21  issue in the case.  It's kind of the big thing, I think,
22  in the case.
23     A.  Right.
24     Q.  And that was a line of credit, as I understand
25  it, that you took out with a company called Beneficial

1  Washington, but they changed names over the years.

**2     A.  They sold out.**

3     Q.  They sold out?

4          For the line of credit, can we just agree to

5  refer to it as "the line of credit" without getting into

6  specifics?

**7     A.  Yes.**

8     Q.  Okay.  I think there is only one line of credit

9  at issue in the case.  Right?

**10    A.  Yes.**

11    Q.  How do you think of Beneficial?  Is it HFC?  Is

12 it Beneficial?

**13    A.  HFC bought out Beneficial or merged with them,**

**14 and then I think HSBC bought them out or they changed**

**15 names.  I forget which.**

16    Q.  Okay.  Do you have a preference how we refer to

17 them?

**18    A.  I don't know that we'll be referring to them**

**19 that much.  It doesn't matter.  I know who they are.**

20    Q.  Okay.  I'll probably just say Beneficial.

**21    A.  Okay.**

22    Q.  If that's okay.

**23    A.  That's fine.  I'll correct you if it doesn't**

**24 pertain to them.**

25    Q.  Yes.  Okay.

1        But if it's at a time frame when HFC or HSBC --

2   we'll just call it all Beneficial.  Is that fair?

3       **A.  Okay.**

4       Q.  I don't think their entity changes are material

5   to the case at all.

6       **A.  Um-um.**

7       MR. ABBOTT:  All right.

8       (Exhibit 1 marked for identification.)

9   BY MR. ABBOTT:

10      Q.  Well, I'm going to hand you what I've marked as

11  Exhibit 1.  Some of this stuff is just setting up the

12  background so we all know we're talking about the same

13  thing.  So I apologize, but it's a little -- it takes a

14  little bit of time.

15       I'm handing you what is marked as an exhibit.

16  For this, let me say, don't write on any of these,

17  because they become part of the record.  And at the end,

18  we're all going to have to collect these and give them

19  to the court reporter.  He won't let us out of the room

20  until he has them all.  So that's just an FYI for you.

21       This is a document that has -- it was recorded

22  in the Skagit County Auditor's Office and it has the

23  title Statutory Warranty Deed.  Do you see that?

24      **A.  Yep, I do.**

25      Q.  Do you know what this document is?

1      A.  Yep.

2      Q.  Okay.  Could you tell me, please.

3      **A.  This is the Warranty Deed for when I bought the**

4  **property from James Cook.**

5      Q.  All right.  So when was this -- okay.  So this

6  was like May of 1992 that you got the property.

7      A.  Correct.

8      Q.  How much did you pay for the property?

9      **A.  I believe it was $17,000.**

10      Q.  And did the property have the same improvements

11  as it has now?

12      **A.  No.  No improvements.**

13      Q.  No improvements.  Raw land?

14      **A.  Yep.**

15      Q.  Was there, at some point, like a manufactured

16  home on the property?

17      **A.  There was.  I put it on there.**

18      Q.  Okay.  And then later, you took it off?

19      **A.  Yeah.**

20      Q.  And then you replaced it with the structure

21  that's there now?

22      **A.  Correct.**

23      Q.  Okay.  Did you build that structure or did you

24  have someone --

25      **A.  I did.**

1     Q.  Oh, you did?

2     **A.  I did.**

3     Q.  How long did that take you?

4     **A.  It's still going.**

5     Q.  That's the answer everyone says when they're

6  working on -- that project is only about 70 percent

7  done.

8     **A.  Right.**

9         MR. ABBOTT:  Okay.  That's cool.

10        All right.  So that's Exhibit 1.  Nothing too

11 major there.

12        (Exhibit 2 marked for identification.)

13 BY MR. ABBOTT:

14    Q.  I'm going to hand you what I'm marking as

15 Exhibit 2.  This is a copy of the contract with

16 Beneficial for the line of credit that you took out.

17    **A.  Um-hmm.**

18    Q.  I'll hand that to you and a copy to your

19 attorney.

20        All right.  So do you recognize this document?

21    **A.  Yes, I believe I do.**

22    Q.  Okay.  And could you just give me just a real

23 brief description of what your understanding of this

24 document is.

25    **A.  This is a line of credit to build the house with**

1  the terms and rates and everything.

2      Q.  Now, we do our preparation, looking up public

3  records and stuff like that.  I saw a construction loan,

4  too, that was on the property at one point.  Can you

5  explain that one.

6      A.  No, you didn't see a construction loan on this

7  property.

8      Q.  Okay.

9      A.  I had another property that I had -- from

10  Beneficial.  That was a line of credit for the other

11  property.

12      Q.  Oh, okay.  So what property was that?

13      A.  In Glenhaven.  Glenhaven Lakes.

14      Q.  Glenhaven Lakes.  Okay.

15          And that was a construction loan?

16      A.  Yes.  Basically the same thing.  I went through

17  Beneficial and got a line of credit for it, too.

18      Q.  Okay.  How closely did you review this before

19  signing it back in 1997?

20      A.  Not super close.

21      Q.  And this has Lorin Massingale and also Terri

22  Massingale.  That was your wife at the time.  Is that

23  right?

24      A.  Correct.

25      Q.  I saw some documents that only has your name on

1  it.  Were you the primary borrower or obligor on this

2  line of credit; do you know?

3     **A.  We separated and she signed power of attorney or**

4  **release of interest or something like that for me.**

5  **Because she went back to Kentucky for a while.**

6     Q.  All right.  So is it fair to say she wasn't

7  involved with the taking out of this line of credit?

8     **A.  No, she was involved.  It was after we took this**

9  **out that we separated.**

10     MR. ABBOTT:  Got it.  Okay.  I'm just trying to

11  get my timeline correct.

12     We may go back to this Exhibit 2 at some point,

13  but I'm going to put it aside for now.

14     (Exhibit 3 marked for identification.)

15  BY MR. ABBOTT:

16     Q.  The next document I want to show you is what I'm

17  going to mark as Exhibit 3.  It's a document that has a

18  title of Trust Deed.  Actually, there is only one copy

19  of that.  Why is that?  All right.

20     MR. CRAMER:  Do you need a couple?

21     MR. ABBOTT:  Yes, if you have it.  I think I

22  misorganized.  So a copy for you.

23     Thank you.

24     MR. CRAMER:  Yes.

25  BY MR. ABBOTT:

1    Q.   Okay.  So you signed this Trust Deed as part of

2    the same transaction where you got the line of credit.

3    Is that correct?

4    **A.   Correct.**

5    Q.   And what is your understanding of a Trust Deed?

6    **A.   I have no understanding of a Trust Deed.  There**

7    **are a lot of legal documents that most people, even the**

8    **people that wrote them, don't have any understanding of.**

9    Q.   Okay.  And in any case -- I don't want you to

10   speculate as to that, but it's fair to say you don't

11   necessarily have an understanding of it -- of this one

12   at least, the Trust Deed.

13   **A.   This, I believe, just puts Beneficial on the**

14   **title; does it not?  It's been so long ago.**

15   Q.   Did you understand, at the time, that by signing

16   the Trust Deed, that if there was some -- for example,

17   say if you didn't repay the line of credit, that then

18   they would have a right to sell the property?

19   **A.   Correct.**

20   Q.   Okay.  So you understood the basic purpose of

21   it.

22   **A.   Right.**

23   Q.   That's pretty much the primary purpose.

24        And do you recall, when you took out the line of

25   credit, if you were going to pay the property taxes and

1   insurance, yourself, or if Beneficial was going to do

2   that and then charge you for it?

3      **A.  No, I was doing the taxes and the insurance.**

4      Q.  Okay.  So you were paying Skagit County for the

5   property taxes --

6      **A.  Right.**

7      Q.  -- and some insurance company for hazard

8   insurance.

9      **A.  Right.**

10      Q.  Okay.  So one of the issues I gathered from your

11   complaint is that Caliber had at some point -- I think

12   it was almost right away -- identified that there was a

13   bankruptcy filed with your Social Security number, and

14   that there was some disagreement between you and Caliber

15   regarding what Caliber should do in response to that.

16   Is that right?

17      **A.  Caliber -- I don't know what Caliber did.  I**

18   **have never filed bankruptcy.  That bankruptcy was filed**

19   **in 1998.**

20      Q.  Do you know whether your Social Security number

21   was used to file that bankruptcy?

22      **A.  I have no -- sorry.**

23      Q.  That's okay.  This is an emotional aspect of it.

24   And I'm not trying to poke you or -- but for the court

25   reporter's benefit -- go ahead.

1    A.  I had no clue there was a bankruptcy filed until
2   I phoned Caliber's payment center in 2017.
3    Q.  Don't look at your attorney, because then people
4   wonder if you're asking for testimony.
5    A.  Timeframe-wise, I think it was 2017 when I was
6   informed that there was a bankruptcy filed under my
7   name.  HSBC didn't mention anything about a bankruptcy
8   filed in my name.  Beneficial didn't mention anything
9   about a bankruptcy filed in my name, only Caliber.
10   Q.  Have you since -- I know this was 2017, so it's
11  been five years already.  Right?  Wow.
12   A.  Um-hmm.
13   Q.  Have you gone and searched the bankruptcy
14  records or have anyone confirm independently whether a
15  bankruptcy was filed with your Social Security number?
16  You might be concerned about that separate and apart
17  from its effect on this line of credit, I would imagine.
18  I certainly would be concerned if someone was filing
19  something with my Social Security number.  I assume you
20  would be, too.
21   A.  No, I was forced to hire an attorney.
22   Q.  And your attorney investigated the use of your
23  Social Security number in the filing of the bankruptcy?
24   A.  No.  I asked Caliber where they got this
25  information, and they never did provide me with that

1  information.

2     Q.  They didn't provide you with the case number or

3  any information regarding the bankruptcy that they

4  found?

5     A.  I think it was -- they finally gave me a name

6  like in October or November after I requested it in

7  March, I believe it was.  But they never provided any

8  other information.  They said get it from my new loan

9  servicer.

10     Q.  So they didn't provide you with like a case

11  number or anything like that?

12     A.  Not that I can remember.  Like I said, I had to

13  hire an attorney.  So at that point --

14        MR. HATHAWAY:  Just answer the question.

15        THE WITNESS:  I don't recall.

16  BY MR. ABBOTT:

17     Q.  You can just respond as you're doing.  It's

18  fine.

19     A.  I don't remember a number.

20     Q.  You don't remember a case number?

21     A.  No.

22     Q.  Okay.  Are you aware that you can just put in

23  your Social Security number in the federal PACER system

24  and it will bring back a search -- list of all

25  bankruptcies filed with that Social Security number?

1      A.  I think I tried that and I didn't find anything.
2   But I think they asked for a state, too, and there was
3   nothing filed in this state.
4      Q.  Okay.
5      A.  Until recently.
6      Q.  Were you having any financial difficulties --
7   I'm sorry.  Let me strike that.
8          When did they say you had filed the bankruptcy?
9      A.  1998.
10     Q.  Okay.  That's what I thought.
11         Were you having any financial difficulties in
12  1998?
13     A.  I believe so.
14     Q.  Okay.
15     A.  I was divorced at the time or getting divorced
16  at the time.  I was building houses at the time.  And
17  the economy kind of tanked back then.  I think it was in
18  '98.  But no, I didn't file bankruptcy under someone
19  else's name and my Social Security either.
20     Q.  I think the concern would be -- just putting
21  myself in the shoes of someone whose Social Security
22  number was used -- would be identity theft and really
23  wanting to make sure -- if someone was using my social
24  security number to file a bankruptcy, I'd have all level
25  of discomfort separate and apart from anything any bank

1    said to me or that kind of thing.

2          MR. HATHAWAY:  Objection.  Do you have a

3    question for him?  Ask questions.  Don't speculate.  I

4    object to the form of the question, if there is a

5    question in there.

6          MR. ABBOTT:  Nice talking objection, but -- so

7    it's the form of the question?

8          MR. HATHAWAY:  It's the form of the question.

9          MR. ABBOTT:  Okay.

10         **THE WITNESS:  I know where you're going with**

11   **this.  Do you want me to answer?**

12         MR. ABBOTT:  Go ahead.

13         MR. HATHAWAY:  Answer the questions you're

14   asked.  If you hear me object -- listen to my objection,

15   and then answer the questions that you are asked.

16         **THE WITNESS:  Okay.**

17   BY MR. ABBOTT:

18      Q.  So what did you -- what were your concerns when

19   you found out that someone had filed a bankruptcy with

20   your number, but not your name?

21      **A.  After almost 20 years?  What concern could I**

22   **have?  Whatever damage was done was done.  There was no**

23   **damage.  I've never had anything on my credit report.**

24   **I'm not so sure that somebody used my name or Social**

25   **Security number or if somebody typed in the wrong number**

1   or something when they were doing their search on

2   bankruptcies.  I have no idea what this bankruptcy was

3   about.

4       Q.  And you never did your own search independently.

5   Right?

6       A.  No.  I didn't know anything about it until

7   recently.

8       Q.  Until 2017?

9       A.  Yeah.

10      MR. ABBOTT:  All right.  So I have a couple of

11  documents I found just doing research, and I think they

12  relate to the financial difficulties you're alluding to.

13  So we're just going to briefly go over these.

14      (Exhibit 4 marked for identification.)

15  BY MR. ABBOTT:

16      Q.  So I've marked as Exhibit 4, a document called

17  Statement and Claim of Lien that was recorded in the

18  Skagit County Auditor's Office.  Do you recognize that

19  document?

20      A.  Yeah.

21      Q.  Can you describe what this is.

22      A.  Employment Security filed a lien.  They claimed

23  that I had wages on employees that I didn't have.

24      Q.  Did you have employees?

25      A.  At one time, yeah.

1    Q.  At what time?

**2    A.  From '94 until, I think, 2000.  I had**

**3  employees -- employees from time to time.**

4    Q.  Okay.  And this was filed when?

**5    A.  July something.**

6    Q.  1998?

**7    A.  Okay.  Yeah.**

8    Q.  All right.  So you're saying you disagree with

9  the Washington State Employment Security Department's

10  assessment here that you owed taxes?

**11    A.  Yes, I do.**

12    Q.  Okay.  Did you ever dispute that formally with

13  them?

**14    A.  No.  Just over the phone, actually.  Sorry.**

15    Q.  That's okay.  Over the phone?

**16    A.  Yeah.**

17    Q.  Okay.  So no formal dispute?

**18    A.  No.**

19    Q.  And what happened with this lien?

**20    A.  I have no idea.**

21    Q.  Did you ever pay it?

**22    A.  No.  The bankruptcy court may have, though.  I'm**

**23  not sure what all was paid.**

24        (Exhibit 5 marked for identification.)

25  BY MR. ABBOTT:

1    Q.  I'm going to mark as Exhibit 5, a document

2  entitled Certified Copy of Judgment, recorded in the

3  Skagit County Auditor's Office.  Do you recognize that

4  document?

5    A.  Not yet.

6        I don't know who Greenwood Trust is.

7    Q.  Did you ever have a Discover Card?

8    A.  Oh, yeah.  Is that what Greenwood Trust is?

9    Q.  The grantee of the judgment on the first page of

10  Exhibit 5 says Greenwood Trust Company, by its servicing

11  agent, Novus, N-O-V-U-S, Services, Inc., d/b/a Discover

12  Card.  So I don't know.  I'm just --

13    A.  Yeah, it must be Discover Card.

14    Q.  All right.  Were you sued for collection of an

15  amount owed on a Discover Card at some point?

16    A.  Must have been.

17    Q.  All right.  And then on page two, it shows the

18  balance due of $7,413.02.

19    A.  Um-hmm.

20    Q.  Do you recall having that kind of --

21    A.  Balance.

22    Q.  -- balance with a Discover Card that you didn't

23  pay?

24    A.  I believe so.  Well, not that much.  $5,000

25  something maybe.  The rest is fees.

1    Q.  Or interest, too.  Right?

2    **A.  Right.**

3    Q.  $1,099 in interest.

4    **A.  Right.**

5    Q.  Did you ever pay this judgment off?

6    **A.  I don't believe so.**

7    MR. ABBOTT:  So the lien from Washington State

8  will be marked as Exhibit 4.  And the judgment that was

9  recorded in the public records is Exhibit 5.

10  BY MR. ABBOTT:

11    Q.  You never paid either of those off.  Is that

12  right?

13    **A.  Right.**

14    (Exhibit 6 marked for identification.)

15  BY MR. ABBOTT:

16    Q.  All right.  I'm going to mark as Exhibit 6 a

17  document called -- well, it's another judgment, and it's

18  recorded in the Skagit County Auditor's Office.

19    Just take a look at that and let me know if you

20  recognize it.

21    **A.  Okay.  Just for the record, I believe it's**

22  **Skagit County, not Skagit.**

23    Q.  Thank you.  I'm sure I was mispronouncing it.

24  I'm not from this area.

25    **A.  And it's Yakima, not Yakima.**

1    Q.  Oh, boy.  I have another case in that county.  I

2  think I've been mispronouncing it.

3    **A.  Save you some embarrassment.**

4    Q.  Thank you.

5    Do you recognize this document marked as

6  Exhibit 6?

7    **A.  Not yet.**

8    **No.**

9    Q.  How do you pronounce this again?  Sorry.

10    **A.  Skagit.**

11    Q.  Skagit.  Okay.

12    Do you recognize Skagit Bonded Collectors LLC?

13    **A.  It's a collection agency in Skagit County, but**

14  **I've never done business with them.**

15    Q.  Did you ever make any payment to resolve this

16  judgment?

17    **A.  I don't know what the judgment is.**

18    Q.  So is that no, then, to --

19    **A.  No.**

20    Q.  So you never made any payment -- sorry, just

21  making the record clear.  You never made any payment.

22    **A.  No.  There isn't even -- Skagit Bonded doesn't**

23  **provide anything other than a collection service.**

24    Q.  I imagine they were collecting it for some other

25  original creditor, based on what you were describing.

1     A. Right.

2     Q. Is that your understanding of their business?

3     A. That is, yeah.

4     Q. Right.  So like they get it secondhand?

5     A. Right.  So I have no idea who it is.

6     Q. Okay.  In any case, you never paid anything with

7  respect to this judgment we marked as Exhibit 6.

8  Correct?

9     A. Right.

10        (Exhibit 7 marked for identification.)

11 BY MR. ABBOTT:

12    Q. I'm marking as Exhibit 7, a Notice and Statement

13 of Lien recorded in the Skagit County Auditor's Office.

14 Take a look at this and let me know if you recognize it.

15    A. Yeah.

16    Q. All right.  What is this document?

17    A. A lien from Support Enforcement.

18    Q. Okay.  So Division of Child Support.  Right?

19    A. Correct.

20    Q. So what was this lien in relation to?

21    A. Actually, I have no idea.  I've never paid Child

22 Support Services.  I paid child support directly to my

23 ex-wife.  Support Enforcement was -- sent me collection

24 notices for my brother and his wife's kids.  And I can

25 explain that one.

1          My name is Lorin Massingale.  My ex-wife's name

2    is Terri Massingale.  My brother's name is Terry

3    Massingale; his ex-wife's name is actually Lori, but she

4    went by Lauren.  So they were attaching my brother's

5    child support to my Social Security number.

6        Q.  So your brother had past-due child support?

7        A.  Yes.

8        Q.  Did you resolve this lien in any way?

9        A.  The lien -- I didn't know there was a lien.

10       Q.  So no, you didn't resolve it?

11       A.  No.  I had no clue there was a lien.

12           I notice the Social Security number is blocked

13   out.

14           MR. HATHAWAY:  Mr. Massingale, just answer the

15   questions.

16           THE WITNESS:  Oh.  Okay.

17           MR. HATHAWAY:  Please.

18           THE WITNESS:  Okay.

19           MR. HATHAWAY:  You don't need to explain your

20   answers.  Just answer the questions.

21           THE WITNESS:  Okay.

22           MR. ABBOTT:  I don't know if I agree with that.

23   I think you need to make your answers.

24           THE WITNESS:  No, that's not my lien, though.

25   BY MR. ABBOTT:

1    Q.  Okay.  It's not your lien.

2    **A.  It's liened on -- filed on me, but it wasn't my**

3    **obligation.**

4    Q.  Okay.  And is it your testimony that you were

5    unaware of this lien until today?

6    **A.  Yes.**

7    Q.  You've never seen this or heard of this lien

8    before?

9    **A.  No.**

10    MR. HATHAWAY:  Objection, asked and answered.

11    He's answered the question multiple times.

12    **THE WITNESS:  No.  I was unaware of that.**

13    BY MR. ABBOTT:

14    Q.  You were unaware.  Okay.  Your attorney is so

15    frustrated by my asking questions, it's making me linger

16    on this document to wonder whether I should ask more.

17    So your brother's name is -- can you tell me his

18    first name.

19    **A.  Terry.**

20    Q.  How is that spelled?

21    **A.  T-E-R-R-Y.**

22    Q.  T-E-R-R-Y.

23    And his wife was named Lori, you said, but her

24    nickname was Lauren?

25    **A.  She called herself Lauren, L-A-U-R-E-N.**

1    Q.  Spell that one more time.

2    **A.  L-A-U-R-E-N.**

3    Q.  What was her given name?

4    **A.  Lori.**

5    Q.  L-O --

6    **A.  I have no idea.**

7    Q.  There's a few different ways to spell that.

8    **A.  Yeah.  Different Social Security numbers, but**

9  **Support Enforcement felt that they needed --**

10     MR. HATHAWAY:  Again, Mr. Massingale, please

11  just answer the question.

12  BY MR. ABBOTT:

13    Q.  Do you understand what Support Enforcement --

14  what their understanding was?

15    **A.  They just tried to collect.  They're some sleazy**

16  **individuals.**

17    Q.  At the Division of Child Support?

18    **A.  Yes.**

19    Q.  Do you know whether they filed anything against

20  your brother?

21    **A.  I have no idea.  Probably.**

22    Q.  Why do you say probably?

23    **A.  Well, they have two different couples with**

24  **similar names.  They came after me for his, so I imagine**

25  **they went after him for his as well.**

1    Q.  Did you ever confront the Division of Child

2  Support and say, "Hey, this is not mine, this has to do

3  with my brother's," or something along those lines?

4    **A.  I was unaware of that.  But I did provide them**

5  **with a court letter saying that I had no arrears.  There**

6  **is a record of that in Skagit County.**

7    Q.  When did you do that?

8    **A.  About that same time.  But I didn't know they**

9  **filed a lien on my property.**

10    MR. ABBOTT:  We're going to mark as Exhibit 8, a

11  document entitled Order of Default Judgment, recorded in

12  Skagit County.

13    (Exhibit 8 marked for identification.)

14  BY MR. ABBOTT:

15    Q.  Have you ever heard of a company called CACH,

16  LLC?

17    **A.  No.**

18    Q.  Do you recognize this document we marked as

19  Exhibit 8?

20    **A.  I do not.**

21    Q.  Well, review this document for a moment or two

22  and let me know if there is anything in this document

23  that refreshes your memory or gives you a basis for

24  understanding what this document might be.

25    **A.  It's a default judgment, I'm assuming on a**

1   credit card.

2       Q.  Were there credit cards that you hadn't paid in

3   pre-2009 that might have resulted in this judgment?

4       A.  2009?  Different time frame.

5       Q.  Let's say the time frame between 2006 and 2009.

6   Because it takes time for a judgment like this to be

7   entered.

8       A.  I don't recall.

9       Q.  Are there any documents you could refer to, to

10  refresh your memory as to whether you were paying your

11  credit card bills in that time period of 2006 to 2009?

12      A.  I actually -- this is probably a credit card.  I

13  didn't have any for a long time.  So I would imagine

14  this is a credit card.  They should list the name on

15  there.

16      Q.  Why didn't you have a credit card for a long

17  time?

18      A.  Divorce.

19      Q.  Can you expand on that answer.  I don't

20  understand the one word, divorce, why you didn't have

21  credit cards.

22      A.  Divorce, you -- most people lose just about

23  everything -- most men lose just about everything in a

24  divorce.  So --

25      Q.  Did you lose about everything?

1    A.  I lost a lot.

2    Q.  Did you lose everything?

3    A.  I didn't lose everything.  I got all the bills.

4    Q.  Go ahead.  I'm sorry.

5    A.  I got all the bills.

6    Q.  You got the house, too.  Right?

7    A.  And she got a house.

8    Q.  Which house did she get?

9    A.  She got the mobile home.

10   Q.  Okay.  And you got the property -- what we've

11   agreed to refer to as the property?

12   A.  Correct.

13   Q.  How many acres is the property?

14   A.  Just under three.

15   Q.  So you got the property and your ex-wife got the

16   mobile home?

17   A.  Um-hmm.  I got the property with the mortgage,

18   and she got the mobile home free and clear and no debts

19   whatsoever.

20   Q.  Was the mobile home encumbered with debts before

21   the divorce?

22   A.  No.  The mobile home was paid for.

23   Q.  Do you keep in touch with your ex-wife?

24   A.  Only when I have to.

25       (Exhibit 9 marked for identification.)

1  BY MR. ABBOTT:

2   Q.  I'm going to hand you what I'm marking as

3  Exhibit 9, a document entitled Notice of Default.

4  Please just thumb through that and let me know when

5  you're ready.  I'll ask you some questions.

6       MR. HATHAWAY:  This doesn't appear to be the

7  whole document.  Is this the whole document, counsel?

8       MR. ABBOTT:  It's my understanding this is the

9  whole document.  But what part of it are you thinking or

10  expecting there would be --

11       MR. HATHAWAY:  A cover page or a page with his

12  name on it, who it's addressed to.  I don't see that

13  this is --

14       MR. ABBOTT:  Formulate an objection and try not

15  to coach the witness.  Thank you.

16       MR. HATHAWAY:  Object to the foundation of the

17  document.  Incomplete document.

18  BY MR. ABBOTT:

19   Q.  So, Mr. Massingale, do you recognize this

20  document?

21   **A.  No.  Not really.**

22   Q.  Do you recall Beneficial beginning foreclosure

23  against you in 1999?

24   **A.  That's where everybody doesn't dot their Is and**

25  **cross their Ts properly.  I'm thinking this is supposed**

1  to be the Glenhaven property that they actually did

2  foreclose on.  The other Beneficial loan that I had

3  mentioned earlier.

4       MR. ABBOTT:  Mr. Court reporter, could you

5  repeat my question, please.

6       **THE WITNESS:  Do I repeat this?**

7       MR. ABBOTT:  No, I'm asking the court reporter.

8       (Question read by the reporter.)

9       **THE WITNESS:  Did I not say -- not on this**

10  **property.**

11  BY MR. ABBOTT:

12    Q.  Okay.  So you don't recall a foreclosure in 1999

13  against the property?

14    **A.  Not this property.**

15    Q.  Got it.

16       So let's look at this Exhibit 9.  And I want you

17  to also look at Exhibit 3.

18    **A.  Um-hmm.**

19    Q.  All right.  So having both those documents

20  handy, I'm going to ask you to look at Exhibit 9.  And

21  in Section 1, there is a description of the default, and

22  also of the Trust Deed that's related to the default.

23       So, in paragraph one, in the last sentence, I

24  think -- well, it's kind of one big sentence -- but

25  there is a reference to a recorder's/auditor's number,

1  towards the end of that first paragraph, in Section 1.

2  Do you see that?

3      A.  (No response).

4      Q.  If it helps, I can just point to it here so you

5  don't have to --

6          MR. HATHAWAY:  Objection, counsel.  You've

7  already asked him if he recognized the document, and he

8  testified that he does not recognize the document.  And

9  asking him to look at a recording number which he has

10 no --

11         MR. ABBOTT:  Make your objection, but if you're

12 going to do speaking objections, I have to be concerned

13 about coaching the witness, even if you're not intending

14 that, Mr. Hathaway.  That would cause some complexities

15 for our procedure today.  I don't think you intend that.

16         MR. HATHAWAY:  I don't intend that.

17         MR. ABBOTT:  Okay.  So your objection is --

18         MR. HATHAWAY:  Asked and answered.

19         MR. ABBOTT:  Asked and answered.  Okay.

20         MR. HATHAWAY:  That he doesn't recognize the

21 document.

22         MR. ABBOTT:  Okay. That's a coaching objection.

23 You've just done a speaking objection.

24 BY MR. ABBOTT:

25     Q.  Mr. Massingale, do you see where it says

1  "recorder's/auditor's number" in that paragraph in
2  Section 1?
3      A.  I do.
4      Q.  Can you just read, for the record ,what the
5  number is, the auditor's number.
6      A.  9105200009.
7      Q.  That's in the property description.  Can you go
8  to the first paragraph in Section 1.  There is another
9  reference.
10      A.  9712040038.
11      Q.  Okay.  And if you go to Exhibit 3, can you
12  please read for the record the auditor's number for the
13  Trust Deed.
14      A.  Auditor's file number?
15      Q.  Yes.  It's stamped in a couple places on the
16  first page at the bottom.  It's also stamped at the top.
17  It starts with 9712.
18      A.  9712040038.
19      Q.  Okay.  So you'll agree with me that Exhibit 9
20  references the Trust Deed that we marked as Exhibit 3.
21  Right?
22      A.  Correct.
23      Q.  I'm sorry.  You said what?
24      A.  Yeah, I recognize it.
25      Q.  All right.  And in 1999, were you -- well, let's

1  go to Section 2 of Exhibit 9, where it says, "Statement

2  of Default and Itemized Arrearages."  Do you see that

3  section?

4  **A.  Um-hmm.**

5  Q.  There is a statement there in subparagraph

6  2(a)(i), "Delinquent monthly payments due from July 26,

7  1999 through October 26, 1999."  Do you see that?

8  **A.  I see that.**

9  Q.  Okay.  Were you making payments on the line of

10  credit -- timely payments -- in that time period of July

11  of 1999 through October 1999?

12  **A.  In that time, I was.  And then I was possibly**

13  **late at times as well.**

14  Q.  Do you dispute this total delinquency of

15  $4,808.15 that Beneficial stated for this notice of

16  default?

17  **A.  Yes.**

18  Q.  Okay.  What did you do -- did you communicate

19  with Beneficial that you were disputing the

20  representation of this delinquency on this Notice of

21  Default?

22  **A.  I don't recall this document.**

23  MR. HATHAWAY:  Mr. Massingale, just answer the

24  questions, please.

25  **THE WITNESS:  Right.  I'm trying to.**

1        This must have been resolved, otherwise they

2    would have foreclosed on my property.

3    BY MR. ABBOTT:

4        Q.  Let me circle back and be more clear on my

5    question, just to make sure.  Don't guess.  If you don't

6    remember, that's your answer, I suppose.  But do you

7    recall ever communicating with Beneficial in a way where

8    you were disputing their assessment that you were

9    delinquent for the payments due from July of 1999

10   through October 1999?

11       A.  I communicated with Beneficial constantly.  And

12   the property -- this current property, all payments with

13   Beneficial were made, otherwise -- they were the

14   lienholder.  They would have foreclosed on this property

15   if I didn't make the payments.

16       Q.  That's what this Notice of Default is the start

17   of.  Right?

18       A.  As I said earlier, there were two properties.

19       Q.  Okay.  But I think we've already established

20   that this Notice of Default is referencing the Trust

21   Deed for the property that's at issue in this case.

22   Correct?

23       A.  No.  What we've established is the same numbers

24   are on both documents.

25       Q.  Right.

1    A.  That doesn't mean that's the property.  They

2  foreclosed on one property.

3    Q.  What property did they foreclose on?

4    A.  This property.  The $103,000 -- whatever that

5  total was at the top.  $103,675.35.  Their property

6  numbers and stuff are put on the wrong property.  The

7  property on Baker Lake Road, all payments with

8  Beneficial were --

9        MR. HATHAWAY:  Mr. Massingale --

10       MR. ABBOTT:  I'm just going to put for the

11  record -- this will be warning No. 1 -- that

12  Mr. Hathaway is interrupting the witness' testimony and

13  is coaching the witness.

14       MR. HATHAWAY:  I'm directing the witness --

15       MR. ABBOTT:  You're directing your witness how

16  to answer --

17       MR. HATHAWAY:  -- answer the question.

18       MR. ABBOTT:  So I'm going to give you three

19  warnings, and then I'm going to seek the assistance of

20  the judge, because there is no way to put the genie back

21  in the bottle once a witness has been tampered with.

22  That's warning No. 1.

23  BY MR. ABBOTT:

24    Q.  Mr. Massingale, so your testimony is that this

25  Notice of Default -- that Beneficial just put the wrong

1    property address?

**2       A.  Correct.**

3       Q.  So they do have a reference to the street

4    address as well as 39681 Baker Lake Road.  Do you see

5    that in Section 1?

**6       A.  Yes, I do.**

7       Q.  And they're referencing the Trust Deed that was

8    recorded with respect to the line of credit that's at

9    issue in this case.  Correct?

**10      A.  Correct.**

11      Q.  Do you have any written documentation that

12   establishes what you're saying is Beneficial's confusion

13   or mix-up regarding this loan and the other loan that

14   you had with them?

**15      A.  With me, no.**

16      Q.  What was the -- can you just give me the full

17   street address of the other property that you're saying

18   they foreclosed on.

**19      A.  It was on East Alder.  I don't remember the**

**20   house number.  Glenhaven Lakes Estates in Sedro-Woolley,**

**21   Washington, but it's in Whatcom County.**

22      Q.  Glenhaven Lakes, you said?

**23      A.  Yeah.**

24      Q.  Is that the name of the town or city?

**25      A.  It's like a housing development, basically.**

1     Q.  When was that -- when did that foreclosure sale

2  occur?

3     A.  About this time.

4     Q.  1999?

5     A.  Yeah.  Somewhere around there.

6     Q.  What were you using that property for, before

7  you lost it in the foreclosure?

8     A.  That was a spec house.

9     Q.  Can you explain what you mean by that.

10    A.  Speculation.  Build it to sell it.

11    Q.  And you couldn't sell it?

12    A.  Right.

13    Q.  Had you finished building it?

14    A.  Yeah.  The market tanked.

15    Q.  Go to the last page of Exhibit 9.  The last page

16  is an affidavit of mailing.  Do you see that?

17    A.  Um-hmm.

18    Q.  Was that your mailing address?

19    A.  Correct.

20    Q.  Okay.  Do you recall whether you actually

21  received a copy of this Notice of Default in 1999?

22    A.  No.

23    Q.  You don't recall?

24    A.  No.

25    Q.  One way or the other?

1    A.  No.  I don't recall.  Twenty years ago.

2    Q.  So you might have received it; you might not

3  have, but you don't know.

4    A.  Right.

5        MR. HATHAWAY:  Objection, asked and answered,

6  counsel.  How many times are you going to ask the

7  question?  He answered the question.  He doesn't --

8        MR. ABBOTT:  Okay.  Speaking objection,

9  argumentative.  Making a note of it for the record.  All

10  right.

11        Your attorney again is clearly trying to have us

12  move on from this document, so I'm thinking there is

13  something here I need to linger on for a second.  So

14  give me a moment, because he's signaling that this is a

15  problem for his case.

16  BY MR. ABBOTT:

17    Q.  Have you ever heard of Bishop Lynch & White,

18  P.S.?

19    A.  No.

20    Q.  Just for reference, so you can see how it's

21  spelled, it's on page two of Exhibit 9.

22    A.  It sounds like an attorney's name.

23    Q.  Do you recognize the name?

24    A.  No.

25    Q.  Do you recall whether you might have had any

1  dealings with them?

2      **A.  No.**

3      Q.  And that's inherently a tough question for me to

4  ask is do you recall whether and then you say no.  So I

5  might sometimes follow up with, is it one way or the

6  other; or are you saying no, you don't recall it?

7  Because those are two different answers.  Right?  I just

8  want to make sure for the record that notwithstanding

9  any unclarity from my question, that I understand your

10  answer, if that makes sense.

11      **A.  I've never had personal dealings with Bishop**

12  **Lynch & White.**

13      Q.  Okay.  Or professional dealings?

14      **A.  No.**

15      Q.  All right.  Have you ever received any kind of

16  document that looks to be of the form of the document,

17  Exhibit 9, a Notice of Default with this kind of

18  formatting and structure?

19      **A.  Not that I can remember.**

20      Q.  All right.  So to sum this up, you believe that

21  this was a mistake on Beneficial's part; that they were

22  actually referring to the foreclosure of the other

23  property.

24      **A.  To the best of my knowledge.**

25      Q.  Okay.  And that's the Glenhaven Lakes property.

1     A.  Correct.

2     Q.  And that you don't recall exactly when you lost

3  the Glenhaven Lakes property in foreclosure, but it was

4  in 1999.

5     A.  That decade.  '90 --

6     Q.  The 20th century.

7     A.  Yeah.  '98, '99, somewhere around there.

8     Q.  That's totally fine.  It's not trying to pin you

9  on the date.  That's fine.

10         Had you lost any other properties in

11  foreclosure, either before then or since?

12    A.  No.

13         (Exhibit 10 marked for identification.)

14  BY MR. ABBOTT:

15    Q.  All right.  I'm going to hand you what I'm going

16  to mark as Exhibit 10.  Take a look at that and let me

17  know when you're ready, please.

18         MR. HATHAWAY:  I again object to the form of the

19  document.  It doesn't appear to be a complete document

20  to me.

21  BY MR. ABBOTT:

22    Q.  Mr. Massingale, have you seen this document

23  before today?  What we've marked as Exhibit 10.

24    A.  A resounding no.  This is the same document as

25  the last one.

1    Q.  Okay.  So let's go to the last page of this

2  document that we've marked as Exhibit 10.  You'll see

3  that this is dated July 22nd, 2004.  Do you see that?

4    **A.  Yes.**

5    Q.  Okay.  Then if you go to Exhibit 9, Exhibit 9 is

6  dated -- second to last page -- what's the date for

7  Exhibit 9?

8    **A.  Is it '99?**

9    Q.  November 16, 1999.  Right?

10    **A.  Correct.**

11    Q.  So do you still think these are the same

12  documents?

13    **A.  Date-wise, it's not the same document, but it is**

14  **the same Notice of Default.  Different dates.**

15    Q.  Well, when you say, "The same Notice of

16  Default," you're saying the same type of document?

17    **A.  Correct.**

18    Q.  Okay.  I agree with you, it would fall in the

19  same category of document, being a Notice of Default.

20      Let's look at page one of Exhibit 10.  Again, I

21  want you to focus in on the first paragraph of

22  Section 1.  This is a reference to a recorder and

23  auditor's number.  Could you just read that reference

24  for me into the record, please.

25    **A.  9712040038.**

1    Q.  Okay.  And we established earlier that that

2  matches the Trust Deed for the line of credit in this

3  case.  Correct?  In terms of the recording number.

4    **A.  In terms of the recording number, yes.**

5    Q.  Okay.  And in this Notice of Default we've

6  marked as Exhibit 10, Beneficial is saying that you have

7  failed to make payments due from February 2004 to July

8  2004.  Do you see that?  That's in Section 2(a).

9    **A.  I do.**

10    Q.  Do you recall falling behind on your payments on

11  the line of credit during that time period?

12    **A.  That time period, no, I do not recall, but I**

13  **would imagine -- I do recall falling behind several**

14  **times.  This could have been one of those times.**

15    Q.  So, as you sit here today, you have no reason to

16  dispute the accuracy of this particular statement on

17  Exhibit 10; do you?

18    **A.  No.**

19    Q.  And this Exhibit 10, do you have any reason to

20  believe that this was Beneficial mistaking this loan for

21  the one they had foreclosed on in 1999?

22    **A.  As far as that, I have no idea.**

23    Q.  Do you recall ever receiving this document?

24    **A.  No.**

25    Q.  Do you recall being aware that Beneficial had

1  commenced another foreclosure regarding the line of

2  credit?

3      A.  No.

4      Q.  Did you ever bring the loan current in 2004

5  regarding the delinquency that's referenced here?

6      A.  I do not recall.  I can only assume --

7  Beneficial was the primary noteholder on this.  I don't

8  understand why they would need to find a -- get a

9  judgment against it.  If I was behind, I would assume

10  they would just foreclose.

11      Q.  Did you have any contact with Bishop White

12  Miersma & Marshall?

13      A.  No.

14      Q.  What about Ann T. Marshall?

15      A.  Who would that be?

16      Q.  It's the person that apparently signed this

17  Notice of Default in 2004.

18      A.  No.

19      Q.  It's on the last page.

20      A.  No.  I've never seen this document before.

21      Q.  When you originally took out the line of credit,

22  you had set up automatic payments from a Bank of America

23  checking account.  Is that right?

24      A.  Right.

25      Q.  Have you ever changed banking institutions for

1  making payments on this line of credit?

2  **A.  No.  But I change banks a lot.**

3  Q.  So until when were you using Bank of America,

4  that checking account that you had set up the automatic

5  payments for?

6  **A.  Probably about the time of the Child Support**

7  **Enforcement judgment.  Bank of America -- Support**

8  **Enforcement went into my Bank of America account and**

9  **cleaned my account out.**

10  Q.  So it's around 2003?

11  **A.  Whatever is on that -- whatever document that**

12  **was.  It was somewhere around that time period.**

13  Q.  Do you want to look at that document to refresh

14  your memory?

15  **A.  Yeah.**

16  Q.  Okay.  I might be able to find it, sir.

17  **A.  Oh, there it is.  Seven.**

18  **2003.  Yeah.**

19  Q.  2003.  Okay.

20  So after the event that you're describing with

21  the Bank of America account in 2003, what account did

22  you use to make payments on the line of credit?

23  **A.  I think I wrote them checks or took them cash.**

24  Q.  And in writing checks, what institution's checks

25  were you writing?

1      A.  Skagit State Bank, KeyBank.

2      Q.  Any others?

3      A.  No.  I don't think so.  I think those were the

4  only two.

5      Q.  And you said you also sometimes paid by cash?

6      A.  Yes.

7      Q.  How would you do that?

8      A.  I'd go into the branch with cash.

9      Q.  And Beneficial has branches?

10     A.  Yeah.  They did.

11     Q.  Do you recall which branch you went to?

12     A.  Mount Vernon.  College Way.

13     Q.  All right.  So besides Bank of America, Skagit

14  State Bank and KeyBank, what other banks have you had

15  accounts with from which you've made payments on a line

16  of credit over the years, from the beginning to the

17  present?

18     A.  To Beneficial?

19     Q.  No, just -- well, Beneficial, Caliber, and

20  Rushmore.

21     A.  Well, went back to Skagit State and they were

22  bought out by Banner.

23     Q.  By who?

24     A.  Banner Bank.

25     Q.  Banner bank.

1          Any others?

**2      A.  Not that I can recall.**

3      Q.  And do you still have accounts with Bank of

4  America?

**5      A.  No.**

6      Q.  What about -- I'm going to say Skagit State

7  Bank/Banner Bank, because they were bought out.

**8      A.  Yeah.  I still have accounts with Banner.**

9      Q.  What about KeyBank?

**10      A.  No.**

11      Q.  So when you make payments on the line of credit

12  most recently, you're using the Banner Bank account to

13  do so?

**14      A.  Correct.**

15      Q.  When did you start using Skagit State Bank and

16  Banner Bank for your banking with respect to making

17  payments on the line of credit?

**18      A.  I think around 2005.**

19      Q.  And until when were you making periodically

20  cash -- making your payments by cash, as you described

21  earlier?

**22      A.  That was just to Beneficial until they got**

**23  bought out by HSBC or HFC.**

24      Q.  And just year, if you remember, around what time

25  that was.

1     A.   I don't know when they closed their offices.  It

2  had to have been prior to 2003, I believe.

3     Q.   Okay.  I don't remember either.

4     A.   Yeah.

5     Q.   And I understand -- I'm going to make it clear

6  for the record -- you're estimating here.

7     A.   Right.

8     Q.   Because neither of us can remember when that

9  happened.

10        You remember, though, that you stopped making --

11  you didn't make any cash payments on your line of credit

12  once Beneficial was taken over by HFC and then HSBC.  So

13  that's correct?

14     A.   Once they closed their branches down.

15     Q.   Okay.  And they closed their branches down when

16  they were taken over?

17     A.   Yeah.  Well, I'm not sure exactly when.

18     Q.   Okay.  And then in terms of estimating the time,

19  you're estimating it around 2003, but you're not 100

20  percent sure?

21     A.   Correct.

22     Q.   Would you say that -- and I'm trying to get your

23  best estimate here, like I described -- would you say

24  that after 2005, that you're reasonably sure you didn't

25  make any cash payments on the line of credit?

1      A.  **Reasonably sure, yes.**

2      Q.  Ninety percent sure?

3      A.  **Ninety percent sure.**

4      Q.  What about 2004?  The same answer or --

5      A.  **I don't know when they closed.**

6      Q.  Okay.  That would peg the time, though.  Right?

7   Am I understanding you correctly?

8      A.  **Correct.**

9      Q.  Do you recall making any lump sum payments --

10  let me strike that for a second.

11         When I say lump sum payment with respect to the

12  line of credit, what I'm referring to is a sum that's

13  larger than a single month's payment.  Okay?

14     A.  **Yes.**

15     Q.  So did you make any lump sum payments on the

16  line of credit in 2004?

17     A.  **Possibly.**

18     Q.  Do you recall whether you would have made lump

19  sum payments by check or by cash?

20     A.  **Either.**

21     Q.  It could have been either.

22     A.  **Correct.**

23     Q.  What about 1999?  Do you recall making any lump

24  sum payments on the line of credit?

25     A.  **Do I recall?  No.**

1      Q.  Are there any documents you could refer to, to
2  refresh your memory as to your payments on the line of
3  credit, from when you took out that line of credit to
4  the present?
5      A.  Is there any document?  Just checkbook registers
6  that I can find.  My house was rummaged through, and
7  they went through absolutely everything.  A lot of stuff
8  got thrown away.
9      Q.  Can you describe that in a little more detail.
10 What do you mean, your house got rummaged through?
11     A.  When I wasn't there, somebody came through and
12 prowled through absolutely everything.  Stole washer and
13 dryer, kids' toys, fishing poles, clothes, furniture,
14 light fixtures, absolutely everything.
15     Q.  When did this happen?
16     A.  I don't remember what year.
17     Q.  Did you make a police report on this?
18     A.  Several.
19     Q.  Which police agency did you make it with?
20     A.  Skagit County Sheriff's Department.
21         They kicked in doors, busted out windows,
22 everything else, to get in.
23     Q.  I'm sorry.  Can you even remember around what
24 year that occurred?
25     A.  Prior to 2000.  So it probably would have been

1   about that time.

2       Q.  Prior to 2000?

3       A.  Yes.

4       Q.  So 1998, 1999?

5       A.  Yeah.

6       Q.  Okay.  So your records from say 2000, going

7   forward, would have been unaffected by this break-in?

8       A.  Correct.

9       Q.  What types of records have you kept since -- for

10  this line of questioning, let's just say since 2000.

11  Okay?

12      A.  Very few.

13      Q.  Very few.

14      A.  Uh-huh.

15      Q.  So let me finish my question just so that the

16  record is good.

17          What types of records have you kept in terms of

18  payments on the line of credit since 2000?

19      A.  I assumed that I had access to all my bank

20  statements online, but that's not the case.  Banner Bank

21  went through and wiped everything out except for -- they

22  only keep records back to three years.  And the records

23  I did get, I ordered, and they could only go back so far

24  after they took over Skagit Bank.  So since 2005 until

25  2012, '13, '14 maybe -- I don't remember how far back

1  they go, but they -- Banner Bank wiped it all out.

2  Q.  Okay.  I think you're anticipating my next

3  question.  But my question is a little more general,

4  which is what records do you keep?

5  A.  None.

6  Q.  For example, a ledger at home, check register,

7  any notations for reference for tax returns later that

8  particular year, things like that, documentation.

9  A.  Right.  I have some check registers at home.  I

10 have a bookkeeper that does all my paperwork now, have

11 since 2010.  Just business-wise.  Personal-wise, I

12 didn't think I would ever need it.

13 Q.  So you've employed a bookkeeper since 2010 to

14 take care of these things for you?

15 A.  Business things.

16 Q.  Business things.

17    So not things related to the line of credit?

18 A.  No.  Or the household, no.

19 Q.  At any point, did you start making -- did you

20 make more detailed records about your payments on the

21 line of credit?

22 A.  I believe, at one time, I set up automatic

23 payment with Skagit State even.  I don't remember.

24 Q.  Oh, like you had done with Bank of America?

25 A.  I believe.  I'm not really sure.

1      Q.  Do you keep records that you receive from your

2   banks, like bank statements or any other mailings that

3   they send you?

4      **A.  Nobody mails anymore.**

5      Q.  Well, that doesn't quite answer my question.

6   Because we're talking about a time period from 2000 to

7   2022.

8      **A.  No.**

9      Q.  Are you saying -- is it your testimony you have

10  no records of correspondence with your banks -- and only

11  the ones related to any payments you might have made on

12  the line of credit -- from 2000 to the present?

13     **A.  That's what I'm saying.  I have very few, if**

14  **any.**

15     Q.  Okay.  You have very few.  So you might have a

16  few?

17     **A.  Maybe.**

18     Q.  So do you keep your records in a particular --

19  do you organize your records in any way at home?

20     **A.  Not at all.**

21     Q.  So your records might just be like strewn about

22  the house maybe in one area or another area,

23  disorganized?  Is that what you're saying?

24     **A.  Disorganized, in boxes.**

25     Q.  Okay.  And where do you keep these boxes?

1     A.   **That would be in the living room right now.**

2     Q.   Okay.  How many boxes would you estimate that

3  you have of records?

4     A.   **One.**

5     Q.   One?

6     A.   **I've gone through and thrown most everything**

7  **out.**

8     Q.   When did you go through and throw things out?

9     A.   **Several years ago.**

10    Q.   Have you thrown out any records in the last 24

11 months?

12    A.   **No.**

13    Q.   What about the last 48 months?  The last four

14 years?

15    A.   **No.**

16    Q.   And it's your testimony that you're not

17 receiving anything in the mail from your banking

18 institutions presently?

19    A.   **No.**

20    Q.   That's not your testimony?

21    A.   **That is my testimony.**

22    Q.   See, that's the unclarity of these things.

23 That's why I ask questions a couple different ways.

24 Okay.

25         MR. ABBOTT:  I'm going to hand you a document --

1    really just a compilation of letters.  I'm going to mark

2    them as Exhibit 11.

3            (Exhibit 11 marked for identification.)

4    BY MR. ABBOTT:

5        Q.  Just take a moment to look through there.  I'll

6    represent to you I added the yellow highlighting.

7    That's not part of the actual letter.  I don't think

8    that was -- it certainly wasn't on any letter that was

9    sent to you.

10       **A.  Yes.  I do recognize these.**

11       Q.  You do.  Okay.

12           Let's go through these.  I'm just going to start

13   with the first page.

14           Now, for convenience sake, I suppose, they have

15   a stamp on the lower right corner.

16       **A.  Um-hmm.**

17       Q.  Caliber with some number.

18       **A.  Um-hmm.**

19       Q.  So if we want to go back or I want to take you

20   back to some letter, I might just reference that so you

21   can quickly get to the page.  Okay?  I don't know if we

22   need to do that.

23           Let's just start with this first one.  So this

24   is a letter dated March 12, 2012 from HFC -- that was

25   their name at the time, Beneficial -- to you, stating

1  that they're concerned about the overdue status of your

2  account.  Do you recall being past due on this

3  account -- on the line of credit in early 2012?

4      **A.  I can try to save us some time.**

5      Q.  Sure.

6      **A.  I've been past due on the status of my account**

7  **several times.  And prior to the end of every year, I've**

8  **gone through and made a lump sum payment on anything**

9  **that wasn't brought current prior to that.**

10      Q.  So let me make sure I understand that.  We may

11  not have to go through all these letters.  I appreciate

12  your candor.

13      **A.  Right.**

14      Q.  So are you describing a pattern that's prevalent

15  throughout most of the time period that you had your

16  line of credit; that you would fall behind during the

17  year, but then submit a lump sum towards the end of the

18  year?

19      **A.  It's happened a few times, but it wasn't really**

20  **a habit.  I learned that Beneficial doesn't accept**

21  **partial payments.  So if I fell behind, I had to save up**

22  **until I could pay the full amount.**

23      Q.  Okay.  Do you understand -- what's your

24  understanding of the impact on your credit rating by

25  falling behind 30, 60, maybe 90 or 120 days on an

1  account?

2  **A.  I understand it impacts it; but after getting**

3  **divorced, your credit really doesn't really matter**

4  **anymore.**

5  Q.  Oh, okay.

6  So to make sure the record is clear, are you

7  saying that your credit was --

8  **A.  Destroyed.**

9  Q.  -- destroyed by the divorce?

10  **A.  Yes.**

11  Q.  Did it ever rebound?

12  **A.  I don't apply for credit.  I just pay cash for**

13  **everything now.**

14  Q.  Okay.  So you haven't seen an adverse action

15  letter in years, because you haven't applied for

16  anything in years.  Is that right?

17  **A.  Right.**

18  Q.  Do you pull your credit report at all?

19  **A.  I did here a while back, to see what was on**

20  **there.  And I don't even remember what was on there, but**

21  **I don't think there was anything current.**

22  Q.  What do you mean, you don't think -- I don't

23  understand your statement.

24  **A.  Well, I haven't applied for credit in a long**

25  **time.**

1    Q.  Okay.  So you're saying you don't have any

2  credit accounts open, so there really isn't anything

3  that you found in your credit report.  Is that what

4  you're saying?

5    **A.  Yeah.**

6    Q.  And I don't want to put words in your mouth.

7  I'm trying to understand --

8    **A.  That's what I remember anyway.**

9    Q.  So just your best estimate -- you don't need to

10 give me the exact date -- but when was, approximately,

11 the last time that you ordered your credit report?

12   **A.  It probably would have been in 2017.**

13   Q.  Okay.  And do you recall whether it was the

14 first half or second half of 2017?

15   **A.  The first half.**

16   Q.  Oh, so Caliber was still servicing your loan at

17 that time?

18   **A.  I believe so, yes.**

19   Q.  And do you have a copy of that credit report?

20   **A.  With me, no.**

21   Q.  Not with you.  That's not the question.

22   **A.  Right.**

23   Q.  Do you have a copy of the -- have you retained a

24 copy?

25   **A.  Yes.**

1    Q.  Okay.  Do you recall whether you saw any

2  reporting by Caliber?

3    **A.  I don't recall.**

4    Q.  Okay.  Do you recall whether you saw any

5  reporting by -- I'll call it Beneficial, but it may have

6  shown up as HFC or HSBC, depending on -- I don't know

7  how they formatted when they reported stuff.  Do you

8  recall seeing anything from Beneficial relating to the

9  line of credit?

10    **A.  I don't recall, no.**

11    Q.  Do you recall seeing any references to the loan

12  that was foreclosed that you had testified to earlier?

13    **A.  Never.**

14    Q.  Never?  Okay.

15      Was there anything on your credit report that

16  related to bankruptcy in any way?

17    **A.  No.**

18    Q.  Okay.  Do you recall what your credit score was?

19    **A.  Not exactly.  Five something.  575 or something**

20  **like that.**

21    Q.  So under six?

22    **A.  Yes.**

23    Q.  All right.  Let's just go through this

24  Exhibit 11 briefly here.

25    **A.  Um-hmm.**

1      Q.  What I'd like to ask is that -- just because you

2  have been candid about having that pattern occasionally

3  where you would fall behind because Beneficial wouldn't

4  accept the partial payment; that you had to save up and

5  make a lump sum later in the year -- is that my

6  understanding of what you said earlier?

7      A.  HSBC.

8      Q.  I'm referring to them as Beneficial per our

9  agreement earlier.  I don't want to confuse things.  I

10  don't mean to be -- but it was HSBC at the time that you

11  were encountering that.

12      A.  Right.

13      Q.  Okay.  Right.  And this letter, in fact, from

14  March 12, 2012, is HFC, Member HSBC Group.  So at that

15  point, the branding had changed.  Correct?

16      A.  Correct.

17      Q.  All right.  So you don't dispute that your

18  account was overdue in March of 2012.  Right?

19      A.  Right.

20      Q.  Let's go to the next page of Exhibit 11.  This

21  is just another letter from -- I'm going to call it

22  Beneficial, but I understand it's HSBC at this point.

23  They're suggesting that you enroll in an automatic

24  payment plan.  So I'm assuming, from this statement,

25  that you weren't at that time.  Do you recall whether

1  you were in an automatic payment plan in March of 2012?

2      **A.  I don't recall.  But if they suggested it, I**

3  **would assume I was not.**

4      Q.  Okay.  And why wouldn't you have -- why not sign

5  up for the automated payment plan, at that time?

6      **A.  Well, if I'm behind on a payment, it means I**

7  **didn't have the money in my account to pay it.**

8      Q.  Okay.  Let's talk about that.  Why didn't you

9  have the money to make your payments on the line of

10  credit in that time period?

11      **A.  2012, I believe I had a truck break down and I**

12  **had an engine to rebuild, and I either made the house**

13  **payment or I rebuilt the engine in my truck in my**

14  **current business.  My livelihood versus making a house**

15  **payment on time.**

16      Q.  All right.  Let's go to the next page.  It's a

17  letter dated April 17, 2012.  This is the same vintage,

18  very close in time.

19      **A.  Correct.**

20      Q.  Now, this letter talks about, "At HFC, we have a

21  team of experienced mortgage servicing professionals

22  dedicated to assisting you with options to avoid further

23  delinquency."

24          Did you contact HFC or even -- there is a

25  reference to a HUD-approved agency -- to talk about ways

1 to bring your account current, maybe do some kind of

2 loan mod or something, or some kind of option like that?

3     **A. I never recall that ever.**

4     Q. Okay. What about HFC?

5     **A. I have talked to representatives at HFC.**

6     Q. Did you talk to them in April of 2012 when you

7 received this letter?

8     **A. I don't recall.**

9     Q. Did you ever apply for a loan modification with

10 HFC or Beneficial or HSBC?

11     **A. No.**

12     Q. Okay. That's why I thought we should just call

13 it Beneficial.

14     Okay. Why not?

15     **A. I knew this was temporary.**

16     Q. You knew what was temporary?

17     **A. Not having money to make that payment was**

18 **temporary.**

19     Q. Okay. And this is at the time period where your

20 truck broke down, so you were using it as a finite

21 situation?

22     **A. Correct.**

23     Q. Let's go to the next page, which is September

24 2012.

25     **A. Um-hmm.**

1    Q.  It's very similar format.  It says, "We are

2  concerned about the overdue status of your account."

3        As you sit here today, do you have any reason to

4  dispute that your account was overdue in September 2012?

5    **A.  No.**

6    Q.  Were you still dealing with the truck breakdown

7  in September 2012?

8    **A.  Continually.**

9    Q.  Okay.  And how long did that situation persist?

10    **A.  Well, if you notice, the date is September and**

11  **the balance is $1,419.**

12    Q.  Um-hmm.

13    **A.  That means the first two letters that you**

14  **referenced have been paid.**

15    Q.  Um-hmm.  You're running what I would say is sort

16  of like a 30/60 perpetual situation, where you're making

17  payments, but you're not bringing it 100 percent

18  current, I think.

19    **A.  Well, it was current from -- was it April until**

20  **this September payment or August payment?**

21    Q.  Okay.  That's your testimony.

22        Okay.  So you're testifying that you were

23  current until between April of 2012 and September or

24  maybe August 2012 --

25    **A.  Correct.**

1    Q.  -- that precipitated them sending you this

2  letter?

3    A.  Correct.

4    Q.  Okay.  Let's go to the next one.  Before we go

5  to the next page, when you were current -- just going

6  off of your testimony here of the time period between

7  April and August or September 2012 -- when you had

8  brought the loan current or the line of credit current,

9  why didn't you enroll in an automatic payment plan while

10  you were current?

11    A.  I have no idea.

12        Clarify something.  The people that I work for

13  don't pay the same days all the time.  I work for

14  different people.  So I might get a check on the 15th

15  this month and I might not get a check for 60 days next

16  time.

17    Q.  Okay.  So there is a little bit of --

18    A.  Fluctuation.

19    Q.  Yes.  It's not a regular payment.

20    A.  Correct.

21    Q.  Okay.  Speaking of your employment or your

22  livelihood, can you just briefly describe that.  I

23  understand you have a trucking business, is my

24  understanding.

25    A.  Correct.

1    Q.  And you're referring to people who pay you, and

2  you used the word -- you used it in the plural sense.

3  Are they kind of what you would view as customers for

4  your company?

5    A.  Correct.

6    Q.  And what do they do?  They contract with you to

7  haul some goods?

8    A.  Correct.

9    Q.  You provide the truck, they provide the goods

10  and the location?

11    A.  Correct.

12    Q.  Okay.  So your customers may change from time to

13  time, depending upon who needs goods to be shipped.  Is

14  that right?

15    A.  Correct.

16    Q.  So it's kind of by assignment really; isn't it?

17  Is that right?  Or do you have regular --

18    A.  I have regular --

19    Q.  You have regular customers, too, with regular

20  delivery?

21    A.  Correct.  It's a log truck.

22    Q.  Oh, right.  I was thinking -- right.  A log

23  truck.  You mentioned that --

24    A.  Correct.

25    Q.  -- in your paperwork.

1      So it's just the vagaries of the logging

2  industry, when there is logs that need to be shipped?

3      **A.  Correct.**

4      Q.  Thank you.  I appreciate that.

5          And when did you start this trucking business as

6  it exists now?

7      **A.  2010.**

8      Q.  What did you do before 2010?

9      **A.  I drove for someone else.**

10     Q.  Who did you drive for?

11     **A.  Leonard Hornbeck Trucking from 2005 or so until**

12  **2010.**

13     Q.  All right.  And then, before 2005, before you

14  were driving for Leonard Hornbeck Trucking, who were you

15  driving for or what were you doing?

16     **A.  I think right before him, I worked for Frank**

17  **Harkness Trucking or Logging.**

18     Q.  Can you spell that for the record.

19     **A.  H-A-R-K-N-E-S-S.**

20     Q.  Okay.  How long were you driving for Frank

21  Harkness?

22     **A.  Maybe about seven months.**

23     Q.  And before Frank Harkness Trucking?

24     **A.  Herman Hobbick Construction.**

25     Q.  Can you spell that one.

1      A.  Good luck on that one.  H-O-B-B-I-C-K, I think.
2  He's dead now.

3      Q.  That's construction.  Okay.

4          And I don't want to go through -- I don't need
5  to go through your whole resume, but were you driving
6  for various logging trucking companies from the time --
7  throughout the time period that you've had this line of
8  credit up until 2010 when you opened your own business,
9  to do the same thing essentially?  Is that fair?

10     A.  Prior to Hobbick, I think -- I don't know what
11 the date is now -- I'd driven for people off and on up
12 until then.

13     Q.  I'm just trying to confirm that's generally been
14 the employment or line of work you've been in for all
15 times relevant to the case.

16     A.  Correct.  I built houses for a time, from '94 to
17 about '98, '99.

18     Q.  When you say you built houses -- you had talked
19 about a spec home, the one that was foreclosed.

20     A.  Um-hmm.

21     Q.  Were you developer, construction company, the
22 whole nine yards, or were you working for someone else?

23     A.  Just the construction company.

24     Q.  You were a construction company?

25     A.  I built houses for people, did remodels for

1    people.

2        Q.  I'm trying to understand the spec house now,

3    just plug it into what you're describing.  Was that a

4    foray where you bought land and you built that house

5    with the idea of selling it, so you were kind of running

6    the whole show for that?

7        A.  Correct.

8        Q.  Did you hire an architect or buy plans?  How did

9    that work?

10       A.  I bought plans.

11       Q.  Okay.  Did you employ anyone in that process for

12   the spec homes?

13       A.  Yeah.  I had my brother and another guy work for

14   me mostly, and then I hired subcontractors to do a lot

15   of the work.

16       Q.  All right.  Let's go back to this Exhibit 11.  I

17   think we were on the September 12, 2012 letter.  Let's

18   just go on to the next letter.  The next letter is from

19   September 2012, another reference to the delinquent

20   account.  As you sit here today, you're not disputing

21   that the line of credit was delinquent in September of

22   2012?

23       A.  No.

24       Q.  There is another letter on the next page from

25   November 2012.  The same thing, you don't dispute that

1   your line of credit was past due at that time?

2   **A.  For that month, no.  But if you notice, the**

3   **balance is just for that one month's payment.**

4   Q.  Is that what your monthly payments were at that

5   time, $1,419?  I think it was about half of that.  I

6   thought this was two months.

7   **A.  Oh, maybe that is --**

8   Q.  I don't think your payments ever crested over

9   $1,000 -- your monthly payment

10  **A.  They were at the beginning.**

11  Q.  They were in the beginning, you said?

12  **A.  Yes.  Thirteen percent interest or 12 percent**

13  **interest.**

14  Q.  In the late '90s.  Right?

15  **A.  Yes.**

16  Q.  So this is in 2012.  So in that time period, do

17  you recall --

18  **A.  Okay.**

19  Q.  It's not a big deal, but you mentioned it, so

20  I'm asking, because I thought it was actually two

21  months.

22  **A.  7 --**

23  Q.  47 or something?

24  **A.  -- 47 or 48, something like that.  Yeah.**

25  Q.  So this would have been two months?

1     **A.  Two months.**

2     Q.  Okay.  It's not a big deal.  I thought it was

3  two months and you said one.  So I'm just clarifying.

4       All right.  So the next page is also a

5  November 12th letter.  Just so we're on the same page,

6  I'm looking at CALIBER 0591 on the bottom right hand.

7       Going to the next page, it's another letter in

8  November talking about the delinquent account.

9       Then on the next page, we go to December 17,

10  2012.  And this is another letter saying, "The amount to

11  bring your loan current is $2,241.60."

12      Do you dispute that your account was past due by

13  that amount in December of 2012?

14     **A.  According to their letters, no, I don't dispute**

15  **that.**

16     Q.  All right.  And then there is a letter -- the

17  next letter is from November 2013.  And the subject line

18  says, "Loss mitigation hardship assistance."  Is this a

19  general letter, to your understanding, or were they

20  responding to your request for loss mitigation hardship

21  assistance?

22     **A.  No, I didn't request any.**

23     Q.  Okay.  And they say here -- without reference to

24  any numbers, they just say, "As you are probably aware,

25  your account is currently past due."

1     A.   Um-hmm.

2     Q.   Do you have any reason to believe that wasn't

3   true back in November 2013?

4     A.   No.

5     Q.   Okay.  Now, May of 2014 is the next letter.

6   Very similar in format to the previous letter we just

7   looked at where it references loss mitigation hardship

8   assistance.  And this is the same thing.  It's an

9   unspecific statement that you are probably aware your

10   account is currently past due.

11     A.   Correct.

12     Q.   Does that comport with your recollection that

13   you were past due in May of 2014?

14     A.   According to this letter, yes.

15     Q.   Well, do you have any reason to dispute that or

16   do you have any reason to believe that's not true?

17     A.   No.  Because there is a letter here saying I

18   was -- I had fallen behind several times.

19     Q.   Okay.  And I don't mean to run all this through

20   you.  I mean, I know you kind of said in the beginning

21   that you were, but I have to kind of get this.  We only

22   get one shot at you, so to speak, in terms of

23   deposition.

24     A.   Correct.

25     Q.   I know you said a few times that you never asked

1  for loss mitigation hardship assistance.  Why is that?

2  **A.  Whatever financial problems I had at the time, I**

3  **knew were short term.**

4  Q.  Okay.  So we're looking through letters now.

5  You had described this truck breakdown in 2012.

6  **A.  Um-hmm.**

7  Q.  And now we're in May of 2014, with a relatively

8  consistent sort of smattering of letters.  I don't even

9  know if I got all the letters, frankly.  Were you still

10  dealing with the truck breakdown in 2014?

11  **A.  With trucks, you always have a breakdown.**

12  Q.  So that's constant.  Right?

13  **A.  Occasionally, yeah.**

14  Q.  Well, hold on.  So it's not a constant.  It's a

15  regular -- it's not an unexpected occurrence.

16  **A.  No.**

17  Q.  Is that fair?

18  **A.  Correct.  It's not unexpected.  It just depends**

19  **on the severity.**

20  Q.  Okay.  So I've asked you a couple times, why

21  didn't you apply for loss mitigation hardship

22  assistance, and you said that you knew that your

23  hardship, I guess, was of a short duration.  Right?

24  Short term?

25  **A.  Correct.**

1     Q.  If I'm not summarizing your testimony correctly,
2  please don't hesitate to correct me.
3         So was your hardship based on periodic
4  breakdowns of your equipment or was there something else
5  going on?
6     **A.  In this time period?**
7     Q.  Yes.
8     **A.  Some equipment.  Weather has an impact on it,**
9  **too.  Wintertime, we get shut down.  Summertime, we get**
10 **shut down.  Fire season, whatnot.  A new business.  I**
11 **didn't have a large cash flow either.**
12    Q.  Oh, 2014.  You had started your business four
13 years earlier.  Right?
14    **A.  Right.**
15    Q.  That's what you mean by "new business"?
16    **A.  Right.**
17    Q.  Okay.
18    **A.  Or large cash reserve, I should say.**
19    Q.  Did you ever -- do you recall explaining your
20 circumstances to -- I'm calling it Beneficial, but
21 whatever the name was at the time?
22    **A.  Occasionally.**
23    Q.  Occasionally.
24        And did they ever reference or say, "Hey, you
25 can apply for hardship assistance"?

1     **A.  I don't think they referenced that.  I actually**

2   **make too much money for hardship assistance of any kind.**

3   **They just told me that a payment was due, and I either**

4   **made a payment or I told them that I would make one**

5   **shortly.  I tried the partial payment, they returned my**

6   **check.**

7     Q.  Yeah.

8     **A.  So --**

9     Q.  I think there is some kind of provision in the

10  Trust Deed that says that they're allowed not to accept

11  partial payments.  You mentioned you didn't know -- I

12  got a sense you were surprised by that when they

13  originally didn't do it.  I don't know if my impression

14  was correct.

15    **A.  They have the option of accepting or not**

16  **accepting.**

17    Q.  Okay.  And they elected not to?

18    **A.  Correct.**

19    Q.  All right.  Let's continue.

20     I'm at CALIBER 0649 at this point.  This is sort

21  of just a continuation.  These are very similar letters

22  from Beneficial to you.

23    **A.  Correct.**

24    Q.  This one is in October of 2014, referencing the

25  account being delinquent or past due.

1          The next letter is from December 2014, talking

2    about the overdue status of the account.

3          The next letter is also from December.  This one

4    says they've made numerous attempts to contact you

5    regarding your delinquent account.

6          **A.   Um-hmm.**

7          Q.   Do you recall periods of time when you might not

8    have been reachable or, for whatever reason, Beneficial

9    was trying to contact you, but you weren't available?

10         **A.   By mail?**

11         Q.   It doesn't specify how they tried to contact

12   you.  Were there time periods when you were perhaps

13   driving a truck and sort of out of pocket, as they say,

14   doing runs or anything like that?  Is that an aspect of

15   your employment?

16         **A.   Yes, I worked away from home.**

17         Q.   Okay.

18         **A.   I've been in areas where there is no cell**

19   **service.  And if I don't recognize the number, sometimes**

20   **I won't answer it.  In fact, most times anymore.**

21         Q.   Me, too.

22         **A.   Right.  Or I knew what they were calling about**

23   **and there really wasn't anything I could do at the time.**

24         Q.   All right.  Let's move on.  The next letter is

25   January 2015.  This one sort of says, "We are committed

1   to working with our borrowers who may be experiencing

2   financial difficulties."  So this is a sort of outreach

3   about this.

4          Did you respond at all at this point, in January

5   of 2015 or later with Beneficial, to take them up

6   perhaps on any overtures they were making regarding

7   hardship assistance?

8      **A.  I don't recall.**

9      Q.  The next page is a letter from May of 2015,

10  referencing your concern about your overdue status of

11  your account.  This one is saying the amount due is

12  $2,316.32.  As you sit here today, do you have any

13  reason to dispute the statement of the overdue status of

14  the amount in this letter?

15     **A.  No.  But it means it's not overdue from**

16  **January 2nd, 2015 anymore.**

17     Q.  And why do you say that?  Walk me through

18  your --

19     **A.  Well, because of the balance.**

20     Q.  So are you using that number, like seven hundred

21  and change?

22     **A.  $2,316 from January 2nd to May 12th, in 2015, at**

23  **six and a quarter percent interest.**

24     Q.  I'm doing rough calculations.

25     **A.  Right.**

1    Q.  It seems like this is about three months.

2    A.  Correct.

3    Q.  Three months.  Okay.

4        So that's what we were talking about before,

5    this kind of a rolling situation of 30, 60, 90 days.

6    A.  Correct.

7    Q.  That's fine.  I appreciate your candor.

8        Let's go to the next page.  This is another May

9    2015 letter.  This is a few days later.  I meant to ask

10   you about this, so I'll take this opportunity now.  I'm

11   referencing the Bates number with the two letters from

12   May from Beneficial to you.  One is CALIBER 0615; one is

13   CALIBER 0635.

14   A.  Um-hmm.

15   Q.  The first is dated May 12th -- we were just

16   looking at that -- where the current amount due that

17   they're saying is $2,316.32.

18   A.  Correct.

19   Q.  Then they send you another letter a couple

20   weeks -- ten days later, and it's May 22nd, 2015, and

21   they say the current amount due is $2,391.04.  Do you

22   see that?

23   A.  Yep.

24   Q.  It's a little more.  Do you have any

25   understanding as to why the amount due increased in that

1  ten-day period?

2  **A.  Without doing the math, no.  How much did it**

3  **increase exactly?**

4  Q.  I don't know.  But are you familiar with the

5  simple daily interest mechanism that applies to your

6  line of credit?

7  **A.  Yep.**

8  Q.  So I didn't do the math either, but I was sort

9  of curious if you were familiar with that.  I would

10  hazard a guess that that's probably what it is, is

11  they're just adding the interest from the ten days.  I

12  don't know if that's true or not.

13  **A.  That would be double dipping then; because the**

14  **next time a payment is due, they'd be adding that same**

15  **interest to it.**

16  Q.  I don't know if they would be adding the same

17  ten-day period.  I think they just add up how many days

18  have elapsed since the last time.  So I think it's

19  whatever the date is, it's going to have incrementally

20  more -- a higher number.

21        But in any case, do you feel that Beneficial was

22  double dipping?  I'm just using your terminology.

23  **A.  That would be where a mortgage audit would be**

24  **handy; wouldn't it?**

25  Q.  That doesn't answer my question.  My question to

1  you is, do you think that Beneficial was double dipping,

2  or are you saying you have no idea and that you would

3  need to do a mortgage audit to form an opinion on that?

4      A.  I don't know how they would increase that

5  balance in a month --

6      Q.  In ten days.  Right?

7      A.  -- and then have another payment due, without

8  double dipping.

9      Q.  So, as you sit here today, are you expressing

10  some skepticism about these two numbers --

11      A.  Absolutely.

12      Q.  -- in these two May 2015 letters from

13  Beneficial?  Okay.

14      A.  And I have requested a mortgage audit and it

15  wasn't given to me.

16      Q.  From Beneficial?

17      A.  No.

18      Q.  From who?

19      A.  Caliber.

20      Q.  Okay.  From anyone else?

21      A.  Rushmore.

22      Q.  Did they give it to you?

23      A.  No.

24      Q.  And what is a mortgage audit, just so I

25  understand your terminology?

1    A.  A mortgage audit, you go through and recalculate

2    the entire payment history, with the daily periodic and

3    when payments posted and everything else.

4    Q.  So for a mortgage audit, would you have to

5    provide proof of payment of every time you made payment

6    so they'd have the credits and debits columns both

7    covered?  I'm maybe using those terms loosely, because

8    I'm not an accountant.  I would think, for an audit,

9    they need to analyze the payments that you're saying you

10   made, and then factor in how that affects the repayment

11   obligations under the line of credit agreement.

12        MR. HATHAWAY:  I object to the form of the

13   question.  If you've got a question, just ask the

14   question.

15        MR. ABBOTT:  Got it.  You made an objection.

16        **THE WITNESS:  It's a confusing one; isn't it?**

17   BY MR. ABBOTT:

18   Q.  It's not, actually.

19   **A.  The mortgage company has provided a spreadsheet,**

20   **but it's not a mortgage audit.**

21   Q.  Let me ask you a different way.  For a mortgage

22   audit, do you need to provide the proof of every payment

23   you've made?

24   **A.  If someone requested me for one, yes.**

25   Q.  Okay.

1    A.  But I don't calculate the interest and all the

2  other things.

3    Q.  Yes.  There is information that's beyond your

4  possession that needs to be added for that audit.

5    A.  Correct.

6    Q.  What you bring to it is the proof of all the

7  payments you made.

8    A.  Correct.

9    Q.  You agree with that.

10    A.  Not entirely.

11    Q.  You're saying correct, so I'm not sure now what

12  you mean by "correct."

13    A.  Well, I'm not in the business of accepting money

14  from people.  I'm just making a payment on a loan.

15  Mortgage companies accept money from people for these

16  mortgages, and they calculate interest and charge fees

17  and everything else.  So that is their business to keep

18  accurate records.

19    Q.  Okay.  I'm going to move strike as

20  non-responsive.  We can move on.

21    All right.  So I'm at Caliber 0643.  And let's

22  go to -- well, this is June 2015 where Beneficial is

23  saying you're probably aware your account is currently

24  past due.  As you sit here today, do you have any reason

25  to dispute that your account was past due in June of

1    2015?

2    **A.  Nope.**

3    Q.  All right.  Going to the next page, it's a

4    letter from Beneficial to you dated September 4, 2015.

5    **A.  Um-hmm.**

6    Q.  And there is a statement there that says, "This

7    is notice of breach under the terms of the Note and

8    Mortgage/Deed of Trust for this account because we have

9    not received the payments that were due on or after

10   May 1, 2015.  To correct this breach, the total amount

11   of $4,856.80, in the form of certified funds, must be

12   received in our office no later than October 4, 2015."

13        Do you see that?

14   **A.  Yes, I do.**

15   Q.  Do you recall receiving this letter?

16   **A.  No.**

17   Q.  As you sit here today, do you have any reason to

18   dispute that your account was past due in September of

19   2015?

20   **A.  No.**

21   Q.  Do you dispute the amount or the timing of the

22   delinquency as it's stated in Beneficial's letter?

23   **A.  No.**

24   Q.  Let's go to the next letter.  This is a letter

25   dated December 12, 2015.

1    A.  Um-hmm.

2    Q.  This is a more generic letter saying, "We are

3  concerned about the overdue status of your account," and

4  says your current amount due is $1,494.40.  So it looks

5  like, at this point, you must have submitted some

6  payment, because you brought it within the 60 days past

7  due.

8    A.  Correct.

9    Q.  Do you agree with that?

10    A.  I agree.

11    Q.  All right.  Let's go to the next letter, which

12  is December 22nd, 2015.  This is again a reference to

13  making numerous attempts to contact you regarding your

14  delinquent account.  They're saying that your account is

15  past due for $1,569.12.  So do you dispute anything in

16  this letter, as you sit here today?

17    A.  No.

18    Q.  Okay.  The next letter is marked CALIBER 0684,

19  dated January 3rd, 2016, a letter from Beneficial to

20  you.  Do you recall this letter at all?

21    A.  Specifically, no.

22    Q.  Were you receiving mailings from Beneficial

23  during the time periods that we have this exhibit --

24    A.  All of this exhibit.

25    Q.  Yes.

1    A. Yes.

2    Q. You were receiving mailings from them?

3    A. Correct.

4    Q. So you don't remember specifically any of these

5 letters. Right?

6    A. No.

7    Q. As you sit here today, you don't have any reason

8 to dispute that you probably received them?

9    A. Correct.

10    Q. All right. Going back to CALIBER 684, do you

11 recall contacting or having any communications with a

12 Regina Williams at Beneficial?

13    A. No.

14    Q. Do you recall having communications with

15 Beneficial in early 2016 about -- they're referring to

16 it as you were experiencing financial difficulties?

17    A. I have talked with several Beneficial

18 representatives, but I don't recall exactly when, what

19 year, what month or anything like that.

20    Q. And you talked to them about experiencing

21 financial difficulty?

22    A. Correct. Correct.

23    Q. Sort of what was -- can you just sort of

24 summarize how the conversations went. What did you talk

25 to them about?

1    A.  Specifically, no.  But I imagine they told me I

2  was behind, about loss mitigation.  I told them, "No,

3  I've got a check coming, I'll take care of this as soon

4  as possible."

5    Q.  All right.  Let's go to CALIBER 0639.  It's the

6  next page of this Exhibit 11.

7    A.  Um-hmm.

8    Q.  It's a letter dated January 13, 2016, from

9  Beneficial to you.  It again just references your

10  account being currently past due, but it doesn't really

11  mention any amount.

12    A.  Um-hmm.

13    Q.  It's more of an invitation to, I think, apply

14  for loss mitigation hardship assistance.

15    A.  Correct.

16    Q.  Now, this letter, as all the other letters that

17  talk about hardship assistance in this exhibit, they

18  list loan modification, short sale, deed in lieu.  Did

19  you ever consider doing a short sale or deed in lieu for

20  the property?

21    A.  No.

22    Q.  Do you understand those terms?  Are you familiar

23  with those terms?

24    A.  Yes.

25    Q.  What's your understanding of the term "short

1  sale"?

2  A.  I really never paid that much attention to it.

3  I believe that -- where they sell it; and if you're

4  short, they absorb the loss or something like that.

5  Q.  Okay.  And what about -- what's your

6  understanding of deed in lieu?

7  A.  I really haven't looked into that.

8  Q.  Okay.  And what's your understanding of loan

9  modification?

10  A.  Loan modification, they adjust your interest

11  rate, your terms, stuff like that.

12  Q.  All right.  And under your understanding of loan

13  modification, do you have to submit any financial

14  documentation to the lender?

15  A.  I have no idea.

16  Q.  Did you have any concern about documenting your

17  finances?

18  A.  No.

19  Q.  Do you file taxes?

20  A.  Yeah.

21  Q.  Okay.

22  A.  I think if you look at some of these letters,

23  every time a new representative came on board, they sent

24  out these same letters.

25  Q.  There is a form to it that certainly is

1  repeating.

2      **A.  Yeah.**

3      Q.  I did notice that the representative's name

4  changed.

5      **A.  Right.  It's a, "Hello, I'm such and such, we're**

6  **here to help you."  This is it, basically.**

7      Q.  I will represent, I don't think I pulled every

8  single letter Beneficial sent you.  I just sort of

9  pulled some.  It feels a bit like beating a dead horse

10  to pull everything, but I wanted to get a sense of the

11  timeline.

12          All right.  Let's go to the next one, which is

13  very close to the end of this.  This is a letter from

14  June of 2016.  This is the same format as the previous

15  letter.  It looks like the representative may have

16  changed.  I don't know.  Yeah, Robert Williams instead

17  of Regina Williams.

18      **A.  Right.**

19      Q.  So let's go to the next letter, which is, I

20  think, the last letter in this Exhibit 11.  This is a

21  letter from Beneficial to you, dated July 15, 2016.  It

22  says, "Notice of Servicing Transfer."

23      **A.  Correct.**

24      Q.  And it talks about the servicing of the loan

25  changing effective July 31, 2016.  Do you see that?

1    A. Yep.

2    Q. So around this time, what was your -- do you

3    recall -- you may not, but do you recall the status of

4    your line of credit, like how many -- were you current

5    or were you -- how many months were you past due?  Do

6    you remember?

7    **A. I think I was fairly past due.**

8    Q. Okay.

9    **A. This was due to an illness.**

10   Q. Can you explain, please.

11   **A. I came down with a cold in October, November --**

12   **yeah, cold in October that turned to pneumonia in**

13   **November, and I was just down -- I think I finally went**

14   **back to work still sick in January, and then was**

15   **involved in an accident with my truck.  So my truck was**

16   **down for -- it took my insurance company two or three**

17   **months to finally get settled up with me.**

18   Q. That's an unusual set of circumstances.

19   **A. Yeah.**

20   Q. I mean, fixing an engine or doing this and

21   that --

22   **A. Right.**

23   Q. -- that you were describing earlier.

24   **A. Right.**

25   Q. Okay.  So it may be like late 2015, your account

1  might have been due for --

2  **A.  Started going behind again.**

3  Q.  Okay.  Got it.

4  **A.  And that's when Caliber took it over was after**

5  **that.**

6  MR. ABBOTT:  Got it.

7  Well, I'm going to break for a restroom break.

8  We've just gone through Exhibit 11 --

9  MR. HATHAWAY:  For the record, I want -- I

10  object to the relevance of Exhibits 4 through 11.  I

11  just don't --

12  MR. ABBOTT:  Relevancy is not waived.  You don't

13  need to object for the record.

14  MR. HATHAWAY:  Okay.

15  MR. ABBOTT:  You don't waive relevancy.

16  MR. HATHAWAY:  Okay.

17  MR. ABBOTT:  I mean, if you're trying to

18  communicate something to your client to contour his

19  testimony, then you might make a relevancy objection in

20  a deposition.  If you're really just trying to preserve

21  objections, relevancy is not waived.

22  MR. HATHAWAY:  Okay.  Good.

23  MR. ABBOTT:  Yeah, so good job.

24  MR. HATHAWAY:  Then we're good.

25  MR. ABBOTT:  Make notes.  You're getting a lot

1  of coaching, sir.

2       We're going to take that restroom break.

3       That's warning No. 2, by the way, for coaching

4  the witness.

5       (Recess taken from 11:45 to 12:00.)

6       MR. ABBOTT:  We can go back on the record.

7  BY MR. ABBOTT:

8  Q.  We left off before the break, going through

9  Exhibit 11.  And the last page of that exhibit is a

10 letter from Beneficial, advising you of the transfer of

11 servicing to Caliber Home Loans.

12      This was the first time that your contact for

13 making payments or anything about the line of credit

14 changed.  Right?

15 **A.  Correct.**

16 Q.  It was Beneficial sort of -- and its various

17 successors in interest --

18 **A.  Correct.**

19 Q.  -- from the origination until this time in 2016.

20 Right?

21 **A.  Correct.**

22 Q.  Okay.  Had you, in any other -- had you ever had

23 the experience of a loan servicer changing on a line of

24 credit or a mortgage loan in your life before?

25 **A.  No.**

1    Q.  Did you have any questions about this, what it
2  meant or anything like that?
3    A.  No.
4    Q.  And this letter from Beneficial -- just going to
5  Exhibit 11 on the last page for a moment -- it states
6  that you're to send all payments due on or after
7  8/1/2016 to Caliber Home Loans at P.O. Box 650856,
8  Dallas, Texas.  Did you make a note of that?  Did you
9  notice that instruction in this letter?
10    A.  I did.
11    Q.  Okay.  And when was the first payment -- as you
12  can best recall sitting here today, when was the first
13  payment that you sent to Caliber on the line of credit?
14    A.  I believe the first payment was made the 1st of
15  December or something, somewhere around there, when it
16  was due.
17    Q.  December 2016?
18    A.  Correct.
19    Q.  And at that point, you were about a year behind.
20  Is that right?  Going back to December or so of 2016.
21    A.  I don't know exactly how far.
22    Q.  Okay.  According to the amount, it would
23  probably be about right.
24       (Exhibit 12 marked for identification.)
25  BY MR. ABBOTT:

1     Q.  I'm marking as Exhibit 12, a letter from Caliber

2  to you.  This is a Notice of Servicing Transfer dated

3  August 9, 2016.  Do you recall receiving this letter?

4     **A.  Yes.**

5     Q.  Okay.  And this letter has the same instruction

6  to send all payments on or after August 1st to Caliber

7  Home Loans instead of Beneficial at that P.O. box.  Do

8  you see that?

9     **A.  On the second page.**

10     Q.  Yes.

11     **A.  Yeah.**

12     Q.  Okay.  Do you recall receiving this letter?

13     **A.  Yes.**

14     Q.  Okay.

15     **A.  I also recall the first page, too.  "If you**

16  **filed a bankruptcy petition and there is either an**

17  **'automatic stay' in effect, or you received a discharge**

18  **from the bankruptcy court of your personal liability:**

19  **Caliber will not pursue collection on your mortgage..."**

20     Q.  From you personally.

21     **A.  Right.**

22     Q.  "This is for informational purposes only."

23     **A.  Um-hmm.**

24     Q.  Et cetera.  So the document speaks the itself.

25  But you're reading the cover page here of Exhibit 12?

1    A.  Correct.

2    Q.  That's marked CALIBER 0027.  Okay.

3        Is there something -- why do you point out this

4    language?

5    **A.  Well, because Caliber claims that I have a**

6    **bankruptcy filed under my name.  If I have a bankruptcy**

7    **filed, why are they trying to collect from me or why**

8    **were they trying to collect from me?**

9    Q.  I don't think they ever claimed the bankruptcy

10   was filed under your name, though.  They claimed the

11   bankruptcy was filed and they identified the name of

12   somebody else.  No?

13   **A.  Why is that associated with me?**

14   Q.  Because you have a Social Security number that

15   was used to file the bankruptcy.

16   **A.  And they never provided me with that information**

17   **after I requested it.**

18   Q.  All right.  We'll get to that.

19   **A.  Okay.**

20   Q.  So your point being that -- let's go back to

21   that.  I want to make sure I understand the relevancy of

22   this language for you.

23       That Caliber said that they would not -- if you

24   file a bankruptcy or if you receive a discharge, Caliber

25   would not pursue collection on your mortgage loan from

1  you personally.  So what's your understanding of that?

2  Is it that you didn't have to repay the loan if they

3  think you were in bankruptcy?

4      **A.  I don't understand the importance of the**

5  **message.  They're saying that if I filed bankruptcy,**

6  **Caliber will not pursue collection on my mortgage.**

7      Q.  Personally.  Right?

8      **A.  Personally, yeah.**

9      Q.  Okay.  But do you think that if Caliber thought

10  that you had filed bankruptcy or gotten a discharge in

11  bankruptcy, that you would no longer have to pay the

12  loan back to Caliber?

13      **A.  I'm not sure what to think, because I didn't**

14  **know I had a bankruptcy.  I just know that Caliber kept**

15  **my loan in default even after I brought it current**

16  **because of a bankruptcy that was filed on my name.  So**

17  **Caliber obviously thinks I filed bankruptcy.**

18      Q.  What do you mean, kept your loan in default.

19  Can you explain what you mean by that.

20      **A.  You've read it.  You know what's going on.**

21      Q.  No, that's not how it works here.

22      **A.  Oh, right.  For the Court.  Sorry.**

23      Q.  We're doing discovery.  So I've got to

24  understand it.

25      **A.  Got it.  Okay.**

1          The first payment was to bring my loan out of

2     default to Caliber in December.

3          Q.  In December 2016?

4          A.  Correct.

5          Q.  Okay.  Go on.

6          A.  Caliber put me in default because of a

7     bankruptcy filed under my Social Security immediately.

8          Q.  So after December 2016 when you sent that -- I'm

9     going to call it $8,000 and change lump sum payment,

10    when was the next time that you tendered a payment to

11    Caliber on the line of credit?

12         A.  Oh, February or March.  I never heard from them

13    again.

14         Q.  February or March.  Okay.

15         So is it fair to say you don't remember, as you

16    sit here today, exactly whether it was February or March

17    of 2016 that you next submitted a payment to Caliber?

18         A.  Right at this moment, no.

19         Q.  Do you have any record that you can refer to

20    that would refresh your memory on that?

21         A.  I didn't bring anything, no.

22         Q.  That's not my question.  Do you have any records

23    that you might refer to that would refresh your memory

24    on that?

25         A.  Yes.

1    Q.   Okay.  Can you describe those records, please.

2    **A.   Bank statement.**

3    Q.   Bank statement from where?

4    **A.   Banner Bank.**

5    Q.   So it's a bank statement from what month and

6    year?

7    **A.   March or April of 2016.**

8    Q.   And that would have included payments you had

9    made in January, February, or March of --

10   **A.   There are no payments made in January or**

11   **February.**

12   Q.   Okay.  So it would indicate payments made in

13   March of 2016.

14   **A.   Correct.**

15   Q.   And you didn't make any payments in January or

16   February.

17   **A.   I never received a payment notice.**

18   Q.   Okay.

19   **A.   So no, I did not make payments.**

20   Q.   Okay.  You didn't make payments.

21   **A.   Is that how you want me to say it?**

22   Q.   Well, I just want you to answer the question.

23   It's the say it works.

24   **A.   Okay.**

25   Q.   I'm just trying to clarify here.  Because

1  earlier, you weren't -- I asked you what you recalled,

2  and you weren't sure if it was February or March that

3  you made your next payment.

4  **A.  And I'm still not sure.**

5  Q.  You're still not sure.

6     So the records you might look at to refresh your

7  memory might also include your February 2017 bank

8  statement from Banner Bank, because that would clear up

9  whether you made a payment in February.  Right?

10  **A.  No.**

11  Q.  Why not?  Where am I getting that wrong?

12  **A.  Well, yeah, I'm not sure when I made the payment**

13  **at this point.**

14  Q.  Okay.  Do you have the bank statements from

15  Banner Bank for January, February, and March 2017?

16  **A.  Yes.**

17  Q.  I'll represent, I think Caliber's records show a

18  payment in March 2017.

19  **A.  Okay.**

20  Q.  I'm trying to understand, I think, based on the

21  questioning this last few minutes or so, whether you

22  would dispute that or not.

23  **A.  No.**

24  Q.  Okay.

25  **A.  Not at this time.**

1    Q.  Okay.  You would need to refer back to your bank

2  statements to figure out whether you dispute it.

3    **A.  Correct.**

4    Q.  So we can't answer that question today.  That

5  has to be left open as an open question.

6    **A.  Okay.**

7       MR. ABBOTT:  Fair enough.

8       Okay.  Let's move on then.

9       (Exhibit 13 marked for identification.)

10  BY MR. ABBOTT:

11    Q.  I'm going to mark as Exhibit 13, a letter from

12  Caliber to you, dated August 12th, 2016.  Do you

13  recognize this document?

14    **A.  Yes.**

15    Q.  All right.  What is your understanding of this

16  Exhibit 13?

17    **A.  I really didn't understand it.**

18    Q.  So do you recall receiving this sometime in

19  August of 2016?

20    **A.  Yes, I remember seeing it, yes.**

21    Q.  Okay.  And is there anything about this letter

22  that you don't agree with?

23    **A.  I really didn't pay that much attention to it**

24  **when I got it.**

25       MR. ABBOTT:  Fair enough.  Fair enough.

1          Okay.  I appreciate your candor.

2          (Exhibit 14 marked for identification.)

3    BY MR. ABBOTT:

4     Q.  I'm going to mark as Exhibit 14, a letter from

5    Caliber to you, dated October 31, 2016.  Do you

6    recognize what I've marked as Exhibit 14?

7     **A.  I do.**

8     Q.  Okay.  Can you explain what this is.

9     **A.  It looks like payments past due.  This is the**

10    **balance of my first payment to cure the default to my**

11    **loan.**

12    Q.  All right.  And this letter is a little

13    different than Beneficial's letters to you.  Right?

14    Because this is giving you sort of an itemization month

15    by month, and Beneficial gave you just sort of lump sum

16    numbers.  Right?

17    **A.  Correct.  Beneficial's lump sum number was just**

18    **for two or three months at a time.**

19    Q.  Yeah, I think your delinquency had gotten longer

20    this period because you had gotten ill, and then you had

21    the accident.  Right?

22    **A.  Right.**

23    Q.  All right.  So in the second paragraph, it

24    states, "You have a right to cure your default.  To cure

25    the default, you must pay the full amount of the default

1  on this loan by December 5, 2016."

2     A.  I do.

3     Q.  Okay.  And then it states that the total amount

4  required to cure the default is $8,930.29.

5        Now, your monthly payment went down in September

6  of 2016, it looks like.  Do you know or are you familiar

7  with how the interest is calculated on the line of

8  credit?

9     A.  Daily.  Yes.

10    Q.  But are you familiar with how the interest

11 amount is determined?

12    A.  On the billing cycle?  The interest amount on

13 the billing cycle?

14    Q.  The percentage rate.

15    A.  Oh, the percentage rate.

16    Q.  Sorry.  Yes, the percentage rate.

17    A.  Yeah.  Annually divided by the interest rate

18 kind of.

19    Q.  Well, it's actually quarterly, and it's in

20 reference to an index which is a number that I think

21 under the line of credit agreement --

22        MR. HATHAWAY:  Objection.

23        MR. ABBOTT:  I'm sorry.  I'm just going to

24 continue.

25 BY MR. ABBOTT:

1    Q.  So it's a line of credit agreement.  It states

2    that it's an index, which is a number that's published

3    by Bank of America.

4        **A.  Um-hmm.**

5        Q.  And then there is a margin amount that's added

6    to that.  Okay?  Are you familiar with how that works?

7    We can go to Exhibit 3 -- or Exhibit 2, to look at that.

8        **A.  No.  I'm familiar how that works.**

9        Q.  Okay.  So you understand that.

10       So then it may change quarterly or whenever Bank

11   of America's number changes.

12       **A.  No.**

13       Q.  Okay.  So let's look at Exhibit 3, because I

14   don't think you understand --

15       **A.  Yes, I do.  There is four times a year that that**

16   **interest rate can change.**

17       Q.  Okay.

18       **A.  And whatever it is -- and I forget what month it**

19   **is -- I think the end of December or the 1st of**

20   **December -- whatever the interest rate is at that point**

21   **is how they calculate the interest for the remaining**

22   **quarter or the following quarter.**

23       Q.  By adding a margin rate to the --

24       **A.  Correct.**

25       Q.  Okay.  So it does sound like you understand it.

1    A.  Right.  But there is a specific date, it's not

2  just quarterly.  And it's like the 1st of -- I forget

3  what month.

4    Q.  I don't remember either, but it is -- it does

5  work that way.

6    A.  Yeah.

7    Q.  I think we agree.

8    A.  Yeah.

9    Q.  There is a specific date that's fairly certain.

10    A.  Correct.

11    Q.  And it actually describes it by steps.

12    A.  Right.  But it's not whenever Bank of America's

13  rate changes.

14    Q.  No.

15    A.  It's a specific date.

16    Q.  Yes.

17    A.  That's what you said, whenever Bank of America's

18  interest rate changes.

19    Q.  If I said that, I misspoke.

20    Right.  So there is specific predefined change

21  dates.

22    A.  Correct.

23    Q.  And the reference point is -- when there is a

24  change date, they look to whatever is the current number

25  that Bank of America has, then they add the margin.

1    A.  Correct.

2    Q.  I think we're on the same page then.

3    A.  Yeah.

4    Q.  Your attorney objected that it was irrelevant,

5    the calculation of the monthly payment amount.  Do you

6    agree with that, that that's irrelevant to your case?

7    A.  I'm going to abstain.

8    Q.  Okay.  So I think if your attorney objected to

9    relevancy, maybe you need to dismiss the case right now,

10   because --

11        MR. HATHAWAY:  Objection, counsel.  Ask

12   questions --

13        MR. ABBOTT:  I'm confused here.

14        (Overlapping speakers.)

15        THE REPORTER:  I can't hear you both at the same

16   time.

17        MR. ABBOTT:  He's got to yell a little bit.  Go

18   ahead, Steven.

19        MR. HATHAWAY:  Objection.  We're at a

20   deposition.  Ask him questions.  Don't explain to him or

21   try to explain to him what the meaning of the documents

22   are and try to lead him into an answer.

23        MR. ABBOTT:  Okay.

24        MR. HATHAWAY:  Ask him questions.

25        MR. ABBOTT:  So I'm going to respond that that's

1   an untrue statement, what you're describing as what I

2   was doing.

3          But I do think that you are obliged to dismiss

4   this lawsuit, because you have objected to relevancy

5   regarding the calculation of the amounts due under the

6   loan.  That's pretty much what you put in your complaint

7   as being one of the core issues.  But you've admitted

8   now, through your objection, Steven, that actually it's

9   not relevant.  So I'm going to ask that you do that.

10  And we'll follow up and see if you comply with your

11  Rule 11 obligations.

12         MR. HATHAWAY:  I can give you an answer now.

13  BY MR. ABBOTT:

14     Q.  So moving on to Exhibit 14 -- or back to

15  Exhibit 14.  I'm going to direct the witness' attention

16  to it.

17         You received this in early November 2016.  Would

18  that be fair?  Do you remember when you received this

19  letter?

20     **A.  It had to have been.**

21     Q.  Okay.  Because it's dated the very last day of

22  October.

23     **A.  Um-hmm.**

24     Q.  Do you recall what, if any, actions you took in

25  response to getting this letter from Caliber?

1     A.   No.  I don't believe I took any actions.

2     Q.   I'm sorry?

3     A.   I don't believe I took any actions to the letter

4   other than making the payment before it was due.

5     Q.   Okay.  Do you have any -- the itemization of

6   amounts due here only goes to November 1, 2016.  Yeah,

7   November 1, 2016.  Do you see that?

8     A.   Yes.

9     Q.   There is a list, and there is no allocation or

10   reference to December 1, 2016.  What's your

11   understanding of what would happen with the December 1,

12   2016 payment?

13     A.   I would receive a statement for December's

14   payment.

15     Q.   Well, so it was your understanding that this

16   $8,930.29 did not include the December 1, 2016 payment?

17     A.   Yes.

18     Q.   Okay.  So to bring the loan current through and

19   including December of 2016, you would have to submit

20   more than the $8,930.29.  Is that correct?

21     A.   No.  The $8,900 payment brought the loan current

22   to the end of November.  There would not be a payment

23   due until December.

24     Q.   Right.

25     A.   And there was never an invoice sent for

1   December's payment.

2      Q.  Okay.  I'll move to strike the last part as

3   non-responsive.

4         So you don't disagree that this letter is only

5   addressing your obligations -- your past-due obligations

6   through the end of November 2016.

7      A.  Correct.

8         MR. ABBOTT:  Okay.

9         (Exhibit 15 marked for identification.)

10  BY MR. ABBOTT:

11     Q.  I'm going to mark as Exhibit 15, a one-page

12  document that appears to be a copy of a check.

13        Do you recognize what I have marked as

14  Exhibit 15?

15     A.  Yes.

16     Q.  All right.  What is this?

17     A.  That is the check that I mailed to cure the

18  default on my loan.

19     Q.  Okay.  So this check is dated December -- I

20  can't tell.  There are several dates on the top of this

21  letter.  There is a December 8th, 2016 date; there is a

22  December 2nd, 2016 date; there is a December 13th, 2016

23  date.  Do you recall when you mailed this to Caliber?

24     A.  December 2nd.

25     Q.  And do you recall where you mailed it?

1    A.  From the Post Office.

2    Q.  Do you recall to where you mailed it, like what

3    address at Caliber that you sent it to?

4    A.  **The payment center in Texas.  The exact address,**

5    **I don't know.**

6    Q.  Do you have any documentation showing that you

7    mailed this or how you mailed it?

8    A.  **Just that they received it.**

9    Q.  I'm going to move to strike as non-responsive.

10       So you don't have any documentation that shows

11   how you mailed this to Caliber.  Is that right?

12   A.  **Not with me at this time.**

13   Q.  When I ask you if you have anything, I'm not

14   asking in this room.

15   A.  **Okay.**

16   Q.  I'm just asking -- let me be clear with that.

17   With that clarification, could you answer the question,

18   please.

19   A.  **I'm not sure.**

20   Q.  Okay.

21   A.  **I have some return of service records, but I'm**

22   **not sure if I did that with this check.**

23   Q.  Okay.  For context, I don't mean to be giving

24   you a hard time, but we served discovery requests

25   earlier in the case, production of documents.  We didn't

1  receive things that you've testified to as documentation

2  you could rely on to testify.  So at the end of this

3  deposition, I'll give your attorney an opportunity to

4  rectify that.

5    **A.  What -- oh, as far as -- okay.**

6    Q.  So when was this check negotiated or when did it

7  show as being cleared from your account?  Do you recall?

8    **A.  No, I don't recall.**

9    Q.  Are you familiar with the information that

10  appears on I think what is a copy of the back of the

11  check, the second box on Exhibit 15?  It looks like it's

12  a copy of the back.  Do you see that?

13    **A.  Yeah.**

14    Q.  Sequence: 5; Department: 022903; Date:

15  December 13, 2016.  Do you see that?

16    **A.  I do see that.**

17    Q.  There is also a date of stamping of December 8,

18  2016.  It's a little harder to see.  Do you see that?

19    **A.  Yep, I do.**

20    Q.  Do you have any understanding of what these

21  stamps mean?

22    **A.  Not really.  One is probably --**

23    Q.  Don't guess.  I don't think I understand either.

24      And you don't recall what your bank records from

25  the bank on which you wrote this check -- I guess Skagit

1  State Bank is probably Banner Bank.  Right?

**2**      **A.  Correct.**

3      Q.  You don't recall, as you sit here today, what

4  your records show as when these funds cleared?

**5**      **A.  No.**

6      Q.  But you have bank records from December 2016

7  that you can refer to, to refresh your memory.

**8**      **A.  Yes.**

9      Q.  Do you recall if you sent -- you said you went

10  to the U.S. Post Office.  I had asked you how you mailed

11  this.  Am I remembering that correctly?

**12**      **A.  Yes.**

13      Q.  What service did you use to send it to Caliber?

14  Do you remember?

**15**      **A.  No.**

16      Q.  So you didn't send it by Fed Ex or UPS overnight

17  or anything like that; did you?

**18**      **A.  No.**

19      Q.  Let's go back to Exhibit 14, which is that

20  letter from October 31, 2016, from Caliber to you.  Then

21  go to the second page.  The second page of Exhibit 14.

22  All right.  And the first paragraph -- can you read that

23  into the record, please.

**24**      **A.  "You can cure this default by making a payment**

**25**   **of $8,930.29 by 12/05/2016."**

1     Q.  Go ahead.  Just continue with that paragraph,

2  please.

3     A.  "Please note any additional monthly payments,

4  late charges and other charges that may be due under the

5  Note, Security Instrument, and applicable law after the

6  date of this notice must also be paid to bring your

7  account current.  You may contact our Loss Mitigation

8  Department at (800) 621-1437 to obtain updated payment

9  information.  This letter is in no way intended as a

10  payoff statement for your mortgage..."

11     Q.  That's good.  Thank you.  I appreciate that.

12         Did you ever call the 1-800 number to obtain

13  updated payment information?

14     A.  No.

15     Q.  Okay.  And when I say that, I'm asking at any

16  time that Caliber was servicing it, did you ever call

17  that number?

18     A.  That number, I don't know.  I've called several

19  numbers.

20     Q.  Did you ever call Caliber to obtain updated

21  payment information at any number?

22     A.  Yeah.  I called several numbers to get a payment

23  invoice sent to me.

24     Q.  Okay.  I'll move to strike as non-responsive.

25         Did you ever call Caliber to ask them for

1  updated payment information; in other words, how much

2  you had to submit by a certain date to bring the loan

3  current?

4      **A. No, I paid it.**

5      Q. No, you never called them to ask them for that

6  information?

7      **A. No.**

8      Q. Okay.  I understand.

9          Did you ever contact Caliber to dispute the

10 calculation of the amount of the delinquency in this

11 letter that's dated October 31, 2016?

12     **A. No.**

13     Q. Did you ever call -- there is a third

14 paragraph -- I'm just kind of going through some of

15 these paragraphs on the second page of Exhibit 14 --

16 there is a paragraph, sort of the second or third

17 paragraph, that says, "If you are unable to bring your

18 account current, Caliber Home Loans, Inc., offers

19 consumer assistance programs designed to help resolve

20 delinquencies and avoid foreclosures," and it provides

21 an 800 number and the days and times that people are

22 available.  And it states, in all capital letters, "We

23 are very interested in assisting you."

24         Did you ever contact Caliber for assistance for

25 dealing with the financial difficulties in repaying the

1 line of credit?

2 **A. No. Because I brought it current.**

3 Q. So no, you didn't ever contact Caliber to get

4 assistance in terms of a loan mod or anything like that.

5 Correct?

6 **A. Correct.**

7 Q. I think you testified earlier that you were

8 paying the property taxes and insurance.

9 **A. Correct.**

10 Q. Did you ever fall behind on either of those?

11 **A. Yes.**

12 Q. Let's talk about insurance. When did you fall

13 behind on the insurance?

14 **A. I didn't.**

15 Q. I'm sorry?

16 **A. You brought both up together.**

17 Q. Oh. So just the taxes.

18 **A. Correct.**

19 Q. Okay. Sorry.

20 All right. So when did you fall behind on

21 paying the property taxes?

22 **A. I don't remember what year. When I found out**

23 **that they were overtaxing me. I had planned on suing**

24 **the County, because they were charging me a higher tax**

25 **rate than most other residents in the County.**

1    Q.  So let me unpack that for a moment.

2        You stopped paying the taxes to Skagit County?

3    **A.  Pronunciation, please.**

4    Q.  No.  Let me ask you questions, and then you

5  offer testimony under oath and let's do that.  Okay?

6    **A.  All right.**

7    Q.  So you stopped paying your taxes to the County

8  as a form of -- was it in protest because you felt they

9  were overcharging you for the taxes?

10   **A.  I didn't actually stop.  I had a -- I filed an**

11  **appeal and had an appeal hearing with Skagit County, not**

12  **Skagit.  And they ruled in my favor on the appeal, but**

13  **they didn't change the tax.  They changed the**

14  **multiplier.  So the tax remained the same.**

15   Q.  And the multiplier is what?  How much land you

16  have?

17   **A.  How they calculate the taxes.**

18   Q.  Okay.  And do you have any documentation

19  regarding this?

20   **A.  I do.**

21   Q.  And around when was this?  What year was this?

22   **A.  I don't remember.**

23   Q.  So you would have to review your documentation

24  to refresh your memory?

25   **A.  I would have to review that, yeah.**

1    Q.  All right.  So, at some point, did either

2  Beneficial or Caliber pay the County for taxes that it

3  had been under the impression were delinquent?

4    **A.  Caliber did.**

5    Q.  When did Caliber do that?

6    **A.  Maybe April or so of 2017.**

7    Q.  Okay.  Oh, that's when it's due.  Right?  April

8  and November, on or about?

9    **A.  Something -- I don't know.**

10   Q.  You don't know when taxes are due?

11   **A.  Well, April 30th, I believe, the first half.**

12   Q.  Okay.  So Caliber paid the taxes in April of

13  2017.

14   **A.  Correct.**

15   Q.  That's your testimony.  Okay.

16       And do you recall how much, approximately, they

17  paid to the County?

18   **A.  No.  They paid all of them, though.**

19   Q.  When you say "all of them," how many --

20   **A.  What is it, three years?**

21   Q.  Oh, three years?

22   **A.  Plus the current.**

23   Q.  Had you stopped paying for three years?

24   **A.  I stopped longer than that.  I had planned on**

25  **suing them.  I just paid the farthest year back.**

1    Q.  So you stopped paying them more than three years
2  prior to Caliber paying the delinquent taxes.  Is that
3  right?
4    **A.  No.**
5    Q.  I'm just trying to understand the timeline.
6    **A.  I was three years behind.**
7    Q.  Okay.
8    **A.  But I paid the farthest year behind.**
9    Q.  Oh.  Are you saying that it was a rolling three
10  years?
11    **A.  Yes.**
12    Q.  Okay.  I got it.
13        So at any time say within the few years before
14  2017 when Caliber paid it, you were just always three
15  years behind?
16    **A.  Correct.**
17    Q.  So you were paying the County, but you were
18  paying them for essentially maybe taxes due four years
19  earlier?
20    **A.  Correct.**
21    Q.  Okay.  And what was the thinking there?  Why
22  were you doing it that way?
23    **A.  Well, I was planning on suing them, and I still**
24  **am.**
25    Q.  I don't understand your answer.

1    A.  Over 20 years -- they've been overtaxing me for

2    over 20 years.

3    Q.  But my understanding -- my question is, why did

4    you choose to -- was it just an accident in the sense

5    that you hadn't planned it this way, or were you

6    planning on it where you would pay the fourth year back

7    and leave three years rolling?  Was that on purpose?

8    A.  Yeah.

9    Q.  And what was the reason for that?

10   A.  Eventually, I knew I was going to sue them.

11   Q.  Okay.  So do you understand the Trust Deed has

12   provisions that require you to pay --

13   A.  Um-hmm.

14   Q.  Okay.

15   A.  Yes.

16   Q.  And that if you don't, that the lender or

17   secured party can pay it to avoid a lien?

18   A.  Yes.

19   Q.  Yes.  Okay.

20       (Exhibit 16 marked for identification.)

21   BY MR. ABBOTT:

22   Q.  So I'm going to hand you then what I'm marking

23   as Exhibit 16.  It's a letter from Caliber to you in

24   January of 2017.  Do you recognize this letter?

25   A.  Not really, but yeah.

1    Q.  Okay.  So you had testified about this with

2  Beneficial's correspondence, too.  You've received it;

3  but you don't necessarily remember, as you sit here

4  today, particular letters.

5    A.  Correct.

6    Q.  Would that also be the same with Caliber

7  letters?

8    A.  No.  Caliber letters are more freshly in my

9  mind.

10    Q.  Okay.  They're more recent?

11    A.  Yes.

12    Q.  But this particular one, you don't happen to

13  recall, as you sit here today?

14    A.  I probably glanced at it, but I know the

15  situation with my taxes, so I didn't really pay that

16  much attention to it.

17    Q.  Did you ever contact Caliber -- there is an

18  instruction here that if you have any questions

19  regarding this, to contact their toll-free number.  Did

20  you do that?

21    A.  No.

22    Q.  Did you make any attempt to advise or apprise

23  Caliber of what the County was doing in the situation

24  that you were in with the property taxes?

25    A.  No.

1    Q.  All right.  And then in April, I guess, three or

2  four months after this letter, they paid the taxes.

3    **A.  Correct.**

4    Q.  Has, I guess, Caliber, then Rushmore, been

5  paying the taxes since then?

6    **A.  No.  I believe -- they did for a while.  I**

7  **believe the bankruptcy court is paying them now.**

8    Q.  Okay.  And then once those taxes were paid, that

9  was rolled into what was owed on the line of credit.

10  Correct?

11    **A.  I don't know.  There was an agreement or -- what**

12  **would you call that?  You probably have it.  They sent**

13  **me a letter saying they paid this, I can either pay this**

14  **amount in full or I can make this payment for 12 months.**

15    Q.  Okay.

16    **A.  A modification to my loan agreement, basically.**

17    Q.  I don't recall seeing anything like that.  But

18  what you're describing is an escrow situation.  But we

19  can get to that later and see what you're talking about.

20  Okay.

21      So, in any case, you did pay extra --

22    **A.  Yes.**

23    Q.  -- on a monthly basis to address the lump sum

24  that Caliber had paid to the County for the property

25  taxes?

1    A.  Yes.

2    Q.  Okay.  That covers it, I think.  Okay.

3    A.  **Funny you didn't bring that.**

4    Q.  Oh, I probably did bring it.

5        So how did you feel about Caliber paying the

6    County when you kind of had this, I guess, ongoing

7    dispute with them; and had, as you said, planned and

8    even to this day are planning to file a lawsuit against

9    the County?  How did you feel about Caliber paying the

10   taxes?

11   **A.  I wasn't real thrilled about it, but as you say,**

12   **it's in my HELOC agreement, no matter who is servicing**

13   **the loan, taxes and the insurance.**

14   Q.  You understand that like the taxes, if they

15   become delinquent, the County could actually foreclose;

16   and everyone, including the line of credit secured

17   party, might lose their interest.

18   **A.  Yes.**

19   Q.  You understand that.  Okay.

20       And then that the hazard insurance -- you

21   understand that the risk there is that if the property

22   burned down, the value of the Trust Deed is

23   significantly diminished, because there is no property

24   on it anymore.  So if you don't have insurance to fix

25   it, it's a big problem.  Do you understand that?

1    A.  Yes and no.

2    Q.  What is the "no" part?

3    A.  **Well, the "no" part is the value in the land**

4  **exceeds more than what the loan is.**

5    Q.  So your point being that for your particular

6  property, the land exceeds the amount of the

7  encumbrances on it.  So even if the house burned down,

8  there wouldn't be any risk to the lender.

9    A.  **In so many words, yes.**

10    Q.  All right.  So you testified earlier that you

11  didn't make any payment in January of 2017.  You're not

12  sure, as you sit here today, whether you made one in

13  February or March.  You'd have to refer back to your

14  Banner Bank statements to refresh your memory.  Right?

15    A.  **No, I did not say that.**

16    Q.  Okay.  So did you make a payment to Caliber on

17  the line of credit in January of 2017?

18    A.  **Which payment?**

19    Q.  Any payment.

20    A.  **I made payments on the very first invoice they**

21  **sent me.**

22    Q.  What month was that?

23    A.  **Would that have been March?**

24    Q.  All right.  So I'm just starting back with

25  January.  Because I was summarizing what I thought I

1  understood your testimony to be, and you said no, that's

2  not what you testified to.  So I'm just going to go back

3  and redo this, because apparently I misunderstood you.

4      Did you send a payment on your line of credit to

5  Caliber for January of 2017?

6      **A.  Eventually, I did.  I didn't receive an invoice**

7  **from Caliber.**

8      Q.  You're answering a slightly different question.

9  So my question isn't did you get an invoice from Caliber

10  in January of 2017; my question is, did you write a

11  check or send cash, whatever -- did you tender a payment

12  to Caliber in January 2017 on the line of credit?

13      **A.  I would need to reference my records.**

14      Q.  What records would you have to reference?

15      **A.  Bank statement.**

16      Q.  From Banner Bank?

17      **A.  Correct.**

18      Q.  And is that the same account number that's

19  referenced on this check that we marked as Exhibit 15?

20      **A.  Yes.**

21      (Exhibit 17 marked for identification.)

22  BY MR. ABBOTT:

23      Q.  Okay.  I'm going to mark as Exhibit 17, a letter

24  from Caliber to you, dated February 21, 2017.  Take a

25  look at that, please, and I'll ask you a few questions.

1          All right.  Do you recognize this document I've

2   marked as Exhibit 17?

3      **A.  Yeah.**

4      Q.  What's your understanding of what this document

5   is?

6      **A.  Well, this apparently is payments -- the**

7   **payments that were due.  This is the payments that are**

8   **due to cure the default.**

9      Q.  This format seems to be very similar to a

10  previous exhibit that we looked at.

11     **A.  Yes.**

12     Q.  That October 31st letter.  Right?

13     **A.  Correct.**

14     Q.  Okay.  And this one seems to acknowledge the

15  receipt of your payment, because at least for February

16  through September 2016, there is a zero in the column.

17  Do you see that?

18     **A.  Yep.**

19     Q.  So --

20     **A.  Confusing; isn't it?**

21     Q.  No, it's not.  Were you confused by it?

22     **A.  Was I confused by it?  Yeah.**

23     Q.  How so?

24     **A.  Well, there is no December payment on that.**

25     Q.  Okay.

1     **A.  And the one, two, and three is basically -- I**

2  **don't know whether that's interest only or principal**

3  **only.  And this is the first invoice of any kind**

4  **received from Caliber since I made the December 5th**

5  **payment.**

6     Q.  All right.  So what I have is that there is no

7  reference -- the points of confusion for you are there

8  is no December -- reference to a December payment.

9  You're not sure if the numbers for January through March

10  relate to interest only or principal only.

11     **A.  Correct.**

12     Q.  And that, just more generally, this is the

13  first what you're calling an invoice that you received

14  since the October letter.

15     **A.  Correct.**

16     Q.  Okay.  So they're not really asking you for

17  money for November -- for December of 2016.  Right?

18     **A.  It doesn't look like it.**

19     Q.  It doesn't look like it.

20     And then are these numbers for January,

21  February, and March lower than you would have expected?

22     **A.  My previous mortgage payment was $747.58 for**

23  **years.  The interest rate is higher and the payment is**

24  **lower.  Yeah.**

25     Q.  Why do you say the interest rate is higher?

1  Where do you see an interest rate?

2      A.  I just know what the interest rate was.

3      Q.  How do you know?  Can you explain?

4      A.  I've researched this.

5      Q.  So the interest rate in February of 2017 was

6  higher than when?  I'm not following you.

7      A.  From when Beneficial had it.

8      Q.  Well, Beneficial had it from '98 to 2016.

9      A.  Correct.

10     Q.  So are you saying that the interest rate in 2017

11  was higher than that entire time period?

12     A.  I think it was, yeah.

13     Q.  Okay.

14     A.  It was only like a quarter of a percent or

15  something like that.

16     Q.  So when you received this letter, was it in like

17  late February or early March 2017?

18     A.  Yes.

19     Q.  Did you call Caliber to ask about this letter?

20     A.  Specifically?  I don't recall.

21     Q.  Okay.

22     A.  I had been calling Caliber.

23     Q.  About what?

24     A.  Why I hadn't received any kind of payment

25  invoice.

1    Q.  And when you say "payment invoice," are you

2  referring to a monthly statement?

3    **A.  Yes, I am.**

4    Q.  What did Caliber say when you called them and

5  asked them about that?

6    **A.  "I'm sorry.  I don't know what happened.  I'll**

7  **look into it and get back to you."**

8    Q.  Do you recall who you spoke to?

9    **A.  Name-wise, not right offhand, no.**

10    Q.  Do you have any records regarding these phone

11  calls?

12    **A.  Yes.**

13    Q.  What records?

14    **A.  Phone records.**

15    Q.  What do you mean, phone records?  Are they like

16  from your cellular provider?

17    **A.  Yes, they are.**

18    Q.  Is there anything indicating what was spoken or

19  what was said in those calls?

20    **A.  Nope.  Just my word.**

21    Q.  Okay.  Did you do anything in response to

22  receiving this letter we've marked as Exhibit 17?

23    **A.  Off the top of my head, I would say I called**

24  **them again.**

25    Q.  Do you remember taking any other action besides

1  that?

2  **A.  After the call, that's probably when I started**

3  **writing letters to them.**

4  Q.  Did you tender any payment to them?

5  **A.  I would have to check my records, but I would**

6  **imagine so.**

7  Q.  And then I think I understand where we are, but

8  there was a little confusion earlier.  As you sit here

9  today, do you dispute their statement essentially that

10  you were past due for the January 1 payment?

11  **A.  Do I dispute that I was past due?  Yes, I do.**

12  Q.  So you're saying that you made that payment?

13  **A.  No.  I'm saying I didn't get a bill for that**

14  **payment.  How are you supposed to make a payment when**

15  **you don't know what it is?**

16  Q.  Is it your testimony that you're not obliged to

17  make a payment unless you get a monthly statement?

18  **A.  I had no idea how much to pay.**

19  Q.  So did you call Caliber's number for updated

20  payment information?

21  **A.  Yes, I did.**

22  Q.  You said earlier you didn't.  So you're changing

23  your testimony here.  Correct?

24  **A.  No, I just told you I called them.**

25  Q.  Okay.  I asked you earlier and you said you

1 didn't. So you're changing your testimony. But that's

2 fine. You can do that.

3      So you're changing your testimony. You called

4 Caliber to ask them for updated payment information. Is

5 that what you're saying?

6 **A. Yes. I called Caliber several times.**

7 Q. Okay. When did you call Caliber to ask them for

8 the payment information?

9 **A. The first time, I believe was in December.**

10 Q. Of what year?

11 **A. Of 2016.**

12 Q. Okay. And then the next time?

13 **A. I would imagine -- I'm not sure if it was**

14 **January or February. I called several times.**

15 Q. And when you called and asked for payment

16 information, did Caliber provide it?

17 **A. When they answered, yes.**

18 Q. Okay. And so when they provided you with that

19 information, did you use that to make a payment?

20 **A. No. I disagreed with the information they gave**

21 **me.**

22 Q. And did you tell them that?

23 **A. Yes, I did.**

24 Q. Okay. And did you follow it up with anything in

25 writing?

1    A.  I don't recall.

2    Q.  So I asked you if you had disputed the January

3 2017 being past due and you said yes.  Do you also

4 dispute being past due for February 2017?

5    A.  Yes.

6    Q.  And then March 2017?

7    A.  I would have to check, but I would say yes.

8    Q.  And not that you were tendering payments, but

9 because you hadn't received monthly statements?

10   A.  Correct.  I didn't know how much to pay.

11        (Exhibit 18 marked for identification.)

12 BY MR. ABBOTT:

13   Q.  All right.  I'm going to mark as Exhibit 18, a

14 copy of a couple of e-mails, I think, from March 2017.

15        Do you recognize what I've marked as Exhibit 18?

16   A.  Yes, I do.

17   Q.  What is this?  What's your understanding of

18 Exhibit 18?

19   A.  This is the first e-mail I sent to Caliber,

20 letting them know that they hadn't invoiced me for my

21 monthly payments that were due.

22   Q.  What's your reference here to saying, "And you

23 may want to check, late fees in this state are not equal

24 to the past-due amount"?  What do you mean by that?

25   A.  Without looking at the statements, I am not

1  sure.

2     Q.  And do you recall what you were looking at when

3  you were writing this e-mail?  It sounds like you were

4  looking at some kind of written communication from

5  Caliber that includes reference to a late fee, and

6  you're disagreeing with the amount that they're saying

7  that's due.

8     A.  It's possible I was looking at the online

9  account.  They have an online account.

10    Q.  Okay.  You were looking on the online.  I forget

11  about that.  So CaliberHomes.com or something like that?

12    A.  Something like that.

13    Q.  Did you set up an account with them?

14    A.  I did.  I can't access it now.

15    Q.  Let's answer the questions I ask.

16    A.  Okay.

17    Q.  You can put that in a declaration later for

18  yourself.

19    A.  All right.

20    Q.  When did you set up your online access?

21    A.  I don't recall.

22    Q.  Was it in 2016?

23    A.  I don't recall.

24    Q.  Okay.

25    A.  I don't recall.

1      Q.  You don't recall?

2      A.  No.  I know I didn't care for it.

3      Q.  Did the online access -- what information was

4  available?

5      A.  Yeah, I don't even remember.

6      Q.  That's all right.  We'll get all that.  Believe

7  me, that's all well known.

8      A.  Yeah.

9      Q.  Don't worry about it.  We'll even get the dates

10  that you logged in.

11      A.  Right.

12      Q.  That's no problem at all.

13          So at what point did your access get -- you said

14  you don't have access to it anymore?

15      A.  Yeah.

16      Q.  Now you don't, because I think the loan

17  servicing transferred.  When did your access end?  Was

18  that in November of 2017 when it transferred to

19  Rushmore?

20      A.  I don't know.  I think I went on, looking for an

21  invoice and I couldn't find one.  I couldn't find

22  anything.

23      Q.  Okay.

24      A.  I took pictures of the screens that I had,

25  though.

1      Q.  Oh, you did.

2      **A.  Yes.**

3      Q.  Oh, okay.  Do you still have those pictures?

4      **A.  Yes.**

5      Q.  Those are like digital files or did you take

6   like --

7      **A.  I think I printed them off.**

8      Q.  You printed them off.  Okay.  That makes sense.

9          So you still have those?

10     **A.  Yes.**

11     Q.  Okay.  So printouts of the internet screens that

12  you were accessing when you logged onto your Caliber

13  account online.  Is that right?

14     **A.  Correct.**

15     Q.  How many printouts do you have?

16     **A.  I don't recall.**

17     Q.  Okay.  It's more than a couple?

18     **A.  Just a few.  I was looking for an invoice and**

19  **there wasn't one.**

20     Q.  Okay.  Interesting.

21         I think the genesis of us getting into that side

22  thing was I was asking you what you were looking at or

23  what you meant by late fees in the state are not equal

24  to the past-due amount, and it seemed like you were

25  looking at something for that.  I think you had said you

1  were looking at your online account.

2      A.  Um-hmm.

3      Q.  So as you sit here today, do you remember what

4  it was that made you say that the late fees in this

5  state are not equal to the past-due amount?

6      A.  No.

7      Q.  Okay.  I'm having trouble parsing what you mean

8  by that.  I'm trying to get context.

9      A.  Right.

10      Q.  But you don't recall, as you sit here today,

11  what you meant by that?

12      A.  No, I would have to --

13      Q.  That's fine.  That's fair enough.  I don't mean

14  to -- okay.  You said it.  You were starting to get

15  frustrated.  So maybe you were venting a little.  I

16  don't know.

17      A.  Maybe.

18      Q.  Is it possible?

19      A.  That I was venting?

20      Q.  Yes.

21      A.  Yeah, with their non-compliance with my request,

22  yes.

23          MR. HATHAWAY:  I'm going to object to the form

24  of your questions, counsel.  You're leading the witness,

25  you're putting words into his mouth, and you have been

1 throughout this deposition, but this is another

2 objection to that.

3 BY MR. ABBOTT:

4    Q.  So moving on to the second page of Exhibit 18,

5 you're not -- well, before I get to the second page of

6 Exhibit 18, are you testifying in accordance with what

7 I'm telling you, something I'm saying to you?

8    **A.  As far as -- how do you mean?**

9    Q.  Am I influencing your answers?

10   **A.  You're not liking the answers I give you.**

11   Q.  That's par for the course for a deposition.

12   **A.  Right.**

13   Q.  But my question is, am I influencing your

14 answers?

15   **A.  In some way, yeah.**

16   Q.  In what way am I influencing your answers?

17   **A.  If I don't say what you want me to say, you**

18 **redirect it.**

19   Q.  You mean I ask you the question, I want you to

20 answer?

21   **A.  In a different way, yes, yes.  And then you**

22 **disregard -- what is that you tell him on some of my**

23 **answers?**

24   Q.  I move to strike as non-responsive.

25   **A.  Non-responsive.  That's what it is.  It's**

1  **responsive and it's totally relevant.**

2     Q.  Okay.  Okay.  That's fine.  The judge will rule

3  on motions to strike.  So I have to do that.  I can't

4  just --

5     **A.  Not just say what's going on?**

6     Q.  No, I can't say motions later.  I have to make

7  it at the time.

8     **A.  Okay.**

9     Q.  So let's go to the second page of Exhibit 18.

10    **A.  Okay.**

11    Q.  All right.  So there is another e-mail here.

12  This is a separate e-mail.  Is that right?  At different

13  times, it looks like.

14    **A.  It's about the same time, but different e-mails.**

15    Q.  Okay.

16    **A.  Honestly, I couldn't tell you, but they're the**

17  **same date.**

18    Q.  So these are actually in opposite order, it

19  looks like.  If you look at the -- hold on.  Let me see

20  when -- yeah, it looks like the second page is a

21  slightly -- it's the first e-mail by a few minutes.

22  Would you agree?  The time stamps are either 9:09 a.m.

23  or 12:54 p.m.  And then, on the first page, it's either

24  9:12 a.m. or 12:15 p.m.  Do you see that?

25         Let the record show that the attorney,

1  Mr. Hathaway, is pointing to things.

2     **A.  I see the dates, 12:54.  I didn't see nine**

3  **anything.**

4     Q.  Did you send two separate e-mails to Caliber's

5  e-mail address on March 8th?

6     **A.  According to this, yes.**

7     Q.  Okay.  And do you have any reason to dispute

8  that as you sit here today?

9     **A.  No.**

10     Q.  Okay.  So let's look at the second page.  And

11  you say, "Your company's figures are inconsistent."

12  What do you mean by that?

13     **A.  Well, it says right here.  And I was looking**

14  **online.  It says, "I have an online payment due of over**

15  **$3,400, but on the escrow statement you sent, I have a**

16  **balance owing of over $2,100, which includes a $560 late**

17  **fee."  So there is that late fee question you were**

18  **bringing up.  "You have refused to send a payment**

19  **invoice, but continue to send, by registered mail...,**

20  **preforeclosure notices," at my expense.**

21     Q.  All right.  So --

22     **A.  That would be the frustrated part coming out.**

23     Q.  All right.  So we should have started with this

24  e-mail, because it does reference you being online.

25     **A.  Right.**

1    Q.  And showing that the payment due was over

2    $3,400.  Do you recall what the exact amount was?

3    **A.  No, but I have it.**

4    Q.  You have it.  Okay.

5    **A.  Yes.**

6    Q.  So we'll take a look at that when that's

7    produced.

8        "But on the escrow statement, you said I have a

9    balance owing of $2,100."

10       Okay.  So you're looking online.  Reviewing this

11   e-mail -- and I want you to tell me if I'm understanding

12   this correctly --

13       MR. HATHAWAY:  Objection, mischaracterizes.

14   BY MR. ABBOTT:

15   Q.  You're saying that online, it shows you have a

16   payment due of $3,400; and then, when you compare it to

17   the escrow statement, there are different numbers on the

18   escrow statement, so there is an inconsistency.

19   **A.  That's kind of what it sounds like.  Didn't it**

20   **say over $2,100?  Over $2,100.**

21   Q.  I mean, you're rounding it.  You're just giving

22   round numbers?

23   **A.  (Indicating).**

24   Q.  Is this what you're referring to as the escrow

25   statement?

1      A.  It might be.  Exhibit 7?  The $2,187.75.

2      Q.  So for the record, you held up Exhibit 17, I

3  think.

4      A.  Correct.  Seven, not 17.

5      Q.  Seventeen is the -- I'm talking about the

6  exhibit number.

7      A.  Oh, okay.  I thought that was a pound sign.

8  Sorry.  17.

9      Q.  That's fine.

10         So you were holding up Exhibit 17.  I want to

11  try to understand what you're saying here.  Do you think

12  that the escrow statement that you're referring to in

13  your e-mail, the second page of Exhibit 18, that that's

14  actually this letter from February 21, 2017?

15     A.  Yes, I do.

16     Q.  Okay.  And why were you calling it an escrow

17  statement?

18     A.  Well, that's what you called it.

19     Q.  That's not what I called it.

20     A.  Oh.

21     Q.  It's not an escrow statement.  I wouldn't have

22  called it that.  Is there anything on here that even

23  talks about escrow?

24     A.  I didn't know what else to call it.

25     Q.  Okay.

1     **A. Escrow hasn't even been involved yet.**

2     Q. So how sure are you that the reference to the

3  escrow statement that you made in your e-mail, that it

4  refers to this Exhibit 17?

5     **A. Very sure.**

6     Q. Very sure?  Okay.

7     The number is over $2,100, and that seems to

8  correlate with the amount of $2,187?

9     **A. As well as the date.**

10    Q. Where do you see the date?

11    **A. 4/21 is Exhibit 17 and 3/8 -- or 2/21.  Excuse**

12  **me.**

13    Q. Oh, so the proximity of the --

14    **A. Correct.**

15    Q. Okay.  So you may not remember this, but after

16  you've refreshed your memory with the printouts of the

17  online, that might be a better time to answer this.  But

18  do you recall if the $3,400 -- I'm using the number you

19  put in there.  I understand you said it's over that, so

20  it's not exact.  Okay?

21    **A. Yeah.**

22    Q. But do you recall whether it was itemized on the

23  online -- when you logged in online?

24    **A. You're right.  I won't remember.**

25    Q. You won't remember.  So we'll have to revisit

1  that when you have something to refresh your memory.

2  That's fine.

3      A.  Okay.

4          (Exhibit 19 marked for identification.)

5  BY MR. ABBOTT:

6      Q.  All right.  I'm going to give you what is marked

7  as Exhibit 19.  Exhibit 19 is a letter from Caliber to

8  you, dated March 14, 2017.  Do you recognize this

9  letter?

10     A.  Yeah.

11     Q.  All right.  What's your understanding of this

12  letter?

13     A.  They're just acknowledging receipt of my

14  correspondence that I sent to them.

15     Q.  Okay.  Those e-mails we were just talking about.

16     A.  Correct.

17     Q.  Okay.

18     A.  I'm assuming so.

19     Q.  Okay.  And that was your understanding when you

20  received this.

21     A.  Correct.

22     Q.  Okay.  Did you call the 800 number at all when

23  you received this acknowledgment letter?

24     A.  No.  Not that 800 number.

25     Q.  Did you call Caliber in response to receiving

1  this March 14, 2017 acknowledgment letter?

**2  A.  No.**

3  Q.  When did you call Caliber in this time period?

4  Or did you?

**5  A.  I called not this number, though.  I think I**

**6  called a different number.  And it wasn't over this.  It**

**7  was just over the whole payment invoice thing.**

8  Q.  You wanted monthly statements?

**9  A.  Yes.**

10  Q.  Okay.

**11  A.  Who doesn't?**

12  (Exhibit 20 marked for identification.)

13  BY MR. ABBOTT:

14  Q.  All right.  I'm marking as Exhibit 20, a letter

15  from Caliber to you dated April 18, 2017.  Do you

16  recognize this letter?

**17  A.  Yes.**

18  Q.  All right.  What's your understanding of what

19  this letter is?

**20  A.  This is just a response to the letter that I**

**21  sent to them.**

22  Q.  The e-mails?

**23  A.  Yeah.  Possibly.  Yeah.**

24  Q.  Okay.  It says in the first paragraph here,

25  Caliber appreciates the opportunity to respond to your

1  e-mail received on March 8th, so I think that's what

2  it's referring to.  Do you see that?

3      A.  Not yet.

4      Q.  It's in the first paragraph of Exhibit 20.

5      A.  Oh, on the previous one.

6      Q.  No.  Exhibit 20.

7      A.  I don't read that fast.

8      Q.  That's okay.

9      A.  Oh, yeah, I do see it there.  Second line.  Got

10  it.

11     Q.  All right.  So do you recall receiving this

12  sometime in April 2017?

13     A.  Yes.

14     Q.  Okay.  And do you think that this letter doesn't

15  respond to your e-mails -- the issues that you raised in

16  your e-mails?

17     A.  That's correct.  I don't think it does.

18     Q.  In what ways doesn't it respond to the issues?

19     A.  It doesn't address all of them.

20     Q.  Can you just tell me which ones it doesn't

21  address.

22     A.  Well, let me see what I requested.  Something

23  might be missing here.

24     Q.  Let me ask you this:  Let me switch gears and

25  withdraw my question -- strike my question.

1        This letter -- looking at Exhibit 20 -- right in

2    the middle, there is a bullet list.  Do you see that?

3        **A.  Yep.**

4        Q.  The last bullet says, "The loan is contractually

5    next due for the May 1, 2017 monthly payment."  Do you

6    see that?

7        **A.  Yep.**

8        Q.  What's your understanding of what that means?

9        **A.  That means I've already made a payment, and the**

10   **next payment due is the 1st of May.**

11       Q.  So is it fair to say that Caliber is saying, as

12   of writing of the letter, April 18, 2017, that your

13   account is current, it's zero days past due?

14       **A.  I don't know what they're trying to say.**

15       Q.  Well, what's your understanding when --

16       **A.  It just means the next payment is due for**

17   **May 1st.**

18       Q.  Okay.  So it's in the future.  Right?

19       **A.  Right.**

20       Q.  What's your understanding of when you have an

21   account and your next payment that's due is a future

22   date and not a past date?

23       **A.  Well, there is a difference on how you word**

24   **that.**

25       Q.  Well, I'm asking you what your understanding is.

1     A.  It says contractual payment, not your next

2  payment due.  My contract, my next payment would be due

3  for May.  That doesn't mean I made the first three or

4  four.

5     Q.  So are you saying that Caliber might have

6  overlooked a delinquency that you had?

7     A.  No.  They didn't overlook anything.  They made

8  them up.

9     Q.  But Caliber is saying here that your next due is

10  May 1.  So what's it making up?

11     A.  Well, that means it's April 18th that they sent

12  this letter.  My next payment is due on May 1st.

13     Q.  Right.

14     A.  That doesn't mean I made a payment.  I don't

15  know what they're trying to say.  I would have to look

16  at my records to see if I made a payment already.

17     Q.  So to you, this sentence, you don't know what

18  they're trying to say?

19     A.  Well, at the time --

20     MR. HATHAWAY:  Objection, asked and answered,

21  counsel.  You're trying to pry information out of --

22  you're asking questions repeatedly.

23     MR. ABBOTT:  It's a talking objection.

24     MR. HATHAWAY:  I object to the form of the

25  question.

1          MR. ABBOTT:  Okay.  That's the objection.  And

2    the Court will have an opportunity to rule on it.  Why

3    then the attempt to coach the witness?

4          MR. HATHAWAY:  You're attempting to coach the

5    witness, counsel.

6          MR. ABBOTT:  That's a ridiculous --

7          **THE WITNESS:  That one is not so ridiculous.**

8          MR. ABBOTT:  Sir, please, counsel do this, but

9    you are under oath to answer questions.

10         **THE WITNESS:  And I answered.**

11    BY MR. ABBOTT:

12    Q.  I'm trying to understand whether you -- your

13    understanding of this bullet point that says that the

14    loan is contractually next due for May 1, 2017 monthly

15    statement -- monthly installment.

16         MR. HATHAWAY:  Objection, asked and answered.

17         MR. ABBOTT:  Are you instructing the witness not

18    to answer or are you preserving an objection?

19         MR. HATHAWAY:  I'm objecting that you have asked

20    a question --

21         MR. ABBOTT:  So you've objected --

22         (Overlapping speakers.)

23         THE REPORTER:  One at a time, please.  I can't

24    get you both at the same time.

25         MR. ABBOTT:  So you're preserving an objection,

1  but you're not instructing the witness not to answer.

2  That's totally normal.  That's how it's done.  Okay.

3  You made your record.  You don't need to repeat it 20

4  times to make sure your witness hears it for whatever

5  predeposition instructions you gave him to alter his

6  testimony.  Because that's where I think you -- that's

7  not correct.  Right?  You're not really supposed to

8  coach your witness.  Right?  So you're objecting to the

9  form of the question.  Asked and answered.  Which isn't

10  actually an objection.  But form of the question.  Is

11  that right?

12        MR. HATHAWAY:  I'm objecting to the question.

13        MR. ABBOTT:  Okay.  Great.  The record so

14  reflects.

15        Now, can you please repeat the question, the

16  last question that was directed to the witness that

17  there is an outstanding objection to.

18        (Question read by the reporter.)

19        **THE WITNESS:  So I did answer it.**

20        MR. ABBOTT:  I don't know if you answered it,

21  but we'll just make a reference in the record.

22        (Discussion off the record with court reporter.)

23        MR. ABBOTT:  Well, we'll move on.  Well, not

24  from this exhibit, just from the question.

25  BY MR. ABBOTT:

1     Q.  So the first bullet says -- speaks about when

2   the line of credit was opened in November 1997.  Do you

3   have any disagreement with that?

4     **A.  No.**

5     Q.  Or do you have any disagreement with the

6   servicing of the loan, transferring to Caliber on

7   August 1, 2016?

8     **A.  I did after they got it.**

9     Q.  What do you mean by that?

10    **A.  Just the way they handled it the whole time they**

11  **had it.**

12    Q.  So you don't disagree with the factual

13  statement, but you disagree with the sufficiency of

14  their servicing?

15    **A.  Correct.**

16    Q.  Okay.  And then we already had the discussion on

17  the third bullet.

18    **A.  Correct.**

19    Q.  Let me see here.  So when you received this

20  letter, did you think that Caliber believed that you

21  were in default?

22    **A.  I knew I was.**

23    Q.  Can you explain what you mean by that.

24    **A.  One of the many times that I called them -- or**

25  **several times, I guess -- it's not many -- that I called**

1  and talked to somebody -- I spoke to a supervisor at the

2  payment center in Texas, and that's when I learned that

3  my loan was in default because of a bankruptcy.

4         Could you repeat the question.

5    Q.  I was asking you to clarify what you meant by

6  your answer.  You are.  I'm just writing down a note

7  about it.

8         So you spoke to a supervisor in the payment

9  processing -- payment center of Caliber.

10   A.  Right.

11   Q.  And that person told you that your loan was

12  in --

13   A.  Default.

14   Q.  -- default.

15   A.  Because of bankruptcy.

16   Q.  Because of the bankruptcy.

17   A.  Yeah.  That wasn't my bankruptcy, and they knew

18  that.

19   Q.  And do you have any records regarding this

20  alleged conversation with the payment center?

21   A.  Just e-mails.  No, just my word on the phone

22  call.

23   Q.  Okay.  And the e-mails you were just saying are

24  the e-mails that we marked as Exhibit 18?

25   A.  Correct -- well, whatever reference

1 bankruptcy -- I didn't know there was a bankruptcy until
2 I talked to the guy in the payment center.
3     Q. Around when was that, that you had that call
4 with --
5     A. I would have to check my records, but February
6 or March.
7     Q. What records would you be checking?
8     A. Phone records.
9     Q. These are just the cellular phone records?
10     A. Correct. They would be the long one -- the long
11 phone call. You have those records.
12     Q. The long phone call. We have these records.
13 Okay. I'll look and see if we have them.
14     I'm sorry. You said February or March of 2017.
15 You weren't sure.
16     A. I think so. My memory is sketchy at best
17 sometimes.
18     Q. All right. So then below the bullet list,
19 Caliber says, "The loan was discharged in a previous
20 Chapter 7 bankruptcy in June of 1998. Our records do
21 not reflect that the debt was reaffirmed; therefore,
22 Caliber is not generating monthly mortgage statements
23 for this loan." Do you see that?
24     A. I do.
25     Q. Okay. "If you wish for Caliber to send you

1  monthly information statements, you will need to provide

2  signed, written request so that we can update this loan

3  accordingly.  This can be faxed to 405-608-2003 or

4  mailed to the address located in the footer of this

5  letter."

6          Did you do anything in response to this

7  paragraph?  Did you send any kind of fax or letter to

8  Caliber?

9      A.  Yes, I did.  I'm sure I sent a letter.

10     Q.  You're sure you sent a letter.  What do you mean

11  by that?

12     A.  I'm positive I sent a letter.

13     Q.  You're positive you sent a letter?

14     A.  Yeah.

15     Q.  Do you recall how you sent it?

16     A.  Certified mail this time.

17     Q.  Oh, certified mail?

18     A.  Yes.

19     Q.  Do you have a record of the certified mail?

20     A.  Yes, I do.  From this day forward -- from that

21  day forward, everything was certified.

22     Q.  Oh, really?

23     A.  Signed for.

24     Q.  We definitely don't have those records.

25     A.  Oh, yeah?

1    Q.  If I had known that a long time ago, that would

2  have been helpful.

3    A.  Okay.

4    Q.  So you keep the -- what is it, like the green

5  square?

6    A.  Yeah.

7    Q.  And then you get something showing that it

8  was --

9    A.  Received.

10    Q.  -- received.

11    A.  Yes.

12    Q.  I'm going off my personal understanding.  But

13  did you go online to USPS.com to also see the tracking

14  and who signed for it?

15    A.  No.

16    Q.  Okay.

17    A.  I didn't know how important they were.  I found

18  some -- my paperwork is a train wreck.

19    Q.  Okay.

20    A.  I did find the rest of them.

21    Q.  So as you're sitting here today, your testimony

22  is you have these records.

23    A.  Yes.

24    Q.  Okay.  And when did you find them?

25    A.  Long after I needed them probably.  I found some

1    at home the other day.

2        Q.  Oh, really?

3        A.  Yes.

4        Q.  Okay.  Interesting.

5            That would be so helpful.

6        A.  You have the letters that I sent.

7        Q.  I don't, actually.

8        A.  You don't.

9        Q.  I don't.

10       A.  You've got an e-mail that I sent.

11       Q.  Yes, I have an e-mail that you sent, and I have

12   my client's response, but it's helpful to get a complete

13   picture.

14       A.  Well, you picked and choose what you brought

15   with you.

16       Q.  I brought and we, in fact, produced our entire

17   file.

18       A.  And you don't have all the letters that I sent?

19       Q.  I'm sorry?

20       A.  You don't have all the letters that I sent?

21       Q.  I don't know how to answer that, because I don't

22   know -- you haven't shown that you've sent any letters.

23   And in the discovery that you produced in this case, you

24   haven't proven that up; and as plaintiff, you have that

25   obligation.

1          MR. HATHAWAY:  Objection.

2          MR. ABBOTT:  Are you objecting to my answer that

3    your client is examining me?  That's rich.

4          MR. HATHAWAY:  I object to you testifying into

5    the record.

6          MR. ABBOTT:  But your client asked me a

7    question.  You could have said to him then, "Hey, don't

8    talk"; but no, you only say that when he's testifying.

9    So you've got to pick and choose more consistently,

10   Steven.

11         **THE WITNESS:  I don't know.**

12         MR. ABBOTT:  Okay.  So that's why witnesses

13   shouldn't ask questions of attorneys.  Okay?  Because

14   you open doors that can be hard to get out of.

15         **THE WITNESS:  Okay.**

16   BY MR. ABBOTT:

17   Q.  All right.  So on this Exhibit 20, the next

18   paragraph says, "The regular monthly payment amount is

19   $1,142.06 which is comprised of a principal and interest

20   amount of $322.32 and an escrow amount of $819.74."  And

21   then there is a comment about keeping in mind the daily

22   simple interest aspect of the loan.

23         So after April 18, 2017, did you have the

24   information you needed to make monthly payments because

25   you knew to just send in $1,142.06?

1    A.  According to this, yes.  No --

2    Q.  I'm sorry?  I didn't -- can you repeat his

3  answer.

4    A.  No, this is just a reply to my e-mail.  That

5  doesn't mean it's accurate.  That doesn't mean it's

6  correct.

7    Q.  How does that differentiate it -- on what basis

8  are you saying that it might not be correct?

9    A.  I don't have a statement from you to see if

10  those figures are correct.

11    Q.  So is there something about a statement versus

12  some other written communication from the loan servicer

13  that has more credibility with you?

14    A.  Well, I'm not real sure where you're going with

15  that.

16    Q.  That's the question.  I'm trying to understand

17  why -- Caliber sends you a written communication that

18  says your monthly payment is $1,142.06, it's broken out

19  into these different aspects, that's your monthly

20  payment.  And you're saying -- I took your answer to be

21  that that's unreliable if it's in this, because this is

22  in response to your e-mail, it's not a monthly

23  statement, it's not an invoice.  So why is it, from your

24  perspective, that a monthly statement that might have

25  this exact number would be more reliable than this

1  written letter to you stating that that's how much you

2  have to send in every month?

3     A.  **This is just a response to an e-mail that I**

4  **sent.  When I called in December, they said I was**

5  **already $4,000 in arrears.**

6     Q.  This is a letter that's signed by Caliber

7  stating that your regular monthly payment is $1,142.06.

8        MR. HATHAWAY:  Objection.  Is there a question

9  there?  Are you asking the witness a question, counsel?

10       MR. ABBOTT:  This is like the twelfth time

11  you've been coaching him.  You've got to stop that,

12  Steven.

13       MR. HATHAWAY:  You're coaching him.

14       MR. ABBOTT:  I'm not coaching him.

15       MR. HATHAWAY:  I disagree.

16       MR. ABBOTT:  I'm trying to understand why is it

17  that when Caliber sends in writing -- let me finish --

18  why Caliber says in writing, you have to pay this much

19  each month, but the writing is in one format your client

20  doesn't think it's acceptable, but then he wants it in a

21  different format.  And I'm trying to understand why the

22  monthly statement has some pixie dust or magic to it

23  that he would then follow the monthly statement, even

24  though he actually doesn't follow monthly statements

25  because he was perpetually behind when he was getting

1  monthly statements from Beneficial.

2       MR. HATHAWAY:  I object to the form of your

3  question.

4       MR. ABBOTT:  Well, that's fine.  Then make your

5  objection, but stop coaching your witness.

6       MR. HATHAWAY:  I'm not coaching my witness.

7       MR. ABBOTT:  It's so obvious.

8       MR. HATHAWAY:  I'm objecting to the form of your

9  question.

10       MR. ABBOTT:  Then state your objection.

11       MR. HATHAWAY:  You're trying to coach the

12  witness, counsel.

13       MR. ABBOTT:  I am not.  I am not.

14       MR. HATHAWAY:  Save your arguments for trial.

15       MR. ABBOTT:  Okay.  I'm going to suspend the

16  deposition, because you've now tainted the witness.  And

17  I'm going to move that the witness be barred from

18  testifying and that his declaration be stricken from the

19  record, and really just ask the Court for help on this,

20  because you're just coaching --

21       MR. HATHAWAY:  Let's call the Court.

22       MR. ABBOTT:  We can call the Court, if it's

23  done.

24       MR. HATHAWAY:  Sure, if that's what you think

25  needs to be done, go ahead and call the Court.  You're

1  trying to coach the witness, counsel.

2      MR. ABBOTT:  No, you can call the Court if you

3  want.  I'm going to suspend the deposition and seek that

4  Mr. Massingale be barred from testifying or offering any

5  evidence in the case.

6      MR. HATHAWAY:  Oh, really?

7      MR. ABBOTT:  Because you have coached him and

8  you have tainted the witness so much by telling him what

9  he needs to say.  And you've also had nothing but

10  speaking objections today.  And instead of saying I

11  object to the form of the question, it's I object to the

12  form of the question, oh, and here is a bunch of

13  reasons.  Meanwhile, your witness is right next to you

14  in earshot and taking that in.  You've colored and

15  contoured his testimony throughout the entire day.  He's

16  no longer reliable as a witness.  So yes, that I think

17  would be the move now.

18      Does the Court have some procedure -- do they

19  have a number to call them?  I'm happy to do that.  I'm

20  not familiar with Judge Barreca.

21      MR. HATHAWAY:  You can certainly look up Judge

22  Barreca's --

23      MR. ABBOTT:  Well, if you're unwilling to help

24  with that, then I'm going to suspend the deposition and

25  seek to exclude Mr. Massingale as a witness.

1          MR. HATHAWAY:  Again, I object to the form of

2   your questions.

3          MR. ABBOTT:  You're not objecting.  You're

4   coaching the witness, Mr. Hathaway.

5          MR. HATHAWAY:  I am not coaching the witness,

6   counsel.

7          MR. ABBOTT:  I think you are.

8          MR. HATHAWAY:  I think you are coaching the

9   witness.

10          MR. ABBOTT:  I don't think I can coach the

11   witness.

12          MR. HATHAWAY:  When I object to the form of the

13   questions -- if you want to ask him questions, ask him

14   questions.

15          MR. ABBOTT:  I have been.

16          MR. HATHAWAY:  No.  You've been sitting with

17   about 30 seconds of how you want him to testify and what

18   your understanding of the letter is, and then asking him

19   to respond to what your understanding of the letter is.

20   You're trying to coach --

21          MR. ABBOTT:  I am not.  Not at all.

22          MR. HATHAWAY:  I think you are.

23          MR. ABBOTT:  No.

24          MR. HATHAWAY:  And I respectfully disagree with

25   you, counsel.

1          MR. ABBOTT:  I think you understand that you're
2    coaching.
3          All right.  I'm going to suspend.  If you're not
4    willing to share any knowledge you have about Judge
5    Barreca having some system for calling in, then I think
6    I'm just going to suspend the deposition.
7          **THE WITNESS:  I think I answered it.**
8          MR. ABBOTT:  I don't want to be disrespectful to
9    you, sir.  It's sort of an attorney-to-attorney thing.
10   I don't think you've answered all my questions, but I
11   don't want to get into it with you personally.  I
12   appreciate you offering that.
13         So I'm going to suspend the deposition.
14         MR. CRAMER:  He has a phone number.
15         MR. ABBOTT:  Does he?
16         MR. CRAMER:  He does.  Let me get it here.
17         THE REPORTER:  Are we on the record or off the
18   record?
19         MR. ABBOTT:  We're off the record.  Sorry.
20         (Lunch recess taken from 1:19 to 2:32.)
21
22          E X A M I N A T I O N (continued)
23   BY MR. ABBOTT:
24      Q.  I'm going to direct the witness to Exhibit 20.
25   We were talking about that before the break.

1          Actually, before we start the questioning, did

2     you want to put on the record some --

3          MR. CRAMER:  Yes.  We had a discussion off the

4     record about some documents that the witness has

5     mentioned today.  Steve, you believe you've provided

6     everything that you've received.  To the extent there

7     are additional documents, you'll collect them, produce

8     them; and then, if we need to come back for questioning

9     specifically related to newly located documents, we'll

10    agree to do a Zoom or other video deposition so that we

11    can just clear up any questions related to those

12    documents only.

13         MR. HATHAWAY:  Agreed.

14         MR. ABBOTT:  Steve, how much time do you think

15    you would need to confer with your client to make sure

16    there aren't any additional -- or to get additional

17    documents as the case might be?

18         MR. HATHAWAY:  A week.

19         MR. ABBOTT:  A week?  A couple weeks?

20         **THE WITNESS:  It takes us three hours to get**

21    **home.**

22         MR. HATHAWAY:  But you can get them to me within

23    a week?

24         **THE WITNESS:  Yeah.  Yeah.**

25         MR. CRAMER:  Let's just do two weeks to be safe.

1      MR. HATHAWAY:  That's fine.

2      MR. ABBOTT:  Two weeks from today.  Okay.

3  BY MR. ABBOTT:

4      Q.  All right.  Directing the witness' attention to

5  Exhibit 20.  This is the April 18, 2017 letter from

6  Caliber.

7          On this letter, there is an address -- there are

8  two addresses on the bottom of the first page in the

9  footer.  Do you see that?

10     **A.  Oklahoma City and Oklahoma City, two different**

11  **P.O. boxes.**

12     Q.  That's correct.

13         And then the one on the right says, "Notice of

14  error, request for information, or QWR address, P.O. Box

15  270415, Oklahoma City, Oklahoma, 73137."  Do you see

16  that?

17     **A.  I do see that.**

18     Q.  And did you take note of that when you received

19  this letter from April of 2017?

20     **A.  No, I did not.**

21     Q.  Okay.

22     **A.  I can barely see it now.**

23         (Exhibit 21 marked for identification.)

24  BY MR. ABBOTT:

25     Q.  I'm marking as Exhibit 21, a letter from Caliber

1  to Mr. Massingale.  Review that for a moment and let me

2  know when you're ready.

3       A.  Okay.

4       Q.  All right.  So do you recognize or have you seen

5  this document I've marked as Exhibit 21 before?

6       A.  Yes.

7       Q.  All right.  And what do you recognize this

8  letter to be?

9       A.  What do I recognize it to be?

10      Q.  Yes.  What's your understanding of this letter?

11      A.  Instructions on how to contact them, submit

12  any -- what's the word I'm looking for -- any

13  discrepancies I see or any incorrect -- yeah, incorrect

14  figures or anything like that.  This address is where

15  you send your Qualified Written Requests to.

16      Q.  Okay.

17      A.  Yeah.

18      Q.  And do you recall approximately when you

19  received this letter?

20      A.  I received it several times.  I think it came

21  with just about every notice of foreclosure or intent to

22  foreclose that they sent out.

23      Q.  Okay.  Do you recall -- you may not, but do you

24  recall approximately the first time that you received

25  this?

1    A.  December.

2    Q.  Which year?

3    A.  Of 2016.

4    Q.  December of 2016?

5    A.  I believe.

6    Q.  Okay.  I'll put that as your best estimate.

7    A.  Yeah.  The first time they sent me a notice of

8  intent.

9    Q.  Got it.  And do you recall approximately when

10  was the last time that you received a letter like this

11  one that we've marked as Exhibit 21?

12    A.  No.

13    Q.  Okay.  How many letters of -- what did you say,

14  notices of intent?

15    A.  Um-hmm.

16    Q.  How many times did you receive like a notice of

17  intent from Caliber?

18    A.  There is probably a stack of them like that

19  (indicating).  Numerous.

20    Q.  You don't have -- too numerous to count?  That

21  kind of thing?

22    A.  Yeah.  I didn't even keep a log.

23    Q.  Was it a letter like this one telling you where

24  to send disputes?

25    A.  Attached in it.

1    Q.  Oh, okay.  In each of them?

**2    A.  Yeah.**

3    Q.  Okay.

**4    A.  Their instructions.  Not necessarily this**

**5  letter, but instructions on how to respond.**

6    Q.  Okay.  And where to send QWRs and things like

7  that.

**8    A.  Correct.**

9    Q.  Was that always the P.O. Box 270415 in Oklahoma

10  City?

**11    A.  As far as I know.**

12        MR. ABBOTT:  I want to direct you to a

13  previously marked exhibit for a second.  I'm just going

14  to look for it.

15        I'm looking for the e-mail exhibit where you

16  sent a couple of e-mails.

17        MR. HATHAWAY:  Eighteen.

18        MR. ABBOTT:  I'm sorry.  Which one?

19        MR. HATHAWAY:  Eighteen.

20        MR. ABBOTT:  Eighteen.  Thank you.

21        Okay.  Got it.

22  BY MR. ABBOTT:

23    Q.  Do you have that one, sir?

**24    A.  Yeah.**

25    Q.  So these two e-mails we were talking about

1  earlier today, would you call these QWRs?

2    **A.  I would consider it a QWR, but I had never heard**

3  **of a QWR before all of this.**

4    Q.  Understood.

5       And is there a reason you e-mailed it instead of

6  mailing it to the P.O. box, P.O. Box 270415 in Oklahoma

7  City?

8    **A.  I'm not sure why exactly.  They provided an**

9  **e-mail address, so I assumed that was the way to contact**

10  **them.  Obviously, it worked.  You got it.**

11       (Exhibit 22 marked for identification.)

12  BY MR. ABBOTT:

13    Q.  I'm going to mark as Exhibit 22, a letter from

14  you to Caliber, dated October 25, 2017.  Please review

15  that and let me know when you're ready.  I'll ask you

16  some questions.

17    **A.  Okay.**

18    Q.  Do you recognize what I've marked as Exhibit 22?

19    **A.  I do.**

20    Q.  And what is this document?

21    **A.  This is my version of a QWR.  I'm requesting**

22  **information on the bankruptcy, asking them to**

23  **investigate it.**

24    Q.  Okay.  And then the title here -- I'm not sure

25  it's a title -- but there is a thing here that says, "To

1    Caliber Home Loans, Notice of Error, Request for

2    Information Or Qualified Written Request."  So you're

3    kind of borrowing the language that was in those various

4    notices to you.  Correct?

5         **A.  Correct.  I'm not an attorney.**

6         Q.  Was that your intent, to borrow that language so

7    they knew what you were trying to do?

8         **A.  Is that against the law?  It's supposed to be --**

9    **yeah, I had no idea that a Qualified Written Request was**

10   **a thing.  So yeah, that was so they would know this was**

11   **a Qualified Written Request.**

12        Q.  Okay.  Sort of using their language?

13        **A.  Yes.**

14        Q.  That makes sense.

15            In the first sentence here, you say, "In regards

16   to my conversation with the manager of your payment

17   center in Dallas" -- is that the same conversation that

18   you had testified to earlier today?

19        **A.  Yes, it is.**

20        Q.  So I think you couldn't kind of recall exactly

21   when that conversation happened, but it's fair to say it

22   happened before October 25, 2017?

23        **A.  Yes.**

24        Q.  Do you recall, as you sit here today, like if

25   that was -- it happened close in time, proximity-wise,

1  to you writing this letter that we've marked as

2  Exhibit 22, or if it had happened longer -- a longer

3  period of time before then?  It's an awkward question.

4  I can rephrase it if you don't understand.

5      A.  Can you rephrase.

6      Q.  I'm trying to understand, I guess -- if you

7  don't remember, it's fine -- do you recall if you sent

8  this letter that we've marked as Exhibit 22 near the

9  time that you had that call with the Dallas --

10      A.  Shortly after.

11      Q.  Shortly after.

12      A.  Yeah.

13      Q.  So understanding you might not remember the

14  exact date, but it might have been say September or

15  October 2017 when you had that call with the guy in

16  Dallas, or further back?  That's what I'm trying to

17  understand.

18      A.  No.  No.  It was -- I won't swear to it.  I want

19  to -- I shouldn't swear to anything.  I don't remember

20  the date and month.  It's just a memory thing for me.

21  There is only a few calls that I made.

22          The first one, the guy says, "I don't know what

23  happened.  I'll look into it and get back to you."

24  Well, he never got back to me.

25          There is a couple of calls that we got put on

1   hold and they just hung up on us -- on me rather.  And

2   then when I got through -- it was after the first of the

3   year.  It wasn't in 2016.

4       Q.  All right.  So if I'm understanding you

5   correctly, your best estimate is it was in 2017, between

6   January 1 and October 25th, but you're not sure of a

7   more specific time?

8       A.  Right.  Between January and March sometime.

9       Q.  Oh, between January and March?

10      A.  Yeah.

11      Q.  Okay.  Why did you wait until October to send

12  this letter?

13      A.  Was it in October?

14      Q.  That's the date that you have here on the

15  letter.  I don't know if you sent it in October.

16  Exhibit 22, I'm referring to.

17      A.  You know, I'm not real sure right now.

18      Q.  Okay.  That's fine.

19      A.  I thought it was March something.  March 14th or

20  15th.

21      Q.  You sent some e-mails to Caliber in March.  Is

22  that what you're referring to?

23      A.  Is that what was --

24      Q.  But you don't reference a call with --

25      A.  No.  I don't think I had made it yet.

1     Q.  Okay.

2     A.  **That's three.**

3         **You know, this is what, six years ago now?**

4     Q.  Um-hmm.

5     A.  **Yeah.**

6     Q.  If you don't remember, that's fine to say.

7     A.  **I don't remember.**

8     Q.  You don't have to remember.  That's fine.

9     A.  **I have records I could look back on that.**

10    Q.  What records would you look at?

11    A.  **Phone records.**

12    Q.  The phone records.

13    A.  **Yeah.**

14    Q.  And what would you be looking in the phone

15 records to remind you of which call might be --

16    A.  **The length of the call.**

17    Q.  The length of the call?

18    A.  **The length of the call.**

19    Q.  How long was the call with the Dallas guy?

20    A.  **Probably close to half an hour.**

21    Q.  How long were you on hold for that call?

22    A.  **None on that call.**

23    Q.  So you called a number and someone immediately

24 picked up?

25    A.  **Yes.**

1    Q.  And you had this conversation with them?

2    A.  Nope.  They immediately picked up.  I asked him

3  what was going on.  He gave me the same spiel.  He

4  didn't know what happened, he would look into it.  I

5  said, "No, let me talk to your supervisor," and he

6  hooked me up to his supervisor.  So I talked to two

7  people on that one call.

8    Q.  Was there a hold period for when he was

9  connecting to the supervisor?

10    A.  Could have been brief.

11    Q.  Do you recall what phone number you called?  Was

12  it an 800 number or a local number?

13    A.  I don't recall.

14    Q.  One other question for now on this Exhibit 22.

15  It looks like -- is this a notary stamp?  Am I seeing

16  this correctly?

17    A.  It does look like one; doesn't it?

18    Q.  Do you recall getting your signature notarized

19  for this one?

20    A.  Yeah.

21    Q.  And I don't recall seeing this in any of the

22  other correspondence -- well, you sent the two e-mails,

23  so I guess you can't get those notarized.

24    A.  Right.

25    Q.  Why did you get this notarized?

1    A.  I wanted proof that I sent it.  And I think I

2  may have talked to somebody, and they said I don't have

3  to notarize a letter, just get a return receipt when you

4  mail it.  I might have done both on this one.  And I

5  think I sent this to three different addresses.

6    Q.  Caliber only has this one copy.  What other

7  addresses do you think you sent it to?

8    A.  The other two on the bottom of this.  Wherever

9  that exhibit is.  There for a while, I was sending it --

10  multiples.

11    Q.  Do you have any documents or anything showing

12  that you sent it to other addresses?

13    A.  Yeah.  It would have been in the certified

14  receipts.

15    Q.  Okay.  And was that something you provided to

16  your attorney?

17    A.  Yes.

18    MR. ABBOTT:  Okay.  He can't answer, I guess.

19  But you would have produced that?

20    MR. HATHAWAY:  Right.  I produced -- I believe I

21  produced every certified receipt that I have.  I'll

22  double-check.  But I'll get them to you and whatever he

23  provides me.

24    MR. ABBOTT:  That's fine.

25    THE WITNESS:  And I can't swear to every one of

1  them, because eventually, we found out where they were

2  supposed to be going to.  You have customer service, you

3  have the payment center, and you have the resolution

4  center.  So we were sending copies --

5  BY MR. ABBOTT:

6      Q.  I understand.  I don't mean this to sound

7  argumentative.  I'm trying to think of a way to formulate

8  this.  The nature of you providing testimony under oath

9  is you are swearing to stuff.

10     A.  Right.

11     Q.  So if you don't remember something or you

12  don't -- I'd appreciate your input, Steven, how to

13  handle this -- but if you're unsure because you can't

14  recall, which is understandable given the time that's

15  elapsed, I think we need to be clear about it.  Because

16  if you don't know, you don't know.  That happens.

17     A.  Then let me change that.  On this particular

18  letter, I don't know for sure.

19     Q.  Okay.  Okay.  You understand where I'm coming

20  from.

21     A.  Yes, I do.

22     Q.  Because you literally are under oath actually.

23     A.  Yes.

24     Q.  Okay.  Sounds good.

25         Do you know Sara Peterson or was that just like

1  a notary, someone unknown to you?

**2**     A.  **I think it's just a notary at the bank.**

3     Q.  What bank did you go to?

**4**     A.  **Banner.  No, that was Skagit at the time.**

5     Q.  Okay.  In reading this letter that's marked as

6  Exhibit 22 -- let me ask you, do you agree that this

7  letter pertains entirely to the bankruptcy, you're

8  asking Caliber to research it and also to provide you

9  with the name of the person who filed it and then the

10 Court record, et cetera?

**11**    A.  **It appears to be.**

12        MR. ABBOTT:  Okay.

13        (Exhibit 23 marked for identification.)

14 BY MR. ABBOTT:

15    Q.  I'm going to mark as Exhibit 23 a letter from

16 Caliber to you, dated November 17, 2017.

17        Please take a look at that and let me know when

18 you're ready.

**19**    A.  **Okay.**

20    Q.  All right.  So have you seen this letter before?

**21**    A.  **Yeah.**

22    Q.  Okay.  What's your understanding of this letter

23 I've marked as Exhibit 23?

**24**    A.  **It's just a response to the letter that I sent**

**25**    **them.**

1    Q.  Okay.

2    A.  **Giving me the information on the bankruptcy.**

3  **What I'm not clear on is the time, though.**

4    Q.  Can you explain what you mean by that.

5    A.  **Well, this is dated October 25th.**

6    Q.  For the record, can you just say what

7  exhibit you're looking at.

8    A.  **Oh.  Exhibit 22 is dated October 25th.  I**

9  **thought I requested that bankruptcy information a lot**

10  **earlier in the year than that.**

11    Q.  All right.  Let's go back to your understanding

12  of this letter.

13    A.  **Okay.**

14    Q.  Let me go to the second to last paragraph.  Let

15  me direct your attention to that on the first page of

16  Exhibit 23.

17    A.  **Um-hmm.**

18    Q.  The heading says, "Requested information."  Do

19  you see that?

20    A.  **Not yet.**

21    Q.  It's in bold.

22    A.  **Oh, yeah.  Requested.  Okay.**

23    Q.  So I just want to go through that, starting with

24  that for a second.

25    A.  **Okay.**

1     Q.  And again, they're responding to the letter they
2  received on November 9th, which is Exhibit 22.
3     A.  Um-hmm.
4     Q.  And Caliber says, "According to our records,
5  when the loan was transferred to Rushmore on November 1,
6  2017, it was contractually due for the October 1, 2017
7  payment."  Let me stop there.  I don't want to get into
8  the whole thing we got into about contractually due.
9  But what's your understanding in this sentence here --
10  in this letter, what's your understanding of what
11  Caliber is saying to you?
12     A.  I'm not real sure.
13     Q.  Do you recall what your impression or
14  understanding of it was when you first reviewed this
15  letter?
16     A.  No.  I don't know what they're trying to say
17  there.  Contractually due for the October 1st payment.
18  They got the October 1st payment.
19     Q.  Okay.  So just staying -- in terms of the
20  question I asked you, your answer is you're not sure
21  what they're saying there.  Right?
22     A.  Yeah.
23     Q.  All right.  Let's go to the next sentence.  It
24  says, "At that time, the loan was not in preforeclosure
25  or foreclosure status."

1          Did you understand from that, that Caliber was
2    saying that it was not in foreclosure?
3        A.  Yes, I do.
4        Q.  So they're kind of disagreeing with what that
5    guy in Dallas was saying.  Would you agree with me on
6    that?
7        A.  Yes.
8        Q.  And Caliber continues and says, "Caliber
9    respectfully disagrees with your contention that the
10   loan was in preforeclosure status."
11          Did that clarify for you that Caliber wasn't
12   foreclosing on the loan, at least at this time period?
13       **A.  They didn't say they were foreclosing.  It was**
14   **in preforeclosure.  And it was in preforeclosure because**
15   **of a bankruptcy that was filed.  That's what the guy at**
16   **the payment center -- that's why they didn't send**
17   **monthly invoice statements.**
18       Q.  So this letter didn't clarify for you that
19   Caliber was not in a preforeclosure status with your
20   loan?
21       **A.  No.  It didn't clarify anything.**
22       Q.  Okay.  Let's go to the next paragraph.  Caliber
23   provides a case number, 98-02782, for the bankruptcy
24   that it had on record.
25       **A.  Um-hmm.**

1    Q.  Do you see that?

**2    A.  Yes.**

3    Q.  And that it was filed January 29, 1998.

4        Did you look up this bankruptcy once you got the

5    bankruptcy case number from Caliber?

**6    A.  No, I did not.**

7    Q.  Now, the debtor -- and I'm not sure how to

8    pronounce this.  I'll spell it for the record.

9    M-A-R-E-K is the first name and the last name is

10   M-I-E-L-N-I-C-Z-U-K.

11       Was that name familiar to you at all?

**12   A.  No.**

13   Q.  All right.  The rest of that letter, going to

14   the next page, just gives you Rushmore's contact

15   information.

**16   A.  I think I requested that information earlier in**

**17   the year.  I don't understand the date stamps on this.**

18       (Exhibit 24 marked for identification.)

19   BY MR. ABBOTT:

20   Q.  I'm marking as Exhibit 24, a document entitled,

21   "Annual Escrow Account Disclosure Statement."  Please

22   take a look at that and let me know when you're ready.

**23   A.  Ready.**

24   Q.  All right.  Do you recognize the document I've

25   marked as Exhibit 24?

1      A.  I do.

2      Q.  All right.  What's your understanding of this

3  document?

4      **A.  This is the property tax statement, from what**

5  **they paid the property taxes to bring them current.**

6      Q.  Okay.  Anything else?

7      **A.  Is there anything else?**

8      Q.  I'm just wanting to know your understanding of

9  this document.  I wanted to make sure I'm not missing

10  anything.

11     **A.  Oh, it's a -- yeah, an escrow on the taxes that**

12  **they paid and a payment agreement to pay it back.**

13     Q.  Well, let me ask you -- because that's referred

14  to in your pleadings, too.  What makes you think this is

15  some kind of agreement or contract with Caliber?

16     **A.  Well, you can either pay this month in full --**

17  **where does it say? -- "However, you may choose to pay it**

18  **in full and reduce your new monthly payment to $699.  If**

19  **you choose to pay this shortage in full now, please**

20  **detach this coupon and mail it along with your check..."**

21       **"We have spread this amount over 12 months" --**

22  **the second sentence.**

23     Q.  What part of the exhibit are you looking at?

24     **A.  Down in the lower right-hand corner, "Escrow**

25  **Shortage Payment Coupon."**

1     Q.  "For your convenience, we have spread..."

2         Okay.  Go ahead.  I'm trying to follow you.  Go

3  ahead.

4     **A.  "Your escrow disclosure indicates a shortage of**

5  **$7,921.24.  For your convenience, we have spread this**

6  **amount over 12 months and included it in your new**

7  **monthly payment, effective April 1st, 2017.  However,**

8  **you may choose to pay it in full and reduce your new**

9  **monthly payment to $699."**

10    Q.  Now, do you know whether federal law requires

11 that a property tax bill be -- that these options be

12 offered to a borrower?

13    **A.  I have no idea.**

14    Q.  And then go to the second page here.  Just

15 curiosity.  We were talking earlier about when Caliber

16 paid the taxes to the County.  It looks like it was

17 January 2017.  So maybe shortly after that letter was

18 sent to you.

19    **A.  Yeah.**

20    Q.  I think we were kind of not sure exactly when it

21 was sent.

22    **A.  Right.**

23    Q.  Okay.  The letter does start -- if you go to the

24 first paragraph, right above the table on the first

25 page, can you just -- it says, "In accordance with

1  federal guidelines."  Do you see that?

**2      A.  I do see that.**

3      Q.  But you're not aware of what those guidelines

4  are.  Right?

**5      A.  No.**

6          MR. ABBOTT:  Okay.

7          (Exhibit 25 marked for identification.)

8  BY MR. ABBOTT:

9      Q.  I'm going to mark as Exhibit 25, a document that

10  you had filed in court.  I'm going to hand that to you.

11  Let me know when you're ready.

**12      A.  I'm ready.**

13      Q.  Do you recognize this document that's marked as

14  Exhibit 25?

**15      A.  I do.**

16      Q.  What is it?

**17      A.  It's a request for Caliber to investigate the**

**18  Chapter 7 bankruptcy that was supposedly filed under my**

**19  name in 1998, dated March 15th of 2017, not October.**

**20  And it took until November to get a response.**

21      Q.  So this letter --

**22      A.  It doesn't say a Qualified Written Request on**

**23  it.**

24      Q.  Let me ask my question, sir.

25          The letter has no indication of where it was

1  sent or how it was sent.  Do you recall, as you sit here

2  today, how -- well, first of all, did you actually send

3  this to Caliber?

4  **A.  Yes.**

5  Q.  And do you recall how you sent it to Caliber?

6  **A.  I don't recall.  I would assume by mail.**

7  Q.  Okay.  I will represent to you, I had Caliber

8  search this and they couldn't find it.  That's why I'm

9  asking you how you sent it.

10  **A.  Oh, really?**

11  Q.  Yes.

12  **A.  Oh.**

13  Q.  The other thing is your signature on this, it's

14  different than your signature on everything else.  So I

15  want to ask you about this from when I saw this filed in

16  the Court.  Do you recall why it was signed this way?

17  For reference, you can look at Exhibit 2, which is

18  the --

19  **A.  With my signature on it?**

20  Q.  Yeah.  With the line of credit.

21  **A.  That's not my signature, no.**

22  Q.  What's not your signature?

23  **A.  Whatever that is.**

24  Q.  On which document?

25  **A.  On Exhibit 25.**

1     Q.  Oh, okay.  So that's not your signature.

2     A.  No.

3     Q.  Okay.  And your name is not spelled completely

4  out here.  It says, "Lorin E. Massinga."

5     A.  I see that.

6     Q.  You may not remember, sitting here today, but do

7  you have any recollection why it was spelled that way?

8     A.  No.  I can only assume that this may not have

9  been sent.

10     Q.  What makes you say that?

11     A.  Well, I would have signed it.  It would have

12  been spelled out all the way.

13     Q.  Proofread or something.

14     A.  Right.  I've got a stack of papers between

15  Rushmore and Caliber that's about this tall, maybe

16  taller.

17     Q.  Okay.

18     A.  This might have been mixed in some of the

19  correspondence or something.

20     Q.  Okay.  That's fair enough.

21        As you sit here today, you can't say under oath

22  that you're sure you sent this to Caliber?

23     A.  No.

24        MR. ABBOTT:  Okay.  That's fine.  Moving on.

25  That's helpful.  I appreciate it.  Appreciate your

1    candor.

2            (Exhibit 26 marked for identification.)

3    BY MR. ABBOTT:

4       Q.  Marking as Exhibit 26, a document that looks

5    like a docket report from PACER.  Let me know when

6    you're ready, sir.

7       **A.  I'm ready.**

8       Q.  Okay.  All right.  So do you recognize this

9    document I've marked as Exhibit 26?

10      **A.  Nope.**

11      Q.  No?

12      **A.  No.**

13      Q.  Okay.  All right.  That's quick.  Your

14   deposition would go by so much faster.

15      **A.  Never seen this before.**

16           MR. ABBOTT:  All right.

17           (Exhibit 27 marked for identification.)

18   BY MR. ABBOTT:

19      Q.  I'm going to mark as Exhibit 27, a PACER

20   printout, but I'm going to make it very clear on the

21   record, this is a document that I generated and I

22   printed out like this morning, I think, or last night.

23   The time stamp is on here.  Yeah, it was this morning.

24   I'm going to hand this to you.

25           MR. HATHAWAY:  We're not on this anymore?

1          MR. ABBOTT:  No, he's never seen it before, so
2     that doesn't help.
3          So I've marked as Exhibit 27 -- I do have to set
4     this up, because it's a document I created, so bear with
5     me, Steven.
6          MR. HATHAWAY:   Okay.
7     BY MR. ABBOTT:
8     Q.  So I went on PACER.  And PACER is the Federal
9     Government's website for all bankruptcy stuff.  You
10    probably know of it now, I guess, because you have a
11    bankruptcy.  I don't know.  So you can look up, by
12    various ways, information.  And one of the ways is just
13    put in a Social Security number; no state, no name, just
14    the social.  And that's what I did.  And I used the
15    social from your loan application and from your own
16    bankruptcy as a reference.
17    **A.  Um-hmm.**
18    Q.  So first thing I want to ask you -- I'm happy to
19    go off the record with this if you want to conserve
20    privacy -- but I just want to confirm that the Social
21    Security number I used is correct and that it's your
22    social.
23    **A.  It is.**
24    Q.  So we don't need to read it on the record.
25    That's fine.

1          And this is the search results I got back.  And

2    I just -- you recognize, I take it, the middle and the

3    last entries -- right?

4         A.  (Witness nods head).

5         Q.  -- as being -- one is your Chapter -- is it

6    Chapter 13?

7              MR. HATHAWAY:  Thirteen.

8    BY MR. ABBOTT:

9         Q.  -- so Chapter 13 bankruptcy, and then your

10   adversary complaint that is this proceeding?

11        A.  Oh.

12        Q.  Do you recognize those two?

13        A.  No.  I recognize my name and I know that I've

14   got a bankruptcy.

15        Q.  Okay.

16        A.  That's what the second one is, is this

17   proceeding?

18        Q.  I think the third one is the proceeding.  AP.

19   Right?  Adversary proceeding.

20        A.  Oh, okay.

21        Q.  And then the first one is the name that we were

22   looking at that Caliber identified for you in its

23   November letter.  Do you see that?

24        A.  I do see that.

25        Q.  Okay.

1    A.  Have you verified that's his Social Security

2  number though?

3    Q.  I'm sorry?

4    A.  Anybody verify that that is his Social Security

5  number, though?  His could have been 538 --

6    Q.  I'll represent to you, I don't know if there is

7  a way to verify -- my understanding is that there are no

8  duplicate Social Security numbers.

9    A.  All right.

10    Q.  So all I know from my experience with this

11  search system is if you put in a social, it comes back

12  with whatever was used to file the case.

13    A.  Okay.

14    Q.  But I'll leave it at that, because I don't want

15  to be the one testifying.

16    Okay.  So I just want to leave that with you.

17    A.  Okay.

18    MR. ABBOTT:  That's 27.

19    (Exhibit 28 marked for identification.)

20  BY MR. ABBOTT:

21    Q.  Let me mark as Exhibit 28, a letter from Caliber

22  to you.

23    Can you look on with the witness?  Is that okay?

24    MR. HATHAWAY:  Sure.

25    MR. ABBOTT:  I'm sorry.  I only made two copies

1  for some of these.

2  BY MR. ABBOTT:

3      Q.  All right.  So Exhibit 28 is a letter dated

4  February 8, 2017, from Caliber to you.  Do you recognize

5  this letter?  Take your time.

6      **A.  Yes, I've seen it.**

7      Q.  What's your understanding of what this letter

8  is?

9      **A.  This is an offer for -- options to resolve, as**

10  **far as I know.**

11     Q.  Options to resolve what?

12     **A.  Your loan, if you're delinquent.  Resolution.**

13         **Oh, it's in Spanish, too.**

14     Q.  I don't know if that helps.

15         So do you understand whether or not this letter

16  is related to foreclosure?

17     **A.  Yes.**

18     Q.  Your understanding is it is related to

19  foreclosure?

20     **A.  Yes.**

21     Q.  And this has a stamp that has "USPS Certified

22  Mail" on it.  Do you see that?

23     **A.  Yes.**

24     Q.  I think it was your e-mails that you referenced

25  that Caliber was charging you for mailing things out.

1  If you want to look at Exhibit 18 to --

2     **A.  I remember reading something --**

3     Q.  Do you remember?  I'm just paraphrasing.  But my

4  question to you would be, is this Exhibit 28 one of the

5  examples of things being mailed out to you where you

6  were having to pay the postage?

7     **A.  No.  I don't recall.  I don't think that's what**

8  **I intended at all.**

9     Q.  Okay.  So that begs the question for me -- let

10  me ask while it's in my mind -- for Exhibit 18, your

11  e-mails to Caliber --

12     **A.  Yeah.**

13     Q.  -- where you referenced -- let's see here -- you

14  say -- and I'm looking on the first page -- I'll wait

15  until you get there, just so you can follow along.

16     **A.  Okay.**

17     Q.  So the first page of Exhibit 18, you say --

18  starting at the very end of the first line -- "Since

19  then, you have neglected to send an invoice, but were

20  more than eager to send preforeclosure notices.  And

21  bill me for them."  What did you mean by that?

22     **A.  That would be the fees on the invoices when they**

23  **did finally start sending invoices, home inspection**

24  **fees, legal fees.  There is probably $5,000 in fees and**

25  **charges that they've added to my loan.**

1    Q.   Okay.  Going back to Exhibit 28, do you recall
2  receiving this in February of 2017?
3    **A.   Just a second.  Twenty-eight?  Yeah.  Yes, I do.**
4    Q.   And what was your reaction or what was your
5  response to it?
6    **A.   I've been annoyed throughout the whole time**
7  **Caliber had my loan -- serviced my loan, so just annoyed**
8  **that I was in preforeclosure because of a bankruptcy**
9  **that I didn't file.**
10   Q.   Are you thinking -- I'm reading from your answer
11 that -- are you saying that by February 8th, 2017, you
12 had spoken to that guy in Dallas?
13   **A.   No.  But I spoke to someone else when I called**
14 **about why I hadn't received any invoices yet, and they**
15 **told me I was -- I believe that was in -- maybe I'm**
16 **thinking Rushmore.**
17   Q.   I mean, if you don't know, that's fine, but I
18 just --
19   **A.   I'm going to stop there, because I might have my**
20 **dates confused here.**
21   Q.   Okay.  I will say -- I'm going to say on the
22 record that the reason I'm focusing in on this -- I'm
23 trying to understand your position on this is because --
24 I'm not aware of my client foreclosing solely because
25 someone is in a bankruptcy.  So I'm trying to understand

1  what this guy told you and things like that.

2     **A.  He said it was in preforeclosure because of a**

3  **bankruptcy, is what the guy told me.**

4     Q.  Okay.

5     **A.  No, what's the other word?  What's the other**

6  **word?  It starts with a D.  Default.**

7     Q.  Default.

8     **A.  They didn't send invoices because my loan was in**

9  **default because of a bankruptcy.**

10    Q.  Is it possible -- and you've been candid that

11 your memory from five years ago --

12    **A.  No.**

13    Q.  You're very clear about this?

14    **A.  I am absolutely clear.**

15    Q.  Let me just ask this to make sure I close the

16 loop on it.  Is it possible that this person or someone

17 at Caliber said, "You're not receiving the monthly

18 statements because you're in bankruptcy"?

19    **A.  Nope.**

20    Q.  That's not possible?

21    **A.  Nope.  Not possible.  And he almost got a**

22 **personal visit from me.  That's how clear I am.**

23    Q.  Did you say that to him?

24    **A.  No.**

25    Q.  What do you mean that he almost got a personal

1   visit from you?

2      A.  His attitude, his tone of voice, everything, was

3   completely unprofessional.

4      Q.  In what way?

5      A.  Snotty tone of voice.  The accent didn't help.

6      Q.  What accent?

7      A.  It was like a New Jersey accent or something.

8   Sounded like a New Jersey accent.  Ever heard

9   New Jersey?  You're from New York.  Right?

10     Q.  Yeah, but I can never pull out someone and say,

11  "Oh, you're from Jersey."

12     A.  Oh, yeah.  I was in the service.  I was around a

13  couple guys that were from New Jersey.  They had the

14  same accent.

15     Q.  So you developed a dislike for New Jersey?

16     A.  No.  It's just what he said, the way he said it.

17     Q.  Well, what did he say?

18     A.  He said, "You know you have to make a payment,"

19  in a snotty tone of voice like that.  I said, "I'm more

20  than willing to if I know how much it is."

21     Q.  You must have had his name and employee ID when

22  you were doing that.

23     A.  No.

24     Q.  No?

25     A.  No.

1    Q.  Why not?

2    **A.  They don't give that out.**

3    Q.  Did you ask?

4    **A.  No.**

5    Q.  Well, why didn't you ask?

6    **A.  I should have.**

7    Q.  But why didn't you?

8    **A.  Because I didn't think we were going to be here,**

9    **doing this.  I had no intentions of this at the time.**

10   Q.  Your -- I think it was in your complaint, but

11   it's in one of the papers that was filed in the case,

12   alluded to damages for credit -- like your credit harm,

13   I guess, or damage to your credit.

14   **A.  Um-hmm.**

15   Q.  Do you believe that Caliber has damaged your

16   credit?

17   **A.  Somewhat, yeah.**

18   Q.  In what way?

19   **A.  I have to look at my credit report and see.**

20   Q.  You're aware Caliber did not report on this

21   loan.  Are you aware of that?

22   **A.  No.**

23   Q.  Okay.  Caliber thought it was in bankruptcy, so

24   they did not.  You're not aware of that?

25   **A.  Oh, no.**

1     Q.  Okay.  That's fine.

**2     A.  HSBC didn't report on it either.**

3     Q.  I don't know.  But I checked on the other one

4  and I can tell you that.  So I'm trying to understand

5  your damages.  You testified earlier that you had not

6  applied for credit for a long time.  This was part of

7  the deposition where you were talking about the outcome

8  of divorce basically.

**9     A.  Right.**

10     Q.  And I thought -- had you applied for credit

11  sometime in 2016 or '17; or since then, have you applied

12  for credit?  Let's say -- let me make a better question.

13        Have you applied for credit since January 1,

14  2017 to the present?

**15     A.  I don't believe so.**

16     Q.  And I understood your earlier testimony to be

17  that you don't order your credit reports.  You might

18  have ordered one over the last couple of years, but you

19  weren't sure about the timing of it.

**20     A.  Right.  For the bankruptcy I filed.**

21     Q.  For the bankruptcy.  What was the purpose of

22  that?

**23     A.  The purpose of the credit report?**

24     Q.  Yes.  In connection to your bankruptcy?

**25     A.  To see what was on it.  And I don't recall what**

1  was on it.

2      Q.  How have you been harmed by Caliber?

3      **A.  I'm not sure yet.**

4      Q.  What do you mean by that?

5      **A.  Well, I haven't applied for anything.**

6      Q.  Okay.  Let's get away from the credit reporting

7  or credit harm.

8      **A.  Okay.**

9      Q.  Do you think Caliber has harmed you in any other

10  way?

11      **A.  Yes.  Mentally throughout all of this.**

12      Q.  Mentally.  Okay.  Can you explain a little bit

13  what you mean by that.

14      **A.  Trying to foreclose on me since the day they**

15  **took my loan over.  Between them and Rushmore both doing**

16  **this preforeclosure because of a bankruptcy that I**

17  **didn't file.**

18      Q.  Did Caliber try to foreclose on you from --

19  let's focus on 2016.

20      **A.  Um-hmm.**

21      Q.  Caliber started servicing the loan August 1,

22  2016.

23      **A.  Um-hmm.**

24      Q.  I think that's what you said in your complaint,

25  too.  We're all on the same page?

1    A.  Yeah.

2    Q.  And then they continued until, I think,

3  October 31st, 2017?

4    A.  Correct.

5    Q.  So for purposes of the next few questions, let's

6  focus on 2016, from August 1 to December 31st.

7    A.  Okay.

8    Q.  Did Caliber try to foreclose on your house

9  during that time period?

10    A.  They sent preforeclosure notices.

11    Q.  Have you produced -- have you provided to your

12  attorney any copies of preforeclosure notices from

13  Caliber during that time period?

14    A.  I'm not sure.

15    Q.  Okay.  I don't recall seeing anything like that.

16  Do you recall?  I don't.

17        MR. HATHAWAY:  I think he's confused.

18        THE WITNESS:  I received so much --

19        MR. HATHAWAY:  No.  I don't recall.

20  BY MR. ABBOTT:

21    Q.  Okay.  I'm trying to understand that, too.  I

22  know it's a very -- the time line is so long here.

23    A.  Yeah.

24    Q.  That you're actually far less confused is

25  impressive.  So I'm just going to represent, I haven't

1  seen any indication Caliber ever took a step towards any

2  foreclosure, preforeclosure or otherwise, in 2016.  If

3  you have a document like that, I would ask that you

4  provide it to your attorney so he can produce it within

5  that two-week period that we agreed to.

6      **A.  Okay.**

7      Q.  It would be helpful to know.  Because if that's

8  part of your claim against my client, I want to

9  understand it.

10      **A.  Right.**

11      Q.  Let's go to January -- well, before we do that,

12  we already confirmed on the record earlier that Caliber

13  sent you a letter in October 2016 saying, hey, here is

14  what you need to pay to bring the loan current.

15      **A.  Correct.**

16      Q.  And then you tendered that pretty much close to

17  the deadline.  I'm not sure when the letter was sent or

18  the check.  But you sent the money -- the exact money to

19  the penny --

20      **A.  Right.**

21      Q.  -- in early December.  Okay.  And I am still

22  unclear whether your testimony is that you made a

23  payment to Caliber for the January 2017 payment.  But my

24  question to you is, for the time period between

25  January 1, 2017 -- well, actually January 2017 -- did

1  Caliber do anything relating to foreclosure in that

2  month?

3      A.  I don't recall.

4      Q.  Okay.

5      A.  And the January payment was made.  I'm not sure

6  when it was made.

7      Q.  Is it possible that was made in say March?

8      A.  Yes.

9      Q.  Okay.  So I want to clarify.  The way I may have

10  said something may have been unclear to you.  When I

11  said did you make a payment in January of 2017, what I

12  was trying to understand was did you send in a payment

13  in that month?

14      A.  No.

15      Q.  Okay.  And I think your answer, now that you've

16  clarified, it sounds like you're referring to I made the

17  payment for that January, but I did it in March or did

18  it whenever.

19      A.  Correct.

20      Q.  That's helpful.  Because now it's more

21  consistent with the records I was seeing.  And I didn't

22  think we were disagreeing on that.

23      A.  Right.

24      Q.  So for the January payment, you tendered that in

25  March, around that time period, in 2017?

1    A.  Probably, yeah.

2    Q.  Okay.  And what about the February payment?

3  Would you have sent that in as like a lump sum in March?

4    A.  Yeah.  December, January, or February would have

5  been a lump sum.

6    Q.  Okay.  All right.  Sometime in March.

7    A.  Correct.  I believe.

8    Q.  That's consistent with what I've seen.  Okay.

9  That makes me feel better.

10        So I want to go back to this document we marked

11  as Exhibit 28.

12    A.  Um-hmm.

13    Q.  Okay?  Because this is the first document that

14  I've seen that's a foreclosure-related document by

15  Caliber.

16    A.  Um-hmm.

17    Q.  My first question -- I think you answered this

18  already -- you do associate this with foreclosure?

19    A.  Right.

20    Q.  When you say Caliber is trying to foreclosure on

21  me, is it correct that there are documents like this

22  that you're thinking of?

23    A.  Correct.

24    Q.  Okay.

25    A.  And I've seen them, but I'm not clear whether

1    it's Caliber or Rushmore now.  It says, "Preforeclosure

2    Notice," bold letters across the top.

3        Q.  I appreciate that.  I understand.  It's four

4    years or something now.  Okay.

5        A.  Six.

6        Q.  Did you receive foreclosure-related notices from

7    Rushmore?

8        A.  Yes.

9        Q.  Okay.  On February 8, 2017 -- now, understanding

10   your clarification about when you actually tendered the

11   payment for January and February in a lump sum in

12   March -- on February 8th, 2017, Caliber had not received

13   your January 2017 payment yet.  Right?

14       A.  Correct.

15       Q.  Or the February 2017 payment yet.

16       A.  Correct.

17       Q.  Okay.

18       A.  They also hadn't billed me for it either.  They

19   just expected it.

20       Q.  Okay.  Quickly refer you back to Exhibit 24.

21   You said a few times this morning -- you referred to an

22   escrow -- I forgot how you referred to it -- a contract

23   or something like that.

24       A.  Correct.

25       Q.  You had even said you didn't bring that with

1 you.  That was a comment you might have made.  I don't

2 remember.  I want to make sure this is the one you were

3 thinking of.

4      My question to you is, are there any other

5 Annual Escrow Account Disclosure Statements other than

6 this one that you're thinking of?

7      **A.  The other form was probably misnamed as escrow.**

8 **I referred to it as an escrow form when it actually**

9 **wasn't an escrow form.**

10     Q.  Do you remember what that document would have

11 been?  Have we already gone through it?

12     **A.  Yes.  We've already gone over it.  That was that**

13 **payment history.  Probably one of the first documents.**

14     Q.  The one that lists like October 31st --

15     **A.  Yeah.**

16     Q.  Let's just take a look at it to make sure.  I

17 want to make sure you have an opportunity to testify --

18     **A.  I am a log truck driver.  I don't know names of**

19 **things really well.  I definitely don't remember names**

20 **of things.**

21          MR. HATHAWAY:  Exhibit 17, I believe --

22          MR. ABBOTT:  Okay.

23          MR. HATHAWAY:  I believe that's what he's

24 talking about.

25          **THE WITNESS:  Seventeen or 14?**

1    BY MR. ABBOTT:

2        Q.  Let me pull those up and see if those are the

3    ones you're referring to.

4            So which exhibit are you looking at right now,

5    sir?

6        **A.  I've got both up, 14 and 17.**

7        Q.  Fourteen and 17.  Are these the ones that you

8    were referring to that you may have been mislabeling as

9    an escrow statement?

10       **A.  Yeah, it would be 17.  Fourteen was the initial**

11   **statement -- the initial amount when Caliber took it**

12   **over.  So it would be 17.**

13       Q.  Seventeen?

14       **A.  Yeah.**

15       Q.  Now, on February 21st, 2017 -- and for the

16   record, we're now talking about Exhibit 17 -- Caliber

17   wouldn't have received that lump sum yet that covered

18   your January, February -- you made some lump sum payment

19   in March.  Right?

20       **A.  Right.**

21       Q.  So when Caliber issued this February 21st, 2017

22   letter, they would not have been in possession yet of

23   that lump sum payment you were going to make in March.

24   Correct?

25       **A.  Probably correct.**

1    Q.  Okay.  All right.  Let's go back to the damages.

2  I was asking you how you think -- I wanted to understand

3  your position on how Caliber has harmed you.  You said

4  mental distress.  What was the word you used?

5    A.  I don't recall.

6    Q.  Emotional or mental distress?

7    A.  Right.  Right.

8    Q.  So what do you mean by that?

9    A.  For the first few years, everything that they've

10 done and since then is on my mind all day long, every

11 day.  Go from a mortgage company that sends regular

12 monthly statements, late notices, preforeclosure notice,

13 everything, to a mortgage servicer that doesn't send you

14 monthly statements and then expects you to make the

15 payment anyway, and then sends foreclosure options -- or

16 foreclosure -- what do they call that?

17   Q.  Notice of preforeclosure?

18   A.  Right.

19   Q.  One of Caliber's letters to you -- I can look it

20 up -- I don't remember which one it is right now -- said

21 please mail us your -- send something to Caliber saying,

22 "Hey, I didn't file bankruptcy.  What are you talking

23 about?"  I'm paraphrasing.

24   A.  Right.

25   Q.  And Caliber responded and said, "Mail or fax a

1  written statement signed by you that you didn't do

2  this." And I can pull up the letter if you want. Do

3  you remember what I'm talking about?

4      **A. (No response).**

5      Q. Let me pull up the letter.

6      **A. I don't remember seeing a letter where they**

7  **say -- I remember a letter saying, "Send your request in**

8  **writing."**

9      Q. Okay. So if you go to Exhibit 20, this is

10  Caliber's April 18, 2017 letter to you. Let me know

11  when you're there.

12      **A. I'm there.**

13      Q. There is a section at the bottom that says,

14  "Requested Clarification," in bold and underlined. Do

15  you see that?

16      **A. Yep.**

17      Q. Okay. And then, in the middle of the first

18  paragraph, it says, "If you wish for Caliber to send you

19  monthly information statements, you will need to provide

20  signed, written request so that we can update this loan

21  accordingly. This can be faxed to 405-608-2003 or

22  mailed to the address located in the footer of this

23  page."

24          Now, we found one document that we realized -- I

25  think you testified to it -- you probably didn't send,

1  because it had a misspelling and it wasn't signed.

2      A.  Right.

3      Q.  Did you ever send a written request to Caliber,

4  either by fax at this number or at one of the addresses

5  in the footer, that requested that they send you monthly

6  information statements?

7      A.  I believe so.

8      Q.  Do you know whether you've produced a copy of

9  that to your attorney?

10     A.  I believe so, but I hope it wasn't that one --

11     Q.  That's the only one that's in the mix, I'll

12  represent to you.  But none of us have everything in

13  front of us.

14     A.  Right.

15     Q.  But I have not seen a letter where you sent

16  that.  So that's why I'm asking you.

17     A.  I'm pretty sure I did, yes.

18     Q.  Can you locate -- can you check and make sure

19  that you've provided whatever --

20     A.  I can do that.

21     Q.  It could be more than one.  I don't know what

22  the situation is.

23     A.  Right.

24     Q.  Is two weeks enough time to get that, so your

25  attorney can give it to us?

1      A.   Yeah.

2      Q.   Okay.  And if you faxed it, any fax confirmation

3    sheet would be helpful, of course.

4      A.   Yeah, that would be great.  But time out.  Back

5    up to that again.  "This loan was discharged in a

6    previous Chapter 7 bankruptcy in June.  Our records do

7    not reflect that the debt was reaffirmed; therefore,

8    Caliber is not generating monthly mortgage statements

9    for this loan."

10        It wasn't my bankruptcy, nothing to do with it.

11   So they shouldn't have stopped sending statements,

12   period; they should have done it from day one, just for

13   the record.

14      Q.   I will say that that's been communicated in your

15   complaint.

16      A.   Numerous times.

17      Q.   Well, I think it's clearly communicated in the

18   complaint.  I think the position is there.

19      A.   Oh, okay.

20      Q.   I mean, for what it's worth, your attorney has

21   very clearly communicated that.

22      A.   I don't understand the legal thing here.

23      Q.   Just letting you know that your attorney has

24   done that.

25      A.   All right.

1     Q.  All right.  This might be my last exhibit.  I
2  don't want to get anyone's hopes up.
3     **A.  I'll give you a nickel.**
4        (Exhibit 29 marked for identification.)
5  BY MR. ABBOTT:
6     Q.  Okay.  I've marked as Exhibit 29 a document.  It
7  looks like it's a Home Equity Credit Line Statement from
8  HFC, dated August 1, 2016.  Do you recognize this
9  document I've marked as Exhibit 29?
10    **A.  Specifically, no, but it looks like Beneficial's**
11 **or HFC's monthly statement.**
12    Q.  Okay.  And were you receiving statements from
13 Beneficial in 2016?
14    **A.  Yes.**
15    Q.  And there is a few sections to this, but the
16 top-left box is called a "Summary of Account Activity."
17 Do you see that?
18    **A.  Yeah.**
19    Q.  Okay.  And there is a -- statement closing date
20 is July 6, 2016.
21    **A.  Okay.**
22    Q.  Do you see that?
23    **A.  Yeah.**
24    Q.  And it says, "Previous balance, $117,622.63."
25 Do you see that?

1     A.  I see that.

2     Q.  Do you have any dispute with Beneficial's

3  summary of the account as far as those two figures are

4  concerned?

5     **A.  Well, part of what I see is I had a $100,500**

6  **line of credit.  Now it's $118,000.**

7     Q.  Are you saying that you dispute Beneficial's

8  calculation of what you owed?

9     **A.  Kind of, yeah.**

10    Q.  Did you ever take that up with Beneficial?

11    **A.  No.**

12    Q.  Why not?

13    **A.  I don't know.  I never really thought about it.**

14    Q.  Let's go further.  There is more numbers in this

15 box.

16        There is a couple of items where there is a

17 zero, so we don't have to go into that.  But there is a

18 thing that says, "Other charges, $74.72."  Do you see

19 that?

20    **A.  Yep.**

21    Q.  Now it doesn't say it there, but on the top of

22 the statement, it says, "If payment is received after

23 August 11, 2016" --

24    **A.  Right.**

25    Q.  -- "a $74.72 late fee will be charged."  Do you

1  see that?

2      A.  I see that.

3      Q.  So I'm inferring from this that this "other

4  charges" is a late fee, because it's the exact same

5  amount in the Summary of Account Activity.  I don't know

6  if that's true or not, though.  But you understand that

7  you were being -- under the loan documents, that you

8  were subject to a late fee if you didn't pay.  I think

9  it was ten percent of a certain amount of the loan --

10     A.  Correct.

11     Q.  -- outstanding balance.  So you understood that.

12     A.  Yes.

13     Q.  Okay.  Then it says, "Finance charges, $518.77."

14  Do you see that?

15     A.  Yes.

16     Q.  Do you have any dispute with the other charges

17  are finance charges?

18     A.  That's got to be the monthly interest fee for

19  that month.

20     Q.  I think that's how it's referred to.

21     A.  Yeah.

22     Q.  Are you saying you don't have any dispute with

23  those two figures?

24     A.  No.

25     Q.  And then the new balance is $118,216.12, and

1  that's in bold.  Do you have any dispute with that?  Is

2  it the same dispute you had had with the previous

3  balance?

4      **A.  Yeah.  The same dispute basically.**

5      Q.  And then the credit line is $100,500.

6      **A.  Correct.**

7      Q.  That's no dispute.  That's in your loan

8  document.

9      **A.  Right.**

10     Q.  So why is it that you think -- why would you

11  dispute that the balance had become $118,000 from this

12  $100,000 credit line after your -- what's the basis of

13  dispute?  What is it that you don't agree with?

14     **A.  After paying for 20 years, it just doesn't seem**

15  **possible.**

16     Q.  Well, there is a minimum payment due of $7,247.

17  In your understanding of how the numbers would work,

18  understanding what you would dispute here, this

19  $7,247.84, that would be an explanation for a certain

20  portion of the $118,000?  Is that how you read it?

21     **A.  Yes.**

22     Q.  So then your dispute would be with the

23  difference between -- and my math is horrible -- but the

24  combination of the $7,247.84 and your credit line, and

25  then the difference between that sum and the balance?

1     **A.  My math is just as bad.**

2     Q.  Okay.

3     **A.  So that's why I requested a mortgage audit to**

4     **see where everything was at.**

5     Q.  And Beneficial -- how did they respond?

6     **A.  I requested it from Caliber.**

7     Q.  And when did you request a mortgage audit?

8     **A.  I don't recall exactly.**

9     Q.  Do you remember how you requested it?

10    **A.  No.  I know it was in really, really tiny print**

11    **that you couldn't even read.**

12    Q.  What was in really tiny print?  The request for

13    mortgage audit?

14    **A.  No.  What I received was a spreadsheet that was**

15    **in really tiny print and really faded, really light ink,**

16    **like you could not even read it.**

17    Q.  And this was the payment history?

18    **A.  That's the payment history.**

19    Q.  The transaction history.

20    **A.  Yeah.  So your question was do I agree with**

21    **this?**

22    Q.  I was just trying to understand if you had a

23    dispute with Beneficial's accounting of this line of

24    credit as of July 2016.  This is the month before

25    Caliber gets it.

1      A.  Right.

2      Q.  So this is the information Caliber will

3  ultimately get from Beneficial.

4      A.  Right.

5      Q.  So I'm trying to understand if you have a

6  dispute.  I think you said you did.

7      A.  Yeah.

8      Q.  Is it anything beyond not understanding how your

9  line of credit that was starting out at $100,500 would

10  go up to 118?

11     **A.  That's pretty much it.  How it could increase**

12  **like that.**

13     Q.  Now, do you know if Beneficial was paying taxes

14  or insurance?

15     **A.  No, they weren't.  Now, I shouldn't say that.  I**

16  **don't work for them, so -- I don't think so, because**

17  **there is still a balance with the County.**

18     Q.  But it was a rolling three-year balance, you had

19  testified to.

20     **A.  Yeah.**

21     Q.  How many late charges do you have a sense of

22  like that would have been imposed on you?  You had

23  described earlier in your testimony today -- you were

24  candid about there was oftentimes a pattern of 30, 60,

25  even 90 days when you were past due.

1      A.  Correct.

2      Q.  There was one instance, because of the illness

3  and accident, where you were more than six months past

4  due.  So you were getting late charges imposed, I guess,

5  often.  I don't know.

6      A.  **Three, four times a year at least.**

7      Q.  At least, if not more.  Do you know how many --

8  how much in late charges in total that you were charged

9  by Beneficial?

10     A.  **No.  Haven't figured it up.**

11     Q.  What's your understanding of Beneficial's --

12  what's your understanding of what Beneficial did when

13  you didn't pay interest?  If that question doesn't make

14  sense, I can clarify it.

15     A.  **Yeah, clarify that one a little bit.**

16     Q.  So you understand that for the line of credit,

17  every month, you have to pay a portion for principal.

18     A.  **Right.**

19     Q.  And that's paying down the $100,500.

20     A.  **Correct.**

21     Q.  But there is another component to it, which is

22  the interest.

23     A.  **Correct.**

24     Q.  In fact, it was in one of the documents we saw

25  recently where -- I think it was Caliber that broke it

1  down -- where like it was $308 for principal, but it was

2  a much higher number for interest.

3    A.  Correct.

4    Q.  And when you don't make a payment, your

5  principal balance, which is -- I think, from what you're

6  thinking of, it starts at that $100,500 figure -- that

7  just doesn't go down.  Right?

8    A.  Right.

9    Q.  Do you agree with me on that?

10   A.  Yeah.

11   Q.  Because you haven't paid anything into it.  But

12 then your balance increases because you have some

13 interest that you were supposed to pay that became due

14 and then that interest gets added on.  Do you agree with

15 that or do you have a different understanding of how the

16 interest works on your loan?

17   **A.  No, that's the way that works.  There is other**

18 **multiples, something else here.  It doesn't show where**

19 **that is, where that came in at.  There are other**

20 **statements.  Like I say, I don't agree with this**

21 **statement.**

22   Q.  All right.  Let me look at -- let me direct your

23 attention to Exhibit 13 for a minute.  Actually, I'm not

24 sure we need to do that.

25        Let me take a break and see if there are any

1  other questions I have and then we can go forward.  Give

2  me like five or ten minutes.

3          (Recess taken from 3:40 to 3:49.)

4          MR. ABBOTT:  All right.  We're back on the

5  record.

6  BY MR. ABBOTT:

7      Q.  Besides the mental stress that you described

8  from not getting mortgage statements, not knowing what

9  to pay, while Caliber was servicing the loan, is there

10  anything else about mental distress that you feel that

11  you've incurred as a result of Caliber's actions?

12      **A.  Mental stress, no.**

13      Q.  Did you ever see a psychologist or a

14  psychiatrist or some medical professional regarding

15  mental distress?

16      **A.  No.  I just dealt with it -- deal with it.**

17      Q.  All right.  So besides the potential credit

18  harm -- I know you're going to look at documents at

19  home, so you're not 100 percent sure on that -- and the

20  mental distress that you've described -- before I go on,

21  have I given you a full opportunity to testify about the

22  mental distress?

23      **A.  Yeah.**

24      Q.  What about the credit harm?

25      **A.  See, I don't know credit-wise -- I'd have to**

1   look and see if there is any -- anything on there.

2        Mentally-wise, like I say, I've been for -- what

3   is it? -- six years now, this is on my mind constantly.

4   I haven't counted how many days and how many hours I've

5   missed dealing with this, writing letters, sending

6   letters and stuff like that.

7       Q.  I'm just asking you with respect to Caliber.  So

8   I understand that since November 1st, 2017, you've been

9   dealing with Rushmore.

10      A.  Um-hmm.

11      Q.  So I just want to make it clear, I'm asking

12  about Caliber.  There is an attorney for Rushmore who

13  will want to ask you probably similar questions.

14      A.  Right.

15      Q.  So when you talk about time spent writing

16  letters -- I mean, I think I went through every letter

17  that my client received from you, and it was only a few

18  from my count.  Do you think that there -- was there

19  some other letter that you sent to Caliber that I

20  haven't shown you today?

21      A.  It seems like it.

22      Q.  It seems --

23      A.  It seems like it, but I can't swear to it right

24  now.

25      Q.  Okay.

1    A.  That's one of those -- I need to look and see if
2  I've got a copy of it still.

3    Q.  Right.  And you said you would provide that to
4  your attorney and your attorney would provide it to us
5  within two weeks.

6    A.  Right.

7    Q.  I mean, we may revisit that through a remote
8  deposition if he does find something that he sent,
9  clearly.  Okay.

10       Anything else about the concept of mental
11  distress that you feel Caliber has caused you?

12    A.  Don't I look --

13       THE REPORTER:  I'm sorry?

14       THE WITNESS:  It was a joke actually.  No, I --
15  BY MR. ABBOTT:

16    Q.  Okay.  Are there any other types of damages
17  besides credit or mental distress that you feel that
18  Caliber has caused you?

19    A.  Just some time lost from work.

20    Q.  Anything else?

21    A.  No.  That's all I can think of.

22    Q.  Can you just describe what you mean by "time
23  lost from work."

24    A.  Take time to write these letters and get them
25  sent in the mail.  I am not a computer person.

1    Q.  All right.  So the time to write letters.  And
2  you said time lost from work.  My understanding of your
3  work was sort of that you're driving.
4    **A.  Yeah.**
5    Q.  Are you testifying -- is it your testimony that
6  you couldn't take certain assignments because you had to
7  stay home and write a letter to Caliber?
8    **A.  Yeah.**
9    Q.  What assignments couldn't you take or did you
10  turn down because you were going to write a letter to
11  Caliber?
12    **A.  I drive a log truck.  So like yesterday, I was**
13  **in Loomis.  You probably don't know where Loomis is.**
14  **Eastern Washington.  I got home at 11 o'clock last**
15  **night.  So I just can't take time off to go to the Post**
16  **Office during the day when they're open -- or I have to**
17  **take time off rather to go to the Post Office when**
18  **they're open to mail anything.**
19    Q.  Your mail carrier doesn't pick up mail from your
20  mailbox?
21    **A.  Not registered mail or not return receipt mail.**
22    Q.  Okay.  So are you able to itemize your lost time
23  from work?
24    **A.  Yes.**
25    Q.  How would you do that?

1    A.  I'd just go back through the letters that I've

2  written and the days that I had to go mail stuff.  So I

3  don't have it right now, but I could itemize that.

4    Q.  Okay.  That would certainly, I think, fall in

5  one or more categories of things we asked for in terms

6  of supporting damages.  Can you provide that to your

7  attorney within two weeks --

8    A.  Yes.

9    Q.  -- so he can provide it to us?

10    A.  Yes.

11    Q.  Okay.  I mean, your attorney explained it, but

12  the idea is no surprises in court.  So if you're relying

13  on something, with damages, something like that, please

14  provide it to your attorney so he can give it to us.

15        Any other kinds of damages that you think

16  Caliber has caused you?

17    A.  I can't think of anything right now.

18    Q.  Well, do you want to take a minute?  Because

19  we're deposing you now.

20    A.  Oh, okay.

21    Q.  Yes.

22    A.  Oh, attorney fees.

23    Q.  Can you explain what you mean by that.

24    A.  I had to hire an attorney to deal with all this.

25  Why did Caliber jump ship after only a year of servicing

1    my loan?

2    Q.  I'm trying to understand -- is that an answer to

3    my question or are you asking me a question?

4    A.  That's actually a question.

5    MR. HATHAWAY:  Don't ask questions.

6    THE WITNESS:  Don't ask questions?  All right.

7    BY MR. ABBOTT:

8    Q.  Okay.  Let me ask you this:  Let me ask you a

9    question.  Are you frustrated that Caliber only serviced

10   your loan for 14 or 15 months and that it moved to

11   another servicer in November of 2017?

12   A.  I'm frustrated why they moved to another

13   servicer.  The bankruptcy thing -- whole bankruptcy

14   thing and all the numbers that were not right didn't

15   seem right.  The way that they handled servicing my loan

16   was frustrating.

17   Q.  Was there a letter Caliber sent to you saying,

18   "We're transferring the servicing of your loan because

19   we think you were in bankruptcy"?  I'm trying to

20   understand your answer.  Is that what you're saying,

21   that you think that they transferred it?

22   A.  No.  I think they wanted to duck out of

23   liability, the whole bankruptcy thing and no statements

24   and the way they handled my -- serviced my whole loan.

25   Q.  I'm not following.  How would a loan servicer

1 duck out of liability by transferring your loan?

2 **A. They might have been afraid I was going to sue**

3 **them or something.**

4 Q. I don't understand, though. There is a record

5 replete of documents of their touching the file. It

6 doesn't matter if they transferred or not. The record

7 is all over the place. How would a servicer --

8 **A. I have no idea.**

9 Q. What benefit is there to transfer a loan? I'm

10 not sure I understand what you're saying.

11 **A. I'm just confused why they would find me in**

12 **default because of a bankruptcy I didn't file.**

13 Q. Again, your belief that Caliber found you in

14 default because of a bankruptcy is from what this person

15 in Dallas said?

16 **A. Yes.**

17 Q. This rude person in Dallas.

18 **A. Yes.**

19 Q. Even though in later letters, they said you

20 weren't in default or preforeclosure.

21 **A. Well -- but no, they did say that I was. That's**

22 **why they weren't providing me with monthly statements.**

23 Q. Well, they said -- right. They said, "We're not

24 providing you with monthly statements, because our

25 records show you were in bankruptcy," but they didn't

1    say you were in default.

2    **A.  Bankruptcy, yeah.  Okay.**

3    Q.  I'm trying to understand this, because --

4        MR. HATHAWAY:  Counsel, I'm going to object to

5    the form of the question.

6        MR. ABBOTT:  All right.

7        **THE WITNESS:  Any other damages, no.**

8    BY MR. ABBOTT:

9    Q.  Okay.  So is there any written communication

10   from Caliber saying, "You are in default because we

11   think you filed bankruptcy"?

12   **A.  Written communication.**

13   Q.  Right.

14   **A.  No.**

15   Q.  Okay.

16   **A.  Other than that letter that you just mentioned,**

17   **but I don't remember how it was worded.**

18   Q.  Well, let's look at that for a second.

19   **A.  You don't receive statements because --**

20   Q.  It's Exhibit 23.

21   **A.  Yeah.**

22   Q.  It might be the -- hold on.  It's the March -- I

23   think it's the April letter.  Sorry.

24       MR. HATHAWAY:  Twenty?

25       MR. ABBOTT:  Twenty?

1           MR. HATHAWAY:  It's the April letter.

2           **THE WITNESS:  Yep.  Discharged in a bankruptcy.**

3      BY MR. ABBOTT:

4      Q.  The language says, "This loan was discharged in

5      a previous Chapter 7 bankruptcy in June of 1998.  Our

6      records do not reflect that the debt was reaffirmed;

7      therefore, Caliber is not generating monthly mortgage

8      statements for this loan."

9           Now, there is no statement in here that your

10     loan is in default because of the Chapter 7 bankruptcy;

11     is there?

12     **A.  Not in there, no.**

13     Q.  Okay.  Or that they're foreclosing because

14     you -- well, because they think you had a Chapter 7

15     bankruptcy.  Right?

16     **A.  Right.**

17     Q.  There is no statement to that effect in here; is

18     there?

19     **A.  No.**

20     Q.  Okay.  Is there any other communication that you

21     can think of that you think Caliber said that you were

22     in default because of the bankruptcy, or that you were

23     in foreclosure solely because they believed you were in

24     bankruptcy?

25     **A.  No.  Other than the guy I spoke to on the phone.**

1      MR. ABBOTT:  Okay.  All right.  I don't have

2  anything else for now.  I'm going to leave what's open

3  subject to any documents that are produced in the next

4  two weeks.  And, also, I may -- I'll just reserve after

5  Rushmore examines the borrower -- excuse me -- the

6  plaintiff.

7

8                E X A M I N A T I O N

9  BY MR. CRAMER:

10     Q.  Good afternoon, Mr. Massingale.  My name is

11  David Cramer.  I am the attorney for Rushmore Loan

12  Management Services, which I'll refer to as Rushmore;

13  and U.S. Bank National Association, as legal title

14  trustee for Truman 2016 SC6 Title Trust.  We'll just

15  call it U.S. Bank.

**16     A.  (Witness nods head).**

17     Q.  I wanted to just clear up a couple things.

18         Have you ever had your deposition taken before?

**19     A.  Yeah.**

20     Q.  When was that?

**21     A.  Memory question.  Probably around 2000.**

22     Q.  Was that a lawsuit you filed?

**23     A.  Yeah.**

24     Q.  So you were the plaintiff.  And who did you sue?

**25     A.  The City of Everett.**

1    Q.  What was the dispute with the City of Everett?

**2    A.  False arrest.**

3    Q.  Did that case go to trial?

**4    A.  No.**

5    Q.  Did that case settle?

**6    A.  Yes.**

7    Q.  Any other depositions?

**8    A.  Not that I can recall.**

9    Q.  So we know of one lawsuit you filed.  Have you

10   filed any other lawsuits?

**11   A.  No.**

12   Q.  Have you ever been sued?

**13   A.  No.**

14   Q.  Did you file that lawsuit against anyone other

15   than the City of Everett or was there any other

16   defendant?

**17   A.  I think it was just the City of Everett.  Well,**

**18   the officers involved in the City of Everett.**

19   Q.  I'm not asking for any communications that you

20   had with your attorney to prepare for this, but did you

21   review any documents to prepare for this deposition

22   today?

**23   A.  Very few.  My computer is not working real well.**

24   Q.  So you reviewed some.  What documents did you

25   review?

1     A.  None of Rushmore's.

2     Q.  Okay.

3     A.  I was unaware you were doing this today as well.

4     Q.  Oh.  So what documents did you review, though,

5  to prepare for today?

6     A.  It was Caliber's.  And it was mainly just ones

7  that I filed.  I don't even remember -- I don't even

8  think we brought them up here.

9     Q.  When you say "filed," do you mean letters that

10  you sent to Caliber?

11     A.  Yes.

12     Q.  Okay.  You mentioned some difficulties with your

13  truck.

14     A.  Um-hmm.

15     Q.  Do you personally own that truck?

16     A.  Yeah.

17     Q.  Okay.  So it's in your name?

18     A.  Yeah.

19     Q.  What is your business?

20     A.  A log truck.  I haul logs up and down and into

21  the mills.

22     Q.  Sorry.  That was a bad question.

23     A.  Okay.

24     Q.  Do you have an LLC or a corporation?

25     A.  A corporation.

1      Q.  It's a corporation.  Okay.  What is the name of

2  your corporation?

3      A.  **Massingale Trucking, Inc.**

4      Q.  And when was that company formed?

5      A.  **I incorporated last September.  I was a sole**

6  **proprietor from '10 until last summer.**

7      Q.  So when you were previously testifying about

8  your truck breaking down and needing to make payments on

9  that, you were a sole proprietorship?

10     A.  **Yeah.**

11     Q.  Okay.

12     A.  **I wasn't making payments on it.  I was paying**

13  **for the parts to repair it.**

14     Q.  Sorry.  I mean making payments towards your line

15  of credit.

16     A.  **Oh, okay.**

17     Q.  You were choosing one over the other, as I

18  understood.

19     A.  **Right.**

20         (Exhibit 30 marked for identification.)

21  BY SPEAKER:

22     Q.  I'm going to mark Exhibit 30.  Mr. Massingale,

23  I've handed you a document that is titled First Amended

24  Complaint.  Do you recognize this document?

25     A.  **Kind of.  Did I sign it?**

1    Q.  You can look and see if you signed it.  I don't
2  believe you signed it.  You can look.
3        **A.  Yeah, I do recognize the document.**
4    Q.  What do you understand this document is?
5        **A.  This is the complaint filed against Caliber -- I**
6  **believe, Caliber and Rushmore.  Correct?**
7    Q.  So this lists out what you are alleging
8  Mr. Abbott's client and my clients did.  This is stating
9  the cause of action against our clients.
10       **A.  Right.**
11   Q.  So I want to look through some of the
12  allegations here, because I admit I am a little
13  confused.
14       So if you go to page 3 of 28 and you look at
15  paragraph ten -- now, you testified that you dispute
16  this $118,216.12 amount.  Correct?
17       **A.  Yes.**
18   Q.  But you do agree that that's what showed on the
19  document HFC sent?
20       **A.  Yes, it is.**
21   Q.  Okay.  And if you look at -- we've introduced
22  it -- I think it's Exhibit 12.  Exhibit 12 is a letter
23  dated -- no, not that one.  I apologize --
24       MR. HATHAWAY:  Thirteen.
25       MR. CRAMER:  Yes.  Exhibit 13.

1  BY MR. CRAMER:

2      Q.  On August 12, 2016 -- I'm looking at paragraph

3  13 of the complaint -- Caliber states that the total

4  debt is $118,891.36.  Do you see that?

5      **A.  Yes.**

6      Q.  So my question is going to be about paragraph

7  11.  It says, "August 1, 2016.  According to payment

8  histories provided in response to Qualified Written

9  Requests and discovery, $15,104.23 was written off the

10  balance of the HELOC on August 1, 2016."  Do you see

11  that?

12      **A.  Yep.**

13      Q.  What documents did you receive in response to

14  Qualified Written Requests that suggested that $15,000

15  had been written off?

16      **A.  I believe that would be in the payment history.**

17          (Exhibit 31 marked for identification.)

18  BY MR. CRAMER:

19      Q.  Okay.  Let's take a look at those.  This will be

20  marked as Exhibit 31.  And I believe -- so this is a

21  two-sided document, 135 on one page.  We're going to be

22  looking at 135.

23          MR. HATHAWAY:   This is Exhibit 31?

24          MR. CRAMER:  This is Exhibit 31.

25  BY MR. CRAMER:

1    Q.  Mr. Massingale, have you seen this document

2  before?

3    **A.  I'm not sure if this is the same one that I've**

4  **seen or not.**

5    Q.  Okay.

6    **A.  I've seen one similar.**

7    Q.  You've seen one similar to this.  Okay.

8        So I want you to look about midway down on

9  Caliber 135, and there is an entry dated 8/1/2016.  It

10  says, "Write off deferred balance."

11   **A.  Correct.**

12   Q.  Do you see that?

13   **A.  Yep.**

14   Q.  And there is that number, $15,104.23.

15   **A.  Yep.**

16   Q.  And then I want you to look right down at the

17  line below that where it says, "8/8/2016, administrative

18  adjustment."  And we go over and there is a line that

19  says, "Deferred interest," and it's that same amount.

20   **A.  Yep.**

21   Q.  Do you see that?

22   **A.  I see that.**

23   Q.  So I guess my question is, what led you to

24  understand that that had been written off and no longer

25  owed on your loan?

1     A.  I believe it was the manager at Beneficial at

2  the time had told me that that had been forgiven, I

3  think is what he said.  It was about the time that HFC

4  had taken over or was merging rather with Beneficial.

5     Q.  Okay.  So a manager at Beneficial told you that

6  15 grand had been forgiven?

7     A.  Yep.

8     Q.  When was this conversation?

9     A.  A long time ago.

10     Q.  I think I would remember a conversation where I

11  was told I didn't owe $15,000.  What date was that?

12     A.  The exact date, I don't know.  It was somewhere

13  in the early 2000s.  I don't even remember when HFC

14  bought them out.

15     Q.  So in the early 2000s, you were told that

16  $15,000 had been written off?

17     A.  Yeah.

18     Q.  Who told you that?

19     A.  His name is Dave Binton, Benton.  He was a

20  manager at Beneficial at the time.

21     Q.  Okay.  So if $15,000 had been written off, why

22  didn't you call HFC when you received its July 6, 2016

23  letter that said you owed $118,216.12?

24     A.  I really didn't pay much attention to it.

25  That's like calling all the letters that Caliber sent.

1    The attorney was asking if I called them when they sent

2    me all these notices.

3         Q.  Do you have anything in writing from Dave Benton

4    regarding that $15,000 write-off?

5         A.  No.

6         Q.  You don't have an e-mail?

7         A.  No.  I don't even know if they had computers

8    back then; did they?

9         Q.  Do you have any understanding as to why HFC said

10   it was writing that off?

11        A.  No.  I would assume because they were being

12   taken over.  They were cleaning house.  They overcharged

13   me interest and sent a $12- or $1300 overpayment back to

14   me.

15        Q.  So you said a few different things there.  You

16   assume it was because they were taken over and cleaning

17   house and because you had overpaid on interest.  Do you

18   have any documentation to show that they were just

19   forgiving massive amounts of loans because they were

20   being taken over?

21        A.  I might have the receipt on the interest payment

22   that they returned to me.  It's not that I overpaid

23   interest; it's they overcharged me interest.

24        Q.  Okay.  Do you believe that amount -- well, was

25   that overcharged interest $15,104.23?

1    A.  No.  That was -- the interest they overcharged
2  me was like $12- or $1300.
3    Q.  Okay.  So let's focus on this $15,000.  Was
4  there anything -- was that part of -- what you testified
5  to as forgiveness, was that -- did you have to do
6  anything for them?  Was there a modification?  Was there
7  any kind of additional agreement --
8    A.  No.
9    Q.  -- in exchange for that $15,104.23 write-off?
10    A.  No.  I think that was, like I say, about the
11  time they were transferring everything over to HFC.  I
12  think they were auditing all their books and just making
13  sure that their stuff was right.
14    Q.  Did anything that HFC ever sent you show a
15  reduction of $15,104.23?
16    A.  Off of the balance, they had a separate amount.
17    Q.  Off of the amount owing on the account?
18    A.  Yeah.  On the statements, yeah, it had the
19  balance -- even their statements were all kind of
20  confusing and not consistent, and I can't remember what
21  the numbers were.
22    Q.  Do you recall the month and year when HFC sent
23  you a statement saying it was writing down $15,000 plus?
24    A.  No.
25    Q.  Did you save that statement?

1      A.  I have a lot of statements, but I don't know if
2  I've got one -- that one or any one for that matter.
3  I'm just going off of this.  That's why I requested a
4  mortgage audit.
5      Q.  But not from HFC.
6      A.  No.  I even hired an accountant to do one, and
7  she didn't do it.
8      Q.  Who did you hire to do it?
9      A.  Some gal in Mukilteo.
10      Q.  What is her name?
11      A.  I don't have that with me.
12      Q.  What was her company's name?
13      A.  I can get that to you.  Like I say, she didn't
14  do it.  I gave her all my paperwork and she -- paperwork
15  and paid her and she didn't do it.  And that was about
16  the time that you guys filed your foreclosure.
17      Q.  How much did you pay her?
18      A.  Too much.  And she gave it all back.
19      Q.  Okay.  I'm asking how much.
20      A.  Oh.  I want to say I gave her $1,500, but I --
21  that's just going off of memory.
22      Q.  Did you pay that by check?
23      A.  Yes, I did.
24      Q.  A check drawn from Banner Bank?
25      A.  Yep.  It may have been -- well, same thing --

1    Skagit State Bank at the time.

2        Q.  Do you recall what year this was?

3        A.  Oh.

4        Q.  You're grabbing your phone.  What are you

5    looking for on your phone?

6        A.  I have a text message from her apologizing for

7    whatever and asking how I wanted the money back.

8            Can I look that up?

9        Q.  That's fine.  We'd ask that you provide that to

10   your counsel and produce it since it's being used to

11   refresh your recollection.  But go ahead --

12       A.  What, the phone?

13       Q.  No, the text messages.

14       A.  Okay.  July 1st, 2020 is when she returned it.

15   December 30th, 2019 is when I met with her and gave her

16   money.

17       Q.  And when we say "her," to whom are we referring?

18       A.  I didn't put her name in here.

19       Q.  How do you have her identified in your phone?

20       A.  Just -- she's the very last message in here that

21   I didn't delete.

22       Q.  It's just by the phone number?

23       A.  Yes.

24       Q.  What is the phone number?

25       A.  425-343-3267.  It looks like I just gave her

1    **$1,000.**

2         Q.  Okay.  And you said you gave her $1,000?

3         **A.  Yeah.**

4         Q.  Okay.  Did you ask anyone else to do a mortgage

5    audit?  Let me clarify.

6         **A.  Okay.**

7         Q.  Any private individual, not Caliber, not

8    Rushmore, anyone similar to this Mukilteo accountant.

9         **A.  No.**

10        Q.  Does the name Lavender House LLC ring a bell?

11        **A.  Not as an accountant, no.**

12        Q.  Does the name Annette Hamilton --

13        **A.  Yes, it does.**

14        Q.  Okay.

15        **A.  That's who it is.**

16        Q.  So in or around December of 2019, you asked

17   Ms. Hamilton to do an audit, gave her $1,000, she did

18   not do the audit, she returned your money in July of

19   2020.

20        **A.  Correct.**

21        Q.  When you saw Exhibit 13, the Caliber letter from

22   August of 2016 --

23        **A.  Yep.**

24        Q.  -- did the fact that there were $15,701.99 in

25   fees and costs -- did that raise any eyebrows?

1    A.  It certainly did.

2    Q.  Did you ever specifically talk to Caliber about

3  the fact that there were $15,701.99 --

4    A.  No, I did not.

5    Q.  So if you look at your principal balance on

6  Exhibit 13 and your total debt, it's about a $20,000

7  delta.  Right?

8    A.  Yep.

9    Q.  A little bit more than that.

10    A.  Yep.

11    Q.  Do you know whether, between your December 2nd

12  payment until the time that Caliber transferred the

13  servicing of this to Rushmore, whether you paid $20,000

14  to Caliber?

15    A.  In 2016?

16    Q.  From 2016 -- so from the time that Caliber took

17  over the loan until the time that Rushmore took over

18  servicing of the loan.  So in that period of 14 months,

19  do you know the number -- the amount of money that you

20  paid to Caliber?

21    A.  No, but I have it.

22    Q.  Okay.  Do you know if it's $20,000?

23    A.  In a year?

24    Q.  Right.

25    A.  Possibly.

1    Q.  You allege in here, in the complaint, that you
2  made your $8,930.29 payment.  Correct?
3    **A.  Yep.**
4    Q.  And that you made additional payments in March
5  through September of 2017.
6    **A.  Um-hmm.**
7    Q.  That's paragraph 20.  Do you know if the totals
8  for these numbers add up to $20,000?
9    **A.  Maybe not.**
10   Q.  I'll represent to you that they do not.
11   **A.  Okay.**
12       (Exhibit 32 marked for identification.)
13  BY MR. CRAMER:
14   Q.  Let's look at what is marked as Exhibit 32.  I
15  should have done this better.  I covered up a little
16  bit.
17       Mr. Massingale, do you recall seeing this
18  document?
19   **A.  I do.**
20   Q.  And what do you understand this document to be?
21   **A.  This is the transfer of sale -- or Notice of**
22  **Assignment to transfer sale from Caliber to Rushmore.**
23  **And there is a payment coupon attached to the back.**
24   Q.  And there was some testimony earlier about the
25  address.  If you look at the address that this is mailed

1  to, 39681 Baker Lake Road, and then you look at the

2  property address, 743 Baker Lake Road --

3      A.  Correct.

4      Q.  -- those are the same address.  Correct?

5      A.  Yes, they are.

6      Q.  It goes to the same residence?

7      A.  Hopefully.

8      Q.  The same property?

9      A.  It's the same property, but --

10     Q.  Do you know whether you received this letter?

11     A.  This one, Notice of Assignment?  Yeah, I did.

12     Q.  All right.  So even though it had the old

13  address on it, you were still receiving mail at that

14  address?

15     A.  Correct.

16     Q.  Did Rushmore send you monthly statements?

17     A.  I believe they did.

18     Q.  One of the contentions that you raised in the

19  complaint -- let's go back to the complaint,

20  Exhibit 30 -- in paragraph 36, you allege that Rushmore

21  sent you a statement showing the balance owing on the

22  account as $11,634.97, which included that deferred

23  balance of $15,104.23.  Correct?

24     A.  I don't know.

25     Q.  I'm just reading paragraph 36 of the complaint.

1      A.  Okay.

2      Q.  These are the allegations that you've made.  So

3   this is what -- I'm trying to understand what you will

4   have to prove.  And this references a current payment of

5   $2,176.10 and the due date being December 1, 2017.

6          Do you recall where you got this information

7   from?

8      A.  No, I don't.

9      Q.  Do you know if this came from a statement -- the

10  November 17th statement?

11     A.  I am not positive exactly where -- like I say, I

12  haven't looked at your stuff yet.

13     Q.  Understood.

14         Do you recall whether you made a payment to

15  Rushmore for the October 2017 balance?

16     A.  October 2017.  That was right when Rushmore took

17  it over?

18     Q.  Yes.

19     A.  I mailed that payment to Caliber.

20     Q.  Okay.

21     A.  My last payment went to Caliber.  I'm not

22  sure -- that was a big deal.  I made my payments on time

23  to Caliber once they finally got set up, what they were;

24  and my last payment was due before Rushmore took it

25  over, so I mailed it to Caliber.  And it took months for

1   Caliber to get those funds -- it took Caliber months to

2   get those funds to Rushmore, from what I understand.

3       Q.  So your testimony is you paid the October 2017

4   payment to Caliber?

5       A.  Yes.

6       Q.  How did you pay that?

7       A.  By check.

8       Q.  Do you have that check stub?

9       A.  They keep it.  I sent Rushmore a copy of that.

10      Q.  When did you send Rushmore a copy of that check?

11      A.  I'm not positive.  It's in the letters written

12  to them.

13      Q.  Did you make a November 2017 payment to

14  Rushmore?

15      A.  I don't recall.  There was a little dispute

16  going on there.

17      Q.  It's a yes or no question.  Did you make a

18  November 2017 payment to Rushmore?

19      A.  I believe so, but I'm not sure when.

20      Q.  Let me clarify my question.  In November of

21  2017, did you make a payment to Rushmore?

22      A.  I'm going to say, I believe, no.

23      Q.  So you may have paid the November of 2017

24  payment, just not in the month that it was -- just not

25  in the month of November?

1      A.  Correct.

2      Q.  In the month of December of 2017, did you make a

3  payment to Rushmore?

4      A.  The same answer.  I'm not positive on that,

5  because I called, and that's when they said that I was

6  $4,000 in arrears after a month.  That's when the

7  dispute started with Rushmore.

8      Q.  Prior to the filing of the bankruptcy, do you

9  know what month Rushmore was saying you were

10  contractually due for?

11      A.  No.  They returned three of my checks, I believe

12  it was.

13      Q.  So let's talk about that.  When did you send the

14  first check that got returned?

15      A.  Date-wise, I don't recall.

16      Q.  Let's start with year and let's work back from

17  there.  Okay?

18      A.  Okay.

19      Q.  What year was it that you sent the first

20  returned --

21      A.  I believe 2018 was when they sent them back.

22      Q.  Were all three checks in 2018?

23      A.  Yeah.  Yeah, I think so.

24      Q.  Do you recall when the first check was returned?

25      A.  No.  I don't remember dates.

1     Q.  Would it have been early in the year?

2     A.  Yes.  Early in the year.

3     Q.  I'm not going to pin you down to a month, but

4  January?  February?

5     A.  Yeah.  Probably February, March, maybe April.

6  It might have been later.  They accepted a few and then

7  they returned the others.

8     Q.  How many checks did Rushmore accept from you?

9     A.  I really don't recall.  I can get that to you,

10  though.

11     Q.  So you believe the first check was returned --

12  when you say February, March, is that when the check

13  came back to you or is that when you mailed the check?

14     A.  See, I'm not positive of the months even.  Like

15  I say, they accepted a couple of checks, and then they

16  returned them.  I reduced the payment amount to what my

17  Beneficial payment was, $747 and change or whatever,

18  until they got their numbers right.  In December, they

19  said that I was over $4,000 in arrears already and they

20  had only had it for a month.

21     Q.  So you decided that you were going to pay the

22  amount that you had been paying to Beneficial --

23     A.  Correct.

24     Q.  -- to Rushmore?

25     A.  And they accepted I don't know how many of

1  those, two or three of those.

2      Q.  But you don't recall the month that you sent

3  those?

4      A.  No.

5      Q.  What would you look at to remind yourself of

6  when you sent those?

7      A.  Probably bank statement, checkbook register.

8      Q.  Do you have those documents -- do you have

9  access to those documents?

10     A.  I do.

11     Q.  Do you know if you've provided those documents

12  to your attorney?

13     A.  I am pretty sure I have.

14     Q.  Okay.  I know you've testified that you don't

15  remember, but prior to your bankruptcy, does it sound

16  accurate to you if I represent to you that you were due

17  for your December 2017 loan payment?

18     A.  Before the bankruptcy?  2017.  No.  Oh, wait.

19  Would that be the one -- I'm going to say no.  That

20  sounds like the one that they were -- that I sent to

21  Caliber.

22     Q.  You sent your December 2017 loan payment to

23  Caliber?

24     A.  No.  That would be October.

25     Q.  Okay.

1    A.  I remember seeing a statement and it was for --

2  it might have been for two months, but it wasn't -- they

3  raised my mortgage payment from whatever it had been to

4  over $2,000.  It's coming back to me now.

5    Q.  Sorry for jumping around here.

6       One of the allegations in the complaint is that

7  Rushmore didn't include that $15,000 in its Proof of

8  Claim.  Are you aware of that?

9    A.  No.

10    Q.  You're not aware that that's one of the

11  allegations in the complaint?

12    A.  This is pretty thick, and there is no way I'm

13  going to remember everything that's in there, even if I

14  wrote it.

15      MR. CRAMER:  We'll mark as Exhibit 33 --

16      (Exhibit 33 marked for identification.)

17      MR. HATHAWAY:  What paragraph of the complaint

18  were you referring to, counsel?

19      MR. CRAMER:  So if we look at paragraph 37, and

20  it's the last sentence.  "The deferred balance is also

21  not listed on the account history included with the

22  Proof of Claim filed with the bankruptcy court."  I'm

23  not going to dwell on this.

24      MR. HATHAWAY:  That's fine.  I just wanted --

25  thank you.

1  BY MR. CRAMER:

2      Q.  I'm not going to dwell on this exhibit long.

3  I'll represent to you it's not all 32 pages.  But if you

4  turn to the very last page -- it's page 8 of 32 -- and

5  just look at the very last line at the bottom of the

6  spreadsheet -- do you see that?  $15,104.23?

7      **A.  Yeah.**

8      Q.  So would you agree with me that it is in the

9  Proof of Claim that was filed with the Court?  To the

10 extent this is the Proof of Claim that was filed with

11 the Court, would you agree that that deferred balance is

12 in there?

13     **A.  I agree that that's in there.**

14     Q.  In November of 2017 -- I will mark this as -- I

15 did not put this notebook together, so I am not loving

16 this right now.  Here we are.  Let's mark this as

17 Exhibit 34.

18         (Exhibit 34 marked for identification.)

19 BY MR. CRAMER:

20     Q.  Mr. Massingale, do you recognize this document?

21     **A.  Yeah.**

22     Q.  What is this document?

23     **A.  This is a notice of delinquent and**

24 **reconciliation options.  I've got tons of these if you**

25 **want it back.**

1    Q.  You have tons of these?

**2    A.  (Witness nods head).**

3    Q.  How many of these would you reckon you have

4  received from Rushmore?

**5    A.  I could hardly even guess.**

6    Q.  More than one?

**7    A.  Yes.**

8    Q.  More than two?

**9    A.  Yeah.**

10    Q.  Did each one of these letters come with -- I'll

11  just direct your attention to RUSHMORE -- I'm looking at

12  the number at the very bottom -- 2493.  The page that

13  says, "Checklist."

**14    A.  Yep.**

15    Q.  And then the next page is Borrower Assistance

16  Application.

**17    A.  Yep.**

18    Q.  Do you recall whether any one of these --

19  whether each one of these letters contained that

20  Borrower Assistance Application?

**21    A.  Yes.**

22    Q.  It did?

23       Let's go back to RUSHMORE_2492.  One of the

24  things that we will talk about is -- you sent some --

25  what we've been calling Qualified Written Requests.

1    A.  Correct.

2    Q.  When you did so, were you following the Notice

3   of Error Resolution and Information Request Procedures

4   contained on this page?

5    A.  I believe so, yes.

6    Q.  And let me ask you this:  Did you ever call

7   Rushmore?

8    A.  Yes.

9    Q.  How many times, approximately, did you call

10   Rushmore?

11    A.  Probably at least three, I think.

12    Q.  At least three times?

13    A.  I believe so, yes.

14    Q.  Can you give me your best estimate of the first

15   time that you called Rushmore?

16    A.  No.

17    Q.  Would it have been in 2017?

18    A.  Yep.  It would have.

19    Q.  So we're pegging that sometime in November or

20   December of 2017?

21    A.  Yes.

22    Q.  Do you know when the next time -- well, let me

23   ask you this:  Did you reach -- did you speak to anybody

24   when you called in 2017?

25    A.  Let me back up.  I called the payment center in

1    December, I believe it was, and I did speak to somebody

2    there.  And the next person I spoke to was in the legal

3    department.  Gabriel something, I believe is his name.

4    Gabriel Sanchez.

5        Q.  You called the payment center in December of

6    2017.  Do you remember what number you dialed?

7        A.  No.  I have access to it, though.

8        Q.  In the phone records?

9        A.  Yes.

10       Q.  Did you ever speak to Tim Allan?

11       A.  I don't -- I don't know.

12       Q.  I'm looking at Exhibit 34.

13           MR. HATHAWAY:  What page?

14           MR. CRAMER:  The front page.

15   BY MR. CRAMER:

16       Q.  If you look at the -- right above the last

17   paragraph.

18       A.  Yeah.

19       Q.  The name and contact information for your

20   relationship manager is Tim Allan, and there is a phone

21   number there.  Did you ever call that phone number?

22       A.  No.

23       Q.  Was the number you called a 1-888 number?

24       A.  I believe so.

25       Q.  Have you ever tried to reach somebody that you

1  understand one of these letters have identified as your

2  relationship manager?

3       A.  No.

4       Q.  You've always called what you understood to be a

5  Rushmore main line?

6       A.  Right.

7       Q.  Did you speak with anybody at the payment center

8  in December of 2017?

9       A.  I did.  I spoke with a woman there.

10      Q.  And do you remember the woman's name?

11      A.  No.

12      Q.  Approximately how long did you speak with this

13  woman?

14      A.  I don't recall.

15      Q.  Do you recall the substance of your

16  conversation?

17      A.  Yes.  It was over the new payment amount.

18      Q.  Do you recall what you said to her?

19      A.  Not exactly.

20      Q.  Do you recall anything that she said to you?

21      A.  Not word for word, not exactly, no.  She told me

22  the amount as of January 1st that I would be in arrears;

23  and to this day, I can't understand how they came up

24  with that figure.

25      Q.  What was the figure?

1    A.  Over $4,000.

2    Q.  And the date was as of January 1st?

3    A.  Yes.  It might have been more than that even.

4        MR. CRAMER:  Let's take a look.  Because I think

5    we can answer that question.

6        (Exhibit 35 marked for identification.)

7    BY MR. CRAMER:

8    Q.  I'm handing you what has been marked as

9    Exhibit 35.  Do you recall receiving this document?

10    A.  I believe I do, yes.

11    Q.  And what do you understand this document to be?

12    A.  Notice of Intent to Foreclose.  That's what it

13    says.

14    Q.  If you look down to right above the sentence

15    that says, "Remit these funds directly to:" --

16    A.  Yep.

17    Q.  Does this refresh your recollection as to the

18    amount --

19    A.  That they claim, yes.

20    Q.  Let me finish my question, please.

21    A.  All right.  Sorry.

22    Q.  Does this refresh your recollection as to the

23    amount that you were told you would be in arrears by the

24    unnamed woman in the payment center?

25    A.  Yes.

1    Q.  And you recall that this is the exact number to
2  the penny that she told you?

3    **A.  No.**

4    Q.  Okay.  This is approximately the amounts that
5  she told you that you would need to pay.

6    **A.  Yes.**

7    Q.  Did you have any question about -- well, let me
8  ask you this:  What did you understand, at this point,
9  your regular monthly payments to be?

10    **A.  I'll circle back to item 13 from Caliber -- it**
11  **might not have been item 13 -- but what they set my**
12  **payment at.**

13    Q.  Exhibit 13?

14    **A.  Yes.  Is it 13?  No, it's not 13.  Seventeen.**
15  **Nope.  All right.  It is the escrow statement.  Which**
16  **one is that one?**

17        MR. CRAMER:  Is that 14?

18        MR. HATHAWAY:   Twenty-four.

19        MR. CRAMER:  Twenty-four.

20        MR. HATHAWAY:  I believe.

21        **THE WITNESS:  Yeah, it is 24.**

22  BY MR. CRAMER:

23    Q.  And what is the amount on 24 that you're looking
24  at?

25    **A.  No, that's not it.  Well, whatever $7,921**

1  divided by 12 is.  It's the same payment I had been

2  making to Caliber for seven months.  $13- or $1400.  Oh,

3  $1,359.26.

4        MR. ABBOTT:  What's the exhibit number?

5        THE WITNESS:  Twenty-four.  Top right-hand

6  corner, payment amount.

7  BY MR. CRAMER:

8     Q.  That's what you understood your monthly payment

9  needed to be?

10    A.  Yes.

11    Q.  $1,359.26?

12    A.  300?

13    Q.  $1,359.26.

14    A.  Correct.

15    Q.  And if you look at this letter -- we're back to

16  Exhibit 35 --

17    A.  Um-hmm.

18    Q.  -- and you look at subparagraph (b), it says,

19  "Your regular monthly payments are $1,410.03."  Do you

20  see that?

21    A.  I see that.

22    Q.  Do you have any reason to dispute that that was

23  your new regular monthly payment?

24    A.  Yes.

25    Q.  And on what basis do you dispute that that was

1  your new regular monthly payment?

2  **A.  I dispute how did you get from $1,359 and some**

3  **change to $1,410?  Just by transferring ownership of my**

4  **HELOC?  The only thing that changed was the ownership.**

5  Q.  So you don't understand the math?

6  **A.  There is no math.**

7  Q.  Well, I think we went through some exhibits

8  earlier today that talked about an adjustment on the

9  interest rate.

10  **A.  Um-hmm.**

11  Q.  Do you recall that?

12  **A.  Um-hmm.**

13  Q.  And we're talking about a delta of about $50.

14  Right?

15  **A.  Um-hmm.**

16  Q.  But you don't think that you could have anything

17  to do with this change --

18  **A.  I have no idea how they figured this.**

19  Q.  So it's just that you don't understand how it

20  went from roughly $1,360 to $1,410.

21  **A.  Right.**

22  Q.  Did you ever discuss that with anyone at

23  Rushmore?

24  **A.  Yes, I did.  That was a phone call I made.**

25  Q.  To whom did you make that phone call?

1     A.  Well, I made the one in December and talked to

2  her.  She told me it was $4,900.  See, and that's

3  another thing.  How do you get $4,900 out of one month?

4  Rushmore took it over -- what was that, October 1st?

5  November.  So in two months, it went to $5,000.

6     Q.  Okay.  So I understand that you dispute the

7  $4,905.71.

8     A.  Right.

9     Q.  You've also disputed the $1,410.03.

10    A.  Um-hmm.

11    Q.  I want to ask you about this call that you made.

12 Do you recall what number you dialed?

13    A.  To talk about the --

14    Q.  I think I asked you if you disputed the

15 $1,410.03.

16    A.  Oh.  With someone.

17    Q.  Yes.

18    A.  I believe that might have been that Gabriel

19 Sanchez that I talked to.

20    Q.  Do you recall when you spoke to Gabriel Sanchez?

21    A.  No.

22    Q.  Do you recall what year it was that you spoke to

23 Gabriel Sanchez?

24    A.  2018.

25    Q.  Do you recall whether it was rainy and sometimes

1  snowy outside, or whether it was just rainy, or whether

2  there was some sunshine?

3      A.  We get it all year round.  It was the first part

4  of the year and I have that information.  I can provide

5  that information.

6      Q.  And you would be looking at phone records.

7      A.  Phone records, yes.

8      Q.  Do you recall how long your conversation with

9  Mr. Sanchez was?

10     A.  No, I don't.

11     Q.  Do you recall what department you dialed to

12 speak to Mr. Sanchez?

13     A.  That was the legal department.  And I'm not

14 positive I called him or if he called me.  Like I said,

15 I didn't know you were here or I would have looked over

16 some of this ahead of time.

17     Q.  It's okay.  I'm just trying to get what

18 information you have; and if there are documents, we can

19 equally look at the documents.

20     A.  Okay.

21     Q.  Did you pay this -- have you ever paid to

22 Rushmore an amount, $1,410.03?

23     A.  I don't recall.

24     Q.  Did you ever contact Rushmore to talk about

25 options to prevent foreclosure?

1    A.  No.

2    Q.  In the three phone calls that you had, you never

3  asked for options to avoid foreclosure?

4    A.  I know what it takes to stop foreclosure.  I

5  didn't have a problem making payments.  It's getting the

6  numbers right.  And I believe the letters that we sent

7  or I sent reflect that.  Because I believe Rushmore's

8  monthly payments were all over the place.

9    Q.  Rushmore's monthly payments?

10    A.  Yes.

11    Q.  When you say "monthly payments," are you

12  referring to the monthly statements --

13    A.  Yes.

14    Q.  -- and the amount needed to bring the loan

15  current?

16    A.  The monthly payments.

17    Q.  The monthly payments.

18    A.  Yeah.

19    Q.  Okay.  And what is it about the monthly

20  payments?

21    A.  Well, it kept going up.  It went to $1,410 and

22  it never did go back down.  It went up.  And it had

23  nothing to do with the interest thing again.  And they

24  started doing home inspections and adding legal fees.

25  There was the whole process dealing with Rushmore.

1    Q.  Okay.  So it is the monthly amounts.

2    A.  **Um-hmm.**

3    Q.  Property inspections.  Other foreclosure

4    information.  Did I hear that right?

5    A.  **Legal fees.**

6    Q.  Legal fees.  Okay.

7         Anything else?

8    A.  **For later.  That's all I can think of right now.**

9    Q.  Okay.  Do you know whether, under either the

10   line of credit or the deed of trust, the secured party

11   has the right to conduct property inspections if the

12   loan is in default?

13   A.  **No.  The loan wasn't in default.**

14   Q.  Why do you say the loan wasn't in default?

15   A.  **All of this between the two companies you**

16   **represent here, you claim is in default because of a**

17   **bankruptcy.  There was no bankruptcy.**

18   Q.  Well, we'll deal with those arguments.

19   A.  **Oh, okay.**

20   Q.  What I'm asking is -- you're saying that it

21   wasn't in default.  My question to you is, had you --

22   and we can dispute whether the amount was proper.

23   A.  **Got you.**

24   Q.  Had you paid everything that either Caliber or

25   Rushmore said needed to be paid to bring the loan

1  current?  Actually, let's put aside Caliber.  Strike

2  that question.

3      Had you paid everything that Rushmore said

4  needed to be paid to bring the loan current?

5  **A.  Have I or did I?**

6  Q.  Did you?

7  **A.  No.**

8  Q.  Okay.  So we can dispute whether it was properly

9  in default.  I understand that.  Your complaint says

10  that.

11  **A.  Right.**

12  Q.  But what I'm asking is, if it is in default, do

13  you have an understanding that the secured party can

14  conduct property inspections --

15  **A.  Yes.**

16  Q.  -- and can add in legal fees?

17  **A.  Yes.**

18  Q.  Okay.  If it's in default.

19      I want to ask you a question about paragraph 64

20  of your complaint.  So go look at Exhibit 30.  It's on

21  page 16.

22  **A.  Okay.**

23  Q.  You allege, "Plaintiff was never provided an

24  opportunity for a communication to establish a workout

25  or mediation as is required by the Washington Deed of

1  Trust Act."  Do you see that?

2      A.  I see that.

3      Q.  You testified that you had received information

4  regarding modification applications -- various

5  communications with modification applications --

6      A.  Correct.

7      Q.  -- and other options to avoid foreclosure.

8  Right?

9      A.  (No response).

10     Q.  Your allegation there is specifically related to

11  the Washington Deed of Trust Act.  Correct?

12     A.  I assume so.

13         (Exhibit 36 marked for identification.)

14  BY MR. CRAMER:

15     Q.  This is marked as Exhibit 36.  Mr. Massingale,

16  I've handed you a document marked as Exhibit 36.  Have

17  you seen this document before?

18     A.  I would assume so, yes.

19     Q.  What is the basis for your assumption?

20     A.  The date on it.  And I don't recall everything

21  that has been mailed to me.

22     Q.  But we've established that the address, 39681

23  Baker Lake Road, that was coming to you.

24     A.  Correct.

25     Q.  Okay.  And this document appears to be -- the

1  first line says, "Washington law requires Rushmore, as

2  the servicer of your loan, to contact you in order to

3  explore options to avoid foreclosure."  Do you see that?

4      **A.  Yes, I do.**

5      Q.  You received a notice of preforeclosure.

6  Correct?

7      **A.  Correct.**

8      Q.  It says, "We made three attempts to contact you

9  at the telephone number we have on file for you without

10  success."

11         Do you know if Rushmore called you three times?

12     **A.  No.  I don't know.**

13     Q.  Do you have any reason to dispute that Rushmore

14  called you three times?

15     **A.  From which number did they call?**

16     Q.  It says, "the telephone number we have on file

17  for you."  Do you know which telephone number you put on

18  file --

19     **A.  No, which number did they call from?**

20     Q.  I don't know.  I'm asking you, do you have any

21  reason to dispute that Rushmore made three attempts to

22  call you?

23     **A.  No.**

24     Q.  Okay.  Did you ever reach out to the Washington

25  State Department of Financial Institutions?

1      A.  No.

2      Q.  Did you ever reach out to the Washington State

3  Bar Association?

4      A.  I don't recall.

5      Q.  Did you ever reach out to the Office of Civil

6  Legal Aid?

7      A.  No.

8      Q.  Did you ever reach out to any approved

9  counseling agencies?

10     A.  Yes.  I don't recall which one, though.

11     Q.  Did you reach out to the approved counseling

12  agency by calling the number listed in this document?

13     A.  No.

14     Q.  Did you ever call the U.S. Department of Housing

15  and Urban Development?

16     A.  I don't recall.

17     Q.  Do you recall gathering any of the documents on

18  page Bates No. RUSHMORE_1720, the back side?  There is a

19  list of one through seven.

20     A.  What about that?

21     Q.  Did you ever gather any of these documents?

22     A.  No.

23     Q.  I'm sorry?

24     A.  No.

25     Q.  No?

1       Did you call Rushmore Loss Mitigation at

2   888-504-7300?

3     A.  I don't recall the number I called.

4     Q.  Did you speak with anyone at a counseling

5   agency?

6     A.  The one that I called, yes.

7     Q.  Who did you speak with at a counseling agency?

8     A.  I don't recall.

9     Q.  Do you recall how long you spoke to them --

10    A.  No.

11    Q.  -- or the substance?

12    A.  I ended up going a different route.

13    Q.  When you say, "going a different route," what do

14  you mean?

15    A.  Here we are.  I had to hire an attorney.  I had

16  to file bankruptcy and hire an attorney.

17    Q.  But you didn't file bankruptcy in 2018.

18    A.  No.

19    Q.  Did you take any steps, between 2018 and when

20  you filed the bankruptcy, to pursue any kind of loan

21  modification?

22    A.  No.  You should have a whole stack of letters,

23  correspondence written to Rushmore, trying to get them

24  to get this stuff straightened out.

25    Q.  I'm asking you about loan modification.

1    A.  No.

2    Q.  No.  Okay.

3        There are a number of allegations in the

4    complaint.  Let's go back to look at the complaint.

5    Because you've now mentioned a stack of letters.  I'll

6    represent to you I didn't bring a stack of letters, but

7    we have a concise list of the letters that you sent.

8    A.  Okay.

9    Q.  Look at page 11 of No. 30, and we're looking at

10   paragraph 41.

11   A.  Forty-one?  Okay.

12   Q.  So paragraph 41 says, "On January 21, 2018,

13   plaintiff sent Rushmore a Qualified Written Request..."

14   Right?

15   A.  Okay.

16   Q.  And then it says, "Rushmore failed to respond to

17   plaintiff's January 21, 2018 written request in a proper

18   and timely way."  Correct?

19   A.  Okay.

20   Q.  So I understand that we're going to dispute the

21   propriety of those funds.  That's part of what is at

22   issue in the complaint.  We're going to talk about the

23   timeliness of the response.

24       Let me ask about this:  I've got two exhibits

25   that are related and then we can take a break.  I don't

1  want to take a long break.  I want to get home.

2        This is Exhibit 37.

3        (Exhibit 37 marked for identification.)

4  BY MR. CRAMER:

5     Q.  Mr. Massingale, you've been handed an exhibit

6  marked 37.  Do you recognize this document?

7     **A.  Yes.**

8     Q.  Is that your address at the top left corner?

9     **A.  Yes.**

10    Q.  And what is this dated?

11    **A.  January 31st, 2018.**

12    Q.  And the first sentence says, "Rushmore Loan

13  Management Services LLC (Rushmore) is in receipt of your

14  correspondence dated January 21, 2018, and received by

15  our office January 25, 2018..."

16    **A.  Okay.**

17    Q.  The next paragraph, "Your correspondence is

18  currently under review," and they anticipate having a

19  response within 30 days.  Right?

20    **A.  Okay.**

21    Q.  Would you agree with me that Rushmore

22  acknowledged your QWR?

23    **A.  Yes.  They acknowledged receiving it.**

24    Q.  And they did so within ten days.  Correct?

25    **A.  They acknowledged receiving it, yes.**

1          MR. CRAMER:  This is 38.

2          (Exhibit 38 marked for identification.)

3    BY MR. CRAMER:

4     Q.  This is an exhibit marked 38.  Mr. Massingale,

5    do you recall receiving this exhibit?

6     **A.  Yes.**

7     Q.  And when you received this, did you review this?

8     **A.  Yes.**

9     Q.  Did you reach out to -- well, let me ask you

10   this:  Did you review the exhibits or the enclosures

11   included with this letter?

12    **A.  I don't recall, it was so long ago.**

13    Q.  Okay.  But this appears to be a response -- if

14   you look at the first sentence --

15    **A.  Yes.**

16    Q.  -- to your January 21, 2018 letter.  Correct?

17    **A.  Okay.  Yes.**

18    Q.  And according to this -- and if you look at the

19   very last sentence, it says, as of March 7, 2018, the

20   amount is due for the December -- it says, "As of the

21   date of this response, the account is due for the

22   December 1, 2017 monthly installment."  That looks to be

23   a typo.

24    **A.  Okay.**

25    Q.  It says, "If you have proof that the account was

1  brought current with the prior servicer, please remit it

2  so we can further our research."

3       Do you recall ever providing proof that the

4  account was current with Caliber?

5       A.  I believe so.

6       MR. CRAMER:  Let's take five.

7       MR. ABBOTT:  Yes.

8       (Recess taken from 4:18 to 4:23.)

9  BY MR. CRAMER:

10      Q.  Look at paragraph 42.  You allege that on

11  July 8th, you sent Rushmore another QWR.  Correct?

12      A.  Correct.

13      Q.  Does that date sound right to you?

14      A.  Yeah.  I would imagine so.

15      Q.  It says you also enclosed a check in the amount

16  of $3,122.84.

17      A.  Correct.

18      Q.  Was that a personal check from Banner Bank?

19      A.  Yes.

20      Q.  It was not certified funds --

21      A.  Nope.

22      Q.  -- or a cashier's check?

23      A.  Nope.

24      Q.  Let's see.  Look at paragraph -- actually, I

25  guess you do allege that we responded to that one.  So

1  that's good.  Although I think we actually responded

2  later than that.

3     A.  Which paragraph?

4     Q.  We're looking at 43.  But let's go to 47.  It

5  says, "Rushmore failed to respond to plaintiff's July 8,

6  2018 written request in a proper and timely way."  Let's

7  look at that.

8        Again, we can dispute proper, but let's look at

9  timely.  This is Exhibit 39.

10        (Exhibit 39 marked for identification.)

11  BY MR. CRAMER:

12     Q.  You've been handed a document marked Exhibit 39,

13  Mr. Massingale.  Do you recall seeing this document?

14     A.  Yes.

15     Q.  You received this document?

16     A.  Yes.

17     Q.  What is the date on the document?

18     A.  July 18th.

19     Q.  What does this document appear to be?

20     A.  Just a notice in receipt of my correspondence.

21  It's not an answer to my correspondence, though.

22     Q.  Okay.  It's an acknowledgment?

23     A.  Yeah.

24        (Exhibit 40 marked for identification.)

25  BY MR. CRAMER:

1    Q.  Let's look at Exhibit 40.

2        I apologize for the monotony, but we're going to

3    do this.  We're going to push forward and get it done.

4    **A.  That's all right.**

5    Q.  Do you recall seeing what I've handed you, a

6    document marked as Exhibit 40?

7    **A.  Yes.**

8    Q.  Have you seen this document before?

9    **A.  Yes.**

10   Q.  Did you receive this document?

11   **A.  Yes.**

12   Q.  And do you recall whether you received it on or

13   after August 24th?

14   **A.  I don't recall, but I would assume I received it**

15   **shortly thereafter.**

16   Q.  And what do you understand this document to be?

17   **A.  A response to my --**

18   Q.  Your Qualified Written Request from July 8th?

19   **A.  Correct.**

20   Q.  Now, while it's not alleged in the complaint, do

21   you recall sending a Qualified Written Request on

22   October 25th, 2018?

23   **A.  October 25th?  Not exactly.**

24   Q.  Okay.  According to the complaint, you -- this

25   is paragraph 48 -- you sent another Qualified Written

1  Request on January 7, 2019.  Do you see that?

**2       A.  Yep, I do.**

3       Q.  Okay.  Do you know if Rushmore responded to this

4  one?

**5       A.  I couldn't say right now, but I would assume so.**

6            MR. CRAMER:  Let's do this one more time.  We'll

7  do it a couple more times.

8            (Exhibit 41 marked for identification.)

9  BY MR. CRAMER:

10      Q.  Here is an exhibit that has been marked

11  Exhibit 41.  Mr. Massingale, have you seen this

12  document?

**13      A.  I believe so.**

14      Q.  Does this document appear to be an

15  acknowledgment of your January 7, 2019 QWR?

**16      A.  It appears to be.**

17           (Exhibit 42 marked for identification.)

18  BY MR. CRAMER:

19      Q.  Okay.  I've just handed you a document marked

20  Exhibit 42.  Mr. Massingale, have you seen this document

21  before?

**22      A.  Yes.**

23      Q.  Does this document appear to be a response to

24  your January 7th QWR?

**25      A.  Yes.**

1    Q.  And this one contains an explanation of why it
2   is two pages.  Correct?
3    **A.  Okay.**
4    Q.  I guess there are enclosures that I did not
5   include with it for the sake of preserving paper, I'll
6   just represent that.
7        It says that -- if you look at the second
8   paragraph -- "Rushmore has determined that your
9   correspondence is a duplicative notification of error
10  and/or request for information.  We made this
11  determination because your current correspondence is
12  substantially the same as your previous correspondence,
13  which Rushmore received on October 9, 2018, and it does
14  not contain new and material information.  Rushmore
15  complied with our obligation to respond to this matter
16  with our previous correspondence to you, which was sent
17  on November 21, 2018."
18       Do you have any reason to dispute that Rushmore
19  sent you a response on November 21, 2018?
20   **A.  Nope.**
21   Q.  Okay.  It says, "Notwithstanding the fact that
22  your current complaint is duplicative, we can provide
23  the following clarifying information:  Rushmore has not
24  been refusing your payments due to the inquiries
25  received from you.  Rather, Rushmore has not been

1 accepting payments because the enclosed Notice of Intent

2 to Foreclose" -- which we looked at previously -- "was

3 issued to your attention on January 8, 2018.  Once an

4 NOI has been issued, anything less than the full amount

5 to cure the default may be returned."  Do you see that?

6     A.  I see that.

7     Q.  Does that provide you with the explanation as to

8 why the July check that you allege was returned without

9 explanation -- does that clarify it for you?

10     A.  Nope.

11     Q.  Okay.  Is it your testimony that the $3,000

12 check in July of 2018 was all that would have been

13 required to bring the loan current?

14     A.  Could you rephrase that question or repeat it at

15 least.

16     Q.  Sure.  Let me try to clarify.

17         We talked about the January 8th notice of intent

18 to foreclose.

19     A.  Um-hmm.

20     Q.  It said you need to pay $4,900 and change via

21 certified funds or cashier's check.  Correct?

22     A.  That's what you say.

23     Q.  Okay.

24     A.  Or that's what they say.

25     Q.  Do you want to look at it?

1     A.  No.  That's what they say.

2     Q.  All right.  That's what Rushmore says in the

3  letter.

4     A.  Right.

5     Q.  Okay.  So whatever the letter says, that's what

6  the letter says.

7     A.  Correct.

8     Q.  We'll agree on that.

9     A.  Correct.

10    Q.  You allege that you sent a check that was

11  returned to you.  Correct?

12    A.  Correct.

13    Q.  A July check in the amount of -- this is

14  paragraph 42 of your complaint -- $3,122.84.

15    A.  Correct.

16    Q.  You further allege that it was returned without

17  explanation.

18    A.  Correct.

19    Q.  I'm asking, does this provide the explanation to

20  you?

21    A.  It's an explanation.

22    Q.  Okay.

23    A.  Remember, this whole thing is in dispute and has

24  been for a few years.

25    Q.  I understand that.

1    **A.  Yeah.**

2    Q.  What I'm saying is you're making allegations.

3    **A.  Yep.**

4    Q.  And I'm trying to understand the evidence that

5  you're going to bring to bear on these allegations.

6    **A.  Okay.**

7    Q.  Paragraph 48 contains a number of other

8  allegations about QWRs and that Rushmore failed to

9  properly and timely respond to any of them.  There is a

10  January 7th, which we've already looked at.  There is an

11  April 7th, 2019, which if you want, we can look at.

12  That was acknowledged on -- I will represent to you --

13  we'll just mark this.  We'll just mark them all.

14        (Exhibit 43 marked for identification.)

15  BY MR. CRAMER:

16    Q.  I'm going to hand you a document marked

17  Exhibit 43.  Have you seen something similar to this

18  previously?

19    **A.  (No response).**

20    Q.  Mr. Massingale, have you seen Exhibit 43 before?

21    **A.  Yes.**

22    Q.  Does this appear to be an acknowledgement from

23  Rushmore to your April 7, 2019 QWR?

24    **A.  It appears to be, yes.**

25        (Exhibit 44 marked for identification.)

1  BY MR. CRAMER:

2    Q.  I'm handing you a document that has been marked

3  Exhibit 44.  Mr. Massingale, have you seen this document

4  before?

5    **A.  Yes, I believe so.**

6    Q.  Does this appear to be a response to your

7  April 7, 2019 QWR?

8    **A.  It would appear to be.**

9       MR. CRAMER:  So, in this complaint, it says

10  August 21, 2019 was the next date that a QWR was sent.

11  I will represent to you that I have never seen a QWR

12  dated August 21, 2019.

13       Let me mark this as Exhibit 45.

14       (Exhibit 45 marked for identification.)

15  BY MR. CRAMER:

16    Q.  Do you know whether you sent a QWR on August 21,

17  2019?

18    **A.  Not at this time.**

19    Q.  Okay.  What would you need to look at?

20    **A.  The rest of the QWRs.**

21    Q.  Okay.

22    **A.  Could it be possible it was August 21?**

23    Q.  You've been handed a document identified as

24  Exhibit 45.

25    **A.  Okay.**

1    Q.  Have you seen this document before?

**2    A.  I would imagine so, yes.**

3    Q.  Did you receive this document from Mr. James

4  Sturdevant?

**5    A.  Yeah, I believe so.**

6    Q.  Okay.  So just to be clear -- and your attorney

7  will make any objections that he feels are necessary --

8  I'm not entitled to know the substance of your

9  communications with Mr. Sturdevant, but I can ask you

10  about your relationship with him.

**11    A.  Okay.**

12    Q.  In part, because there is allegations about

13  money that you've paid to him.

14        When did you retain Mr. Sturdevant?

**15    A.  Oh, exact date, I don't recall.  It must have**

**16  been in 2019, just before this letter was sent.**

17    Q.  And what was your motivation to retain an

18  attorney?

**19    A.  The lack of cooperation.**

20    Q.  The lack of cooperation from Rushmore?

**21    A.  And Caliber, yes.**

22    Q.  Had you retained another attorney prior to this?

**23    A.  Prior to --**

24    Q.  To Mr. Sturdevant.

**25    A.  No.**

1    Q.  There is an allegation related to a Melissa

2  Huelsman.

3    **A.  That was a consultation.  I didn't retain her.**

4    Q.  But you paid $400 for a consultation with

5  Melissa Huelsman?

6    **A.  Yeah.**

7    Q.  Mr. Sturdevant sent another letter.  Correct?

8    **A.  Did he actually send something?**

9    Q.  That's a great question.

10       In your complaint, it alleges that -- this is

11  paragraph 49 -- "On October 22, 2019, plaintiff's former

12  attorney, James Sturdevant, sent defendant Rushmore a

13  QWR..."

14       (Exhibit 46 marked for identification.)

15  BY MR. CRAMER:

16    Q.  This is a document identified as Exhibit 46.

17       Mr. Massingale, have you seen this document

18  before?

19    **A.  I would imagine, yes.**

20    Q.  Okay.  And I'll represent to you that this does

21  not contain all the enclosures, of which there are 12.

22  If your attorney wants to see those -- they've been

23  provided.  They've been produced.  The consecutive Bates

24  numbers follow this.

25       Does this appear to be a response to the

1    October 22nd, 2019 QWR from Mr. Sturdevant?

**2        A.  It does.**

3        Q.  Do you recall whether Mr. Sturdevant ever

4    provided this to you?

**5        A.  I think I did finally get all my paperwork back**

**6    from him, so yes.**

7            MR. HATHAWAY:  Excuse me.  There were 12

8    enclosures, did you say?

9            MR. CRAMER:  That's what it says on page two of

10   it.

11           MR. HATHAWAY:   Oh, okay.

12           MR. CRAMER:  So I guess 5786, it says,

13   "Enclosures (12)."

14   BY MR. CRAMER:

15       Q.  And then, paragraph 50 -- we're almost

16   through -- it says, "In December 2021, plaintiff's

17   former attorney, Paul Richmond, sent defendant Rushmore

18   a Qualified Written Request, requesting all information

19   about, and corrections to, plaintiff's mortgage

20   account."

21           (Exhibit 47 marked for identification.)

22   BY MR. CRAMER:

23       Q.  Let's look at this one, which has a familiar

24   name.  I'm sure your counsel will remember this,

25   although not in this light.

1        You've been handed a document marked as

2   Exhibit 47.  I will represent to you that this has about

3   975 pages of attachments, which I did not print for the

4   sake of the forest, although you might want us to log.

5        Do you recall ever seeing this document before?

6   **A.  Yes.**

7   Q.  Did you receive the enclosures accompanied by

8   this letter?

9   **A.  I've got two copies.  Not a truckload, but --**

10  Q.  And this appears to be a response to the

11  December 16, 2020 QWR.  Correct?

12  **A.  From Mr. Richmond.**

13  Q.  Right.  From Mr. Richmond.

14  **A.  Um-hmm.**

15  Q.  When did you retain Mr. Richmond?

16  **A.  After Sturdevant.  And he referred me to**

17  **Mr. Hathaway.**

18  Q.  When did -- let me just start with this:  When

19  did you retain Mr. Richmond?

20  **A.  I don't recall the exact date.**

21  Q.  Do you recall the exact year?

22  **A.  No.  Not really.  2020 or 2021.  It was --**

23  Q.  If he sent a letter in December of 2020 --

24  **A.  It would have been --**

25  Q.  -- is it safe to assume that you had retained

1  him by that point?

2      A.  Yeah.

3      Q.  Do you recall how long in advance you had

4  retained him before he sent the letter?

5      A.  I'm not positive, but I want to say maybe

6  September.

7      Q.  All right.  And when did he refer you to

8  Mr. Hathaway?

9      A.  I don't recall exactly.

10     Q.  Was Mr. Hathaway your counsel by January 5th,

11 2021?

12     A.  I believe so.

13     Q.  Was Mr. Richmond still your counsel on

14 January 5th, 2021?

15     A.  I guess I never did fire him or let him go.  So

16 he's probably still my counsel, actually.

17     Q.  To your knowledge, did Mr. Hathaway's receipt of

18 the QWR response in any way impair your ability to get

19 the response?

20     A.  Which response?  From Mr. Richmond?

21     Q.  Well, Mr. Richmond mailed a QWR on December 16,

22 2020.

23     A.  Correct.

24     Q.  A response came January 5th, 2021.

25     A.  Okay.

1    Q.  Did you receive that response?

**2    A.  Yeah.**

3    Q.  Okay.  Can you tell me approximately when you

4  received the response -- when you personally received

5  it.

**6    A.  Is that the whole stack of papers?  No, that**

**7  went directly to Mr. Hathaway.**

8    Q.  But he received it, and did he provide a copy to

9  you?

**10    A.  Yes.**

11    Q.  I know some of these questions were asked by

12  Caliber's attorney with respect to Caliber.  I would

13  like to ask some questions related to the damages

14  allegations that are contained in the complaint,

15  beginning in paragraph 91.

16        Mr. Massingale, in your complaint, you allege

17  you suffered real damages.  Correct?

**18    A.  Correct.**

19    Q.  I have a question as to how we came up with

20  these numbers.  Let me first say at the time this

21  lawsuit was filed, when that allegation is here -- this

22  is about two sentences in -- "At the time this lawsuit

23  was filed, plaintiff's damages included" -- when you say

24  "this lawsuit," you're talking about this adversary

25  proceeding.  Correct?

1      A.  Correct.

2      Q.  -- "without limitation, $8,400 in lost wages for

3   time spent meeting with attorneys."

4          Approximately how much time did you spend

5   meeting with your attorneys?

6      A.  Oh, I couldn't say right offhand.

7      Q.  Okay.

8      A.  You can't really go by an hourly thing.  If I

9   have to do something, it's a whole day for me.  I don't

10  bill by the hour.

11     Q.  So anything that you have to do requires you to

12  take an entire day off work?

13     A.  Yes.

14     Q.  What time do you start work?

15     A.  Usually around 2 o'clock in the morning.

16     Q.  Let me ask you this:  You're a log truck driver.

17     A.  Yep.

18     Q.  You're paid by the load.  Correct?

19     A.  Correct.

20     Q.  You take it to the log yard, they scale it, and

21  they determine how much the weight is and the quality,

22  and you get a percentage of that.  Correct?

23     A.  No.  The logger determines a rate.

24     Q.  Okay.

25     A.  Per ton.

1      Q.  Okay.

2      A.  So it doesn't matter what it scales out at.  But

3  they start loading early in the morning.  Some of the

4  jobs, you can do three trips a day; some of the jobs,

5  you can do one; some, you can do barely one a day.

6  Today, I lost $1,675.

7      Q.  How do you calculate that?

8      A.  That's what my one trip today would have paid.

9      Q.  $1,675?

10     A.  Yes.

11     Q.  And that's because you had a current job lined

12  up to deliver one load, and the tonnage of that load

13  would equate to $1,675?

14     A.  Correct.

15     Q.  Who is the logger?

16     A.  That would be Wills Logging.

17     Q.  Spell Wills.

18     A.  W-I-L-L-S.

19     Q.  Are you -- well, how many days per week are you

20  out right now for Wills Logging?

21     A.  Hauling for them?

22     Q.  Yes.

23     A.  I would have hauled today, I hauled there

24  yesterday, and I believe I hauled there the day before,

25  this week.  I hauled two days there last week.

1 Q. Roughly how many days per week are you hauling?

2 A. Five.

3 Q. So you typically haul five days per week; but

4 you just testified that last week, you hauled two days?

5 A. For Wills.

6 Q. Oh, two days for Wills.

7 A. Correct.

8 Q. Who else are you hauling for?

9 A. Icicle Ridge.  I hauled for them.  I don't

10 remember if that was one or two days.  I haul for lots

11 of people.

12 Q. How do you get these jobs?

13 A. I just know all the loggers.

14 Q. And they just call up and say, "Hey, we need a

15 truck out here"?

16 A. Sometimes.  Sometimes I call them, looking for

17 work.

18 Q. And what would you say your average daily wage

19 is -- or your average daily payment?

20 A. I've never really sat down and tried to figure

21 that one out.  Usually, the truck grosses anywhere from

22 $12- to $1800 a day.

23 Q. What are your overheads?

24 A. Fuel, insurance, everything like that.

25 Q. Right.

1    A.  **Right.**

2    Q.  Approximately how much are your overheads?

3    A.  **What does it matter?  What does it matter?**

4    Q.  You're telling me you lost $1,675 today.

5    A.  **Yeah.**

6    Q.  That's the check that you would get from Wills

7  Logging.

8    A.  **Correct.**

9    Q.  I'm asking what your overheads are.

10    A.  **And that varies.  Fuel for Wills Logging is**

11  **probably 80, 85 gallons at $5 a gallon.**

12    Q.  Okay.

13    A.  **What are you guys' overhead?  You know?**

14    Q.  You need to understand, I'm not trying to

15  antagonize you, I'm not trying to badger you.  This is

16  my opportunity to ask you questions.

17    A.  **Okay.**

18    Q.  So I can explain to you why.  I feel like all of

19  us are ready to get out of here.

20    A.  **Right.**

21    Q.  So I'm just asking, because you've thrown out a

22  number, and I don't have to blindly accept the number

23  that you throw out.  I get to ask you questions about

24  it.

25    A.  **Okay.**

1    Q.  So how many days did you lose meeting with

2  attorneys?

3    **A.  I would have to look and see.**

4    Q.  How long was your consultation with

5  Ms. Huelsman?

6    **A.  The drive was probably longer.  It was probably**

7  **an hour and a half, two hours.**

8    Q.  Okay.

9    **A.  Three hours driving, down here and back home.**

10    Q.  Do you recall spending time with Mr. Sturdevant

11  in person?

12    **A.  Unfortunately, yes.**

13    Q.  No comment.

14    And approximately how many meetings did you have

15  with Mr. Sturdevant?

16    **A.  I think four.**

17    Q.  Did you have any meetings with Mr. --

18    **A.  Richmond?**

19    Q.  -- Richmond?  Thank you.

20    **A.  I believe, two with him.**

21    Q.  Approximately how much time did you spend

22  gathering documents related to your loan?

23    **A.  No idea.**

24    Q.  Okay.  That's part of the allegation of lost

25  wages?

1     A.  Right.  Well, if you want an hour number, I'd

2  have to get back to you on that.

3     Q.  It says, obtaining various documentation

4  regarding your home loan.  Where did you have to go to

5  obtain documentation for your home loan?

6     A.  Sturdevant's office, for one.  I believe a lot

7  of that is like the Post Office and stuff like that,

8  mailings and things like that.

9     Q.  How much time did you spend on payments?

10     A.  On what?

11     Q.  Well, I assume this is all documentation --

12  documentation regarding your home loan.

13        Payments.  I assume that's payments regarding

14  your home loan.

15     A.  Oh.

16     Q.  Where did you have to go to collect payments?

17     A.  Time spent --

18     Q.  Let me ask this:  Did you have to leave your

19  house to get information regarding payments that you've

20  made on your home loan?

21     A.  On the older stuff, that I had to go to the bank

22  and order copies of bank statements because they deleted

23  them.

24     Q.  Did you have to leave your house to -- well, let

25  me ask it more broadly -- actually, more narrowly.  Did

1  you have to leave your house and lose out on work

2  because you were collecting information regarding your

3  taxes?

4      **A.  Information regarding my taxes?  At least one**

5  **day.**

6      Q.  Okay.  What day was that?

7      **A.  Exact date, I don't know.**

8      Q.  Can you tell me a month?

9      **A.  No, but I can get it.  I had to meet with my**

10  **accountant.**

11      Q.  Do you have a personal accountant?

12      **A.  I do.**

13      Q.  And what is your personal accountant's name?

14      **A.  Tim Garrison.**

15      Q.  G-A-R-R-I-S-O-N?

16      **A.  Correct.  His accounting firm is called Bill**

17  **Carson Accounting or something like that.**

18      Q.  I think we've talked about the other payments to

19  your other attorneys.

20          Let me ask you this:  How many days of work did

21  you lose contacting Caliber and Rushmore?

22      **A.  (No response).**

23      Q.  Let's start with Caliber.  How many days did you

24  lose contacting Caliber?

25      **A.  Contacting them or dealing with them?**

1    Q.  Contacting them.

2    **A.  Oh, I don't know.**

3    Q.  It says contacting, so that's what I'm asking.

4    How many days of work did you lose contacting

5 Rushmore?

6    **A.  Contacting -- I don't know that I lost any, but**

7 **dealing with -- writing letters, delivering letters,**

8 **and -- because I'm kind of not sure.  You mean just**

9 **calling them or something?  Contacting them?**

10    Q.  This is your allegation.  I'm trying to

11 understand what it means.

12    **A.  Where is this contacting them?**

13    Q.  It's about midway through the paragraph --

14    **A.  Contacting Caliber and Rushmore.**

15    MR. ABBOTT:  Line 16, 17.

16    **THE WITNESS:  I got you.  It's all in one**

17 **paragraph.  It's all combined.**

18 BY MR. CRAMER:

19    Q.  Indeed.

20    **A.  I have no idea.  Contacting -- all the letters**

21 **and stuff that were written and delivered and stuff like**

22 **that.  I would have to figure that out.**

23    Q.  Did you do any of that work on the weekend?

24    **A.  I did some of it on the weekend.  I probably**

25 **couldn't tell you what, though.**

1    Q. Do you know if Rushmore and Caliber had people

2  available on the weekend to talk to you? Let's start

3  with Caliber first.

4    **A. If they did have --**

5    Q. Do you know if you could call the number on the

6  weekend?

7    **A. Yeah. Didn't get any results from calling them**

8  **during the week. Why would it be any different on the**

9  **weekend?**

10    Q. I'm just asking, could you?

11    **A. Oh, could I? I have no idea.**

12    Q. Do you know if you could call Rushmore on the

13  weekend and speak to somebody?

14    **A. No idea.**

15    Q. No idea. Okay.

16    **A. It's not a Qualified Written Request.**

17    Q. I'm just asking could you do it?

18    **A. Okay.**

19    Q. Let's make sure that we're waiting before I

20  finish my question before you so respond.

21    Let's jump down a little bit. It says you've

22  incurred $4,370 for the Chapter 13 bankruptcy. Right?

23    **A. Um-hmm.**

24    Q. It says you've incurred at least $200 for costs

25  associated with obtaining documents. What costs

1  associated with obtaining documents does that refer to?

2  To the extent you have knowledge.

3      **A.  Oh, that would be bank statements and stuff.**

4      Q.  Are you sure?  Because the very next phrase is,

5  "had incurred $106 for 2016, 2017, 2018, 2019 bank

6  statements."

7      **A.  Okay.  I can't think of what that would be right**

8  **offhand.**

9      Q.  Okay.  Let's go to the next paragraph.  We

10  talked about missing time as a logging truck driver.

11  Since you filed this adversary proceeding, how many days

12  have you missed from work because of demands, other than

13  today?

14      **A.  Probably at least ten.**

15      Q.  How do you come up with at least ten?

16      **A.  That's just meeting with attorneys.**

17      Q.  So you've met -- and I want to be clear, we're

18  talking about the adversary proceeding.  That's this

19  lawsuit that you filed against Caliber and against

20  Rushmore and U.S. Bank.

21      **A.  Um-hmm.**

22      Q.  That is separate and aside from the bankruptcy,

23  itself.

24      **A.  All right.**

25      Q.  You met with Mr. Hathaway or another attorney at

1    least ten days since filing this?

2       A.  **Ten times.**

3       Q.  Ten times?

4       A.  **Sturdevant was four.**

5       Q.  Sturdevant wasn't your attorney in the

6    bankruptcy.

7       A.  **Oh.**

8       Q.  Right?

9       A.  **Nope, he wasn't.**

10      Q.  Okay.

11      A.  **I had to meet with him, though.**

12      Q.  That's what I'm talking about.  I'm saying since

13   you've -- I'm asking specific to this adversary

14   proceeding for which Mr. Hathaway is your attorney.

15      A.  **Okay.**

16      Q.  How many days have you missed work -- other than

17   today.  We know that you're missing work today.  Other

18   than today, during this adversary proceeding, how many

19   days have you missed work because of the demands of this

20   case?

21      A.  **I don't recall offhand.  That's even two years**

22   **right now.**

23      Q.  So you don't know?

24      A.  **Not Right offhand, no, but I can find it out.**

25      Q.  What would you need to look at to find it out?

1      A.  Probably our phone message records and e-mails.

2      Q.  In this paragraph 92, we've talked about the

3  credit rating and the lack of access to credit.  You

4  testified that you haven't applied for credit since

5  January of 2017.  Correct?

6      A.  I don't recall, yeah.

7      Q.  Have you seen a treating physician or a

8  treatment provider for any of the symptoms listed in

9  paragraph 92?

10      A.  I was seeing a health care provider, not

11  necessarily for any conditions; but just because if

12  something went wrong, I went to see her.

13      Q.  Who is your health care provider?

14      A.  It was Robyn Choffel.

15      Q.  Can you spell her last name.

16      A.  C-H-O-F-F-E-L, I believe.

17      Q.  Did you ever talk with your treatment

18  provider -- did you ever go to your treatment provider,

19  Dr. Choffel, because of emotional distress?

20      A.  No.

21      Q.  Did you ever go see Dr. Choffel because of

22  anxiety?

23      A.  Yeah, but I don't take pills, so --

24      Q.  Have you ever been diagnosed with anxiety?

25      A.  Not really.

1    Q.  Well, it's a yes or no question.  Have you been

2  diagnosed with an anxiety disorder?

3    **A.  No.**

4    Q.  Have you been diagnosed as a -- well, I don't

5  know -- confusion -- but any kind of dementia or

6  early-onset Alzheimer's?

7    **A.  Not yet.**

8        MR. ABBOTT:  Not that you can remember?

9  BY MR. CRAMER:

10   Q.  Confusion.  Do you find yourself being confused?

11   **A.  Absolutely.**

12   Q.  Is your confusion related to the understanding

13  of the documents that you've received from Caliber and

14  Rushmore?

15   **A.  Yes.**

16   Q.  Do you have any confusion outside of that, that

17  affects other aspects of your life?

18   **A.  Yes.**

19   Q.  Please describe that for me.

20   **A.  As far as confusion -- confusion and**

21  **distraction.  I will be driving along thinking about**

22  **this and realize I'm not paying attention to what I'm**

23  **doing work-wise, and it is a hazard.**

24   Q.  Has any treatment provider ever told you that

25  you should not be driving because you are driving

1  distracted?

**2  A.  No.**

3  Q.  Any frustration that is spilling out into areas

4  other than dealing with the line of credit?

**5  A.  Yeah.  Personal life, yeah.**

6  Q.  Do you attribute your frustration in your

7  personal life to the line of credit?

**8  A.  Stress from the whole situation.**

9  Q.  It's my understanding that you've testified that

10  you don't take medication for anxiety.  Do you take any

11  medication for stress?

**12  A.  No.**

13  Q.  Have you been diagnosed as having an anger

14  disorder?

**15  A.  Not yet.**

16  Q.  Are you seeing anyone because of your anger?

**17  A.  No.**

18  Q.  Anxiety is here again.  Are you seeing anyone

19  because of nervousness?

**20  A.  No.**

21  Q.  Are you seeing anyone because of fear of

22  foreclosure of your home?

**23  A.  No.**

24  Q.  Other than your attorney.

**25  A.  Right.  Yeah, I guess.**

1    Q.  But he's not a treatment provider.

2    **A.  No.**

3    Q.  What kind of embarrassment have you suffered?

4    **A.  Well, just people finding out you had to file**

5 **bankruptcy to keep from losing your home is an**

6 **embarrassment.**

7    Q.  Do you feel like that's an uncommon thing for

8 people to have to resort to bankruptcy?

9    **A.  I don't know.  I never had to deal with it**

10 **before.**

11    Q.  Do you feel like you are unique in needing to

12 deal with bankruptcy?

13    **A.  Unique?  No.  I kind of don't understand what**

14 **you mean by that.  Am I the only one?**

15    Q.  I'm trying to understand the basis for saying

16 that you're embarrassed or humiliated -- we'll just lump

17 those together -- because of needing to file bankruptcy.

18    **A.  Yes, I am a little embarrassed because I had to**

19 **file for bankruptcy.  Yeah.**

20    Q.  Yeah.  I'm trying to understand the -- what's

21 underlying that embarrassment.

22    **A.  Oh.  I make enough money I shouldn't have to.**

23 **This is negotiating with Rushmore at the end.**

24    Q.  So you're embarrassed because -- if I understand

25 you correctly -- you feel like you make enough money

1  that you should not be in bankruptcy, because you should

2  be able to handle your debts.

3      A.  Correct.

4      Q.  And being in bankruptcy means that you're -- it

5  carries the stigma that you're not paying your

6  obligations.

7      A.  Correct.

8      Q.  Okay.  Loss of privacy.  What do you mean by

9  loss of privacy?

10     **A.  My name is out on the internet under bankruptcy**

11  **and lawsuits and everything else now.**

12     Q.  But you chose to file that.

13     **A.  Somebody helped me choose, yeah.**

14     Q.  Okay.  You gave direction to someone who filed a

15  bankruptcy on your behalf.  Correct?

16     **A.  Correct.**

17     Q.  And then you gave direction to your attorney who

18  filed an adversary proceeding on your behalf.

19     **A.  Correct.**

20     Q.  Injury to reputation due to foreclosure.  What

21  do you mean by that?

22     **A.  What was that?**

23     Q.  Looking at paragraph 92.

24     **A.  Ninety-two?**

25     Q.  Loss of privacy and injury to reputation due to

1  foreclosure.

2     A.  Oh.  That would classify under the same as

3  embarrassment.

4     Q.  Okay.  But you had a foreclosure before.  Right?

5     A.  Yeah.

6     Q.  And did that adversely affect your reputation?

7     A.  That was kind of -- yeah, it did.

8     Q.  Okay.  In what way?

9     A.  Well, just the fact that I couldn't maintain my

10  finances back then to keep both homes.

11     Q.  Has anyone told you that they wouldn't do

12  business with you or didn't want to be associated with

13  you because you had a foreclosure?

14     A.  No.  I didn't give anybody the opportunity,

15  so --

16     Q.  Okay.  Have you ever been diagnosed as an

17  insomniac?

18     A.  Not yet.

19     Q.  Do you take any medications for insomnia?

20     A.  No.

21     Q.  Have you ever been diagnosed as somebody who has

22  trouble sleeping?

23     A.  No.

24     Q.  Have you ever been diagnosed as somebody who has

25  an inability or a loss of concentration?

1       A.  No.

2       Q.  Has a medical provider ever diagnosed you as

3   somebody who is, I guess, unusually irritable?  I mean,

4   I have little kids, so I understand irritability.

5       A.  Not yet.

6       Q.  Okay.  What do you mean by instability?

7       A.  Instability?  I'm not sure right now.  I'm not

8   instable.

9       Q.  Weight loss.

10      A.  Yeah.

11      Q.  How much weight have you lost from the start of

12  dealing with Rushmore?

13      A.  Probably 15 pounds.

14      Q.  Has any medical provider ever told you that the

15  weight loss you have suffered is unhealthy?

16      A.  No.  But it's a no-brainer.  No, I don't go to

17  the doctor.

18      Q.  Has anyone ever told you that your hair loss is

19  associated with this as opposed to, like some of us,

20  just being genetic?

21      A.  No, but it sure started falling out faster after

22  I started dealing with this.  You're lucky.

23          MR. ABBOTT:  You get five people in a room,

24  you're going to get half of them that have --

25  BY MR. CRAMER:

1    Q.  Paragraph 93 says you're seeking disgorgement of

2  all payments made to defendants that were not expressly

3  authorized by the HELOC or permitted by the law.

4      What payments have you made to Rushmore that

5  were not expressly authorized by the HELOC or permitted

6  by law?

7    A.  What payments have I made to Rushmore?  I don't

8  think any yet.  They're bills to a private party.  I

9  don't remember who it is right now.  Another attorney

10  here -- is it Seattle, I believe?  You guys haven't seen

11  that?

12    Q.  Let me --

13    A.  Okay.

14    Q.  Let's take a step back.

15    A.  All right.

16    Q.  Prior to the filing of the bankruptcy --

17    A.  Okay.

18    Q.  -- what payments did you make to Rushmore that

19  were not expressly authorized by the HELOC or permitted

20  by law?

21    A.  That's one of those debatable things.  I haven't

22  made any payments.  They've accrued fees that they're

23  trying to pass on to me.

24    Q.  If I understand what you're saying, you didn't

25  cut any checks to Rushmore that were not expressly --

1  for amounts not expressly authorized by the HELOC.

2  **A.  Okay.**

3  Q.  I'll rephrase.

4  **A.  All right.**

5  Q.  As we sit here today -- and discount any

6  payments that you've made as part of the bankruptcy

7  proceeding --

8  **A.  Um-hmm.**

9  Q.  So prior to filing the bankruptcy, what payments

10  did you make to Rushmore that you contend are not

11  authorized -- for amounts that were not authorized by

12  the HELOC or permitted by law?

13  **A.  How do I put this?  What they do with the money**

14  **that I give them is up to them.  But what I consider --**

15  **whether I consider it authorized or not is a matter of**

16  **opinion to me.  Do you follow what I'm saying?**

17  Q.  I think so.  Let me ask a clarifying question.

18  **A.  Okay.**

19  Q.  When we get into court, it's going to be what

20  the law says and what the line of credit says.

21  **A.  Right.**

22  Q.  It's not going to be a matter of your opinion.

23  **A.  Right.**

24  Q.  So what I'm asking is, what payments were made

25  that you contend were not -- to Rushmore, prebankruptcy,

1 that were not expressly authorized by the line of credit

2 or permitted by law?  I'm trying to understand what the

3 evidence you're going to bring to the Court is.

4     **A.  That would be the outside attorney that came in**

5 **or -- I don't have the paperwork in front of me right**

6 **now.  There is like $5,000 in fees and stuff like that**

7 **to an outside firm.**

8     Q.  Okay.  So let me understand.  You're talking

9 about fees that you're saying were added into the loan

10 balance?

11     **A.  Yeah.**

12     Q.  Because that's a separate question.  What you're

13 saying is that there were fees added to the loan balance

14 that you don't think were right.

15     **A.  Right.**

16     Q.  What I'm talking about is what payments have you

17 made -- what checks have you written to Rushmore that

18 you contend were for amounts that were not authorized by

19 the line of credit or permitted by law?

20     **A.  And that would be those fees.  Because we're**

21 **disputing this whole dollar amount and interest and**

22 **everything else.**

23     Q.  Have you paid $5,000 to Rushmore?

24     **A.  I don't recall.  They returned my checks.**

25     Q.  So did that money debit from your bank account?

1     A.  Some of the money that I gave them, yeah.  The

2  money that I gave them, yeah.

3     Q.  Okay.  You still had principal and interest

4  obligations.  Correct?

5     A.  Um-hmm.  Correct.

6     Q.  And at this point, did you have escrow

7  obligations, too?

8     A.  Yes.

9     Q.  So some of that money was going to principal,

10  interest, taxes, and insurance.

11     A.  Correct.

12     Q.  What portion are you contending was for amounts

13  not authorized by the line of credit or permitted by

14  law?

15     A.  I have no idea of a portion.

16        MR. CRAMER:  I have no further questions.

17        MR. ABBOTT:  I have a couple follow-ups.  Sorry.

18  I know everyone wants to leave.  It's easier this way.

19

20            E X A M I N A T I O N

21  BY MR. ABBOTT:

22     Q.  The same question about the disgorgement.  For

23  Caliber, what amounts are you alleging that you paid to

24  Caliber that Caliber wasn't entitled to under the line

25  of credit or under law?

1    A.  I think those amounts were for the late fees and

2  legal fees and stuff like that incurred, because there

3  is a dispute on the amount owed and the interest rates

4  and everything else.

5    Q.  So late fees and any references to attorney

6  fees?

7    A.  Yes.  And like I say, I'm sorry, I didn't

8  prepare for this or you being here.  Sorry.

9    Q.  And then just two other things.  Regarding your

10  weight history, you said you lost 15 pounds since

11  dealing with Rushmore.  How much did you weigh in 2016?

12    A.  I think I weighed 165.

13    Q.  How much do you weigh now?

14    A.  150 on a good day.

15    Q.  Okay.  And then what about in 2000?

16    A.  In 2000?

17    Q.  Yes.

18    A.  I think 165 has been my ultimate --

19    Q.  All right.  And then what tax bracket are you

20  in?

21    A.  As far as?

22    Q.  What federal tax bracket?  What percentage of

23  your income do you have to pay in taxes?

24    A.  I couldn't tell you.  I have an accountant for

25  that.

1    Q.  So you can get that information by --

2    **A.  I can get that.**

3    Q.  So will you just agree to do that?  Because we

4  went through the damages stuff and you were citing gross

5  numbers.  So it makes sense to understand the net

6  numbers.  That's what we would say would be your loss.

7    **A.  Right.**

8    Q.  That's why we're asking about the fuel.

9    **A.  I know that is.  See, I was thinking about that**

10  **the other day.  It doesn't matter how much I gross, how**

11  **much I spend making what I make.  That's what I lose in**

12  **a day.**

13    Q.  The parties will disagree on that.

14        MR. CRAMER:  We can agree to disagree.

15        **THE WITNESS:  There you go.**

16        MR. ABBOTT:  Okay.  So Steven is hotter than us.

17  He's packing up.

18        MR. CRAMER:  He said I'll get you the numbers.

19  I've never heard him be so cooperative.

20        MR. ABBOTT:  Let me see.  Can we ask just to see

21  if there is anything else -- then we're leaving it open

22  pending anything you send, documents and stuff like

23  that.

24        MR. HATHAWAY:  I'll get those within two weeks.

25        MR. CRAMER:  Or video.  We wouldn't have to

1  drive back up here.

2       MR HATHAWAY:  Right.  On video or something.

3       MR. ABBOTT:  Who is going to do the stipulation

4  for the procedural stuff we're discussing about the

5  case?

6       MR. HATHAWAY:  Michael is really good at that.

7       MR. ABBOTT:  Michael is really good at that.

8       THE REPORTER:  Are you reserving signature?

9       MR. HATHAWAY:  Yes.

10      THE REPORTER:  And can I get everyone's order.

11  I know yours.

12      MR. ABBOTT:  You know mine.  And then if we

13  update it, I'll have my assistant --

14      MR. CRAMER:  Yes, we'll want the deposition.

15  Can we just get an E-tran or a PDF.

16      THE REPORTER:  Do you need a rough, also?

17      MR. CRAMER:  I don't need a rough.

18      THE REPORTER:  Are you ordering a copy,

19  Mr. Hathaway?

20      MR. HATHAWAY:  Yes.

21      THE REPORTER:  Do you need a rough?

22      MR. HATHAWAY:  Yeah, I -- no.  No.

23      THE REPORTER:  Okay.

24      (Deposition adjourned at 6:21 p.m.)

25      (Signature reserved.)

1          S I G N A T U R E

2

3          I declare under penalty of perjury under the laws

4     of the State of Washington that I have read my within

5     deposition, and the same is true and accurate, save and

6     except for changes and/or corrections, if any, as

7     indicated by me on the CHANGE SHEET flyleaf page hereof.

8          Signed in _____ , Washington,

9     this _____ day of _____ 20___.

10

11

12                    _____

13                    LORIN EDWIN MASSINGALE

14                    Taken:  Friday, August 5, 2022

15

16

17

18

19

20

21

22

23

24    Re:  Massingale v. U.S. Bank National Association
      Cause No.:  21-01013 MLB
25    Donald W. McKay, RMR, CRR, CCR

1                    C E R T I F I C A T E

2

STATE OF WASHINGTON    )
3                        ) ss
COUNTY OF KING          )

4

5        I, the undersigned Washington Certified Court
Reporter, hereby certify:
6

        That the foregoing deposition upon oral examination
7  of the witness named herein was taken stenographically
before me and transcribed under my direction;
8

        That the witness was duly sworn by me pursuant to
9  RCW 5.28.010 to testify truthfully;

10       That the transcript of the deposition is a full,
true and correct transcript to the best of my ability;
11

        That I am neither an attorney for, nor a relative
12 or employee of any of the parties to the action or any
attorney or counsel employed by the parties hereto, nor
13 financially interested in its outcome.

14       I further certify that in accordance with CR 30(e),
the witness was given the opportunity to examine, read,
15 and sign the deposition, within 30 days upon its
completion and submission, unless waiver of signature was
16 indicated in the record.

17

18

19       _____
         Donald W. McKay, RMR, CRR
20
         Washington Certified Court Reporter No. 3237
21       License effective until: 07/02/2023

22

23

24

25

1    Errata Sheet

2

3    NAME OF CASE: LORIN EDWIN MASSINGALE vs U.S. BANK NATIONAL ASSOCIATION AS LEGAL TITLE TRUSTEE

4    DATE OF DEPOSITION: 08/05/2022

5    NAME OF WITNESS: Lorin Edwin  Massingale

6    Reason Codes:

7         1. To clarify the record.

8         2. To conform to the facts.

9         3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                    _____

## Exhibits

**Exhibit 1**
3:9 16:8,11
18:10

**Exhibit 2**
3:10 18:12,15
20:12 110:7
189:17

**Exhibit 3**
3:12 20:14,17
40:17 42:11,
20 110:7,13

**Exhibit 4**
3:13 27:14,16
30:8

**Exhibit 5**
3:14 28:24
29:1,10 30:9

**Exhibit 6**
3:16 30:14,16
31:6 32:7

**Exhibit 7**
3:17 32:10,12
146:1

**Exhibit 8**
3:18 36:10,
13,19

**Exhibit 9**
3:19 38:25
39:3 40:16,20
42:19 43:1
47:15 48:21
49:17 51:5,7

**Exhibit 10**
3:20 50:13,
16,23 51:2,20
52:6,17,19

**Exhibit 11**
3:21 64:2,3
68:24 69:20
77:16 94:6
96:20 98:8
99:9 100:5

**Exhibit 12**
3:23 100:24
101:1,25
235:22

**Exhibit 13**
4:3 107:9,11,
16 221:23
235:25
243:21 244:6
259:13

**Exhibit 14**
4:5 108:2,4,6
113:14,15
118:19,21
120:15

**Exhibit 15**
4:7 115:9,11,
14 117:11
130:19

**Exhibit 16**
4:9 125:20,23

**Exhibit 17**
4:11 130:21,
23 131:2
134:22 146:2,
10 147:4,11
208:21
209:16

**Exhibit 18**
4:13 137:11,
13,15,18
142:4,6 143:9
146:13
156:24 196:1,
10,17

**Exhibit 19**
4:16 148:4,7

**Exhibit 20**
4:18 149:12,
14 150:4,6
151:1 161:17
167:24 169:5
211:9

**Exhibit 21**
4:20 169:23,
25 170:5
171:11

**Exhibit 22**
4:22 173:11,
13,18 175:2,8
176:16
178:14 181:6
182:8 183:2

**Exhibit 23**
5:3 181:13,
15,23 182:16
229:20

**Exhibit 24**
5:5 185:18,
20,25 207:20

**Exhibit 25**
5:7 188:7,9,
14 189:25

**Exhibit 26**
5:9 191:2,4,9

**Exhibit 27**
5:11 191:17,
19 192:3

**Exhibit 28**
5:12 194:19,
21 195:3
196:4 197:1
206:11

**Exhibit 29**

5:14 214:4,6,
9

**Exhibit 30**
5:16 234:20,
22 246:20
266:20

**Exhibit 31**
5:17 236:17,
20,23,24

**Exhibit 32**
5:18 245:12,
14

**Exhibit 33**
5:20 252:15,
16

**Exhibit 34**
5:21 253:17,
18 256:12

**Exhibit 35**
6:3 258:6,9
260:16

**Exhibit 36**
6:6 267:13,
15,16

**Exhibit 37**
6:8 272:2,3

**Exhibit 38**
6:10 273:2

**Exhibit 39**
6:13 275:9,
10,12

**Exhibit 40**
6:15 275:24
276:1,6

**Exhibit 41**
6:17 277:8,11

**Exhibit 42**
6:19 277:17,

20

**Exhibit 43**
6:21 281:14,
17,20

**Exhibit 44**
6:23 281:25
282:3

**Exhibit 45**
7:3 282:13,
14,24

**Exhibit 46**
7:6 284:14,16

**Exhibit 47**
7:8 285:21
286:2

## $

**$1,000**
78:9 243:1,2,
17

**$1,099**
30:3

**$1,142.06**
161:19,25
162:18 163:7

**$1,359**
261:2

**$1,359.26**
260:3,11,13

**$1,360**
261:20

**$1,410**
261:3,20
264:21

**$1,410.03**
260:19 262:9,
15 263:22

**$1,419**
72:11 78:5

**$1,494.40**
92:4

**$1,500**
241:20

**$1,569.12**
92:15

**$1,675**
290:6,9,13
292:4

**$100,000**
217:12

**$100,500**
215:5 217:5
219:9 220:19
221:6

**$103,000**
45:4

**$103,675.35**
45:5

**$106**
298:5

**$11,634.97**
246:22

**$117,622.63**
214:24

**$118,000**
215:6 217:11,
20

**$118,216.12**
216:25
235:16
238:23

**$118,891.36**
236:4

**$12-**

239:13 240:2
291:22

**$13-**
260:2

**$1300**
239:13 240:2

**$1400**
260:2

**$15,000**
236:14
238:11,16,21
239:4 240:3,
23 252:7

**$15,104.23**
236:9 237:14
239:25 240:9,
15 246:23
253:6

**$15,701.99**
243:24 244:3

**$17,000**
17:9

**$1800**
291:22

**$2,000**
252:4

**$2,100**
144:16 145:9,
20 147:7

**$2,176.10**
247:5

**$2,187**
147:8

**$2,187.75**
146:1

**$2,241.60**
79:11

**$2,316**
85:22

**$2,316.32**
85:12 86:17

**$2,391.04**
86:21

**$20,000**
244:6,13,22
245:8

**$200**
297:24

**$3,000**
279:11

**$3,122.84**
274:16
280:14

**$3,400**
144:15 145:2,
16 147:18

**$308**
221:1

**$322.32**
161:20

**$4,000**
163:5 249:6
250:19 258:1

**$4,370**
297:22

**$4,808.15**
43:15

**$4,856.80**
91:11

**$4,900**
262:2,3
279:20

**$4,905.71**
262:7

**$400**
284:4

**$5**
292:11

**$5,000**
29:24 196:24
262:5 309:6,
23

**$50**
261:13

**$518.77**
216:13

**$560**
144:16

**$699**
186:18 187:9

**$7,247**
217:16

**$7,247.84**
217:19,24

**$7,413.02**
29:18

**$7,921**
259:25

**$7,921.24**
187:5

**$74.72**
215:18,25

**$747**
250:17

**$747.58**
132:22

**$8,000**
104:9

**$8,400**
289:2

**$8,900**
114:21

**$8,930.29**
109:4 114:16,
20 118:25
245:2

**$819.74**
161:20

---

**(**

**(12)**
285:13

**(b)**
260:18

---

**0**

**0027**
102:2

**022903**
117:14

**0591**
79:6

**0615**
86:12

**0635**
86:13

**0639**
94:5

**0643**
90:21

**0649**
83:20

**0684**
92:18

**1**

**1**
16:8,11 18:10
40:21 41:1
42:2,8 45:11,
22 46:5 51:22
91:10 114:6,
7,10,11,16
135:10 151:5
152:10
153:14 155:7
176:6 183:5,6
201:13
202:21 203:6
204:25 214:8
236:7,10
247:5 273:22

**1-800**
119:12

**1-888**
256:23

**10**
50:13,16,23
51:2,20 52:6,
17,19 234:6

**100**
57:19 72:17
222:19

**10:00**
8:2

**11**
64:2,3 68:24
69:20 77:16
94:6 96:20
98:8,10 99:9
100:5 113:11
215:23
225:14 236:7
271:9

**118**
219:10

**11:45**
99:5

**12**
64:24 69:14
77:17 78:12
91:25 100:24
101:1,25
127:14
186:21 187:6
235:22 236:2
260:1 284:21
285:7

**12/05/2016**
118:25

**120**
65:25

**12:00**
99:5

**12:15**
143:24

**12:54**
143:23 144:2

**12th**
79:5 85:22
86:15 107:12

**13**
60:25 94:8
107:9,11,16
117:15 193:6,
9 221:23
235:25 236:3
243:21 244:6
259:10,11,13,
14 297:22

**135**
236:21,22
237:9

**13th**
115:22

**14**
60:25 108:2,
4,6 113:14,15
118:19,21
120:15 148:8
149:1 208:21
209:6 227:10
244:18
259:17

**14th**
176:19

**15**
96:21 115:9,
11,14 117:11
130:19
227:10 238:6
306:13
311:10

**150**
311:14

**15th**
73:14 176:20
188:19

**16**
51:9 125:20,
23 266:21
286:11
287:21
296:15

**165**
311:12,18

**17**
70:17 79:9
130:21,23
131:2 134:22
146:2,4,8,10
147:4,11
181:16

201:11
208:21 209:6,
7,10,12,16
296:15

**17th**
247:10

**18**
137:11,13,15,
18 142:4,6
143:9 146:13
149:15
151:12
156:24
161:23 169:5
196:1,10,17
211:10

**18th**
152:11
275:18

**19**
148:4,7

**1992**
17:6

**1997**
19:19 155:2

**1998**
22:19 25:9,12
28:6 60:4
157:20 185:3
188:19 230:5

**1999**
39:23 40:12
42:25 43:7,11
44:9,10 47:4,
21 50:4 51:9
52:21 58:23
60:4

**1:19**
167:20

**1st**
100:14 101:6
110:19 111:2
151:10,17
152:12
183:17,18
187:7 223:8
242:14
257:22 258:2
262:4

**2**

**2**
18:12,15
20:12 43:1
99:3 110:7
189:17
289:15

**2(a)**
52:8

**2(a)(i)**
43:6

**2/21**
147:11

**20**
26:21 125:1,2
149:12,14
150:4,6 151:1
154:3 161:17
167:24 169:5
211:9 217:14
245:7

**2000**
28:2 59:25
60:2,6,10,18
62:6,12
231:21
311:15,16

**2000s**
238:13,15

**2003**
54:10,18,19,
21 57:2,19

**2004**
51:3 52:7,8
53:4,17 58:4,
16

**2005**
56:18 57:24
60:24 75:11,
13

**2006**
37:5,11

**2009**
37:4,5,11

**2010**
61:11,13
75:7,8,12
76:8

**2012**
60:25 64:24
65:3 69:14,18
70:1,11,17
71:6,24 72:4,
7,23,24 73:7
77:17,19,22,
25 78:16
79:10,13 81:5

**2013**
79:17 80:3

**2014**
80:5,13 81:7,
10 82:12
83:24 84:1

**2015**
84:25 85:5,9,
16,22 86:9,20
88:12 90:22
91:1,4,10,12,
19,25 92:12

97:25

**2016**
92:19 93:15
94:8 96:14,
21,25 99:19
100:17,20
101:3 104:3,
8,17 105:7,13
107:12,19
108:5 109:1,6
113:17 114:6,
7,10,12,16,19
115:6,21,22
117:15,18
118:6,20
120:11
131:16
132:17 133:8
136:11
138:22 155:7
171:3,4 176:3
201:11
202:19,22
203:6 204:2,
13 214:8,13,
20 215:23
218:24
231:14 236:2,
7,10 238:22
243:22
244:15,16
298:5 311:11

**2017**
23:2,5,10
27:8 67:12,14
106:7,15,18
123:6,13
124:14
125:24
129:11,17
130:5,10,12,
24 133:5,10,
17 137:3,4,6,

14 139:18
146:14 148:8
149:1,15
150:12 151:5,
12 153:14
157:14
161:23 169:5,
19 173:14
174:22
175:15 176:5
181:16 183:6
187:7,17
188:19 195:4
197:2,11
201:14 203:3
204:23,25
205:11,25
207:9,12,13,
15 209:15,21
211:10 223:8
227:11 245:5
247:5,15,16
248:3,13,18,
21,23 249:2
251:17,18,22
253:14
255:17,20,24
256:6 257:8
273:22 298:5
300:5

**2018**
249:21,22
262:24
270:17,19
271:12,17
272:11,14,15
273:16,19
275:6 276:22
278:13,17,19
279:3,12
298:5

**2019**
242:15

243:16 277:1,
15 281:11,23
282:7,10,12,
17 283:16
284:11 285:1
298:5

**2020**
242:14
243:19
286:11,22,23
287:22

**2021**
285:16
286:22
287:11,14,24

**2022**
8:1 62:7

**20th**
50:6

**21**
130:24
146:14
169:23,25
170:5 171:11
271:12,17
272:14
273:16
278:17,19
282:10,12,16,
22

**21st**
209:15,21

**22**
173:11,13,18
175:2,8
176:16
178:14 181:6
182:8 183:2
284:11

**22nd**

51:3 86:20
92:12 285:1

**23**
181:13,15,23
182:16
229:20

**24**
63:10 185:18,
20,25 207:20
259:21,23

**2493**
254:12

**24th**
276:13

**25**
173:14
174:22 188:7,
9,14 189:25
272:15

**25th**
176:6 182:5,8
276:22,23

**26**
43:6,7 191:2,
4,9

**27**
191:17,19
192:3 194:18

**270415**
169:15 172:9
173:6

**28**
194:19,21
195:3 196:4
197:1 206:11
235:14

**29**
185:3 214:4,
6,9

**2:32**
167:20

**2nd**
85:16,22
115:22,24
244:11

---

**3**

**3**
20:14,17
40:17 42:11,
20 110:7,13
235:14

**3/8**
147:11

**30**
65:25 86:5
166:17
219:24
234:20,22
246:20
266:20 271:9
272:19

**30/60**
72:16

**300**
260:12

**30th**
123:11
242:15

**31**
96:25 108:5
118:20
120:11
236:17,20,23,
24

**31st**
131:12 203:3,
6 208:14

272:11

**32**
245:12,14
253:3,4

**33**
252:15,16

**34**
253:17,18
256:12

**35**
258:6,9
260:16

**36**
246:20,25
267:13,15,16

**37**
252:19 272:2,
3,6

**38**
273:1,2,4

**39**
275:9,10,12

**39681**
14:2 46:4
246:1 267:22

**3:40**
222:3

**3:49**
222:3

**3rd**
92:19

---

**4**

**4**
27:14,16 30:8
91:4,12 98:10

**4/21**
147:11

**40**
275:24 276:1,
6

**405-608-2003**
158:3 211:21

**41**
271:10,12
277:8,11

**42**
274:10
277:17,20
280:14

**425-343-3267**
242:25

**43**
275:4 281:14,
17,20

**44**
281:25 282:3

**45**
282:13,14,24

**46**
284:14,16

**47**
78:23,24
275:4 285:21
286:2

**48**
63:13 78:24
276:25 281:7

**49**
284:11

**4:18**
274:8

**4:23**
274:8

---

**5**

**5**
8:1 28:24
29:1,10 30:9
109:1 117:14

**50**
285:15

**538**
194:5

**575**
68:19

**5786**
285:12

**5th**
132:4 287:10,
14,24

---

**6**

**6**
30:14,16 31:6
32:7 214:20
238:22

**60**
65:25 73:15
86:5 92:6
219:24

**64**
266:19

**650856**
100:7

**684**
93:10

**6:21**
313:24

---

**7**

**7**
32:10,12
78:22 146:1
157:20
188:18 213:6
230:5,10,14
273:19 277:1,
15 281:23
282:7

**70**
18:6

**73137**
169:15

**743**
13:25 246:2

**7th**
277:24
281:10,11

---

**8**

**8**
36:10,13,19
117:17 195:4
207:9 253:4
275:5 279:3

**8/1/2016**
100:7 237:9

**8/8/2016**
237:17

**80**
292:11

**800**
120:21
148:22,24
178:12

**800 621-1437**
119:8

**85**
292:11

**888-504-7300**
270:2

**8th**
115:21 144:5
150:1 197:11
207:12
274:11
276:18
279:17

**9**

**9**
38:25 39:3
40:16,20
42:19 43:1
47:15 48:21
49:17 51:5,7
101:3 278:13

**90**
50:5 65:25
86:5 219:25

**90s**
78:14

**91**
288:15

**9105200009**
42:6

**92**
300:2,9
304:23

**93**
307:1

**94**
28:2 76:16

**9712**
42:17

**9712040038**
42:10,18
51:25

**975**
286:3

**98**
25:18 50:7
76:17 133:8

**98-02782**
184:23

**99**
50:7 51:8
76:17

**9:09**
143:22

**9:12**
143:24

**9th**
183:2

**A**

**a.m.**
8:2 143:22,24

**Abbott**
8:10,11 16:7,
9 18:9,13
20:10,15,21,
25 24:16
26:6,9,12,17
27:10,15
28:25 30:7,
10,15 32:11
33:22,25
34:13 35:12
36:10,14
39:1,8,14,18
40:4,7,11

41:11,17,19,
22,24 44:3
45:10,15,18,
23 48:8,16
50:14,21
63:25 64:4
89:15,17
98:6,12,15,
17,23,25
99:6,7 100:25
107:7,10,25
108:3 109:23,
25 112:13,17,
23,25 113:13
115:8,10
125:21
130:22
137:12 142:3
145:14 148:5
149:13
152:23 153:1,
6,8,11,17,21,
25 154:13,20,
23,25 161:2,
6,12,16
163:10,14,16
164:4,7,10,
13,15,22
165:2,7,23
166:3,7,10,
15,21,23
167:1,8,15,
19,23 168:14,
19 169:2,3,24
172:12,18,20,
22 173:12
179:18,24
180:5 181:12,
14 185:19
188:6,8
190:24 191:3,
16,18 192:1,7
193:8 194:18,
20,25 195:2

203:20
208:22 209:1
214:5 222:4,6
224:15 227:7
229:6,8,25
230:3 231:1
260:4 274:7
296:15 301:8
306:23
310:17,21
312:16,20
313:3,7,12

**Abbott's**
235:8

**ability**
9:2 287:18

**above-entitled**
8:5

**absolutely**
59:7,12,14
88:11 198:14
301:11

**absorb**
95:4

**abstain**
112:7

**accent**
199:5,6,7,8,
14

**accept**
65:20 69:4
83:10 90:15
250:8 292:22

**acceptable**
163:20

**accepted**
250:6,15,25

**accepting**

83:15,16
90:13 279:1

**access**
60:19 138:14,
20 139:3,13,
14,17 251:9
256:7 300:3

**accessing**
140:12

**accident**
97:15 108:21
125:4 220:3

**accompanied**
286:7

**accordance**
142:6 187:25

**account**
53:23 54:4,8,
9,21 56:12
65:2,3,6 66:1
69:18 70:7
71:1 72:2,4
77:20 79:8,
12,25 80:10
83:25 84:2,5
85:11 90:23,
25 91:8,18
92:3,14 94:10
97:25 117:7
119:7 120:18
130:18 138:9,
13 140:13
141:1 151:13,
21 185:21
208:5 214:16
215:3 216:5
240:17
246:22
252:21
273:21,25
274:4 285:20

309:25

**accountant**
89:8 241:6
243:8,11
295:10,11
311:24

**accountant's**
295:13

**accounting**
218:23
295:16,17

**accounts**
55:15 56:3,8
67:2

**accrued**
307:22

**accuracy**
52:16

**accurate**
90:18 162:5
251:16

**acknowledge**
131:14

**acknowledged**
272:22,23,25
281:12

**acknowledgement**
281:22

**acknowledging**
148:13

**acknowledgment**
148:23 149:1
275:22
277:15

**acres**
38:13

**Act**
267:1,11

**action**
66:14 134:25
235:9

**actions**
113:24 114:1,
3 222:11

**Activity**
214:16 216:5

**actual**
64:7

**add**
87:17 111:25
245:8 266:16

**added**
64:6 90:4
110:5 196:25
221:14 309:9,
13

**adding**
87:11,14,16
110:23
264:24

**additional**
119:3 168:7,
16 240:7
245:4

**address**
46:1,4,17
47:18 116:3,4
127:23 144:5
150:19,21
158:4 169:7,
14 170:14
173:9 211:22
245:25 246:2,

4,13,14
267:22 272:8

**addressed**
39:12

**addresses**
13:24 14:14
169:8 179:5,
7,12 212:4

**addressing**
14:7 115:5

**adjourned**
313:24

**adjust**
95:10

**adjustment**
237:18 261:8

**administrative**
237:17

**admit**
235:12

**admitted**
113:7

**advance**
287:3

**adversary**
193:10,19
288:24
298:11,18
299:13,18
304:18

**adverse**
66:14

**adversely**
305:6

**advise**
126:22

**advising**
99:10

**affect**
305:6

**affects**
89:10 301:17

**affidavit**
47:16

**afraid**
228:2

**afternoon**
231:10

**age**
9:4,5,6

**agencies**
269:9

**agency**
31:13 59:19
70:25 269:12
270:5,7

**agent**
29:11

**agree**
14:16,17 15:4
33:22 42:19
51:18 90:9
92:9,10
107:22 111:7
112:6 143:22
168:10 181:6
184:5 217:13
218:20 221:9,
14,20 235:18
253:8,11,13
272:21 280:8
312:3,14

**agreed**
38:11 168:13
204:5

**agreement**
69:9 89:11
109:21 110:1
127:11,16
128:12
186:12,15
240:7

**agrees**
9:25

**ahead**
22:25 26:12
38:4 112:18
119:1 164:25
187:2,3
242:11
263:16

**Aid**
269:6

**Alder**
46:19

**Allan**
256:10,20

**allegation**
267:10 284:1
288:21
293:24
296:10

**allegations**
235:12 247:2
252:6,11
271:3 281:2,
5,8 283:12
288:14

**allege**
245:1 246:20
266:23
274:10,25
279:8 280:10,
16 288:16

alleged
156:20
276:20

alleges
284:10

alleging
235:7 310:23

allocation
114:9

allowed
83:10

alluded
200:12

alluding
27:12

alter
154:5

Alzheimer's
301:6

Amended
234:23

America
53:22 54:3,7,
8,21 55:13
56:4 61:24
110:3 111:25

America's
110:11
111:12,17

amount
29:15 65:22
79:10,13
85:11,14
86:16,21,25
91:10,21 92:4
94:11 100:22
108:25 109:3,
11,12 110:5
112:5 120:10

127:14 129:6
137:24 138:6
140:24 141:5
145:2 147:8
161:18,20
186:21 187:6
209:11 216:5,
9 235:16
237:19
239:24
240:16,17
244:19
250:16,22
257:17,22
258:18,23
259:23 260:6
263:22
264:14
265:22
273:20
274:15 279:4
280:13
309:21 311:3

amounts
113:5 114:6
239:19 259:4
265:1 308:1,
11 309:18
310:12,23
311:1

analyze
89:9

and/or
278:10

anger
302:13,16

Ann
53:14

Annette
243:12

annoyed
197:6,7

Annual
185:21 208:5

Annually
109:17

answering
130:8

answers
10:14,16
33:20,23 49:7
142:9,10,14,
16,23

antagonize
292:15

anticipate
272:18

anticipating
61:2

anxiety
300:22,24
301:2 302:10,
18

anymore
62:4 66:4
84:20 85:16
128:24
139:14
191:25

anyone's
214:2

AP
193:18

apologize
16:13 235:23
276:2

apologizing
242:6

annoyed
apparently
53:16 130:3
131:6

appeal
122:11,12

appears
115:12
117:10
181:11
267:25
273:13
277:16
281:24
286:10

applicable
119:5

application
192:15
254:16,20

applications
267:4,5

applied
66:15,24
201:6,10,11,
13 202:5
300:4

applies
87:5

apply
66:12 71:9
81:21 82:25
94:13

appreciates
149:25

apprise
126:22

approved
269:8,11

approximately
67:10 123:16
170:18,24
171:9 255:9
257:12 259:4
288:3 289:4
292:2 293:14,
21

April
70:17 71:6
72:19,23 73:7
105:7 123:6,
7,11,12 127:1
149:15
150:12
151:12
152:11
161:23 169:5,
19 187:7
211:10
229:23 230:1
250:5 281:11,
23 282:7

architect
77:8

area
30:24 62:22

areas
84:18 302:3

argumentative
48:9

argumentive
180:7

arguments
164:14
265:18

Arrearages
43:2

**arrears**
36:5 163:5
249:6 250:19
257:22
258:23

**arrest**
232:2

**asks**
9:20

**aspect**
22:23 84:14
161:22

**aspects**
162:19
301:17

**assessment**
28:10 44:8

**assignment**
74:16 245:22
246:11

**assignments**
225:6,9

**assistance**
45:19 79:18,
21 80:8 81:1,
22 82:25 83:2
85:7 94:14,17
120:19,24
121:4 254:15,
20

**assistant**
313:13

**assisting**
70:22 120:23

**associate**
206:18

**Association**
231:13 269:3

**assume**
12:21 23:19
53:6,9 70:3
189:6 190:8
239:11,16
267:12,18
276:14 277:5
286:25
294:11,13

**assumed**
60:19 173:9

**assuming**
36:25 69:24
148:18

**assumption**
267:19

**attached**
171:25
245:23

**attaching**
33:4

**attachments**
286:3

**attempt**
126:22 153:3

**attempting**
153:4

**attempts**
84:4 92:13
268:8,21

**attention**
95:2 107:23
113:15
126:16 169:4
182:15
221:23
238:24
254:11 279:3
301:22

**attitude**
199:2

**attorney**
9:15,25 10:2,
6 13:9 18:19
20:3 23:3,21,
22 24:13
34:14 48:11
112:4,8 117:3
143:25 174:5
179:16
203:12 204:4
212:9,25
213:20,23
223:12 224:4
226:7,11,14,
22,24 231:11
232:20 239:1
251:12
270:15,16
283:6,18,22
284:12,22
285:17
288:12
298:25 299:5,
14 302:24
304:17 307:9
309:4 311:5

**attorney's**
48:22

**attorney-to-attorney**
167:9

**attorneys**
161:13 289:3,
5 293:2
295:19
298:16

**attribute**
302:6

**audit**

87:23 88:3,
14,24 89:1,4,
8,20,22 90:4
218:3,7,13
241:4 243:5,
17,18

**auditing**
240:12

**auditor's**
16:22 27:18
29:3 30:18
32:13 42:5,
12,14 51:23

**August**
8:1 72:20,24
73:7 101:3,6
107:12,19
155:7 202:21
203:6 214:8
215:23 236:2,
7,10 243:22
276:13
282:10,12,16,
22

**authorized**
307:3,5,19
308:1,11,15
309:1,18
310:13

**automated**
70:5

**automatic**
53:22 54:4
61:22 69:23
70:1 73:9
101:17

**average**
291:18,19

**avoid**
70:22 120:20

125:17 264:3
267:7 268:3

**aware**
11:19 24:22
52:25 79:24
80:9 90:23
188:3 197:24
200:20,21,24
252:8,10

**awkward**
175:3

---

**B**

---

**back**
12:20 19:19
20:5,12 24:24
25:17 44:4
45:20 55:21
60:22,23,25
64:19,20
66:19 77:16
80:3 93:10
97:14 99:6
100:20
102:20
103:12 107:1
113:14
117:10,12
118:19
123:25 125:6
129:13,24
130:2 134:7
168:8 175:16,
23,24 177:9
182:11
186:12 193:1
194:11 197:1
206:10
207:20 210:1
213:4 222:4
226:1 239:8,

13 241:18
242:7 245:23
246:19
249:16,21
250:13 252:4
253:25
254:23
255:25
259:10
260:15
264:22
269:18 271:4
285:5 293:9
294:2 305:10
307:14 313:1

**background**
16:12

**bad**
218:1 233:22

**badger**
292:15

**Baker**
13:25 14:2,18
45:7 46:4
246:1,2
267:23

**balance**
29:18,21,22
72:11 78:3
85:19 88:5
108:10
144:16 145:9
214:24
216:11,25
217:3,11,25
219:17,18
221:5,12
236:10
237:10
240:16,19
244:5 246:21,

23 247:15
252:20
253:11
309:10,13

**bank**
11:20 25:25
53:22 54:3,7,
8,21 55:1,13,
14,24,25
56:3,7,12,15,
16 60:19,20,
24 61:1,24
62:2 105:2,3,
4,5 106:7,8,
14,15 107:1
110:3,10
111:12,17,25
117:24,25
118:1,6
129:14
130:15,16
181:2,3
231:13,15
241:24 242:1
251:7 274:18
294:21,22
298:3,5,20
309:25

**Bank/banner**
56:7

**banking**
53:25 56:16
63:17

**bankruptcies**
24:25 27:2

**bankruptcy**
22:13,18,21
23:1,6,7,9,13,
15,23 24:3
25:8,18,24
26:19 27:2

28:22 68:16
101:16,18
102:6,9,11,
15,24 103:3,
5,10,11,14,
16,17 104:7
127:7 156:3,
15,16,17
157:1,20
173:22 181:7
182:2,9
184:15,23
185:4,5
188:18 192:9,
11,16 193:9,
14 197:8,25
198:3,9,18
200:23
201:20,21,24
202:16
210:22 213:6,
10 227:13,19,
23 228:12,14,
25 229:2,11
230:2,5,10,
15,22,24
249:8 251:15,
18 252:22
265:17
270:16,17,20
297:22
298:22 299:6
303:5,8,12,
17,19 304:1,
4,10,15
307:16 308:6,
9

**banks**
54:2 55:14
62:2,10

**Banner**
55:22,24,25
56:8,12,16

60:20 61:1
105:4 106:8,
15 118:1
129:14
130:16 181:4
241:24
274:18

**Bar**
269:3

**barely**
169:22 290:5

**Barreca**
165:20 167:5

**Barreca's**
165:22

**barred**
164:17 165:4

**based**
31:25 82:3
106:20

**basic**
21:20

**basically**
19:16 46:25
96:6 127:16
132:1 201:8
217:4

**basis**
36:23 127:23
162:7 217:12
260:25
267:19
303:15

**Bates**
86:11 269:18
284:23

**bear**
192:4 281:5

**beating**
96:9

**beginning**
39:22 55:16
78:10,11
80:20 288:15

**begs**
196:9

**behalf**
304:15,18

**belief**
228:13

**believed**
155:20
230:23

**bell**
243:10

**Beneficial**
14:25 15:11,
12,13,20 16:2
18:16 19:10,
17 21:13 22:1
23:8 39:22
40:2 43:15,19
44:7,11,13
45:8,25 52:6,
20,25 53:7
55:9,18,19
56:22 57:12
64:25 65:20
68:5,8 69:3,8,
22 71:10,13
82:20 83:22
84:8 85:5
86:12 87:21
88:1,13,16
90:22 91:4
92:19,22
93:12,15,17
94:9 96:8,21
99:10,16

100:4 101:7
108:15 123:2
133:7,8 164:1
214:13
215:10 218:5
219:3,13
220:9,12
238:1,4,5,20
250:17,22

**Beneficial's**
46:12 49:21
91:22 108:13,
17 126:2
214:10 215:2,
7 218:23
220:11

**benefit**
22:25 228:9

**Benton**
238:19 239:3

**big**
14:21 40:24
78:19 79:2
128:25
247:22

**biggest**
8:20

**bill**
135:13
187:11
196:21
289:10
295:16

**billed**
207:18

**billing**
109:12,13

**bills**
37:11 38:3,5
307:8

**Binton**
238:19

**Bishop**
48:17 49:11
53:11

**bit**
16:14 73:17
96:9 112:17
202:12
220:15 244:9
245:16
297:21

**blindly**
292:22

**blocked**
33:12

**board**
95:23

**bold**
182:21 207:2
211:14 217:1

**Bonded**
31:12,22

**bookkeeper**
61:10,13

**books**
240:12

**borrow**
174:6

**borrower**
20:1 187:12
231:5 254:15,
20

**borrowers**
85:1

**borrowing**
174:3

**bottle**
45:21

**bottom**
42:16 79:6
169:8 179:8
211:13 253:5
254:12

**bought**
15:13,14 17:3
55:22 56:7,23
77:4,10
238:14

**box**
100:7 101:7
117:11
169:14 172:9
173:6 214:16
215:15

**boxes**
62:24,25 63:2
169:11

**boy**
31:1

**bracket**
311:19,22

**branch**
55:8,11

**branches**
55:9 57:14,15

**branding**
69:15

**breach**
91:7,10

**break**
70:11 98:7
99:2,8 167:25
221:25
271:25 272:1

**break-in**
60:7

**breakdown**
72:6 81:5,10,
11

**breakdowns**
82:4

**breaking**
234:8

**briefly**
8:18 27:13
68:24 73:22

**bring**
24:24 53:4
71:1 79:11
90:6 104:1,21
114:18 119:6
120:2,17
128:3,4 186:5
204:14
207:25
264:14
265:25 266:4
271:6 279:13
281:5 309:3

**bringing**
72:17 144:18

**broadly**
294:25

**broke**
71:20 220:25

**broken**
162:18

**brother**
32:24 33:6
35:20 77:13

**brother's**
33:2,4 34:17
36:3

**brought**
65:9 73:8
92:6 103:15
114:21 121:2,
16 160:14,16
233:8 274:1

**bubinga**
13:2

**build**
17:23 18:25
47:10

**building**
25:16 47:13

**built**
76:16,18,25
77:4

**bullet**
151:2,4
153:13 155:1,
17 157:18

**bunch**
165:12

**burned**
128:22 129:7

**business**
31:14 32:2
61:15,16
70:14 73:23
75:5 76:8
82:10,12,15
90:13,17
233:19
305:12

**business-
wise**
61:11

**busted**
59:21

**buy**

77:8

**C**

C-H-O-F-F-E-L
  300:16

**CACH**
  36:15

calculate
  90:1,16
  110:21
  122:17 290:7

calculated
  109:7

calculation
  112:5 113:5
  120:10 215:8

calculations
  85:24

**Caliber**
  8:12 22:11,
  14,15,17
  23:9,24 55:19
  64:17 67:16
  68:2 79:6
  83:20 86:12,
  13 88:19
  90:21 92:18
  93:10 94:5
  98:4 99:11
  100:7,13
  101:1,6,19
  102:2,5,23,24
  103:6,9,12,
  14,17 104:2,
  6,11,17
  107:12 108:5
  113:25
  115:23 116:3,
  11 118:13,20

119:16,20,25
120:9,18,24
121:3 123:2,
4,5,12 124:2,
14 125:23
126:6,8,17,23
127:4,24
128:5,9
129:16 130:5,
7,9,12,24
132:4 133:19,
22 134:4
136:4,6,7,16
137:19 138:5
140:12 148:7,
25 149:3,15,
25 151:11
152:5,9
155:6,20
156:9 157:19,
22,25 158:8
162:17 163:6,
17,18 169:6,
25 171:17
173:14 174:1
176:21 179:6
181:8,16
183:4,11
184:1,8,11,
19,22 185:5
186:15
187:15
188:17 189:3,
5,7 190:15,22
193:22
194:21 195:4,
25 196:11
197:7 198:17
200:15,20,23
202:2,9,18,21
203:8,13
204:1,12,23
205:1 206:15,
20 207:1,12

209:11,16,21
210:3,21,25
211:18 212:3
213:8 218:6,
25 219:2
220:25 222:9
223:7,12,19
224:11,18
225:7,11
226:16,25
227:9,17
228:13
229:10 230:7,
21 233:10
235:5,6 236:3
237:9 238:25
243:7,21
244:2,12,14,
16,20 245:22
247:19,21,23,
25 248:1,4
251:21,23
259:10 260:2
265:24 266:1
274:4 283:21
288:12
295:21,23,24
296:14 297:1,
3 298:19
301:13
310:23,24

**Caliber's**
  23:2 106:17
  135:19 144:4
  210:19
  211:10
  222:11 233:6
  288:12

**Caliberhomes
.com**
  138:11

call

10:8,21,24
14:11 16:2
68:5 69:21
71:12 104:9
119:12,16,20,
25 120:13
127:12
133:19 135:2,
19 136:7
146:24
148:22,25
149:3 156:22
157:3,11,12
164:21,22,25
165:2,19
173:1 175:9,
15 176:24
177:15,16,17,
18,19,21,22
178:7 210:16
231:15
238:22 255:6,
9 256:21
261:24,25
262:11
268:15,19,22
269:14 270:1
291:14,16
297:5,12

called
  8:4 10:2
  14:25 27:16
  30:17 34:25
  36:15 119:18,
  22 120:5
  134:4,23
  135:24 136:3,
  6,14,15
  146:18,19,22
  149:5,6
  155:24,25
  163:4 177:23
  178:11

197:13
214:16 239:1
249:5 255:15,
24,25 256:5,
23 257:4
263:14
268:11,14
270:3,6
295:16

calling
  82:20 84:22
  132:13
  133:22
  146:16 167:5
  238:25
  254:25
  269:12 296:9
  297:7

calls
  134:11,19
  175:21,25
  264:2

candid
  69:2 198:10
  219:24

candor
  65:12 86:7
  108:1 191:1

capital
  120:22

card
  29:7,12,13,
  15,22 37:1,
  11,12,14,16

cards
  37:2,21

care
  10:16 61:14
  94:3 139:2
  300:10,13

**carrier**
225:19

**carries**
304:5

**Carson**
295:17

**case**
14:21,22 15:9
16:5 21:9
24:2,10,20
31:1 32:6
44:21 46:9
48:15 52:3
60:20 76:15
87:21 112:6,9
116:25
127:21
160:23 165:5
168:17
184:23 185:5
194:12
200:11 232:3,
5 299:20
313:5

**cash**
54:23 55:5,8
56:20 57:11,
25 58:19
66:12 82:11,
18 130:11

**cashier's**
274:22
279:21

**categories**
226:5

**category**
51:19

**caught**
14:13

**caused**
224:11,18
226:16

**cell**
84:18

**cellular**
134:16 157:9

**center**
23:2 116:4
156:2,9,20
157:2 174:17
180:3,4
184:16
255:25 256:5
257:7 258:24

**century**
50:6

**certified**
29:2 91:11
158:16,17,19,
21 179:13,21
195:21
274:20
279:21

**cetera**
101:24
181:10

**change**
54:2 74:12
85:21 104:9
110:10,16
111:20,24
122:13
180:17
250:17 261:3,
17 279:20

**changed**
14:6 15:1,14
53:25 69:15
96:4,16 99:14

122:13 261:4

**changing**
10:24 96:25
99:23 135:22
136:1,3

**Chapter**
157:20
188:18 193:5,
6,9 213:6
230:5,10,14
297:22

**charge**
22:2 90:16

**charged**
215:25 220:8

**charges**
119:4 196:25
215:18 216:4,
13,16,17
219:21 220:4,
8

**charging**
121:24
195:25

**check**
58:19 61:6,9
73:14,15 83:6
94:3 115:12,
17,19 116:22
117:6,11,25
130:11,19
135:5 137:7,
23 157:5
186:20
204:18
212:18
241:22,24
248:7,8,10
249:14,24
250:11,12,13
274:15,18,22

279:8,12,21
280:10,13
292:6

**checkbook**
59:5 251:7

**checked**
201:3

**checking**
53:23 54:4
157:7

**Checklist**
254:13

**checks**
54:23,24
249:11,22
250:8,15
307:25
309:17,24

**child**
32:18,21,22
33:5,6 35:17
36:1 54:6

**Choffel**
300:14,19,21

**choose**
125:4 160:14
161:9 186:17,
19 187:8
304:13

**choosing**
234:17

**chose**
304:12

**Christmas**
12:8

**circle**
44:4 259:10

**circumstances**
82:20 97:18

**citing**
312:4

**city**
46:24 169:10,
15 172:10
173:7 231:25
232:1,15,17,
18

**Civil**
269:5

**claim**
27:17 204:8
252:8,22
253:9,10
258:19
265:16

**claimed**
27:22 102:9,
10

**claims**
102:5

**clarification**
116:17
207:10
211:14

**clarified**
205:16

**clarify**
73:12 105:25
156:5 184:11,
18,21 205:9
220:14,15
243:5 248:20
279:9,16

**clarifying**
79:3 278:23

308:17

**classify**
305:2

**clean**
9:13

**cleaned**
54:9

**cleaning**
239:12,16

**clear**
31:21 38:18
44:4 57:5
66:6 106:8
116:16
168:11
180:15 182:3
191:20
198:13,14,22
206:25
223:11
231:17 283:6
298:17

**cleared**
117:7 118:4

**client**
98:18 161:3,6
163:19
168:15
197:24 204:8
223:17 235:8

**client's**
160:12

**clients**
235:8,9

**close**
19:20 70:18
96:13 174:25
177:20
198:15

204:16

**closed**
57:1,14,15
58:5

**closely**
19:18

**closing**
214:19

**clothes**
59:13

**clue**
23:1 33:11

**coach**
39:15 153:3,4
154:8 164:11
165:1 166:10,
20

**coached**
165:7

**coaching**
41:13,22
45:13 99:1,3
163:11,13,14
164:5,6,20
166:4,5,8
167:2

**cold**
97:11,12

**collect**
16:18 35:15
102:7,8 168:7
294:16

**collecting**
31:24 295:2

**collection**
29:14 31:13,
23 32:23
101:19
102:25 103:6

**Collectors**
31:12

**College**
55:12

**colored**
13:8 165:14

**column**
131:16

**columns**
89:6

**combination**
217:24

**combined**
296:17

**commenced**
53:1

**comment**
12:15 161:21
208:1 293:13

**committed**
84:25

**communicate**
43:18 98:18

**communicate
d**
44:11 213:14,
17,21

**communicati
ng**
44:7

**communicati
on**
9:9 138:4
162:12,17
229:9,12
230:20
266:24

**communicati
ons**
93:11,14
232:19 267:5
283:9

**companies**
76:6 90:15
265:15

**company**
14:25 22:7
29:10 36:15
74:4 76:21,
23,24 89:19
97:16 210:11
234:4

**company's**
144:11
241:12

**compare**
145:16

**compilation**
64:1

**complaint**
22:11 113:6
193:10
200:10
202:24
213:15,18
234:24 235:5
236:3 245:1
246:19,25
252:6,11,17
266:9,20
271:4,22
276:20,24
278:22
280:14 282:9
284:10
288:14,16

**complete**
50:19 160:12

**completely**
190:3 199:3

**complexities**
41:14

**complied**
278:15

**comply**
113:10

**component**
220:21

**comport**
80:12

**comprised**
161:19

**computer**
224:25
232:23

**computers**
239:7

**concentration**
305:25

**concept**
224:10

**concern**
25:20 26:21
85:10 95:16

**concerned**
23:16,18
41:12 65:1
72:2 92:3
215:4

**concerns**
26:18

**concise**
271:7

**Concrete**
14:1

**conditions**
300:11

**conduct**
265:11
266:14

**confer**
168:15

**conference**
12:20 13:3

**confirm**
23:14 76:13
192:20

**confirmation**
213:2

**confirmed**
204:12

**confront**
36:1

**confuse**
69:9

**confused**
112:13
131:21,22
197:20
203:17,24
228:11
235:13
301:10

**confusing**
89:16 131:20
240:20

**confusion**
46:12 132:7
135:8 301:5,
10,12,16,20

**connecting**
178:9

**connection**

201:24

**consecutive**
284:23

**conserve**
192:19

**consistent**
81:8 205:21
206:8 240:20

**consistently**
161:9

**constant**
81:12,14

**constantly**
44:11 223:3

**construction**
19:3,6,15
75:24 76:3,
21,23,24

**consultation**
284:3,4 293:4

**consumer**
120:19

**contact**
53:11 70:24
84:4,9,11
92:13 99:12
119:7 120:9,
24 121:3
126:17,19
170:11 173:9
185:14
256:19
263:24 268:2,
8

**contacting**
93:11 295:21,
24,25 296:1,
3,4,6,9,12,14,
20

**contained**
254:19 255:4
288:14

**contend**
308:10,25
309:18

**contending**
310:12

**contention**
184:9

**contentions**
246:18

**context**
116:23 141:8

**Continually**
72:8

**continuation**
83:21

**continue**
83:19 109:24
119:1 144:19

**continued**
167:22 203:2

**continues**
184:8

**contour**
98:18

**contoured**
165:15

**contract**
18:15 74:6
152:2 186:15
207:22

**contractual**
152:1

**contractually**
151:4 153:14

183:6,8,17
249:10

**convenience**
64:14 187:1,5

**conversation**
156:20
174:16,17,21
178:1 238:8,
10 257:16
263:8

**conversations**
93:24

**Cook**
17:4

**cool**
18:9

**cooperation**
283:19,20

**cooperative**
312:19

**copies**
180:4 194:25
203:12 286:9
294:22

**copy**
18:15,18
20:18,22 29:2
47:21 67:19,
23,24 115:12
117:10,12
137:14 179:6
212:8 224:2
248:9,10
288:8 313:18

**core**
113:7

**corner**
64:15 186:24

260:6 272:8

**corporation**
233:24,25
234:1,2

**correct**
15:23 17:7,22
19:24 20:11
21:3,4,19
32:8,19 38:12
42:22 44:22
46:2,9,10
47:19 50:1
51:10,17 52:3
56:14 57:13,
21 58:8,22
60:8 69:15,16
70:19 71:22
72:25 73:3,
20,25 74:5,8,
11,15,21,24
75:3 76:16
77:7 80:11,24
81:18,25 82:2
83:14,18,23
86:2,6,18
90:5,8,11,12
91:10 92:8
93:3,9,22
94:15 96:23
99:15,18,21
100:18 102:1
104:4 105:14
107:3 108:17
110:24
111:10,22
112:1 114:20
115:7 118:2
121:5,6,9,18
123:14
124:16,20
126:5 127:3,
10 130:17
131:13

132:11,15
133:9 135:23
137:10
140:14 146:4
147:14
148:16,21
150:17 154:7
155:15,18
156:25
157:10 162:6,
8,10 169:12
172:8 174:4,5
192:21 203:4
204:15
205:19 206:7,
21,23 207:14,
16,24 209:24,
25 216:10
217:6 220:1,
20,23 221:3
235:6,16
237:11
243:20 245:2
246:3,4,15,23
249:1 250:23
255:1 260:14
267:6,11,24
268:6,7
271:18
272:24
273:16
274:11,12,17
276:19 278:2
279:21 280:7,
9,11,12,15,18
284:7 286:11
287:23
288:17,18,25
289:1,18,19,
22 290:14
291:7 292:8
295:16 300:5
304:3,7,15,
16,19 310:4,

5,11

**corrections**
10:22 285:19

**correctly**
58:7 82:1
118:11
145:12 176:5
178:16
303:25

**correlate**
147:8

**corresponden
ce**
62:10 126:2
148:14
178:22
190:19
270:23
272:14,17
275:20,21
278:9,11,12,
16

**costs**
243:25
297:24,25

**counsel**
39:7 41:6
48:6 112:11
141:24
152:21 153:5,
8 163:9
164:12 165:1
166:6,25
229:4 242:10
252:18
285:24
287:10,13,16

**counseling**
269:9,11
270:4,7

**count**
10:1,3 171:20
223:18

**counted**
223:4

**county**
14:6,7 16:22
22:4 27:18
29:3 30:18,22
31:1,13 32:13
36:6,12 46:21
59:20 121:24,
25 122:2,7,11
123:2,17
124:17
126:23
127:24 128:6,
9,15 187:16
219:17

**couple**
13:24 20:20
27:10 42:15
63:23 81:20
86:19 137:14
140:17
168:19
172:16
175:25
199:13
201:18
215:16
231:17
250:15 277:7
310:17

**couples**
35:23

**coupon**
186:20,25
245:23

**court**
8:22 9:12

11:7 13:19
16:19 22:24
28:22 36:5
40:4,7 101:18
103:22 127:7
153:2 154:22
164:19,21,22,
25 165:2,18
181:10
188:10
189:16
226:12
252:22 253:9,
11 308:19
309:3

**cover**
39:11 101:25

**covered**
89:7 209:17
245:15

**covers**
128:2

**Cramer**
20:20,24
167:14,16
168:3,25
231:9,11
235:25 236:1,
18,24,25
245:13
252:15,19
253:1,19
256:14,15
258:4,7
259:17,19,22
260:7 267:14
272:4 273:1,3
274:6,9
275:11,25
277:6,9,18
281:15 282:1,
9,15 284:15

285:9,12,14,
22 296:18
301:9 306:25
310:16
312:14,18,25
313:14,17

**created**
192:4

**credibility**
162:13

**credit**
14:20,24
15:4,5,8
18:16,25
19:10,17
20:2,7 21:2,
17,25 23:17
26:23 37:1,2,
11,12,14,16,
21 43:10 46:8
52:2,11 53:2,
21 54:1,22
55:16 56:11,
17 57:11,25
58:12,16,24
59:3 60:18
61:17,21
62:12 65:3,
16,24 66:3,7,
12,18,24
67:2,3,11,19
68:9,15,18
70:10 73:8
76:8 77:21
78:1 87:6
89:11 97:4
99:13,24
100:13
104:11 109:8,
21 110:1
121:1 127:9
128:16

129:17 130:4, 12 155:2 189:20 200:12,13,16, 19 201:6,10, 12,13,17,23 202:6,7 214:7 215:6 217:5, 12,24 218:24 219:9 220:16 222:17,24 224:17 234:15 265:10 300:3, 4 302:4,7 308:20 309:1, 19 310:13,25

**credit-wise**
222:25

**creditor**
31:25

**credits**
89:6

**crested**
78:8

**cross**
39:25

**cure**
108:10,24 109:4 115:17 118:24 131:8 279:5

**curiosity**
187:15

**curious**
87:9

**current**
44:12 53:4 65:9 66:21 70:14 71:1

72:18,19,23 73:5,8,10 79:11 86:16, 21 92:4 97:4 103:15 111:24 114:18,21 119:7 120:3, 18 121:2 123:22 151:13 186:5 204:14 247:4 264:15 266:1, 4 274:1,4 278:11,22 279:13 290:11

**customer**
180:2

**customers**
74:3,12,19

**cut**
307:25

**cycle**
109:12,13

---

**D**

**d/b/a**
29:11

**daily**
87:5 89:2 109:9 161:21 291:18,19

**Dallas**
100:8 174:17 175:9,16 177:19 184:5 197:12 228:15,17

**damage**
26:22,23 200:13

**damaged**
200:15

**damages**
200:12 201:5 210:1 224:16 226:6,13,15 229:7 288:13, 17,23 312:4

**Dark**
13:8

**data**
11:20

**date**
50:9 51:6 67:10 72:10 76:11 87:19 111:1,9,15,24 115:21,22,23 117:14,17 119:6 120:2 143:17 147:9, 10 151:22 175:14,20 176:14 185:17 214:19 238:11,12 247:5 258:2 267:20 273:21 274:13 275:17 282:10 283:15 286:20 295:7

**Date-wise**
51:13 249:15

**dated**
51:3,6 64:24 70:17 86:15 91:4,25 92:19 94:8 96:21 101:2 107:12 108:5 113:21 115:19 120:11 130:24 148:8 149:15 173:14 181:16 182:5, 8 188:19 195:3 214:8 235:23 237:9 272:10,14 282:12

**dates**
51:14 111:21 115:20 139:9 144:2 197:20 249:25

**Dave**
238:19 239:3

**David**
231:11

**day**
113:21 128:8 158:20,21 160:1 165:15 202:14 210:10,11 213:12 225:16 257:23 289:9, 12 290:4,5,24 291:22 295:5, 6 311:14 312:10,12

**days**

65:25 73:13, 15 86:5,9,20 87:11,17 88:6 92:6 120:21 151:13 219:25 223:4 226:2 272:19, 24 290:19,25 291:1,3,4,6, 10 293:1 295:20,23 296:4 298:11 299:1,16,19

**dead**
76:2 96:9

**deadline**
204:17

**deal**
14:10 78:19 79:2 222:16 226:24 247:22 265:18 303:9, 12

**dealing**
72:6 81:10 120:25 223:5, 9 264:25 295:25 296:7 302:4 306:12, 22 311:11

**dealings**
49:1,11,13

**dealt**
222:16

**debatable**
307:21

**debit**
309:25

**debits**
89:6

**debt**
157:21 213:7
230:6 236:4
244:6

**debtor**
185:7

**debts**
38:18,20
304:2

**decade**
50:5

**December**
79:9,13 84:1,
3 91:25 92:12
100:15,17,20
104:2,3,8
109:1 110:19,
20 114:10,11,
16,19,23
115:19,21,22,
24 117:15,17
118:6 131:24
132:4,8,17
136:9 163:4
171:1,4 203:6
204:21 206:4
242:15
243:16
244:11 247:5
249:2 250:18
251:17,22
255:20 256:1,
5 257:8 262:1
273:20,22
285:16
286:11,23
287:21

**December's**
114:13 115:1

**decided**
250:21

**declaration**
138:17
164:18

**dedicated**
70:22

**deed**
16:23 17:3
20:18 21:1,5,
6,12,16 40:22
42:13,20
44:21 46:7
52:2 83:10
94:18,19 95:6
125:11
128:22
265:10
266:25
267:11

**default**
36:11,25 39:3
40:21,22
43:2,16,21
44:16,20
45:25 47:21
49:17 51:14,
16,19 52:5
53:17 103:15,
18 104:2,6
108:10,24,25
109:4 115:18
118:24 131:8
155:21 156:3,
13,14 198:6,
7,9 228:12,
14,20 229:1,
10 230:10,22
265:12,13,14,
16,21 266:9,
12,18 279:5

**defendant**
8:12 232:16
284:12
285:17

**defendants**
307:2

**deferred**
237:10,19
246:22
252:20
253:11

**delete**
242:21

**deleted**
294:22

**delinquencies**
120:20

**delinquency**
43:14,20 53:5
70:23 91:22
108:19
120:10 152:6

**delinquent**
43:6 44:9
77:19,21 79:8
83:25 84:5
92:14 123:3
124:2 128:15
195:12
253:23

**deliver**
290:12

**delivered**
296:21

**delivering**
296:7

**delivery**
74:20

**delta**
244:7 261:13

**demands**
298:12
299:19

**dementia**
301:5

**department**
59:20 117:14
119:8 256:3
263:11,13
268:25
269:14

**Department's**
28:9

**depending**
68:6 74:13

**depends**
81:18

**deposing**
226:19

**deposition**
80:23 98:20
112:20 117:3
142:1,11
164:16 165:3,
24 167:6,13
168:10
191:14 201:7
224:8 231:18
232:21
313:14,24

**depositions**
8:18 9:21
232:7

**describe**
27:21 59:9
73:22 105:1
224:22

**301:19**

**describes**
111:11

**describing**
31:25 54:20
65:14 77:3
97:23 113:1
127:18

**description**
18:23 40:21
42:7

**designed**
120:19

**destroyed**
66:8,9

**detach**
186:20

**detail**
59:9

**detailed**
61:20

**determination**
278:11

**determine**
289:21

**determined**
109:11 278:8

**determines**
289:23

**developed**
199:15

**developer**
76:21

**development**
46:25 269:15

**diagnosed**
300:24 301:2,

4 302:13
305:16,21,24
306:2

**dialed**
256:6 262:12
263:11

**difference**
151:23
217:23,25

**differentiate**
162:7

**difficulties**
25:6,11 27:12
85:2 93:16
120:25
233:12

**difficulty**
93:21

**digital**
140:5

**diminished**
128:23

**dipping**
87:13,22
88:1,8

**direct**
113:15
167:24
172:12
182:15
221:22
254:11

**directed**
154:16

**directing**
45:14,15
169:4

**direction**
304:14,17

**directly**
32:22 258:15
288:7

**disagree**
28:8 115:4
155:12,13
163:15
166:24
312:13,14

**disagreed**
136:20

**disagreeing**
138:6 184:4
205:22

**disagreement**
22:14 155:3,5

**disagrees**
10:1 184:9

**discharge**
101:17
102:24
103:10

**discharged**
157:19 213:5
230:2,4

**disclosure**
185:21 187:4
208:5

**discomfort**
25:25

**discount**
308:5

**Discover**
29:7,11,13,
15,22

**discovery**
103:23
116:24
160:23 236:9

**discrepancies**
170:13

**discuss**
261:22

**discussing**
313:4

**discussion**
154:22
155:16 168:3

**disgorgement**
307:1 310:22

**dislike**
199:15

**dismiss**
112:9 113:3

**disorder**
301:2 302:14

**disorganized**
62:23,24

**dispute**
28:12,17
43:14 52:16
69:17 72:4
77:25 79:12,
14 80:15
85:13 90:25
91:18,21
92:15 93:8
106:22 107:2
120:9 128:7
135:9,11
137:4 144:7
215:2,7
216:16,22
217:1,2,4,7,
11,13,18,22
218:23 219:6
232:1 235:15
248:15 249:7
260:22,25

261:2 262:6
265:22 266:8
268:13,21
271:20 275:8
278:18
280:23 311:3

**disputed**
137:2 262:9,
14

**disputes**
171:24

**disputing**
43:19 44:8
77:20 309:21

**disregard**
142:22

**disrespectful**
167:8

**distracted**
9:5 302:1

**distraction**
301:21

**distress**
210:4,6
222:10,15,20,
22 224:11,17
300:19

**Ditto**
11:1

**divided**
109:17 260:1

**Division**
32:18 35:17
36:1

**divorce**
37:18,20,22,
24 38:21 66:9
201:8

**divorced**
25:15 66:3

**docket**
191:5

**doctor**
306:17

**document**
16:21,25
18:20,24
20:16,17
27:16,19
29:1,4 30:17
31:5 32:16
34:16 36:11,
18,21,22,24
39:3,7,9,17,
20 41:7,8,21
43:22 48:12
49:16 50:19,
22,24 51:2,
13,16,19
52:23 53:20
54:11,13 59:5
63:25 101:24
107:13
115:12 131:1,
4 170:5
173:20
185:20,24
186:3,9
188:9,13
189:24 191:4,
9,21 192:4
204:3 206:10,
13,14 208:10
211:24 214:6,
9 217:8
234:23,24
235:3,4,19
236:21 237:1
245:18,20
253:20,22

258:9,11
267:16,17,25
269:12 272:6
275:12,13,15,
17,19 276:6,
8,10,16
277:12,14,19,
20,23 281:16
282:2,3,23
283:1,3
284:16,17
286:1,5

**documentation**
46:11 61:8
95:14 116:6,
10 117:1
122:18,23
239:18 294:3,
5,11,12

**documenting**
95:16

**documents**
13:25 14:1
19:25 21:7
27:11 37:9
40:19 44:24
51:12 59:1
112:21
116:25 168:4,
7,9,12,17
179:11
206:21
208:13 216:7
220:24
222:18 228:5
231:3 232:21,
24 233:4
236:13 251:8,
9,11 263:18,
19 269:17,21
293:22

297:25 298:1
301:13
312:22

**dollar**
309:21

**doors**
59:21 161:14

**dot**
39:24

**double**
87:13,22
88:1,8

**double-check**
179:22

**dovetails**
11:4

**dramatic**
9:19

**drawn**
241:24

**drive**
75:10 225:12
293:6 313:1

**driven**
76:11

**driver**
208:18
289:16
298:10

**driving**
75:14,15,20
76:5 84:13
225:3 293:9
301:21,25

**drove**
75:9

**dryer**
59:13

**duck**
227:22 228:1

**due**
29:18 43:6
44:9 52:7
65:2,6 78:1
79:12,25
80:10,13
83:3,25 85:11
86:16,21,25
87:14 88:7
90:24,25
91:9,18 92:4,
7,15 94:10
97:5,7,9 98:1
100:6,16
108:9 113:5
114:4,6,23
119:4 123:7,
10 124:18
131:7,8
135:10,11
137:3,4,21
138:7 144:14
145:1,16
151:5,10,13,
16,21 152:2,
9,12 153:14
183:6,8,17
217:16
219:25 220:4
221:13 247:5,
24 249:10
251:16
273:20,21
278:24
304:20,25

**duly**
8:6

**duplicate**
194:8

**duplicative**
278:9,22

**duration**
81:23

**dust**
163:22

**dwell**
252:23 253:2

---

**E**

---

**e-mail**
137:19 138:3
143:11,12,21
144:5,24
145:11
146:13 147:3
150:1 160:10,
11 162:4,22
163:3 172:15
173:9 239:6

**e-mailed**
173:5

**e-mails**
137:14
143:14 144:4
148:15
149:22
150:15,16
156:21,23,24
172:16,25
176:21
178:22
195:24
196:11 300:1

**E-TRAN**
313:15

**eager**
196:20

**earlier**

40:3 44:18
52:1 56:21
68:12 69:6,9
82:13 97:23
106:1 116:25
121:7 124:19
129:10 135:8,
22,25 173:1
174:18
182:10
185:16
187:15 201:5,
16 204:12
219:23
245:24 261:8

**early**
65:3 93:15
113:17
133:17
204:21
238:13,15
250:1,2 290:3

**early-onset**
301:6

**earshot**
165:14

**easier**
310:18

**East**
46:19

**Eastern**
225:14

**economy**
25:17

**EDWIN**
8:4

**effect**
8:22 10:14
23:17 101:17
230:17

effective
96:25 187:7

Eighteen
172:17,19,20

elapsed
87:18 180:15

elected
83:17

else's
25:19

embarrassed
303:16,18,24

embarrassment
31:3 303:3,6,
21 305:3

emotional
22:23 210:6
300:19

employ
77:11

employed
61:13

employee
199:21

employees
27:23,24 28:3

employment
27:22 28:9
73:21 76:14
84:15

enclosed
274:15 279:1

enclosures
273:10 278:4
284:21 285:8,
13 286:7

encountering
69:11

encumbered
38:20

encumbrances
129:7

end
16:17 41:1
65:7,17 96:13
110:19
114:22 115:6
117:2 139:17
196:18
303:23

ended
270:12

Enforcement
32:17,23
35:9,13 54:7,
8

engage
13:10

engine
70:12,13
97:20

enroll
69:23 73:9

entered
37:7

entire
89:2 133:11
160:16
165:15
289:12

entitled
12:13 29:2
36:11 39:3
185:20 283:8

310:24

entity
16:4

entries
193:3

entry
237:9

equal
137:23
140:23 141:5

equally
263:19

equate
290:13

equipment
82:4,8

Equity
214:7

error
169:14 174:1
255:3 278:9

escrow
127:18
144:15 145:8,
17,18,24
146:12,16,21,
23 147:1,3
161:20
185:21
186:11,24
187:4 207:22
208:5,7,8,9
209:9 259:15
310:6

essentially
76:9 124:18
135:9

establish
266:24

established
44:19,23 52:1
267:22

establishes
46:12

Estates
46:20

estimate
11:24 12:11,
13,16 13:5
57:23 63:2
67:9 171:6
176:5 255:14

estimating
57:6,18,19

event
54:20

eventually
125:10 130:6
180:1

Everett
231:25 232:1,
15,17,18

everyone's
313:10

evidence
165:5 281:4
309:3

ex-wife
32:23 38:15,
23

ex-wife's
33:1,3

exact
67:10 116:4
145:2 147:20
162:25
175:14
204:18 216:4

238:12 259:1
283:15
286:20,21
295:7

examines
231:5

examining
161:3

examples
196:5

exceeds
129:4,6

exception
10:5

exchange
240:9

exclude
165:25

excuse
147:11 231:5
285:7

exhibit
16:8,11,15
18:10,12,15
20:12,14,17
27:14,16
28:24 29:1,10
30:8,9,14,16
31:6 32:7,10,
12 36:10,13,
19 38:25 39:3
40:16,17,20
42:11,19,20
43:1 47:15
48:21 49:17
50:13,16,23
51:2,5,7,20
52:6,17,19
64:2,3 68:24
69:20 77:16

92:23,24
94:6,17 96:20
98:8 99:9
100:5,24
101:1,25
107:9,11,16
108:2,4,6
110:7,13
113:14,15
115:9,11,14
117:11
118:19,21
120:15
125:20,23
130:19,21,23
131:2,10
134:22
137:11,13,15,
18 142:4,6
143:9 146:1,
2,6,10,13
147:4,11
148:4,7
149:12,14
150:4,6 151:1
154:24
156:24
161:17
167:24 169:5,
23,25 170:5
171:11
172:13,15
173:11,13,18
175:2,8
176:16
178:14 179:9
181:6,13,15,
23 182:7,8,16
183:2 185:18,
20,25 186:23
188:7,9,14
189:17,25
191:2,4,9,17,
19 192:3

194:19,21
195:3 196:1,
4,10,17 197:1
206:11
207:20
208:21 209:4,
16 211:9
214:1,4,6,9
221:23
229:20
234:20,22
235:22,25
236:17,20,23,
24 243:21
244:6 245:12,
14 246:20
252:15,16
253:2,17,18
256:12 258:6,
9 259:13
260:4,16
266:20
267:13,15,16
272:2,3,5
273:2,4,5
275:9,10,12,
24 276:1,6
277:8,10,11,
17,20 281:14,
17,20,25
282:3,13,14,
24 284:14,16
285:21 286:2

**exhibits**
98:10 261:7
271:24
273:10

**exists**
75:6

**expand**
37:19

**expect**
10:8 11:23

**expected**
132:21
207:19

**expecting**
39:10

**expects**
210:14

**expense**
144:20

**experience**
99:23 194:10

**experienced**
70:21

**experiencing**
85:1 93:16,20

**explain**
19:5 32:25
33:19 47:9
97:10 103:19
108:8 112:20,
21 133:3
155:23 182:4
202:12
226:23
292:18

**explained**
226:11

**explaining**
82:19

**explanation**
217:19 278:1
279:7,9
280:17,19,21

**explore**
268:3

**expressing**

88:9

**expressly**
307:2,5,19,25
308:1 309:1

**extent**
168:6 253:10
298:2

**extra**
127:21

**eyebrows**
243:25

**F**

**fact**
69:13 84:20
160:16
220:24
243:24 244:3
278:21 305:9

**factor**
89:10

**factual**
155:12

**faded**
218:15

**failed**
52:7 271:16
275:5 281:8

**fair**
16:2 20:6
21:10 76:9
81:17 104:15
107:7,25
113:18
141:13
151:11
174:21
190:20

**fairly**
97:7 111:9

**fall**
51:18 65:16
69:3 121:10,
12,20 226:4

**fallen**
80:18

**falling**
52:10,13
65:25 306:21

**False**
232:2

**familiar**
8:24 87:4,9
94:22 109:6,
10 110:6,8
117:9 165:20
185:11
285:23

**farthest**
123:25 124:8

**fast**
150:7

**faster**
191:14
306:21

**favor**
122:12

**fax**
158:7 210:25
212:4 213:2

**faxed**
158:3 211:21
213:2

**fear**
302:21

**February**

52:7 104:12, 14,16 105:9, 11,16 106:2, 7,9,15 129:13 130:24 131:15 132:21 133:5, 17 136:14 137:4 146:14 157:5,14 195:4 197:2, 11 206:2,4 207:9,11,12, 15 209:15,18, 21 250:4,5,12

**Fed**
118:16

**federal**
24:23 187:10 188:1 192:8 311:22

**fee**
138:5 144:17 215:25 216:4, 8,18

**feel**
87:21 128:5,9 206:9 222:10 224:11,17 292:18 303:7, 11,25

**feels**
96:9 283:7

**fees**
29:25 90:16 137:23 140:23 141:4 196:22,24 226:22 243:25 264:24 265:5,

6 266:16 307:22 309:6, 9,13,20 311:1,2,5,6

**fell**
65:21

**felt**
35:9 122:8

**figure**
107:2 221:6 257:24,25 291:20 296:22

**figured**
220:10 261:18

**figures**
144:11 162:10 170:14 215:3 216:23

**file**
22:21 25:18, 24 42:14 95:19 102:15, 24 128:8 160:17 194:12 197:9 202:17 210:22 228:5, 12 232:14 268:9,16,18 270:16,17 303:4,17,19 304:12

**filed**
22:13,18 23:1,6,8,9,15 24:25 25:3,8 26:19 27:22 28:4 34:2

35:19 36:9 101:16 102:6, 7,10,11 103:5,10,16, 17 104:7 122:10 181:9 184:15 185:3 188:10,18 189:15 200:11 201:20 229:11 231:22 232:9, 10 233:7,9 235:5 241:16 252:22 253:9, 10 270:20 288:21,23 298:11,19 304:14,18

**files**
140:5

**filing**
23:18,23 249:8 299:1 307:16 308:9

**finally**
24:5 97:13,17 196:23 247:23 285:5

**finance**
216:13,17

**finances**
95:17 305:10

**financial**
25:6,11 27:12 81:2 85:2 93:16,21 95:13 120:25 268:25

**find**
25:1 53:8 54:16 59:6 139:21 159:20,24 189:8 224:8 228:11 299:24,25 301:10

**finding**
303:4

**fine**
15:23 24:18 50:8,9 86:7 136:2 141:13 143:2 146:9 148:2 164:4 169:1 175:7 176:18 177:6, 8 179:24 190:24 192:25 197:17 201:1 242:9 252:24

**finish**
60:15 163:17 258:20 297:20

**finished**
47:13

**finite**
71:20

**fire**
82:10 287:15

**firm**
295:16 309:7

**fishing**
59:13

**fix**
128:24

**fixing**
97:20

**fixtures**
59:14

**flow**
82:11

**Fluctuation**
73:18

**focus**
51:21 202:19 203:6 240:3

**focusing**
197:22

**follow**
49:5 113:10 136:24 163:23,24 187:2 196:15 284:24 308:16

**follow-ups**
310:17

**footer**
158:4 169:9 211:22 212:5

**foray**
77:4

**force**
8:21 10:14

**forced**
23:21

**foreclose**
40:2 45:3 53:10 128:15 170:22 202:14,18 203:8 258:12 279:2,18

**foreclosed**
44:2,14 45:2
46:18 52:21
68:12 76:19

**foreclosing**
184:12,13
197:24
230:13

**foreclosure**
39:22 40:12
47:1,7 49:22
50:3,11 53:1
170:21
183:25 184:2
195:16,19
204:2 205:1
206:18,20
210:15,16
230:23
241:16
263:25 264:3,
4 265:3 267:7
268:3 302:22
304:20 305:1,
4,13

**foreclosure-related**
206:14 207:6

**foreclosures**
120:20

**forest**
286:4

**forget**
15:15 110:18
111:2 138:10

**forgiven**
238:2,6

**forgiveness**
240:5

**forgiving**
239:19

**forgot**
207:22

**form**
26:4,7,8
49:16 50:18
88:3 89:12
91:11 95:25
122:8 141:23
152:24 154:9,
10 164:2,8
165:11,12
166:1,12
208:7,8,9
229:5

**formal**
28:17

**formally**
28:12

**format**
72:1 80:6
96:14 131:9
163:19,21

**formatted**
68:7

**formatting**
49:18

**formed**
234:4

**formulate**
39:14 180:7

**Forty-one**
271:11

**forward**
60:7 158:20,
21 222:1
276:3

**found**
24:4 26:19
27:11 67:3
121:22
159:17,25
180:1 211:24
228:13

**foundation**
39:16

**Fourteen**
209:7,10

**fourth**
125:6

**frame**
16:1 37:4,5

**Frank**
75:16,20,23

**frankly**
81:9

**free**
38:18

**freshly**
126:8

**Friday**
8:1

**front**
10:15 212:13
256:14 309:5

**frustrated**
34:15 141:15
144:22 227:9,
12

**frustrating**
227:16

**frustration**
302:3,6

**fuel**
291:24

292:10 312:8

**full**
11:20 46:16
65:22 108:25
127:14
186:16,18,19
187:8 222:21
279:4

**funds**
91:11 118:4
248:1,2
258:15
271:21
274:20
279:21

**Funny**
128:3

**furniture**
59:13

**future**
151:18,21

**FYI**
16:20

___

**G**

___

**G-A-R-R-I-S-O-N**
295:15

**Gabriel**
256:3,4
262:18,20,23

**gal**
241:9

**gallon**
292:11

**gallons**
292:11

**Garrison**
295:14

**gather**
269:21

**gathered**
22:10

**gathering**
269:17
293:22

**gave**
24:5 108:15
136:20 154:5
178:3 241:14,
18,20 242:15,
25 243:2,17
304:14,17
310:1,2

**gears**
150:24

**general**
61:3 79:19

**generally**
8:20 76:13
132:12

**generated**
191:21

**generating**
157:22 213:8
230:7

**generic**
92:2

**genesis**
140:21

**genetic**
306:20

**genie**
45:20

**gentleman**
13:19

**get all**
139:6 285:5

**give**
9:12 12:9,10
13:10 16:18
18:22 45:18
46:16 48:14
67:10 88:22
113:12 117:3
142:10 148:6
200:2 212:25
214:3 222:1
226:14
255:14
305:14
308:14

**giving**
108:14
116:23
145:21 182:2

**glanced**
126:14

**Glenhaven**
19:13,14 40:1
46:20,22
49:25 50:3

**good**
8:11 13:15
60:16 76:1
98:22,23,24
119:11
180:24
231:10 275:1
311:14 313:6,
7

**goods**
74:7,9,13

**Government'
s**
192:9

**grabbing**
242:4

**grand**
238:6

**grantee**
29:9

**great**
154:13 213:4
284:9

**green**
159:4

**Greenwood**
29:6,8,10

**gross**
312:4,10

**grosses**
291:21

**ground**
8:18

**Group**
69:14

**guess**
10:19 11:6,7
12:12,17,23
44:5 81:23
87:10 117:23,
25 127:1,4
128:6 155:25
175:6 178:23
179:18
192:10
200:13 220:4
237:23 254:5
274:25 278:4
285:12
287:15

302:25 306:3

**guessing**
12:15

**guidelines**
188:1,3

**guy**
77:13 157:2
175:15,22
177:19 184:5,
15 197:12
198:1,3
230:25

**guys**
199:13
241:16
307:10

**guys'**
292:13

---

**H**

**H-A-R-K-N-E-
S-S**
75:19

**H-O-B-B-I-C-K**
76:1

**habit**
65:20

**hair**
306:18

**half**
67:14,15 78:5
123:11
177:20 293:7
306:24

**Hamilton**
243:12,17

**hand**
16:10 18:14,

18 39:2 50:15
63:25 79:6
125:22
188:10
191:24
281:16

**handed**
234:23
267:16 272:5
275:12 276:5
277:19
282:23 286:1

**handing**
16:15 258:8
282:2

**handle**
180:13 304:2

**handled**
155:10
227:15,24

**handy**
40:20 87:24

**happen**
12:5 59:15
114:11
126:12

**happened**
11:19 12:4
28:19 57:9
65:19 134:6
174:21,22,25
175:2,23
178:4

**happy**
165:19
192:18

**hard**
9:12 12:10
13:10 116:24
161:14

**harder**
117:18

**hardship**
79:18,20 80:7
81:1,21,23
82:3,25 83:2
85:7 94:14,17

**Harkness**
75:17,21,23

**harm**
200:12 202:7
222:18,24

**harmed**
202:2,9 210:3

**Hathaway**
24:14 26:2,8,
13 33:14,17,
19 34:10
35:10 39:6,
11,16 41:6,
14,16,18,20
43:23 45:9,
12,14,17 48:5
50:18 89:12
98:9,14,16,
22,24 109:22
112:11,19,24
113:12
141:23 144:1
145:13
152:20,24
153:4,16,19
154:12 161:1,
4 163:8,13,15
164:2,6,8,11,
14,21,24
165:6,21
166:1,4,5,8,
12,16,22,24
168:13,18,22
169:1 172:17,

19 179:20
191:25 192:6
193:7 194:24
203:17,19
208:21,23
227:5 229:4,
24 230:1
235:24
236:23
252:17,24
256:13
259:18,20
285:7,11
286:17 287:8,
10 288:7
298:25
299:14
312:24 313:2,
6,9,19,20,22

**Hathaway's**
287:17

**haul**
74:7 233:20
291:3,10

**hauled**
290:23,24,25
291:4,9

**hauling**
290:21 291:1,
8

**hazard**
22:7 87:10
128:20
301:23

**he'll**
10:9

**head**
9:10 134:23
193:4 231:16
254:2

**heading**
182:18

**health**
300:10,13

**hear**
26:14 112:15
265:4

**heard**
34:7 36:15
48:17 104:12
173:2 199:8
312:19

**hearing**
122:11

**hears**
154:4

**held**
146:2

**HELOC**
128:12
236:10 261:4
307:3,5,19
308:1,12

**helped**
304:13

**helpful**
159:2 160:5,
12 190:25
204:7 205:20
213:3

**helps**
41:4 195:14

**Herman**
75:24

**hesitate**
11:14 82:2

**hey**
36:2 82:24

161:7 204:13
210:22
291:14

**HFC**
15:11,13 16:1
56:23 57:12
64:24 68:6
69:14 70:20,
24 71:4,5,10
214:8 235:19
238:3,13,22
239:9 240:11,
14,22 241:5

**HFC's**
214:11

**high-level**
13:4

**higher**
87:20 121:24
132:23,25
133:6,11
221:2

**highlighting**
64:6

**hire**
23:21 24:13
77:8 226:24
241:8 270:15,
16

**hired**
77:14 241:6

**histories**
236:8

**history**
89:2 208:13
218:17,18,19
236:16
252:21
311:10

**Hobbick**
75:24 76:10

**hold**
81:14 143:19
176:1 177:21
178:8 229:22

**holding**
146:10

**home**
8:12 17:16
38:9,16,18,
20,22 61:6,9
62:19 76:19
84:16 99:11
100:7 101:7
120:18 160:1
168:21 174:1
196:23 214:7
222:19 225:7,
14 264:24
272:1 293:9
294:4,5,12,
14,20 302:22
303:5

**homes**
77:12 305:10

**honest**
13:3

**Honestly**
143:16

**hooked**
178:6

**hope**
212:10

**hopes**
214:2

**Hornbeck**
75:11,14

**horrible**

217:23

**horse**
96:9

**hotter**
312:16

**hour**
177:20
289:10 293:7
294:1

**hourly**
289:8

**hours**
168:20 223:4
293:7,9

**house**
18:25 38:6,7,
8 46:20 47:8
59:6,10 62:22
70:12,14
77:2,4 129:7
203:8 239:12,
17 243:10
294:19,24
295:1

**household**
61:18

**houses**
25:16 76:16,
18,25

**housing**
46:25 269:14

**HSBC**
15:14 16:1
23:7 56:23
57:12 68:6
69:7,10,14,22
71:10 201:2

**HUD-
APPROVED**

70:25

**Huelsman**
284:2,5 293:5

**human**
13:20

**humiliated**
303:16

**hundred**
85:20

**hung**
176:1

---

**I**

---

**Icicle**
291:9

**ID**
199:21

**idea**
27:2 28:20
32:5,21 35:6,
21 52:22
73:11 77:5
88:2 95:15
135:18 174:9
187:13
226:12 228:8
261:18
293:23
296:20
297:11,14,15
310:15

**identification**
16:8 18:12
20:14 27:14
28:24 30:14
32:10 36:13
38:25 50:13
64:3 100:24
107:9 108:2

115:9 125:20
130:21
137:11 148:4
149:12
169:23
173:11
181:13
185:18 188:7
191:2,17
194:19 214:4
234:20
236:17
245:12
252:16
253:18 258:6
267:13 272:3
273:2 275:10,
24 277:8,17
281:14,25
282:14
284:14
285:21

**identified**
22:12 102:11
193:22
242:19 257:1
282:23
284:16

**identity**
25:22

**ill**
108:20

**illness**
97:9 220:2

**imagine**
23:17 31:24
35:24 37:13
52:13 94:1
135:6 136:13
274:14 283:2
284:19

**immediately**
104:7 177:23
178:2

**impact**
65:24 82:8

**impacts**
66:2

**impair**
9:2 287:18

**impeaching**
10:24

**importance**
103:4

**important**
9:8 159:17

**imposed**
219:22 220:4

**impression**
83:13 123:3
183:13

**impressive**
203:25

**improvements**
17:10,12,13

**inability**
305:25

**include**
106:7 114:16
252:7 278:5

**included**
105:8 187:6
246:22
252:21
273:11
288:23

**includes**
138:5 144:16

**including**
114:19
128:16

**income**
311:23

**Incomplete**
39:17

**inconsistency**
145:18

**inconsistent**
144:11

**incorporated**
234:5

**incorrect**
170:13

**increase**
87:3 88:4
219:11

**increased**
86:25

**increases**
221:12

**incrementally**
87:19

**incurred**
222:11
297:22,24
298:5 311:2

**independently**
23:14 27:4

**index**
109:20 110:2

**indicating**
134:18
145:23
171:19

**indication**
188:25 204:1

**individual**
243:7

**individuals**
35:16

**industry**
75:2

**inferring**
216:3

**influencing**
142:9,13,16

**informal**
10:12

**information**
23:25 24:1,3,
8 90:3 102:16
117:9 119:9,
13,21 120:1,6
135:20 136:4,
8,16,19,20
139:3 152:21
158:1 161:24
169:14
173:22 174:2
182:2,9,18
185:15,16
192:12
211:19 212:6
219:2 247:6
255:3 256:19
263:4,5,18
265:4 267:3
278:10,14,23
285:18
294:19 295:2,
4 312:1

**informational**
101:22

informed
23:6

inherently
49:3

initial
209:10,11

injury
304:20,25

ink
218:15

input
180:12

inquiries
278:24

insomnia
305:19

insomniac
305:17

inspection
196:23

inspections
264:24 265:3,
11 266:14

instability
306:6,7

instable
306:8

installment
153:15
273:22

instance
220:2

instances
12:5

institution's
54:24

institutions
53:25 63:18
268:25

instructing
153:17 154:1

instruction
100:9 101:5
126:18

instructions
154:5 170:11
172:4,5

Instrument
119:5

insurance
22:1,3,7,8
97:16 121:8,
12,13 128:13,
20,24 219:14
291:24
310:10

intend
41:15,16

intended
119:9 196:8

intending
41:13

intent
170:21 171:8,
14,17 174:6
258:12 279:1,
17

intentions
200:9

interest
20:4 30:1,3
78:12,13
85:23 87:5,
11,15 90:1,16
95:10 99:17

109:7,10,12,
17 110:16,20,
21 111:18
128:17 132:2,
10,23,25
133:1,2,5,10
161:19,22
216:18
220:13,22
221:2,13,14,
16 237:19
239:13,17,21,
23,25 240:1
261:9 264:23
309:21 310:3,
10 311:3

interested
120:23

Interesting
140:20 160:4

internet
140:11
304:10

interrupting
45:12

introduced
235:21

investigate
173:23
188:17

investigated
23:22

invitation
94:13

invoice
114:25
119:23
129:20 130:6,
9 132:3,13
133:25 134:1

139:21
140:18
144:19 149:7
162:23
184:17
196:19

invoiced
137:20

invoices
196:22,23
197:14 198:8

involved
20:7,8 97:15
147:1 232:18

irrelevant
112:4,6

irritability
306:4

irritable
306:3

issue
14:21 15:9
44:21 46:9
271:22

issued
209:21 279:3,
4

issues
22:10 113:7
150:15,18

item
259:10,11

itemization
108:14 114:5

itemize
225:22 226:3

itemized
43:2 147:22

items
215:16

___

**J**

___

James
17:4 283:3
284:12

January
84:25 85:4,
16,22 92:19
94:8 97:14
105:9,10,15
106:15
125:24
129:11,17,25
130:5,10,12
132:9,20
135:10
136:14 137:2
176:6,8,9
185:3 187:17
201:13
204:11,23,25
205:5,11,17,
24 206:4
207:11,13
209:18 250:4
257:22 258:2
271:12,17
272:11,14,15
273:16 277:1,
15,24 279:3,
17 281:10
287:10,14,24
300:5

Jersey
199:7,8,9,11,
13,15

job
98:23 290:11

jobs
290:4 291:12

joke
224:14

judge
9:16,21,25
10:15 45:20
143:2 165:20,
21 167:4

judgment
29:2,9 30:5,8,
17 31:16,17
32:7 36:11,25
37:3,6 53:9
54:7

July
28:5 43:6,10
44:9 51:3
52:7 96:21,25
214:20
218:24
238:22
242:14
243:18
274:11 275:5,
18 276:18
279:8,12
280:13

jump
226:25
297:21

jumping
252:5

June
90:22,25
96:14 157:20
213:6 230:5

jury
10:15

### K

keeping
161:21

Kentucky
20:5

Keybank
55:1,14 56:9

kicked
59:21

kids
32:24 306:4

kids'
59:13

kind
9:1 10:17
12:9 13:8,9,
11,16 14:21
25:17 26:1
29:20 40:24
49:15,17
71:1,2 74:3,
16 77:5
80:20,21
83:2,9 86:5
109:18
120:14 128:6
132:3 133:24
138:4 145:19
158:7 171:21
174:3,20
184:4 186:15
187:20 215:9
234:25 240:7,
19 270:20
296:8 301:5
303:3,13
305:7

kinds
226:15

knew
71:15,16
81:3,22 84:22
125:10
155:22
156:17
161:25 174:7

knowing
222:8

knowledge
12:18,23
49:24 167:4
287:17 298:2

### L

L-A-U-R-E-N
34:25 35:2

L-O
35:5

L-O-R-I-N
8:15

lack
283:19,20
300:3

Lake
14:1,2,18
45:7 46:4
246:1,2
267:23

Lakes
19:13,14
46:20,22
49:25 50:3

land
17:13 77:4
122:15 129:3,
6

language
102:4,22

174:3,6,12
230:4

large
82:11,18

larger
58:13

late
43:13 78:14
97:25 119:4
133:17
137:23 138:5
140:23 141:4
144:16,17
210:12
215:25 216:4,
8 219:21
220:4,8
311:1,5

Lauren
33:4 34:24,25

Lavender
243:10

law
119:5 174:8
187:10 268:1
307:3,6,20
308:12,20
309:2,19
310:14,25

lawsuit
113:4 128:8
231:22 232:9,
14 288:21,22,
24 298:19

lawsuits
232:10
304:11

lead
112:22

leading
141:24

learned
65:20 156:2

leave
125:7 194:14,
16 231:2
294:18,24
295:1 310:18

leaving
312:21

led
237:23

ledger
61:6

left
99:8 107:5
272:8

legal
21:7 196:24
213:22
231:13 256:2
263:13
264:24 265:5,
6 266:16
269:6 311:2

Legally
12:11

lender
95:14 125:16
129:8

length
177:16,17,18

Leonard
75:11,14

letter
36:5 64:7,8,
20,24 66:15
69:13,21

70:17,20 71:7
73:2 77:17,
18,24 79:5,7,
10,16,17,19
80:5,6,14,17
84:1,3,24
85:9,14 86:9,
19 91:4,15,
22,24 92:2,
11,16,18,19,
20 94:8,16
96:8,13,15,
19,20,21
99:10 100:4,9
101:1,3,5,12
107:11,21
108:4,12
113:19,25
114:3 115:4,
21 118:20
119:9 120:11
125:23,24
127:2,13
130:23
131:12
132:14
133:16,19
134:22
146:14 148:7,
9,12,23
149:1,14,16,
19,20 150:14
151:1,12
152:12
155:20 158:5,
7,9,10,12,13
163:1,6
166:18,19
169:5,7,19,25
170:8,10,19
171:10,23
172:5 173:13
175:1,8
176:12,15

179:3 180:18
181:5,7,15,
20,22,24
182:12 183:1,
10,15 184:18
185:13
187:17,23
188:21,25
193:23
194:21 195:3,
5,7,15
204:13,17
209:22 211:2,
5,6,7,10
212:15
223:16,19
225:7,10
227:17
229:16,23
230:1 235:22
238:23
243:21
246:10
260:15
273:11,16
280:3,5,6
283:16 284:7
286:8,23
287:4

**letters**
64:1 65:11
72:13 79:14
81:4,8,9
83:21 86:11
88:12 93:5
94:16 95:22,
24 108:13
120:22 126:4,
7,8 135:3
160:6,18,20,
22 171:13
207:2 210:19
223:5,6,16

224:24 225:1
226:1 228:19
233:9 238:25
248:11
254:10,19
257:1 264:6
270:22 271:5,
6,7 296:7,20

**letting**
137:20
213:23

**level**
25:24

**liability**
101:18
227:23 228:1

**lien**
27:17,22
28:19 30:7
32:13,17,20
33:8,9,11,24
34:1,5,7 36:9
125:17

**liened**
34:2

**lienholder**
44:14

**lieu**
94:18,19 95:6

**life**
99:24 301:17
302:5,7

**light**
13:7 59:14
218:15
285:25

**liking**
142:10

**limitation**

289:2

**lined**
290:11

**lines**
36:3

**linger**
34:15 48:13

**list**
24:24 37:14
94:18 114:9
151:2 157:18
269:19 271:7

**listed**
252:21
269:12 300:8

**listen**
26:14

**lists**
208:14 235:7

**literally**
180:22

**livelihood**
70:14 73:22

**living**
63:1

**LLC**
31:12 36:16
233:24
243:10
272:13

**load**
289:18
290:12

**loading**
290:3

**loan**
19:3,6,15
24:8 40:2

46:13 52:20
53:4 67:16
68:11 71:2,9
73:8 79:11
90:14 94:18
95:8,10,12
96:24 99:23,
24 102:25
103:2,12,15,
18 104:1
108:11 109:1
113:6 114:18,
21 115:18
120:2 121:4
127:16
128:13 129:4
139:16 151:4
153:14 155:6
156:3,11
157:19,23
158:2 161:22
162:12 183:5,
24 184:10,12,
20 192:15
195:12
196:25 197:7
198:8 200:21
202:15,21
204:14
211:20 213:5,
9 216:7,9
217:7 221:16
222:9 227:1,
10,15,18,24,
25 228:1,9
230:4,8,10
231:11
237:25
244:17,18
251:17,22
264:14
265:12,13,14,
25 266:4
268:2 270:20,

25 272:12
279:13
293:22 294:4,
5,12,14,20
309:9,13

**loans**
8:12 99:11
100:7 101:7
120:18 174:1
239:19

**local**
178:12

**locate**
212:18

**located**
158:4 168:9
211:22

**location**
74:10

**log**
74:21,22
171:22
208:18
225:12
233:20 286:4
289:16,20

**logged**
139:10
140:12
147:23

**logger**
289:23
290:15

**loggers**
291:13

**logging**
75:1,17 76:6
290:16,20
292:7,10

298:10

**logs**
75:2 233:20

**long**
18:3 21:14
37:13,16
66:24 72:9
75:20 157:10,
12 159:1,25
177:19,21
201:6 203:22
210:10 238:9
253:2 257:12
263:8 270:9
272:1 273:12
287:3 293:4

**longer**
103:11
108:19
123:24
165:16 175:2
237:24 293:6

**looked**
80:7 95:7
131:10
247:12
263:15 279:2
281:10

**Loomis**
225:13

**loop**
198:16

**loosely**
89:7

**Lori**
33:3 34:23
35:4

**Lorin**
8:4,15 19:21
33:1 190:4

**lose**
37:22,23,25
38:2,3 128:17
293:1 295:1,
21,24 296:4
312:11

**losing**
303:5

**loss**
79:18,20 80:7
81:1,21 94:2,
14 95:4 119:7
270:1 304:8,
9,25 305:25
306:9,15,18
312:6

**lost**
38:1 47:7
50:2,10
224:19,23
225:2,22
289:2 290:6
292:4 293:24
296:6 306:11
311:10

**lot**
21:7 38:1
54:2 59:7
77:14 98:25
182:9 241:1
294:6

**lots**
291:10

**loving**
253:15

**lower**
64:15 132:21,
24 186:24

**luck**
76:1

**lucky**
306:22

**lump**
58:9,11,15,
18,23 65:8,17
69:5 104:9
108:15,17
127:23 206:3,
5 207:11
209:17,18,23
303:16

**lunch**
167:20

**Lynch**
48:17 49:12

---

**M**

**M-A-R-E-K**
185:9

**M-A-S-S-I-N-
G-A-L-E**
8:16

**M-I-E-L-N-I-C-
Z-U-K**
185:10

**made**
12:20 31:20,
21 44:13
55:15 58:18
62:11 65:8
70:12 83:4
84:4 89:5,10,
15,23 90:7
100:14 105:9,
10,12 106:3,
9,12 129:12,
20 132:4
135:12 141:4
147:3 151:9
152:3,7,14,16

154:3 175:21
176:25
194:25
204:22 205:5,
6,7,16 208:1
209:18 245:2,
4 247:2,14,22
261:24 262:1,
11 268:8,21
278:10
294:20 307:2,
4,7,22 308:6,
24 309:17

**magic**
163:22

**mail**
63:17 84:10
144:19
158:16,17,19
179:4 186:20
189:6 195:22
210:21,25
224:25
225:18,19,21
226:2 246:13

**mailbox**
225:20

**mailed**
115:17,23,25
116:2,7,11
118:10 158:4
196:5 211:22
245:25
247:19,25
250:13
267:21
287:21

**mailing**
47:16,18
173:6 195:25

**mailings**

62:2 92:22
93:2 294:8

**mails**
62:4

**main**
257:5

**maintain**
305:9

**major**
18:11

**make**
9:12,23
10:10,21
13:13,17
14:10 25:23
31:15 33:23
41:11 44:5,15
49:8 52:7
54:22 56:11
57:5,11,25
58:15 59:17,
19 61:20
65:10 66:6
69:5 70:9
71:17 83:2,4
98:19,25
100:8 102:21
105:15,19,20
126:22
127:14
129:11,16
135:14,17
136:19 143:6
154:4,21
161:24 164:4
168:15 186:9
191:20
198:15
199:18
201:12
205:11 208:2,

16,17 209:23
210:14
212:18
220:13 221:4
223:11 234:8
248:13,17,21
249:2 261:25
283:7 297:19
303:22,25
307:18
308:10
312:11

**makes**
49:10 140:8
174:14
186:14
190:10 206:9
312:5

**making**
31:21 34:15
43:9 48:9
54:1 56:16,
19,20 57:10
58:9,23 61:19
70:14 72:16
85:6 90:14
92:13 99:13
114:4 118:24
152:10
234:12,14
240:12 260:2
264:5 281:2
312:11

**Management**
231:12
272:13

**manager**
174:16 238:1,
5,20 256:20
257:2

**manufactured**

17:15

**March**
24:7 64:24
69:14,18 70:1
104:12,14,16
105:7,9,13
106:2,15,18
129:13,23
132:9,21
133:17 137:6,
14 144:5
148:8 149:1
150:1 157:6,
14 176:8,9,
19,21 188:19
205:7,17,25
206:3,6
207:12
209:19,23
229:22 245:4
250:5,12
273:19

**margin**
110:5,23
111:25

**mark**
20:17 29:1
30:16 36:10
50:16 64:1
107:11 108:4
115:11
130:23
137:13
173:13
181:15 188:9
191:19
194:21
234:22
252:15
253:14,16
281:13
282:13

**marked**
16:8,10,15
18:12 20:14
27:14,16
28:24 30:8,14
31:5 32:7,10
36:13,18
38:25 42:20
50:13,23 51:2
52:6 64:3
92:18 100:24
102:2 107:9
108:2,6
115:9,13
125:20
130:19,21
131:2 134:22
137:11,15
148:4,6
149:12
156:24
169:23 170:5
171:11
172:13
173:11,18
175:1,8
181:5,13,23
185:18,25
188:7,13
191:2,9,17
192:3 194:19
206:10 214:4,
6,9 234:20
236:17,20
245:12,14
252:16
253:18 258:6,
8 267:13,15,
16 272:3,6
273:2,4
275:10,12,24
276:6 277:8,
10,17,19
281:14,16,25

282:2,14
284:14
285:21 286:1

**market**
47:14

**marking**
18:14 32:12
39:2 101:1
125:22
149:14
169:25
185:20 191:4

**Marshall**
53:12,14

**Massinga**
190:4

**Massingale**
8:4,15,17
10:6 12:19
19:21,22
33:1,2,3,14
35:10 39:19
41:25 43:23
45:9,24 50:22
165:4,25
170:1 231:10
234:3,22
237:1 245:17
253:20
267:15 272:5
273:4 275:13
277:11,20
281:20 282:3
284:17
288:16

**massive**
239:19

**matches**
52:2

**material**

16:4 278:14

**math**
87:2,8 217:23
218:1 261:5,6

**matter**
15:19 66:3
128:12 228:6
241:2 278:15
290:2 292:3
308:15,22
312:10

**meaning**
112:21

**means**
14:18 70:6
72:13 85:15
151:8,9,16
152:11
296:11 304:4

**meant**
86:9 100:2
140:23
141:11 156:5

**mechanism**
87:5

**mediation**
266:25

**medical**
222:14 306:2,
14

**medication**
9:1 302:10,11

**medications**
305:19

**meet**
295:9 299:11

**meeting**
289:3,5 293:1
298:16

**meetings**
293:14,17

**Melissa**
284:1,5

**Member**
69:14

**memories**
11:21

**memory**
36:23 37:10
54:14 59:2
104:20,23
106:7 118:7
122:24
129:14
147:16 148:1
157:16
175:20
198:11
231:21
241:21

**men**
37:23

**mental**
210:4,6
222:7,10,12,
15,20,22
224:10,17

**Mentally**
202:11,12

**Mentally-wise**
223:2

**mention**
8:19 23:7,8
94:11

**mentioned**
10:13 40:3
74:23 78:19
83:11 168:5

229:16
233:12 271:5

**merged**
15:13

**merging**
238:4

**message**
103:5 242:6,
20 300:1

**messages**
242:13

**met**
242:15
298:17,25

**Michael**
313:6,7

**middle**
151:2 193:2
211:17

**midway**
237:8 296:13

**Miersma**
53:12

**mills**
233:21

**mind**
11:2 126:9
161:21
196:10
210:10 223:3

**mine**
36:2 313:12

**minimum**
217:16

**minute**
221:23
226:18

**minutes**
106:21
143:21 222:2

**mischaracteri
zes**
145:13

**mislabeling**
209:8

**misnamed**
208:7

**misorganized**
20:22

**mispronounci
ng**
30:23 31:2

**missed**
223:5 298:12
299:16,19

**missing**
150:23 186:9
298:10
299:17

**misspelling**
212:1

**misspoke**
111:19

**mistake**
49:21

**mistaking**
52:20

**misunderstoo
d**
130:3

**mitigation**
79:18,20 80:7
81:1,21 94:2,
14 119:7
270:1

**mix**
212:11

**mix-up**
46:13

**mixed**
190:18

**mobile**
38:9,16,18,
20,22

**mod**
71:2 121:4

**modification**
71:9 94:18
95:9,10,13
127:16 240:6
267:4,5
270:21,25

**moment**
36:21 48:14
64:5 100:5
104:18 122:1
170:1

**money**
70:7,9 71:17
83:2 90:13,15
132:17
204:18 242:7,
16 243:18
244:19
283:13
303:22,25
308:13
309:25 310:1,
2,9

**monotony**
276:2

**month**
73:15 78:2
88:5 93:19
105:5 108:14,

15 110:18
111:3 129:22
163:2,19
175:20
186:16 205:2,
13 216:19
218:24
220:17
240:22
248:24,25
249:2,6,9
250:3,20
251:2 262:3
295:8

**month's**
58:13 78:3

**monthly**
43:6 78:4,9
109:5 112:5
119:3 127:23
134:2 135:17
137:9,21
149:8 151:5
153:14,15
157:22 158:1
161:18,24
162:18,19,22,
24 163:7,22,
23,24 164:1
184:17
186:18 187:7,
9 198:17
210:12,14
211:19 212:5
213:8 214:11
216:18
228:22,24
230:7 246:16
259:9 260:8,
19,23 261:1
264:8,9,11,
12,16,17,19
265:1 273:22

**months**
63:11,13
75:22 78:6,
21,25 79:1,3
86:1,3 97:5,
17 108:18
127:2,14
186:21 187:6
220:3 227:10
244:18
247:25 248:1
250:14 252:2
260:2 262:5

**morning**
8:11 191:22,
23 207:21
289:15 290:3

**mortgage**
38:17 70:21
87:23 88:3,
14,24 89:1,4,
19,20,21
90:15 99:24
101:19
102:25 103:6
119:10
132:22
157:22
210:11,13
213:8 218:3,
7,13 222:8
230:7 241:4
243:4 252:3
285:19

**Mortgage/
deed**
91:8

**mortgages**
90:16

**motions**
143:3,6

**motivation**
283:17

**Mount**
55:12

**mouth**
67:6 141:25

**move**
48:12 84:24
90:19,20
107:8 115:2
116:9 119:24
142:24
154:23
164:17
165:17

**moved**
227:10,12

**moving**
113:14 142:4
190:24

**Mukilteo**
241:9 243:8

**multiple**
34:11

**multiples**
179:10
221:18

**multiplier**
122:14,15

## N

**N-O-V-U-S**
29:11

**Name-wise**
134:9

**named**
34:23

**names**
15:1,15 35:24
208:18,19

**narrowly**
294:25

**National**
231:13

**natural**
9:10

**nature**
180:8

**necessarily**
21:11 126:3
172:4 300:11

**needed**
35:9 159:25
161:24 260:9
264:14
265:25 266:4

**needing**
234:8 303:11,
17

**neglected**
196:19

**negotiated**
117:6

**negotiating**
303:23

**nervousness**
302:19

**net**
312:5

**newly**
168:9

**nice**
13:4 26:6

**nickel**

214:3

**nickname**
34:24

**night**
191:22
225:15

**Ninety**
58:2,3

**Ninety-two**
304:24

**no-brainer**
306:16

**nod**
9:10

**nods**
193:4 231:16
254:2

**NOI**
279:4

**non-
compliance**
141:21

**non-
responsive**
90:20 115:3
116:9 119:24
142:24,25

**normal**
154:2

**notarize**
179:3

**notarized**
178:18,23,25

**notary**
178:15 181:1,
2

**notations**

61:7

**note**
48:9 91:7
100:8 119:3,5
156:6 169:18

**notebook**
253:15

**noteholder**
53:7

**notes**
98:25

**notice**
32:12 33:12
39:3 43:15,20
44:16,20
45:25 47:21
49:17 51:14,
15,19 52:5
53:17 72:10
78:2 91:7
96:3,22 100:9
101:2 105:17
119:6 169:13
170:21 171:7,
16 174:1
207:2 210:12,
17 245:21
246:11
253:23 255:2
258:12 268:5
275:20 279:1,
17

**notices**
32:24 144:20
171:14 174:4
196:20
203:10,12
207:6 210:12
239:2

**notification**
278:9

**notwithstandi
ng**
49:8 278:21

**November**
24:6 51:9
77:25 79:5,8,
17 80:3
97:11,13
113:17 114:6,
7,22 115:6
123:8 132:17
139:18 155:2
181:16 183:2,
5 188:20
193:23 223:8
227:11
247:10
248:13,18,20,
23,25 253:14
255:19 262:5
278:17,19

**Novus**
29:11

**nuclear**
10:8

**number**
14:8 22:13,20
23:15,19,23
24:2,11,19,
20,23,25
25:22,24
26:20,25
33:5,12 40:25
41:9 42:1,5,
12,14 46:20
51:23 52:3,4
64:17 84:19
85:20 86:11
87:20 102:14
108:17
109:20 110:2,
11 111:24

119:12,17,18,
21 120:21
126:19
130:18
135:19 146:6
147:7,18
148:22,24
149:5,6
162:25
165:19
167:14
177:23
178:11,12
184:23 185:5
192:13,21
194:2,5 212:4
221:2 237:14
242:22,24
244:19
254:12 256:6,
21,23 259:1
260:4 262:12
268:9,15,16,
17,19 269:12
270:3 271:3
281:7 292:22
294:1 297:5

**numbers**
35:8 44:23
45:6 79:24
88:10 108:16
119:19,22
132:9,20
145:17,22
194:8 215:14
217:17
227:14
240:21 245:8
250:18 264:6
284:24
288:20 312:5,
6,18

**numerous**
84:4 92:13
171:19,20
213:16

---

**O**

**oath**
8:21 122:5
153:9 180:8,
22 190:21

**object**
9:15 26:4,14
39:16 50:18
89:12 98:10,
13 141:23
152:24 161:4
164:2 165:11
166:1,12
229:4

**objected**
112:4,8 113:4
153:21

**objecting**
153:19 154:8,
12 161:2
164:8 166:3

**objection**
9:20 10:3
26:2,6,14
34:10 39:14
41:6,11,17,
22,23 48:5,8
89:15 98:19
109:22
112:11,19
113:8 142:2
145:13
152:20,23
153:1,16,18,
25 154:10,17
161:1 163:8

164:5,10

**objections**
9:16,23 41:12
98:21 165:10
283:7

**obligation**
34:3 160:25
278:15

**obligations**
89:11 113:11
115:5 304:6
310:4,7

**obliged**
113:3 135:16

**obligor**
20:1

**obtain**
119:8,12,20
294:5

**obtaining**
294:3 297:25
298:1

**obvious**
164:7

**occasionally**
9:9 69:2
81:13 82:22,
23

**occur**
47:2

**occurred**
59:24

**occurrence**
81:15

**October**
24:6 43:7,11
44:10 83:24
91:12 97:11,

12 108:5
113:22
118:20
120:11
131:12
132:14
173:14
174:22
175:15 176:6,
11,13,15
182:5,8
183:6,17,18
188:19 203:3
204:13
208:14
247:15,16
248:3 251:24
262:4 276:22,
23 278:13
284:11 285:1

**offer**
122:5 195:9

**offered**
187:12

**offering**
165:4 167:12

**offers**
120:18

**offhand**
134:9 289:6
298:8 299:21,
24

**office**
12:20,22,25
16:22 27:18
29:3 30:18
32:13 91:12
116:1 118:10
225:16,17
269:5 272:15
294:6,7

**officers**
232:18

**offices**
57:1

**oftentimes**
219:24

**Oklahoma**
169:10,15
172:9 173:6

**older**
294:21

**one-page**
115:11

**ongoing**
128:6

**online**
60:20 138:8,
9,10,20 139:3
140:13 141:1
144:14,24
145:10,15
147:17,23
159:13

**open**
67:2 107:5
161:14
225:16,18
231:2 312:21

**opened**
76:8 155:2

**opinion**
88:3 308:16,
22

**opportunity**
10:21,23
86:10 117:3
149:25 153:2
208:17
222:21

266:24
292:16
305:14

**opposed**
306:19

**opposite**
143:18

**option**
10:8 71:2
83:15

**options**
70:22 187:11
195:9,11
210:15
253:24
263:25 264:3
267:7 268:3

**order**
36:11 143:18
201:17 268:2
294:22
313:10

**ordered**
60:23 67:11
201:18

**ordering**
313:18

**organize**
62:19

**original**
31:25

**originally**
53:21 83:13

**origination**
99:19

**outcome**
201:7

**outreach**

85:2

**outstanding**
154:17
216:11

**overcharged**
239:12,23,25
240:1

**overcharging**
122:9

**overdue**
65:1 69:18
72:2,4 84:2
85:10,13,15
92:3

**overhead**
292:13

**overheads**
291:23 292:2,
9

**overlapping**
112:14
153:22

**overlook**
152:7

**overlooked**
152:6

**overnight**
118:16

**overpaid**
239:17,22

**overpayment**
239:13

**overruling**
10:2

**overtaxing**
121:23 125:1

**overtures**

85:6

**owe**
238:11

**owed**
28:10 29:15
127:9 215:8
237:25
238:23 311:3

**owing**
144:16 145:9
240:17
246:21

**ownership**
261:3,4

---

**P**

**p.m.**
143:23,24
313:24

**P.O.**
100:7 101:7
169:11,14
172:9 173:6

**P.S.**
48:18

**PACER**
24:23 191:5,
19 192:8

**packing**
312:17

**pages**
253:3 278:2
286:3

**paid**
28:23 30:11
32:6,21,22
37:2 38:22
55:5 72:14

95:2 119:6
120:4 123:12,
17,18,25
124:8,14
127:2,8,13,24
186:5,12
187:16
221:11
241:15
244:13,20
248:3,23
263:21
265:24,25
266:3,4
283:13 284:4
289:18 290:8
309:23
310:23

**paper**
278:5

**papers**
190:14
200:11 288:6

**paperwork**
61:10 74:25
159:18
241:14 285:5
309:5

**par**
142:11

**paragraph**
40:23 41:1
42:1,8 51:21
108:23
118:22 119:1
120:14,16,17
149:24 150:4
158:7 161:18
182:14
184:22
187:24

211:18
235:15 236:2,
6 245:7
246:20,25
252:17,19
256:17
266:19
271:10,12
272:17
274:10,24
275:3 276:25
278:8 280:14
281:7 284:11
285:15
288:15
296:13,17
298:9 300:2,9
304:23 307:1

**paragraphs**
120:15

**paraphrasing**
196:3 210:23

**parsing**
141:7

**part**
16:17 21:1
39:9 49:21
64:7 115:2
129:2,3
144:22
186:23 201:6
204:8 215:5
240:4 263:3
271:21
283:12
293:24 308:6

**partial**
65:21 69:4
83:5,11

**parties**
312:13

**parts**
234:13

**party**
125:17
128:17
265:10
266:13 307:8

**pass**
307:23

**past**
65:2,6 78:1
79:12,25
80:10,13
83:25 90:24,
25 91:18
92:6,15 94:10
97:5,7 108:9
135:10,11
137:3,4
151:13,22
219:25 220:3

**past-due**
33:6 115:5
137:24
140:24 141:5

**pattern**
65:14 69:2
219:24

**Paul**
285:17

**pay**
17:8 21:25
28:21 29:23
30:5 65:22
66:12 70:7
73:13 74:1
103:11
107:23
108:25 123:2
125:6,12,17
126:15

127:13,21
135:18
137:10
163:18
186:12,16,17,
19 187:8
196:6 204:14
216:8 220:13,
17 221:13
222:9 238:24
241:17,22
248:6 250:21
259:5 263:21
279:20
311:23

**paying**
22:4 37:10
121:8,21
122:2,7
123:23 124:1,
2,17,18
127:5,7
128:5,9
217:14
219:13
220:19
234:12
250:22
301:22 304:5

**payment**
23:2 31:15,
20,21 58:11,
13 61:23 65:8
69:4,24 70:1,
5,6,13,15
71:17 72:20
73:9,19 78:3,
9 83:3,4,5
87:14 88:7
89:2,5,22
90:14 92:6
100:11,13,14
104:1,9,10,17

105:17 106:3,
9,12,18
108:10 109:5
112:5 114:4,
12,14,16,21,
22 115:1
116:4 118:24
119:8,13,21,
22 120:1
127:14
129:11,16,18,
19 130:4,11
131:15,24
132:5,8,22,23
133:24 134:1
135:4,10,12,
14,17,20
136:4,8,15,19
144:14,18
145:1,16
149:7 151:5,
9,10,16,21
152:1,2,12,
14,16 156:2,
8,9,20 157:2
161:18
162:18,20
163:7 174:16
180:3 183:7,
17,18 184:16
186:12,18,25
187:7,9
199:18
204:23 205:5,
11,12,17,24
206:2 207:11,
13,15 208:13
209:18,23
210:15
215:22
217:16
218:17,18
221:4 236:7,
16 239:21

244:12 245:2,
23 247:4,14,
19,21,24
248:4,13,18,
21,24 249:3
250:16,17
251:17,22
252:3 255:25
256:5 257:7,
17 258:24
259:12 260:1,
6,8,23 261:1
291:19

**payments**
43:6,9,10
44:9,12,15
45:7 52:7,10
53:22 54:1,5,
22 55:15
56:11,17,20
57:11,25
58:9,15,19,24
59:2 60:18
61:20 62:11
65:21 70:9
72:17 78:4,8
83:11 89:3,9
90:7 91:9
99:13 100:6
101:6 105:8,
10,12,15,19,
20 108:9
119:3 129:20
131:6,7
137:8,21
161:24 234:8,
12,14 245:4
247:22 259:9
260:19 264:5,
8,9,11,16,17,
20 278:24
279:1 294:9,
13,16,19

295:18 307:2,
4,7,18,22
308:6,9,24
309:16

**payoff**
119:10

**PDF**
313:15

**peg**
58:6

**pegging**
255:19

**pending**
312:22

**penny**
204:19 259:2

**people**
9:10 12:12
14:15 21:7,8
23:3 37:22
73:12,14 74:1
76:11,25 77:1
90:14,15
120:21 178:7
291:11 297:1
303:4,8
306:23

**perceived**
13:6

**percent**
18:6 57:20
58:2,3 72:17
78:12 85:23
133:14 216:9
222:19

**percentage**
109:14,15,16
289:22
311:22

**percipient**
12:18,23

**perfect**
11:21

**period**
37:11 43:10
52:11,12
54:12 62:6
65:15 70:10
71:19 73:6
76:7 78:16
82:6 87:1,17
108:20
133:11 149:3
175:3 178:8
184:12 203:9,
13 204:5,24
205:25
213:12
244:18

**periodic**
82:3 89:2

**periodically**
56:19

**periods**
12:2 84:7,12
92:23

**permitted**
307:3,5,19
308:12 309:2,
19 310:13

**perpetual**
72:16

**perpetually**
163:25

**persist**
72:9

**person**
53:16 156:11

181:9 198:16
224:25
228:14,17
256:2 293:11

**personal**
49:11 101:18
159:12
198:22,25
274:18
295:11,13
302:5,7

**Personal-
wise**
61:11

**personally**
101:20 103:1,
7,8 167:11
233:15 288:4

**perspective**
162:24

**pertain**
15:24

**pertains**
181:7

**Peterson**
180:25

**petition**
101:16

**phone**
28:14,15
134:10,14,15
156:21 157:8,
9,11,12
167:14
177:11,12,14
178:11
230:25 242:4,
5,12,19,22,24
256:8,20,21
261:24,25

263:6,7 264:2
300:1

**phoned**
23:2

**phrase**
298:4

**physician**
300:7

**pick**
161:9 225:19

**picked**
160:14
177:24 178:2

**picture**
160:13

**pictures**
12:21 139:24
140:3

**pills**
300:23

**pin**
50:8 250:3

**pixie**
163:22

**place**
228:7 264:8

**places**
42:15

**plaintiff**
160:24 231:6,
24 266:23
271:13

**plaintiff's**
271:17 275:5
284:11
285:16,19
288:23

**plan**
69:24 70:1,5
73:9

**planned**
121:23
123:24 125:5
128:7

**planning**
124:23 125:6
128:8

**plans**
77:8,10

**pleadings**
186:14

**plug**
77:3

**plural**
74:2

**plywood**
13:3,4

**pneumonia**
97:12

**pocket**
84:13

**point**
11:4 14:15
17:15 19:4
20:12 22:11
24:13 29:15
41:4 61:19
69:15,22
83:20 85:4
92:5 100:19
102:3,20
106:13
110:20
111:23 123:1
129:5 139:13
153:13 259:8

287:1 310:6

**pointing**
144:1

**points**
132:7

**poke**
22:24

**poles**
59:13

**police**
59:17,19

**poor**
13:19

**portion**
217:20
220:17
310:12,15

**Portland**
12:21

**position**
197:23 210:3
213:18

**positive**
158:12,13
247:11
248:11 249:4
250:14
263:14 287:5

**possession**
90:4 209:22

**possibly**
43:12 58:17
149:23
244:25

**Post**
116:1 118:10
225:15,17
294:7

**postage**
196:6

**posted**
89:3

**potential**
222:17

**pound**
146:7

**pounds**
306:13
311:10

**power**
20:3

**pre-2009**
37:3

**prebankruptc
y**
308:25

**precipitated**
73:1

**predefined**
111:20

**predeposition**
154:5

**preference**
15:16

**preforeclosur
e**
144:20
183:24
184:10,14,19
196:20 197:8
198:2 202:16
203:10,12
204:2 207:1
210:12,17
228:20 268:5

**preparation**

19:2

**prepare**
232:20,21
233:5 311:8

**present**
55:17 59:4
62:12 201:14

**presently**
63:18

**preserve**
9:16,22 98:20

**preserving**
153:18,25
278:5

**pretty**
21:23 113:6
204:16
212:17
219:11
251:13
252:12

**prevalent**
65:14

**prevent**
263:25

**previous**
80:6 96:14
131:10
132:22 150:5
157:19 213:6
214:24 217:2
230:5 278:12,
16

**previously**
172:13 234:7
279:2 281:18

**primary**
20:1 21:23
53:7

**principal**
132:2,10
161:19
220:17 221:1,
5 244:5
310:3,9

**print**
218:10,12,15
286:3

**printed**
140:7,8
191:22

**printout**
191:20

**printouts**
140:11,15
147:16

**prior**
57:2 59:25
60:2 65:7,9
76:10 124:2
249:8 251:15
274:1 283:22,
23 307:16
308:9

**privacy**
192:20 304:8,
9,25

**private**
243:7 307:8

**problem**
48:15 128:25
139:12 264:5

**problems**
81:2

**procedural**
313:4

**procedure**
41:15 165:18

**Procedures**
255:3

**proceeding**
193:10,17,18,
19 288:25
298:11,18
299:14,18
304:18 308:7

**process**
77:11 264:25

**processing**
156:9

**prod**
9:11

**produce**
168:7 204:4
242:10

**produced**
145:7 160:16,
23 179:19,20,
21 203:11
212:8 231:3
284:23

**production**
116:25

**professional**
49:13 222:14

**professionals**
70:21

**programs**
120:19

**project**
18:6

**pronounce**
31:9 185:8

**Pronunciation**
122:3

**proof**
89:5,22 90:6
179:1 252:7,
22 253:9,10
273:25 274:3

**Proofread**
190:13

**proper**
265:22
271:17 275:6,
8

**properly**
39:25 266:8
281:9

**properties**
44:18 50:10

**property**
13:23 14:4,
11,18,19
17:4,6,8,10,
16 19:4,7,9,
11,12 21:18,
25 22:5 36:9
38:10,11,13,
15,17 40:1,
10,13,14 42:7
44:2,12,14,21
45:1,2,3,4,5,
6,7 46:1,17
47:6 49:23,25
50:3 94:20
121:8,21
126:24
127:24
128:21,23
129:6 186:4,5
187:11 246:2,
8,9 265:3,11
266:14

**proprietor**
234:6

**proprietorship**
234:9

**propriety**
271:21

**protest**
122:8

**prove**
247:4

**proven**
160:24

**provide**
23:25 24:2,10
31:23 36:4
74:9 89:5,22
136:16 158:1
181:8 204:4
211:19 224:3,
4 226:6,9,14
242:9 263:4
278:22 279:7
280:19 288:8

**provided**
24:7 89:19
102:16
136:18 168:5
173:8 179:15
203:11
212:19 236:8
251:11
266:23
284:23 285:4

**provider**
134:16 300:8,
10,13,18
301:24 303:1
306:2,14

**providing**
180:8 228:22,
24 274:3

**provision**
83:9

**provisions**
125:12

**prowled**
59:12

**proximity**
147:13

**proximity-
wise**
174:25

**pry**
152:21

**psychiatrist**
222:14

**psychologist**
222:13

**public**
19:2 30:9

**published**
110:2

**pull**
66:18 96:10
199:10 209:2
211:2,5

**pulled**
96:7,9

**purpose**
21:20,23
125:7 201:21,
23

**purposes**
101:22 203:5

**pursue**
101:19
102:25 103:6
270:20

**push**
276:3

**put**
10:19 17:17
20:13 24:22
45:6,10,20,25
67:6 104:6
113:6 138:17
147:19 168:2
171:6 175:25
192:13
194:11
242:18
253:15 266:1
268:17
308:13

**puts**
21:13

**putting**
25:20 141:25

---

**Q**

**Qualified**
170:15 174:2,
9,11 188:22
236:8,14
254:25
271:13
276:18,21,25
285:18
297:16

**quality**
289:21

**quarter**
85:23 110:22
133:14

**quarterly**
109:19
110:10 111:2

**question**
9:15,20,24
10:7 11:5,11
24:14 26:3,4,
5,7,8 34:11
35:11 40:5,8
44:5 45:17
48:7 49:3,9
60:15 61:3
62:5 67:21
87:25 89:13,
14 104:22
105:22 107:4,
5 116:17
125:3 130:8,
9,10 142:13,
19 144:17
150:25
152:25
153:20 154:9,
10,12,15,16,
18,24 156:4
161:7 162:16
163:8,9
164:3,9
165:11,12
175:3 178:14
183:20
188:24 196:4,
9 201:12
204:24
206:17 208:4
218:20
220:13 227:3,
4,9 229:5
231:21
233:22 236:6
237:23
248:17,20
258:5,20
259:7 265:21
266:2,19
279:14 284:9
288:19

297:20 301:1
308:17
309:12
310:22

**questioning**
60:10 106:21
168:1,8

**questions**
10:13 12:8
26:3,13,15
33:15,20
34:15 39:5
43:24 63:23
100:1 112:12,
20,24 122:4
126:18
130:25
138:15
141:24
152:22 153:9
161:13 166:2,
13,14 167:10
168:11
173:16 203:5
222:1 223:13
227:5,6
288:11,13
292:16,23
310:16

**quick**
191:13

**quickly**
64:21 207:20

**QWR**
169:14 173:2,
3,21 272:22
274:11
277:15,24
281:23 282:7,
10,11,16
284:13 285:1

286:11
287:18,21

**QWRS**
172:6 173:1
281:8 282:20

---

**R**

**rainy**
262:25 263:1

**raise**
243:25

**raised**
150:15
246:18 252:3

**rate**
95:11 109:14,
15,16,17
110:16,20,23
111:13,18
121:25
132:23,25
133:1,2,5,10
261:9 289:23

**rates**
19:1 311:3

**rating**
65:24 300:3

**Raw**
17:13

**reach**
255:23
256:25
268:24 269:2,
5,8,11 273:9

**reachable**
84:8

**reaction**
197:4

**read**
40:8 42:4,12
51:23 103:20
118:22 150:7
154:18
192:24
217:20
218:11,16

**reading**
101:25 181:5
196:2 197:10
246:25

**ready**
39:5 50:17
170:2 173:15
181:18
185:22,23
188:11,12
191:6,7
292:19

**reaffirmed**
157:21 213:7
230:6

**real**
18:22 128:11
162:14
176:17
183:12
232:23
288:17

**realize**
301:22

**realized**
211:24

**reason**
52:15,19 72:3
80:2,15,16
84:8 85:13
90:24 91:17
93:7 125:9
144:7 173:5

197:22
260:22
268:13,21
278:18

**reasons**
165:13

**rebound**
66:11

**rebuild**
70:12

**rebuilt**
70:13

**recalculate**
89:1

**recall**
21:24 24:15
29:20 37:8
39:22 40:12
43:22 44:7
47:20,23
48:1,25 49:4,
6 50:2 52:10,
12,13,23,25
53:6 55:11
56:2 58:9,18,
23,25 65:2
67:13 68:1,3,
4,8,10,11,18
69:25 70:2
71:3,8 78:17
82:19 84:7
85:8 91:15
92:20 93:11,
14,18 97:3
100:12 101:3,
12,15 107:18
113:24
115:23,25
116:2 117:7,
8,24 118:3,9
123:16

126:13
127:17
133:20 134:8
137:1 138:2,
21,23,25
139:1 140:16
141:10 145:2
147:18,22
150:11
158:15
170:18,23,24
171:9 174:20,
24 175:7
178:11,13,18,
21 180:14
183:13 189:1,
5,6,16 196:7
197:1 201:25
203:15,16,19
205:3 210:5
218:8 232:8
240:22 242:2
245:17 247:6,
14 248:15
249:15,24
250:9 251:2
254:18
257:14,15,18,
20 258:9
259:1 261:11
262:12,20,22,
25 263:8,11,
23 267:20
269:4,10,16,
17 270:3,8,9
273:5,12
274:3 275:13
276:5,12,14,
21 283:15
285:3 286:5,
20,21 287:3,9
293:10
299:21 300:6
309:24

**recalled**
106:1

**receipt**
131:15
148:13 179:3,
21 225:21
239:21
272:13
275:20
287:17

**receipts**
179:14

**receive**
62:1 102:24
114:13 117:1
130:6 171:16
207:6 229:19
236:13
276:10 283:3
286:7 288:1

**received**
47:21 48:2
49:15 71:7
91:9,12 93:8
101:17
105:17
113:17,18
116:8 126:2
132:4,13
133:16,24
137:9 148:20,
23 150:1
155:19 159:9,
10 168:6
169:18
170:19,20,24
171:10 183:2
197:14
203:18
207:12
209:17
215:22

218:14
223:17
238:22
246:10 254:4
267:3 268:5
272:14 273:7
275:15
276:12,14
278:13,25
288:4,8
301:13

**receiving**
52:23 63:17
91:15 92:22
93:2 101:3,12
107:18
134:22
148:25
150:11 197:2
198:17
214:12
246:13 258:9
272:23,25
273:5

**recent**
126:10

**recently**
25:5 27:7
56:12 220:25

**recess**
99:5 167:20
222:3 274:8

**reckon**
254:3

**recognize**
18:20 27:18
29:3 30:20
31:5,12 32:14
36:18 39:19
41:8,20 42:24
48:23 64:10

84:19 107:13
108:6 115:13
125:24 131:1
137:15 148:8
149:16 170:4,
7,9 173:18
185:24
188:13 191:8
193:2,12,13
195:4 214:8
234:24 235:3
253:20 272:6

**recognized**
41:7

**recollection**
80:12 190:7
242:11
258:17,22

**reconciliation**
253:24

**record**
8:14 9:8,13
10:22 13:21
16:17 30:21
31:21 36:6
42:4,12 45:11
48:9 49:8
51:24 57:6
60:16 66:6
75:18 98:9,13
99:6 104:19
118:23
143:25 146:2
154:3,13,21,
22 158:19
161:5 164:19
167:17,18,19
168:2,4
181:10 182:6
184:24 185:8
191:21
192:19,24

197:22
204:12
209:16
213:13 222:5
228:4,6

**recorded**
16:21 27:17
29:2 30:9,18
32:13 36:11
46:8

**recorder**
51:22

**recorder's/
auditor's**
40:25 42:1

**recording**
41:9 52:3,4

**records**
14:15 19:3
23:14 30:9
60:6,9,17,22
61:4,20 62:1,
10,18,19,21
63:3,10 90:18
104:22 105:1
106:6,17
116:21
117:24 118:4,
6 130:13,14
134:10,13,14,
15 135:5
152:16
156:19 157:5,
7,8,9,11,12,
20 158:24
159:22 177:9,
10,11,12,15
183:4 205:21
213:6 228:25
230:6 256:8
263:6,7 300:1

rectify
117:4

redirect
142:18

redo
130:3

reduce
186:18 187:8

reduced
250:16

reduction
240:15

refer
13:25 14:2
15:5,16 37:9
38:11 59:1
104:19,23
107:1 118:7
129:13
207:20
231:12 287:7
298:1

reference
40:25 42:9
46:3 48:20
51:22,23 61:7
64:20 70:25
77:19 79:23
82:24 92:12
109:20
111:23
114:10
130:13,14
132:7,8
137:22 138:5
144:24 147:2
154:21
156:25
176:24
189:17
192:16

referenced
53:5 72:14
83:1 130:19
195:24
196:13

references
42:20 68:11
80:7 94:9
247:4 311:5

referencing
44:20 46:7
83:24 85:10
86:11

referred
186:13
207:21,22
208:8 216:20
286:16

referring
15:18 49:22
58:12 69:8
74:1 93:15
134:2 145:24
146:12 150:2
176:16,22
205:16 209:3,
8 242:17
252:18
264:12

refers
147:4

reflect
157:21 213:7
230:6 264:7

reflects
154:14

refresh
37:10 54:13
59:2 104:20,
23 106:6

118:7 122:24
129:14 148:1
242:11
258:17,22

refreshed
147:16

refreshes
36:23

refused
144:18

refusing
278:24

Regina
93:12 96:17

register
61:6 251:7

registered
144:19
225:21

registers
59:5 61:9

regular
73:19 74:17,
18,19 81:15
161:18 163:7
210:11 259:9
260:19,23
261:1

relate
27:12 132:10

related
40:22 61:17
62:11 68:16
168:9,11
195:16,18
267:10
271:25 284:1
288:13
293:22

301:12

relating
68:8 205:1

relation
32:20

relationship
256:20 257:2
283:10

release
20:4

relevance
98:10

relevancy
98:12,15,19,
21 102:21
112:9 113:4

relevant
8:19 76:15
113:9 143:1

reliable
162:25
165:16

rely
117:2

relying
226:12

remained
122:14

remaining
110:21

remember
9:3 11:25
12:7 13:7
24:12,19,20
44:6 46:19
49:19 56:24
57:3,8,10
59:16,23

60:25 61:23
66:20 67:8
93:4 97:6
104:15
107:20 111:4
113:18
118:14
121:22
122:22 126:3
134:25 139:5
141:3 147:15,
24,25 175:7,
13,19 177:6,
7,8 180:11
190:6 196:2,3
208:2,10,19
210:20 211:3,
6,7 218:9
229:17 233:7
238:10,13
240:20
249:25
251:15 252:1,
13 256:6
257:10
280:23
285:24
291:10 301:8
307:9

remembering
118:11

remind
177:15 251:5

remit
258:15 274:1

remodels
76:25

remote
224:7

repair
234:13

**repay**
21:17 103:2

**repaying**
120:25

**repayment**
89:10

**repeat**
40:5,6 154:3,
15 156:4
162:2 279:14

**repeatedly**
152:22

**repeating**
96:1

**rephrase**
175:4,5
279:14 308:3

**replaced**
17:20

**replete**
228:5

**reply**
162:4

**report**
26:23 59:17
66:18 67:3,
11,19 68:15
191:5 200:19,
20 201:2,23

**reported**
68:7

**reporter**
9:13 13:20
16:19 40:4,7,
8 112:15
153:23
154:18,22
167:17
224:13 313:8,

10,16,18,21,
23

**reporter's**
22:25

**reporting**
68:2,5 202:6

**reports**
201:17

**represent**
8:12 64:6
96:7 106:17
189:7 194:6
203:25
212:12
245:10
251:16 253:3
265:16 271:6
278:6 281:12
282:11
284:20 286:2

**representatio
n**
43:20

**representativ
e**
95:23 96:15

**representativ
e's**
96:3

**representativ
es**
71:5 93:18

**reputation**
304:20,25
305:6

**request**
79:20,22
141:21 158:2
169:14 174:1,

2,9,11
188:17,22
211:7,20
212:3 218:7,
12 255:3
271:13,17
275:6 276:18,
21 277:1
278:10
285:18
297:16

**requested**
24:6 88:14
89:24 102:17
150:22 182:9,
18,22 185:16
211:14 212:5
218:3,6,9
241:3

**requesting**
173:21
285:18

**requests**
116:24
170:15 236:9,
14 254:25

**require**
125:12

**required**
8:22 109:4
266:25
279:13

**requires**
187:10 268:1
289:11

**research**
27:11 181:8
274:2

**researched**
133:4

**reserve**
82:18 231:4

**reserved**
313:25

**reserving**
313:8

**residence**
246:6

**residents**
121:25

**resolution**
180:3 195:12
255:3

**resolve**
31:15 33:8,10
120:19 195:9,
11

**resolved**
44:1

**resort**
303:8

**resounding**
50:24

**respect**
32:7 46:8
56:16 58:11
223:7 288:12

**respectfully**
166:24 184:9

**respond**
24:17 85:4
112:25
149:25
150:15,18
166:19 172:5
218:5 271:16
275:5 278:15
281:9 297:20

**responded**
210:25
274:25 275:1
277:3

**responding**
79:20 183:1

**response**
9:11 22:15
41:3 113:25
134:21
148:25
149:20 158:6
160:12
162:22 163:3
181:24
188:20 197:5
211:4 236:8,
13 267:9
271:23
272:19
273:13,21
276:17
277:23
278:19
281:19 282:6
284:25
286:10
287:18,19,20,
24 288:1,4
295:22

**responsive**
143:1

**rest**
29:25 159:20
185:13
282:20

**restroom**
98:7 99:2

**result**
222:11

resulted
37:3

results
193:1 297:7

resume
76:5

retain
283:14,17
284:3 286:15,
19

retained
67:23 283:22
286:25 287:4

return
116:21 179:3
225:21

returned
83:5 239:22
242:14
243:18
249:11,14,20,
24 250:7,11,
16 279:5,8
280:11,16
309:24

returns
61:7

review
19:18 36:21
122:23,25
170:1 173:14
232:21,25
233:4 272:18
273:7,10

reviewed
183:14
232:24

Reviewing
145:10

revisit
147:25 224:7

rich
161:3

Richmond
285:17
286:12,13,15,
19 287:13,20,
21 293:18,19

Ridge
291:9

ridiculous
153:6,7

right-hand
186:24 260:5

ring
243:10

risk
128:21 129:8

road
14:1,2,7,19
45:7 46:4
246:1,2
267:23

Robert
96:16

Robyn
300:14

rolled
127:9

rolling
86:5 124:9
125:7 219:18

room
12:20 13:3
16:19 63:1
116:14
306:23

rosewood
13:2

rough
85:24 313:16,
17,21

roughly
261:20 291:1

round
145:22 263:3

rounding
145:21

route
270:12,13

rude
228:17

rule
113:11 143:2
153:2

ruled
122:12

rules
8:18 9:21
13:17

ruling
9:22

rummaged
59:6,10

run
80:19

running
72:15 77:5

runs
84:14

Rushmore
13:9 55:20
88:21 127:4
139:19 183:5

190:15
197:16
202:15 207:1,
7 223:9,12
231:5,11,12
235:6 243:8
244:13,17
245:22
246:16,20
247:15,16,24
248:2,9,10,
14,18,21
249:3,7,9
250:8,24
252:7 254:4,
11 255:7,10,
15 257:5
261:23 262:4
263:22,24
264:25
265:25 266:3
268:1,11,13,
21 270:1,23
271:13,16
272:12,13,21
274:11 275:5
277:3 278:8,
13,14,18,23,
25 280:2
281:8,23
283:20
284:12
285:17
295:21 296:5,
14 297:1,12
298:20
301:14
303:23
306:12 307:4,
7,18,25
308:10,25
309:17,23
311:11

Rushmore's
185:14 233:1
264:7,9

RUSHMORE_
1720
269:18

RUSHMORE_
2492
254:23

___

S

safe
168:25
286:25

sake
64:14 278:5
286:4

sale
47:1 94:18,19
95:1 245:21,
22

Sanchez
256:4 262:19,
20,23 263:9,
12

Sara
180:25

sat
291:20

save
31:3 65:4,21
69:4 164:14
240:25

SC6
231:14

scale
289:20

scales
290:2

scenes
9:19

score
68:18

screens
139:24
140:11

search
24:24 27:1,4
189:8 193:1
194:11

searched
23:13

season
82:10

Seattle
8:1 307:10

secondhand
32:4

seconds
166:17

section
40:21 41:1
42:2,8 43:1,3
46:5 51:22
52:8 211:13

sections
214:15

secured
125:17
128:16
265:10
266:13

security
22:13,20
23:15,19,23

24:23,25
25:19,21,24
26:25 27:22
28:9 33:5,12
35:8 102:14
104:7 119:5
192:13,21
194:1,4,8

Sedro-
woolley
46:20

seek
45:19 165:3,
25

seeking
307:1

sell
21:18 47:10,
11 95:3

selling
77:5

send
62:3 86:19
100:6 101:6
118:13,16
130:4,11
144:4,18,19
157:25 158:7
161:25 163:2
170:15
171:24 172:6
176:11
184:16 189:2
196:19,20
198:8 205:12
210:13,21
211:7,18,25
212:3,5
246:16
248:10
249:13 284:8

312:22

sending
73:1 179:9
180:4 196:23
213:11 223:5
276:21

sends
162:17
163:17
210:11,15

sense
10:10 12:9
13:13,17
49:10 74:2
83:12 96:10
125:4 140:8
174:14
219:21
220:14 312:5

sentence
40:23,24
152:17
174:15 183:9,
23 186:22
252:20
258:14
272:12
273:14,19

sentences
288:22

separate
23:16 25:25
143:12 144:4
240:16
298:22
309:12

separated
20:3,9

September
71:23 72:4,7,

10,20,23 73:7
77:17,19,21
91:4,18 109:5
131:16
175:14 234:5
245:5 287:6

Sequence
117:14

series
12:8

served
116:24

service
31:23 84:19
116:21
118:13 180:2
199:12

serviced
197:7 227:9,
24

servicer
24:9 99:23
162:12
210:13
227:11,13,25
228:7 268:2
274:1

Services
29:11 32:22
231:12
272:13

servicing
29:10 67:16
70:21 96:22,
24 99:11
101:2 119:16
128:12
139:17 155:6,
14 202:21
222:9 226:25

227:15,18
244:13,18

set
53:22 54:4
61:22 97:18
138:13,20
192:3 247:23
259:11

setting
10:13 16:11

settle
232:5

settled
97:17

Seventeen
146:5 208:25
209:13
259:14

severity
81:19

share
167:4

sheet
213:3

Sheriff's
59:20

ship
226:25

shipped
74:13 75:2

shoes
25:21

short
81:3,23,24
94:18,19,25
95:4

shortage
186:19,25

187:4

**shortly**
83:5 175:10,
11 187:17
276:15

**shot**
80:22

**show**
20:16 77:6
106:17 117:7
118:4 143:25
221:18
228:25
239:18
240:14

**showed**
235:18

**showing**
116:6 145:1
159:7 179:11
246:21

**shown**
68:6 160:22
223:20

**shows**
29:17 116:10
145:15

**shut**
82:9,10

**sick**
97:14

**side**
140:21
269:18

**sign**
70:4 146:7
234:25

**signaling**
48:14

**signature**
178:18
189:13,14,19,
21,22 190:1
313:8,25

**signed**
20:3 21:1
53:16 158:2,
23 159:14
163:6 189:16
190:11 211:1,
20 212:1
235:1,2

**significantly**
128:23

**signing**
19:19 21:15

**silence**
11:15

**similar**
35:24 72:1
80:6 83:21
131:9 223:13
237:6,7 243:8
281:17

**simple**
87:5 161:22

**single**
58:13 96:8

**sir**
54:16 99:1
153:8 167:9
172:23
188:24 191:6
209:5

**sit**
52:15 72:3
77:20 85:12
88:9 90:24
91:17 92:16

93:7 104:16
118:3 126:3,
13 129:12
135:8 141:3,
10 144:8
174:24 189:1
190:21 308:5

**sitting**
100:12
159:21
166:16 190:6

**situation**
71:21 72:9,16
86:5 126:15,
23 127:18
212:22 302:8

**Skagit**
16:22 22:4
27:18 29:3
30:18,22
31:10,11,12,
13,22 32:13
36:6,12 55:1,
13,21 56:6,15
59:20 60:24
61:23 117:25
122:2,11,12
181:4 242:1

**skepticism**
88:10

**sketchy**
157:16

**sleazy**
35:15

**sleeping**
305:22

**slightly**
130:8 143:21

**smattering**
81:8

**snotty**
199:5,19

**snowy**
263:1

**social**
22:13,20
23:15,19,23
24:23,25
25:19,21,23
26:24 33:5,12
35:8 102:14
104:7 192:13,
14,15,20,22
194:1,4,8,11

**sold**
15:2,3

**sole**
234:5,9

**solely**
197:24
230:23

**sort**
10:7 12:14
72:15 81:8
83:20 84:13,
25 85:2 87:8
93:23 96:8
99:16 108:14,
15 120:16
167:9 174:12
225:3

**sound**
110:25 180:6
251:15
274:13

**Sounded**
199:8

**sounds**
48:22 138:3
145:19

180:24
205:16
251:20

**Spanish**
195:13

**speak**
80:22 255:23
256:1,10
257:7,12
263:12 270:4,
7 297:13

**SPEAKER**
234:21

**speakers**
112:14
153:22

**speaking**
41:12,23 48:8
73:21 165:10

**speaks**
101:24 155:1

**spec**
47:8 76:19
77:2,12

**specific**
111:1,9,15,20
176:7 299:13

**specifically**
10:6 92:21
93:4 94:1
133:20 168:9
214:10 244:2
267:10

**specifics**
15:6

**speculate**
21:10 26:3

**Speculation**
47:10

**spell**
8:13 35:1,7
75:18,25
185:8 290:17
300:15

**spelled**
34:20 48:21
190:3,7,12

**spend**
289:4 293:21
294:9 312:11

**spending**
293:10

**spent**
223:15 289:3
294:17

**spiel**
178:3

**spilling**
302:3

**spoke**
134:8 156:1,8
197:13
230:25 256:2
257:9 262:20,
22 270:9

**spoken**
134:18
197:12

**spread**
186:21 187:1,
5

**spreadsheet**
89:19 218:14
253:6

**square**
159:5

**stack**
171:18

190:14
270:22 271:5,
6 288:6

**stamp**
64:15 178:15
191:23
195:21

**stamped**
42:15,16

**stamping**
117:17

**stamps**
117:21
143:22
185:17

**start**
44:16 56:15
61:19 64:12,
23 75:5 168:1
187:23
196:23
249:16
286:18
289:14 290:3
295:23 297:2
306:11

**started**
82:12 98:2
135:2 144:23
202:21 249:7
264:24
306:21,22

**starting**
129:24
141:14
182:23
196:18 219:9

**starts**
42:17 198:6
221:6

**state**
8:13 25:2,3
28:9 30:7
55:1,14,21
56:6,15 61:23
118:1 137:23
140:23 141:5
164:10
192:13 242:1
268:25 269:2

**stated**
43:15 91:22

**statement**
27:17 32:12
43:1,5 52:16
66:23 69:24
80:9 85:13
91:6 105:2,3,
5 106:8 113:1
114:13
119:10
130:15 134:2
135:9,17
144:15 145:8,
17,18,25
146:12,17,21
147:3 153:15
155:13 162:9,
11,23,24
163:22,23
185:21 186:4
209:9,11
211:1 214:7,
11,19 215:22
221:21 230:9,
17 240:23,25
246:21 247:9,
10 251:7
252:1 259:15

**statements**
60:20 62:2
106:14 107:2

129:14 137:9,
25 149:8
157:22 158:1
163:24 164:1
184:17
198:18 208:5
210:12,14
211:19 212:6
213:8,11
214:12
221:20 222:8
227:23
228:22,24
229:19 230:8
240:18,19
241:1 246:16
264:12
294:22 298:3,
6

**states**
100:5 108:24
109:3 110:1
120:22 236:3

**stating**
64:25 163:1,7
235:8

**status**
65:1,6 72:2
84:2 85:10,13
92:3 97:3
183:25
184:10,19

**Statutory**
16:23

**stay**
101:17 225:7

**stayed**
14:7

**staying**
183:19

**step**
204:1 307:14

**steps**
111:11
270:19

**Steve**
168:5,14

**Steven**
112:18 113:8
161:10
163:12
180:12 192:5
312:16

**stigma**
304:5

**stipulation**
313:3

**Stole**
59:12

**stop**
122:10
163:11 164:5
183:7 197:19
264:4

**stopped**
57:10 122:2,7
123:23,24
124:1 213:11

**straightened**
270:24

**street**
13:24 46:3,17

**stress**
222:7,12
302:8,11

**strewn**
62:21

**stricken**

164:18

**strike**
25:7 58:10
90:19 115:2
116:9 119:24
142:24 143:3
150:25 266:1

**structure**
17:20,23
49:18

**stub**
248:8

**stuck**
10:17

**stuff**
16:11 19:3
45:6 59:7
68:7 95:11
180:9 192:9
223:6 226:2
240:13
247:12
270:24 294:7,
21 296:21
298:3 309:6
311:2 312:4,
22 313:4

**Sturdevant**
283:4,9,14,24
284:7,12
285:1,3
286:16
293:10,15
299:4,5

**Sturdevant's**
294:6

**subcontracto
rs**
77:14

**subject**
79:17 216:8
231:3

**submit**
65:17 95:13
114:19 120:2
170:11

**submitted**
92:5 104:17

**subparagraph**
43:5 260:18

**substance**
257:15
270:11 283:8

**substances**
9:2

**substantially**
278:12

**success**
268:10

**successors**
99:17

**sue**
125:10 228:2
231:24

**sued**
29:14 232:12

**suffered**
288:17 303:3
306:15

**suffering**
11:14

**sufficiency**
155:13

**suggested**
70:2 236:14

**suggesting**

69:23

**suing**
121:23
123:25
124:23

**sum**
49:20 58:9,
11,12,15,19,
24 65:8,17
69:5 104:9
108:15,17
127:23 206:3,
5 207:11
209:17,18,23
217:25

**summarize**
93:24

**summarizing**
82:1 129:25

**summary**
214:16 215:3
216:5

**summer**
234:6

**Summertime**
82:9

**sunshine**
263:2

**super**
19:20

**supervisor**
156:1,8
178:5,6,9

**support**
32:17,18,22,
23 33:5,6
35:9,13,17
36:2 54:6,7

**supporting**
226:6

**suppose**
44:6 64:14

**supposed**
39:25 135:14
154:7 174:8
180:2 221:13

**supposedly**
188:18

**surprised**
83:12

**surprises**
226:12

**suspend**
164:15 165:3,
24 167:3,6,13

**swear**
175:18,19
179:25
223:23

**swearing**
180:9

**switch**
150:24

**sworn**
8:6

**symptoms**
300:8

**system**
24:23 167:5
194:11

---

**T**

**T-E-R-R-Y**
34:21,22

**supporting**

**table**
12:20 13:3
187:24

**tainted**
164:16 165:8

**takes**
16:13 37:6
168:20 264:4

**taking**
20:7 134:25
165:14

**talk**
13:18 70:8,25
71:6 93:24
94:17 121:12
161:8 178:5
223:15 244:2
249:13
254:24
262:13
263:24
271:22 297:2
300:17

**talked**
71:5 76:18
93:17,20
156:1 157:2
178:6 179:2
261:8 262:1,
19 279:17
295:18
298:10 300:2

**talking**
16:12 26:6
62:6 79:8
84:1 86:4
127:19 146:5
148:15
152:23
167:25
172:25

187:15 201:7
208:24
209:16
210:22 211:3
261:13
288:24
298:18
299:12 309:8,
16

**talks**
70:20 96:24
146:23

**tall**
190:15

**taller**
190:16

**tampered**
45:21

**tanked**
25:17 47:14

**tax**
61:7 121:24
122:13,14
186:4 187:11
311:19,22

**taxes**
21:25 22:3,5
28:10 95:19
121:8,17,21
122:2,7,9,17
123:2,10,12
124:2,18
126:15,24
127:2,5,8,25
128:10,13,14
186:5,11
187:16
219:13 295:3,
4 310:10
311:23

**team**
70:21

**telephone**
268:9,16,17

**telling**
142:7 165:8
171:23 292:4

**temporary**
71:15,16,18

**ten**
12:25 86:20
87:11 88:6
216:9 222:2
235:15
272:24
298:14,15
299:1,2,3

**ten-day**
87:1,17

**tender**
130:11 135:4

**tendered**
104:10
204:16
205:24
207:10

**tendering**
137:8

**term**
81:3,24 94:25

**terminology**
87:22 88:25

**terms**
19:1 52:3,4
57:18 60:17
80:22 89:7
91:7 94:22,23
95:11 121:4
183:19 226:5

**Terri**
19:21 33:2

**Terry**
33:2 34:19

**testified**
8:6 41:8
68:12 117:1
121:7 126:1
129:10 130:2
174:18 201:5
211:25
219:19
235:15 240:4
251:14 267:3
291:4 300:4
302:9

**testify**
9:2 117:2
166:17
208:17
222:21

**testifying**
10:15 72:22
142:6 161:4,8
164:18 165:4
194:15 225:5
234:7

**testimony**
10:3 13:11
23:4 34:4
45:12,24 62:9
63:16,20,21
72:21 73:6
82:1 98:19
122:5 123:15
130:1 135:16,
23 136:1,3
154:6 159:21
165:15 180:8
201:16
204:22

219:23 225:5
245:24 248:3
279:11

**Texas**
100:8 116:4
156:2

**text**
242:6,13

**theft**
25:22

**thick**
252:12

**thing**
8:20 11:18
13:8,18 14:21
16:13 19:16
26:1 76:9
77:25 80:8
140:22 149:7
167:9 171:21
173:25
174:10
175:20 183:8
189:13
192:18
213:22
215:18
227:13,14,23
241:25 261:4
262:3 264:23
280:23 289:8
303:7

**things**
8:19 9:3
11:19 12:4
14:14 61:8,
14,15,16,17
63:8,22 69:9
90:2 117:1
144:1 172:6
195:25 196:5

198:1 208:19,
20 226:5
231:17
239:15
254:24 294:8
307:21 311:9

**thinking**
39:9,25 48:12
74:22 124:21
197:10,16
206:22 208:3,
6 221:6
301:21 312:9

**thinks**
9:23 103:17

**Thirteen**
78:12 193:7
235:24

**Thomas**
8:11

**thought**
14:9 25:10
71:12 78:6,20
79:2 103:9
129:25 146:7
176:19 182:9
200:23
201:10
215:13

**three-year**
219:18

**thrilled**
128:11

**throw**
63:8 292:23

**thrown**
59:8 63:6,10
292:21

**thumb**

39:4

**Tim**
256:10,20
295:14

**time**
9:12 11:10
12:2,10 13:10
16:1,14 19:22
21:15 25:15,
16 27:25
28:1,3 35:1
36:8 37:4,5,6,
11,13,17
43:10,12 47:3
52:11,12
54:6,12 56:24
57:18 58:6
60:1 61:22
62:6 64:25
65:4,15 66:25
67:11,17
69:10,25
70:5,10,15,18
71:19 73:6,
13,16 74:12,
13 76:6,7,16
78:1,5,16
81:2 82:6,21
84:7,12,23
87:14,18 89:5
92:23 95:23
97:2 99:12,19
104:10
106:25
108:18
112:16
116:12,24
119:16
124:13
133:11 136:9,
12 143:7,14,
22 147:17
149:3 152:19

153:23,24
155:10
158:16 159:1
163:10
168:14
170:24 171:7,
10 174:25
175:3,9 176:7
180:14 181:4
182:3 183:24
184:12
191:23 195:5
197:6 200:9
201:6 203:9,
13,22 204:24
205:25
212:24 213:4
223:15
224:19,22,24
225:1,2,15,
17,22 238:2,
3,9,20 240:11
241:16 242:1
244:12,16,17
247:22
255:15,22
263:16 277:6
282:18
288:20,22
289:3,4,14
293:10,21
294:9,17
298:10

**Timeframe-
wise**
23:5

**timeline**
20:11 96:11
124:5

**timeliness**
271:23

**timely**
43:10 271:18
275:6,9 281:9

**times**
34:11 43:13
48:6 52:14
65:7,19 76:15
80:18,25
81:20 84:20
110:15
120:21 136:6,
14 143:13
154:4 155:24,
25 170:20
171:16
207:21
213:16 220:6
255:9,12
268:11,14
277:7 299:2,3

**timing**
91:21 201:19

**tiny**
218:10,12,15

**title**
16:23 20:18
21:14 173:24,
25 231:13,14

**titled**
234:23

**today**
9:8,17 10:4
13:23 14:10
34:5 41:15
50:23 52:15
72:3 77:20
85:12 88:9
90:24 91:17
92:16 93:7
100:12
104:16 107:4

118:3 126:4,
13 129:12
135:9 141:3,
10 144:8
159:21
165:10 168:5
169:2 173:1
174:18,24
189:2 190:6,
21 219:23
223:20
232:22 233:3,
5 261:8
290:6,8,23
292:4 298:13
299:17,18
308:5

**told**
11:9 83:3,4
94:1,2 135:24
156:11
197:15 198:1,
3 238:2,5,11,
15,18 257:21
258:23 259:2,
5 262:2
301:24
305:11
306:14,18

**toll-free**
126:19

**ton**
289:25

**tone**
199:2,5,19

**tonnage**
290:12

**tons**
253:24 254:1

**top**
42:16 45:5

115:20
134:23 207:2
215:21 260:5
272:8

**top-left**
214:16

**total**
43:14 45:5
91:10 109:3
220:8 236:3
244:6

**totally**
9:10 50:8
143:1 154:2

**totals**
245:7

**touch**
38:23

**touching**
228:5

**tough**
49:3

**town**
46:24

**toys**
59:13

**tracking**
159:13

**train**
159:18

**transaction**
21:2 218:19

**transfer**
96:22 99:10
101:2 228:9
245:21,22

**transferred**
139:17,18

183:5 227:21
228:6 244:12

**transferring**
155:6 227:18
228:1 240:11
261:3

**treating**
300:7

**treatment**
300:8,17,18
301:24 303:1

**trial**
164:14 232:3

**trip**
290:8

**trips**
290:4

**trouble**
141:7 305:22

**truck**
70:11,13
71:20 72:6
74:9,21,23
81:5,10 84:13
97:15 208:18
225:12
233:13,15,20
234:8 289:16
291:15,21
298:10

**trucking**
73:23 75:5,
11,14,17,23
76:6 234:3

**truckload**
286:9

**trucks**
81:11

**true**
80:3,16 87:12
216:6

**Truman**
231:14

**trust**
20:18 21:1,5,
6,12,16 29:6,
8,10 40:22
42:13,20
44:20 46:7
52:2 83:10
91:8 125:11
128:22
231:14
265:10 267:1,
11

**trustee**
231:14

**truth**
8:23,24

**Ts**
39:25

**turn**
225:10 253:4

**turned**
97:12

**TV**
9:19

**twelfth**
163:10

**Twenty**
48:1 229:24,
25

**Twenty-eight**
197:3

**Twenty-four**
259:18,19
260:5

**two-sided**
236:21

**two-week**
204:5

**type**
12:19 13:1
51:16

**typed**
26:25

**types**
60:9,17
224:16

**typically**
291:3

**typo**
273:23

---

**U**

**U.S.**
118:10
231:13,15
269:14
298:20

**Uh-huh**
60:14

**ultimate**
311:18

**ultimately**
219:3

**Um-hmm**
12:1,3 14:3,
12 18:17
23:12 29:19
38:17 40:18
43:4 47:17
64:16,18
68:25 71:25
72:12,15

76:20 80:1
81:6 84:6
86:14 91:5
92:1 94:7,12
101:23 110:4
113:23
125:13 141:2
171:15 177:4
182:17 183:3
184:25
192:17
200:14
202:20,23
206:12,16
223:10
233:14 245:6
260:17
261:10,12,15
262:10 265:2
279:19
286:14
297:23
298:21 308:8
310:5

**Um-um**
16:6

**unable**
120:17

**unaffected**
60:7

**unaware**
34:5,12,14
36:4 233:3

**unclarity**
49:9 63:22

**unclear**
11:9 204:22
205:10

**uncommon**
303:7

**underlined**
211:14

**underlying**
303:21

**understand**
11:5,8,11
13:21 14:24
21:15 35:13
37:20 49:9
53:8 57:5
65:10,23
66:2,23 67:7
69:22 73:23
77:2 88:25
94:22 102:21
103:4,24
106:20
107:17 110:9,
14,25 117:23
120:8 124:5,
25 125:11
128:14,19,21,
25 135:7
146:11
147:19
153:12
162:16
163:16,21
167:1 175:4,
6,17 180:6,19
184:1 185:17
195:15
197:23,25
201:4 203:21
204:9 205:12
207:3 210:2
213:22 216:6
218:22 219:5
220:16 223:8
227:2,20
228:4,10
229:3 235:4
237:24

245:20 247:3
248:2 257:1,
23 258:11
259:8 261:5,
19 262:6
266:9 271:20
276:16
280:25 281:4
292:14
296:11
303:13,15,20,
24 306:4
307:24 309:2,
8 312:5

**understandab**
**le**
180:14

**understandin**
**g**
12:17 18:23
21:5,6,8,11
32:2 35:14
36:24 39:8
58:7 65:24
69:6 73:24
79:19 86:25
94:25 95:6,8,
12 103:1
107:15
114:11,15
117:20 125:3
131:4 137:17
145:11
148:11,19
149:18 151:8,
15,20,25
153:13
159:12
166:18,19
170:10
175:13 176:4
181:22
182:11 183:9,

10,14 186:2,8
194:7 195:7,
18 207:9
217:17,18
219:8 220:11,
12 221:15
225:2 239:9
266:13
301:12 302:9

**understood**
21:20 130:1
173:4 201:16
216:11
234:18
247:13 257:4
260:8

**unexpected**
81:15,18

**unhealthy**
306:15

**unique**
303:11,13

**unknown**
181:1

**unnamed**
258:24

**unpack**
122:1

**unprofession**
**al**
199:3

**unreliable**
10:23 162:21

**unspecific**
80:9

**unsure**
180:13

**untrue**
113:1

**unusual**
97:18

**unusually**
306:3

**unwilling**
165:23

**update**
158:2 211:20
313:13

**updated**
14:15 119:8,
13,20 120:1
135:19 136:4

**UPS**
118:16

**Urban**
269:15

**USPS**
195:21

**USPS.COM**
159:13

---

**V**

**vagaries**
75:1

**varies**
292:10

**venting**
141:15,19

**verbal**
9:9,11

**verified**
194:1

**verify**
194:4,7

**Vernon**

55:12

**version**
173:21

**versus**
12:15 70:14
162:11

**video**
168:10
312:25 313:2

**view**
74:3

**vintage**
70:17

**visit**
198:22 199:1

**visited**
12:25

**voice**
199:2,5,19

---

**W**

**W-I-L-L-S**
290:18

**wage**
291:18

**wages**
27:23 289:2
293:25

**wait**
176:11
196:14
251:18

**waiting**
297:19

**waive**
98:15

**waived**
98:12,21

**walk**
11:20 85:17

**wanted**
96:10 149:8
179:1 186:9
210:2 227:22
231:17 242:7
252:24

**wanting**
25:23 186:8

**warning**
45:11,22 99:3

**warnings**
45:19

**warranted**
13:17

**Warranty**
16:23 17:3

**washer**
59:12

**Washington**
8:1 15:1 28:9
30:7 46:21
225:14
266:25
267:11 268:1,
24 269:2

**ways**
35:7 63:23
70:25 150:18
192:12

**Weather**
82:8

**website**
192:9

**week**

168:18,19,23
290:19,25
291:1,3,4
297:8

**weekend**
296:23,24
297:2,6,9,13

**weeks**
86:20 168:19,
25 169:2
212:24 224:5
226:7 231:4
312:24

**weigh**
311:11,13

**weighed**
311:12

**weight**
289:21 306:9,
11,15 311:10

**Whatcom**
46:21

**whatnot**
82:10

**whatsoever**
38:19

**White**
48:17 49:12
53:11

**wife**
19:22 34:23

**wife's**
32:24

**Williams**
93:12 96:16,
17

**Wills**
290:16,17,20

291:5,6
292:6,10

**windows**
59:21

**Wintertime**
82:9

**wiped**
60:21 61:1

**withdraw**
150:25

**witness'**
45:12 113:15
169:4

**witnesses**
161:12

**woman**
257:9,13
258:24

**woman's**
257:10

**wood**
12:19 13:1

**word**
37:20 74:2
134:20
151:23
156:21
170:12 198:5,
6 210:4
257:21

**worded**
229:17

**words**
67:6 120:1
129:9 141:25

**work**
73:12,13
76:14 77:9,

13,15 97:14
111:5 217:17
219:16
224:19,23
225:2,3,23
249:16
289:12,14
291:17 295:1,
20 296:4,23
298:12
299:16,17,19

**work-wise**
301:23

**worked**
75:16 84:16
173:10

**working**
18:6 76:22
85:1 232:23

**workout**
266:24

**works**
9:24 10:9
103:21
105:23 110:6,
8 221:16,17

**worry**
139:9

**worth**
213:20

**Wow**
23:11

**wreck**
159:18

**write**
16:16 130:10
224:24 225:1,
7,10 237:10

**write-off**

239:4 240:9

**writing**
54:24,25
135:3 136:25
138:3 151:12
156:6 163:17,
18,19 175:1
211:8 223:5,
15 239:3,10
240:23 296:7

**written**
9:8 46:11
138:4 158:2
162:12,17
163:1 170:15
174:2,9,11
188:22 211:1,
20 212:3
226:2 229:9,
12 236:8,9,
14,15 237:24
238:16,21
248:11
254:25
270:23
271:13,17
275:6 276:18,
21,25 285:18
296:21
297:16
309:17

**wrong**
26:25 45:6,25
106:11
300:12

**wrote**
21:8 54:23
117:25
252:14

## Y

**Yakima**
30:25

**yard**
289:20

**yards**
76:22

**year**
14:5 56:24
59:16,24 61:8
65:7,17,18
69:5 93:19
100:19 105:6
110:15
121:22
122:21
123:25 124:8
125:6 136:10
171:2 176:3
182:10
185:17 220:6
226:25
240:22 242:2
244:23
249:16,19
250:1,2
262:22 263:3,
4 286:21

**years**
12:25 13:25
15:1 23:11
26:21 48:1
55:16 60:22
63:9,14
66:15,16
82:13 123:20,
21,23 124:1,
6,10,13,15,18
125:1,2,7
132:23 177:3

198:11
201:18 207:4
210:9 217:14
223:3 280:24
299:21

**yell**
112:17

**yellow**
64:6

**yesterday**
225:12
290:24

**York**
199:9

---

**Z**

---

**Zoom**
168:10